UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

In re MORGAN STANLEY MORTGAGE   :   09Civ2137 (LTS)(MHD)
PASS-THROUGH CERTIFICATES   :
LITIGATION   :   MASTER FILE
  :
_____   :   <u>CLASS ACTION</u>
  :
This Document Relates To:   :
  :
     ALL ACTIONS.   :
_____ x

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who acquired the Mortgage Pass-Through Certificates (the "Certificates") of Morgan Stanley Capital I Inc. ("Morgan Stanley Capital" or the "Depositor") pursuant and/or traceable to the false and misleading Registration Statement and Prospectus Supplements issued in connection therewith, by Morgan Stanley Capital and the defendant Trusts identified in ¶13, between December 2005 and November 2007. This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.      Defendant Morgan Stanley Capital is a Delaware corporation formed in 1985 for the purpose of acquiring and owning mortgage loan assets and selling interests in them. Morgan Stanley Capital is an affiliate of defendant Morgan Stanley & Co. Incorporated ("MS&Co") and is a direct, wholly-owned subsidiary of defendant Morgan Stanley. The issuers of the various offerings are Morgan Stanley Capital and the defendant Trusts identified in ¶13 (the "Issuers") established by Morgan Stanley Capital to issue hundreds of millions of dollars worth of Certificates in 2006 and 2007.

3.      On December 23, 2005 (with amendments on February 17, 2006 and March 14, 2006), the Issuers caused a Registration Statement to be filed with the Securities and Exchange Commission ("SEC") in connection with and for the purpose of issuing hundreds of millions of dollars worth of Certificates. The Issuers issued the Certificates pursuant to Prospectus Supplements, each of which was incorporated by reference into the Registration Statement. The Certificates were supported by pools of mortgage loans generally secured by liens on residential properties, including conventional, adjustable-rate, hybrid adjustable-rate, and negative amortization mortgage loans.

4.     The Registration Statement and Prospectus Supplements contained materially false and misleading statements regarding: (i) the underwriting standards purportedly used in connection with the origination of the underlying mortgage loans; (ii) the appraisal practices purportedly used in connection with the properties underlying the mortgage loans; (iii) the loan-to-value ("LTV") ratios of the underlying mortgage loans; and (iv) the credit ratings of the Certificates.

5.     The true facts, which were misrepresented or omitted from the Registration Statement and Prospectus Supplements, were:

- The underwriting standards that the Registration Statement and Prospectus Supplements stated lenders used were actually ignored. Loans were made to borrowers in contravention of the lenders' stated underwriting standards that borrowers would be evaluated based on their ability to repay the loans. Instead, loans were made to borrowers regardless of their ability to repay. Documentation of a borrower's income, assets and debts were either not obtained or falsified by the borrowers in the cases where documentation was required. In cases where low or no-documentation loans were made, borrowers were given loans where the borrowers' stated inflated income could not possibly be reconciled with the jobs claimed on the loan applications. Borrowers were routinely approved for loans even though they could not afford and were unable to make the loan payments. Lenders were making as many loans as possible without regard for a borrower's ability to repay in order to sell the loans to defendants, who would then resell them in the form of the Certificates to the investing public, thereby shifting these risky loans to plaintiff and the Class.

- The appraisals of the properties underlying the loans were not in conformance with Uniform Standards of Professional Appraisal Practice ("USPAP"), contrary to representations in the Registration Statement and Prospectus Supplements. Instead, the appraisals were falsely inflated and did not reflect the true value of the properties. This was due to the fact that appraisers were pressured by the lenders to provide predetermined, inflated appraisals in order to justify the loans being made.

- As a result, the LTV ratios stated in the Registration Statement and Prospectus Supplements were false because such ratios were calculated based on the false, inaccurate and inflated appraisals.

- The credit ratings for the Certificates, which were assigned by credit rating agencies and repeated in the Registration Statement and Prospectus Supplements, were false. Such ratings inaccurately gave the Certificates much higher credit ratings than the Certificates deserved, and failed to reveal the true, highly-risky nature of the Certificates. This was due to the fact that the credit rating agencies used faulty assumptions and out-dated models to rate the Certificates.

- As a result, the Certificates sold to Plaintiff and the Class were false and misleading because they were secured by assets that had a much greater risk profile than represented in the Registration Statement. In this way, defendants were able to obtain superior ratings on the tranches or classes[1] of Certificates, when in fact these tranches or classes were not equivalent to other investments with the same credit ratings.

6. By mid-2008, the truth about the mortgage loans that secured the Certificates began to be revealed to the public, disclosing the risks that the Certificates would likely receive less absolute cash flow in the future and that investors would not receive it on a timely basis. The credit rating agencies also began putting negative watch labels on the Certificate tranches or classes and to downgrade previously assigned ratings. At present, each Trust contains Certificate tranches that have been downgraded. As an additional result, the Certificates are no longer marketable at prices anywhere near the price paid by Plaintiffs and the Class, and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Registration Statement represented.

## JURISDICTION AND VENUE

7. The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o. Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.

8. The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements in this District. Defendants conduct business in this District.

---

[1] The Certificates were divided into tranches or classes depending on among other things, credit risk and priority of payment.

## PARTIES AND NON-PARTIES

9.     Lead Plaintiff West Virginia Investment Management Board ("Lead Plaintiff" or "Plaintiff") acquired Certificates pursuant and traceable to the Registration Statement and the Prospectus Supplements and has been damaged thereby.  Specifically, on June 20, 2007, Plaintiff purchased 5,430,000 Morgan Stanley Mortgage Loan Trust 2007-11AR Mortgage Pass-Through Certificates, each with a face value of $101.00.   In addition, on December 11, 2007, Plaintiff purchased 935,938 Morgan Stanley Mortgage Loan Trust 2007-11AR Mortgage Pass-Through Certificates, each with a face value of $96.08.  Defendant MS&Co acted as a broker and seller in these transactions.

10.     Defendant Morgan Stanley is a Delaware corporation headquartered in New York, New York.  Morgan Stanley, through its subsidiary Morgan Stanley Mortgage Capital Inc. and later through defendant Morgan Stanley Mortgage Capital Holdings LLC,[2] created and controls Morgan Stanley Capital, a limited purpose, wholly-owned finance subsidiary designed to facilitate the issuance and sale of the Certificates.

11.     Defendant Morgan Stanley Mortgage Capital Inc. was a New York corporation based in New York, New York, until, as alleged above, it was merged into defendant Morgan Stanley Capital Holdings LLC in 2007.  Morgan Stanley Mortgage Capital Inc. was an indirect wholly-owned subsidiary of Morgan Stanley, and the parent of Morgan Stanley Capital.  Morgan Stanley Mortgage Capital Inc. was also an affiliate of defendants MS&Co.  Morgan Stanley Mortgage Capital Inc. originated mortgage loans, or otherwise acquired residential mortgage loans to be

---

[2]     In 2007, Morgan Stanley Mortgage Capital Inc. merged with Morgan Stanley Mortgage Capital Holdings LLC.  By way of this merger, Morgan Stanley Mortgage Capital Holdings LLC became Morgan Stanley Mortgage Capital Inc's successor in interest.

securitized by the Depositor – Morgan Stanley Capital. Morgan Stanley Mortgage Capital Inc. served as the Sponsor and Seller in the securitization of the Trusts and worked with MS&Co, the rating agencies, loan sellers and servicers in negotiating the principal securitization transaction documents and structuring the securitization transactions. As alleged above, in 2007, defendant Morgan Stanley Mortgage Capital Holdings LCC became Morgan Stanley Mortgage Capital Inc.'s successor in interest and carried on Morgan Stanley Mortgage Capital Inc.'s role as the Sponsor and Seller in the securitization of the Trusts. Morgan Stanley Mortgage Capital Holdings LLC is a direct, wholly-owned subsidiary of Morgan Stanley, and an affiliate of defendants MS&Co and Morgan Stanley Capital. Morgan Stanley Mortgage Capital Inc. and Morgan Stanley Mortgage Capital Holdings LLC are collectively referred to herein as "MSMC."

12. Defendant Morgan Stanley Capital is a Delaware corporation headquartered in New York, New York and formed in 1985. Defendant Morgan Stanley Capital was an Issuer of the Certificates, the Depositor and controlled the Trusts.

13. The Issuers of the various Certificates are Defendant Morgan Stanley Capital and the below-listed defendant New York common law trusts (the "Trusts"):

| | |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-4SL | Morgan Stanley Mortgage Loan Trust 2007-1XS |
| Morgan Stanley Mortgage Loan Trust 2006-5AR | Morgan Stanley Mortgage Loan Trust 2007-2AX |
| Morgan Stanley Mortgage Loan Trust 2006-5ARW | Morgan Stanley Mortgage Loan Trust 2007-3XS |
| Morgan Stanley Mortgage Loan Trust 2006-6AR | Morgan Stanley Mortgage Loan Trust 2007-4SL |
| Morgan Stanley Mortgage Loan Trust 2006-7 | Morgan Stanley Mortgage Loan Trust 2007-5AX |
| Morgan Stanley Mortgage Loan Trust 2006-8AR | Morgan Stanley Mortgage Loan Trust 2007-6XS |
| Morgan Stanley Mortgage Loan Trust 2006-9AR | Morgan Stanley Mortgage Loan Trust 2007-7AX |
| Morgan Stanley Mortgage Loan Trust 2006-10SL | Morgan Stanley Mortgage Loan Trust 2007-8XS |
| Morgan Stanley Mortgage Loan Trust 2006-11 | Morgan Stanley Mortgage Loan Trust 2007-9SL |
| Morgan Stanley Mortgage Loan Trust 2006-12XS | Morgan Stanley Mortgage Loan Trust 2007-10XS |

| Morgan Stanley Mortgage Loan Trust 2006-13ARX | Morgan Stanley Mortgage Loan Trust 2007-11AR |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-13AX | Morgan Stanley Mortgage Loan Trust 2007-12 |
| Morgan Stanley Mortgage Loan Trust 2006-14SL | Morgan Stanley Mortgage Loan Trust 2007-13 |
| Morgan Stanley Mortgage Loan Trust 2006-15XS | Morgan Stanley Mortgage Loan Trust 2007-14AR |
| Morgan Stanley Mortgage Loan Trust 2006-16AX | Morgan Stanley Mortgage Loan Trust 2007-15AR |
| Morgan Stanley Mortgage Loan Trust 2006-17XS | |

Defendants Morgan Stanley Capital and the Trusts issued hundreds of millions of dollars worth of Certificates pursuant to the same Registration Statement.

14. Defendant MS&Co is owned by Morgan Stanley and is an affiliate of Morgan Stanley Capital and MSMC. MS&Co acted as sole lead manager and sole bookrunner with respect to the Certificates. Additionally, MS&Co acted as an underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents. MS&Co failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statement were not false or misleading.

15. Defendant David R. Warren ("Warren") was President of Morgan Stanley Capital during the relevant time period. Defendant Warren signed the December 23, 2005 Registration Statement.

16. Defendant Anthony B. Tufariello ("Tufariello") was President (Principal Executive Officer) of Morgan Stanley Capital during the relevant time period. Defendant Tufariello signed the December 23, 2005, February 17, 2006 and March 14, 2006 Registration Statements.

17. Defendant William J. Forsell ("Forsell") was Treasurer (Principal Financial Officer) and Controller of Morgan Stanley Capital during the relevant time period. Defendant Forsell signed the December 23, 2005, February 17, 2006 and March 14, 2006 Registration Statements.

18.     Defendant Steven S. Stern ("Stern") was a director of Morgan Stanley Capital during the relevant time period.  Defendant Stern signed the December 23, 2005, February 17, 2006 and March 14, 2006 Registration Statements.

19.     The defendants identified in ¶¶15 through 18 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors to the Trusts as they were directors of Morgan Stanley Capital and signed the Registration Statement for the registration of the securities issued by the Trusts.

20.     Non-parties Moody's, S&P, and Fitch (collectively referred to as the "Rating Agencies") provided credit ratings, research, risk analysis and data to investors.  The Rating Agencies rated the following defendant Trusts:

| TRUST | PROSPECTUS SUPPLEMENT DATE | RATING AGENCIES |
|---|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-4SL | 3/27/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-5AR | 3/27/2006 | S&P, Moody's, Fitch |
| Morgan Stanley Mortgage Loan Trust 2006-5ARW | 3/27/2006 | S&P, Moody's, Fitch |
| Morgan Stanley Mortgage Loan Trust 2006-6AR | 4/26/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-7 | 5/25/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-8AR | 5/25/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-10SL | 7/20/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-9AR | 7/26/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-11 | 7/26/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-13AX | 8/26/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-13ARX | 9/26/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-12XS | 9/26/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-14SL | 10/24/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2006-15XS | 10/25/2006 and 1/05/2007 | S&P, Moody's |

| Morgan Stanley Mortgage Loan Trust 2006-16AX | 10/26/2006 | S&P, Moody's |
|---|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-17XS | 12/21/2006 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-2AX | 1/24/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-1XS | 1/25/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-3XS | 2/26/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-5AX | 2/26/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-4SL | 2/27/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-6XS | 3/27/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-7AX | 4/26/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-8XS | 5/29/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-9SL | 6/27/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-11AR | 6/26/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-10XS | 6/27/2007 | S&P, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-12 | 7/27/2007 | S&P, Fitch |
| Morgan Stanley Mortgage Loan Trust 2007-13 | 9/26/2007 | S&P, Fitch |
| Morgan Stanley Mortgage Loan Trust 2007-14AR | 10/29/2007 | S&P, Fitch, Moody's |
| Morgan Stanley Mortgage Loan Trust 2007-15AR | 11/29/2007 | Fitch, S&P |

21.     These ratings were discussed in the Registration Statement and each of the Prospectus Supplements and, in part, determined the price at which the Certificates were offered to Plaintiffs and the Class.

22.     Among other things, Moody's, S&P and Fitch were involved in the structuring, rating and monitoring of the Certificates. The Rating Agencies received a substantial fee for helping Morgan Stanley Capital sell the Certificates. The Rating Agencies' substantial remuneration was drawn from the proceeds of the Certificates' issuance, and their ongoing fees were paid out of

income owed to Certificate investors.  It was a condition to each offering that the Certificates receive certain ratings from the Rating Agencies.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired Certificates of the Trusts identified herein pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-130684) and Prospectus Supplements (the "Class").  Excluded from the Class are defendants, the officers and directors and affiliates of the defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Morgan Stanley Capital and/or MSMC or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  The Registration Statement issued hundreds of millions of dollars worth of Certificates.

25.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the 1933 Act;

(b)     whether statements made by defendants to the investing public in the Registration Statement and Prospectus Supplements misrepresented or omitted material facts about the Certificates and/or the underlying mortgage loans held by the Trusts; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

29.     Morgan Stanley Capital established the defendant Trusts, acquired the mortgage loans that were transferred to the Trusts, and then issued Certificates of various classes or tranches that were sold to investors pursuant to the Registration Statement and Prospectus Supplements. While these offering documents contained data about the mortgage loans, some of the most important information for Plaintiff and the other members of the Class was false or was omitted from the Registration Statement and Prospectus Supplements. This misrepresented or omitted information related to the most important aspect of the Certificates – the loan underwriting processes and the collateral that secured the loans. Specifically, the false or omitted information involved the underwriting, quality control, due diligence, approval and funding practices and policies for the

mortgage loans, the appraisal processes concerning the underlying properties, and the likelihood that borrowers would repay the mortgage loans according to the terms of the loans. These omissions caused the Registration Statement and Prospectus Supplements to be materially false and misleading.

**Residential Mortgage Loan Categories**

30. Typically, borrowers who require funds to finance the purchase of a house, or to refinance an existing mortgage, apply for residential mortgage loans with a loan originator. Loan originators assess a borrower's ability to make payments on the mortgage loan based on, among other things, the borrower's Fair Isaac & Company ("FICO") credit score. Borrowers with higher FICO scores are able to receive loans with less documentation during the approval process, as well as higher LTV ratios. Using a person's FICO score, a loan originator assesses a borrower's risk profile to determine the interest rate of the loan to issue, the amount of the loan, the LTV ratio, and the general structure of the loan.

31. A loan originator will issue a "prime" mortgage loan to a borrower who has a high credit score and who can supply the required documentation evidencing their income, assets, employment background, and other documentation that supported their financial health. Borrowers who are issued "prime" mortgage loans are deemed to be the most credit-worthy and receive the best rates and structure on mortgage loans.

32. If a borrower has the required credit score for a "prime" mortgage loan, but is unable to supply supporting documentation of his or her financial health, then a loan originator will issue the borrower a loan referred to as a "low doc" or "Alt-A" loan, and the interest rate on that loan will be higher than that of a prime mortgage loan. In addition, the general structure of the loan will not be as favorable as it would be for a prime borrower. While borrowers of low doc or Alt-A loans typically have clean credit histories, the risk profile of the low doc or Alt-A loan increases because

of, among other things, a higher LTV ratio, a higher debt-to-income ("DTI") ratio, or inadequate documentation of the borrower's income and assets/reserves.

33.     A borrower will be classified as "sub-prime" if the borrower has a lower credit score and higher debt ratios.  Borrowers who have low credit ratings are unable to obtain a conventional mortgage because they are considered to have a larger than average risk of defaulting on a loan.  For this reason, lending institutions often charge interest on sub-prime mortgages at a rate that is higher than a conventional mortgage in order to compensate for assuming more risk.

**The Secondary Market**

34.     Traditionally, the model for a mortgage loan involved a lending institution (*i.e.*, the loan originator) extending a loan to a home buyer in exchange for a promissory note from the home buyer to repay the principal and interest on the loan.  The loan originator also held a lien against the home as collateral in the event the home buyer defaulted on the obligation.  Under this simple model, the loan originator held the promissory note until it matured and was exposed to the concomitant risk that the borrower may fail to repay the loan.  As such, under the traditional model, the loan originator had a financial incentive to ensure that: (1) the borrower had the financial wherewithal and ability to repay the promissory note; and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note and the property was foreclosed.

35.     Beginning in the 1990s, persistent low interest rates and low inflation led to a demand for mortgages.  As a result, banks and other mortgage lending institutions took advantage of this opportunity, introducing financial innovations in the form of asset securitization to finance an expanding mortgage market.  As discussed below, these innovations altered: (1) the foregoing traditional lending model, severing the traditional direct link between borrower and lender; and (2) the risks normally associated with mortgage loans.

36.     Unlike the traditional lending model, an asset securitization involves the sale and securitization of mortgages. Specifically, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage in the financial markets to a third-party financial institution. By selling the mortgage, the loan originator obtains fees in connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby has new capital to issue more mortgages. The mortgages sold into the financial markets are typically pooled together and securitized into what are commonly referred to as "mortgage-backed securities" or "MBS." In addition to receiving proceeds from the sale of the mortgage, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the MBS.

37.     As illustrated below, in a mortgage securitization, mortgage loans are acquired, pooled together or "securitized," and then sold to investors in the form of MBS, whereby the investors acquire rights in the income flowing from the mortgage pools:



(Source: The Wall Street Journal)

38.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash-flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors. The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should borrowers become delinquent or default on their mortgage. Of course,

since the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

39.     In this MBS structure, the senior tranches received the highest investment rating by the Rating Agencies, usually AAA.  After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds.  In accordance with their order of priority, the mezzanine tranches were generally rated from AA to BBB by the Rating Agencies.

40.     The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches.  This process is repeated each month and all investors receive the payments owed to them so long as the borrowers are current on their mortgages.  The following diagram illustrates the concept of tranches within a MBS comprised of residential mortgages (sometimes referred to as a "residential mortgage backed securities" or "RMBS"):



(Source: The Wall Street Journal)

41.     As illustrated below, in the typical securitization transaction, participants in the transaction are: (1) the servicer of the loans to be securitized, often called the "sponsor"; (2) the depositor of the loans in a trust or entity for securitization; (3) the underwriter of the MBS; (4) the

entity or trust responsible for issuing the MBS, often called the "trust"; and (5) the investors in the MBS.

42.     The securitization process begins with the sale of mortgage loans by the Sponsor (here, MSMC) – who acquired the mortgage loans from various originators – to the Depositor (here, Morgan Stanley Capital) in return for cash. The Depositor then sells those mortgage loans and related assets to the individual Trusts (here, the Trusts identified in paragraph 13), in exchange for the Trusts issuing the Certificates to the Depositor. The Depositor then works with the Underwriter (here, MS&Co) of the individual Trusts to price and sell the Certificates to investors. As noted in the Registration Statement, MS&Co and MSMC both work with the rating agencies, loan sellers and servicers in structuring the securitization transaction. Because of this interlocking process, each defendant entity described in this paragraph engaged in the steps necessary to the distribution of the Certificates:



43.     Thereafter, the mortgage loans held by the trusts are serviced, *i.e.*, principal and interest are collected from mortgagors by the servicer, which earns monthly servicing fees for collecting such principal and interest from mortgagors. After subtracting a servicing fee, the servicer sends the remainder of the mortgage payments to a trustee for administration and distribution to the trust, and ultimately, to the purchasers of the MBS certificates.

**Sub-Prime and Low Documentation Alt-A Loans and the Secondary Market**

44.     Over the past 30 years, the sub-prime mortgage market has evolved from being just a small percentage of the overall U.S. home mortgage market to one that has originated hundreds of billions of dollars of sub-prime loans annually. While several important legislative and regulatory changes have induced such growth, the sub-prime mortgage market would not have experienced such enormous growth without the development of a strong secondary market for home mortgage loans.

45.     During the 1980s, credit rating agencies began rating privately-issued MBS, which made them more suitable to a wider range of investors and expanded the market for MBS. By 1988, 52% of outstanding residential mortgage loans had been securitized, up from 23% four years earlier.

46.     This rapid expansion of the secondary mortgage market significantly increased mortgage lenders' access to capital and dramatically reduced the need for loan originators to possess a large deposit base in order to maintain their liquidity. As a result, non-depository mortgage lenders proliferated, comprising approximately 32% of lenders of home mortgage loans by 1989.

47.     During the early to mid-1990s, rising interest rates decreased the demand for prime mortgage loans. To spur continued sales of mortgages, lenders became amenable to originating sub-prime mortgages. This willingness, coupled with technological advances that helped credit rating companies accumulate credit information on a greater number of debtors, increased the market for sub-prime mortgage loans. By 1998, approximately $150 billion in sub-prime mortgage loans were originated, up from approximately $35 billion in 1994.

48.     The growth in the sub-prime mortgage loan market during the 1990s was also aided by mechanisms that allocated and/or moderated risk in sub-prime MBS. These mechanisms, called "credit enhancements," allowed issuers to obtain investment-grade ratings on all, or part of, their MBS, despite the higher risk on the sub-prime mortgages upon which the MBS were based.

49.     As a result of these credit enhancement mechanisms, MBS were deemed to be suitable to a wider market of investors, and the value of sub-prime MBS sold in the secondary mortgage market grew from $10 billion in 1991 to more than $60 billion in 1997.  These sales of MBS provided lenders, including non-depository and mortgage-only companies who were responsible for much of the sub-prime mortgage lending, with ample liquidity to originate new sub-prime loans.  By 2005, the amount of new sub-prime mortgage loans that were originated grew to over $620 billion.

50.     During the 1990s, a new category of mortgage loans emerged.  These loans, which became very popular between 2004 through 2006, offered more lenient lending standards than "prime" loans, but were considered less risky than "sub-prime" loans.  This loan category, which consisted primarily of Alt-A loans, was originally designed for self-employed borrowers who had high FICO scores and were able to document assets, but could not easily document their income.  The Alt-A loans enabled these borrowers to be approved for a mortgage without extensive supporting documentation of their financial history or income.

51.     While Alt-A loans generally have hard to define characteristics, their most distinctive attribute is that borrowers are not required to provide supporting documentation with their applications.  For example, a borrower typically did not provide complete documentation of his or her assets or the amount or source of his or her income.  Other characteristics of Alt-A loans included: (i) LTV ratios in excess of 80% without primary mortgage insurance; (ii) borrowers who were temporary resident aliens; (iii) loans secured by non-owner occupied property; or (iv) a DTI ratio above normal limits.  MBS that are backed by Alt-A loans are appealing because Alt-A loans are perceived to offer temporary protection from prepayment risk, which is the risk that borrowers will pay off their loans immediately.  Mortgage loan securitizations were traditionally valued using

prepayment speeds as an important component. Alt-A loan borrowers exhibit greater resistance to prepayments during the first nine to twelve months following their origination. Prime borrowers, by contrast, tend to be very sensitive to changing interest rates and they refinance or prepay their mortgage loans on a continual basis as interest rates decline.

52.     The market for Alt-A Loans had increased faster than that for sub-prime. Approximately $325 billion of Alt-A loans were originated during 2007 and accounted for approximately 13% of all mortgages originated in that year. In 2006, a record $400 billion of Alt-A loans were originated and accounted for 13.4% of all mortgages originated that year. In 2003, only 2.1% of loan originations were Alt-A. However, the delinquency rate for Alt-A loans also increased. After 21 months, loans that were securitized in 2007 had a delinquency rate of more than 13% for fixed-rate loans and more than 26% for adjustable-rate loans. For 2006 securitizations, the delinquency rate exceeded 8% for fixed-rate loans and 18% for adjustable-rate loans. This is compared to 2005 securitizations which only experienced a 2% delinquency rate for fixed-rate loans and a 4% delinquency rate for adjustable-rate loans, and to 2004 securitizations which only experienced a 1.7% delinquency rate for fixed-rate loans and a 2.5% delinquency rate for adjustable-rate loans.

53.     Additionally, over the past several years, the quality of the borrowers of Alt-A-type mortgage loans weakened. During this time, Alt-A-type loans were extended to borrowers who would otherwise have qualified only for: (i) sub-prime loans; (ii) much smaller dollar value loans at lower LTV ratios; or (iii) no mortgage loans at all. These lower quality Alt-A-type loans were either "Alt-B" loans, sub-prime loans, or loans for completely unqualified borrowers and included increased risks such as a high LTV ratios and the lack of supporting financial documentation.

## THE FALSE AND MISLEADING REGISTRATION
## STATEMENT AND PROSPECTUS SUPPLEMENTS

54.     The Issuers caused the Registration Statement and Prospectus Supplements to be filed with the SEC during 2005, 2006 and 2007 in connection with the issuance of hundreds of millions of dollars in Certificates.   The Registration Statement incorporated by reference the Prospectus Supplements.  The Registration Statement and Prospectus Statements contained materially false and misleading statements and omitted material information.

55.     The Issuers caused the Registration Statement to be filed with the SEC on December 23, 2005 and amended the Registration Statement on February 17, 2006 and March 14, 2006.  The Registration Statement discussed the mortgage loans contained in the mortgage pools held by the defendant Issuers, representing that the mortgage loans were made to creditworthy borrowers whose documentation was not subject to quite as rigorous a set of standards as other borrowers, but that the loans were made based on the value of the underlying properties, as confirmed by appraisals of the properties.

**The Registration Statement and Prospectus Supplements Misrepresented
and Omitted Material Facts Regarding the Underwriting Standards Applied
by the Loan Originators**

56.     The March 14, 2006 amendment to the Registration Statement and each of the Prospectus Supplements discussed the standards by which MSMC purchased the mortgage loans that were eventually transferred to the Trusts in nearly identical language.  The Registration Statement and each of the Prospectus Supplements stated:

> Generally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also have been required to authorize

verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.

*     *     *

Based on the data provided in the application and certain verifications (if required), *a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses*. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective mortgagor's gross income. The percentage applied varies on a case by case basis depending on a number of loan purchasing criteria, including the LTV[3] ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the mortgagor after origination.

Certain of the mortgage loans have been originated under alternative, reduced documentation, no-stated-income, no-documentation, no-ratio or stated income/stated assets programs, which require less documentation and verification than do traditional full documentation programs. Generally, under an alternative documentation program, the borrower provides alternate forms of documentation to verify employment, income and assets. Under a reduced documentation program, no verification of one of either a mortgagor's income or a mortgagor's assets is undertaken by the originator. Under a no-stated-income program or a no-ratio program, certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a stated income/stated assets program, no verification of both a mortgagor's income and a mortgagor's assets is undertaken by the originator. Under a no-documentation program, no verification of a mortgagor's income or assets is undertaken by the originator and such information may not even be stated by the mortgagor. The loan purchasing decisions for such mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination.

57. These representations were false and misleading because they failed to disclose that

MSMC purchased loans from its correspondents and originators that did not meet MSMC's stated

---

[3] The quoted language is from the Registration Statement. The Prospectus Supplements contain identical language except that the abbreviation "LTV" is written out in full as "Loan-to-Value Ratio."

loan purchasing guidelines. Contrary to the representations that lenders were determining whether borrowers could afford the loan payments, loans were made to borrowers regardless of their ability to repay. Borrowers were approved for loans they could not afford and could not repay. For example, MSMC purchased loans where the mortgagor provided the original lender with patently false information regarding the mortgagor's financial condition. In addition, MSMC purchased loans where the original lender failed to determine that the mortgagor's monthly income was sufficient to enable the mortgagor to repay the loan.

58.     According to a former MSMC employee who worked as both a Quality Control Analyst and a Pre-Funding Quality Control and Fraud Investigations Manager from 2003 into 2006, MSMC did not comply with the above loan purchasing guidelines. This former employee was responsible for reviewing loans that MSMC considered acquiring for securitization and then preparing an audit report that provided detailed pre-purchase information about the loans – including flagging any potential fraud in the origination of the loan (such as a borrower providing a salary that was excessive for a given job title) or other indicators that the loan was unlikely to be repaid.

59.     According to this former employee, when MSMC management was presented with information indicating that the loans MSMC was considering for purchase were not originated pursuant to MSMC's stated loan purchasing guidelines, MSMC management would ignore this information. As just one poignant example of numerous cases where MSMC ignored its loan purchasing guidelines, the former employee red-flagged a number of loans purportedly made for completed homes in Maricopa County, Arizona because the homes had been sold numerous times within a short time span for ever increasing sales prices. When the former employee visited the purported location of these homes, she noted that there were no homes built there nor were there any other homes in the area. The employee determined that the "sales" of these "homes" were merely

- 21 -

transactions back and forth between builders to artificially inflate their value. When the former employee notified her MSMC superiors of her findings, they ignored these red flags and purchased the loans (and many others) anyway.

60.    MSMC also purchased loans that were riskier, *i.e.*, less likely to be repaid, than MSMC's guidelines permitted, as the loans exceeded MSMC's limit for LTV ratios. Further, loan originators presented MSMC with loans that the originator claimed to be Alt-A, but instead were riskier subprime loans disguised as Alt-A loans. These loans were securitized and represented to be Alt-A loans when they in fact were not.

61.    According to the former MSMC employee, MSMC was "production-based" and was more concerned with acquiring loans for securitization than whether borrowers could repay the loans. Contrary to MSMC's stated loan purchasing guidelines, MSMC was not concerned with determining whether borrowers' income was sufficient to repay the loans. In fact, MSMC ignored its loan purchasing guidelines in order to purchase as many loans as possible because it was worried that if MSMC did not purchase the loans a competitor would.

62.    MSMC's stated loan purchasing guidelines also failed to disclose that the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage, such as:

- Coaching borrowers to misstate their income on loan applications to qualify for larger mortgage loans under the underwriters' underwriting standards, including directing applicants to no-doc loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting No Income No Assets ("NINA") and Stated Income Stated Assets ("SISA") loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable loan rate adjusted; and

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the underwriters' underwriting standards based on so-called "compensating factors" without requiring documentation for or determining the validity of such compensating factors.

63.     Further, MSMC's loan purchasing guidelines failed to disclose that the originators of loans purchased by MSMC and transferred to the Trusts and the agents of these originators – such as mortgage brokers – were so aggressive in approving and funding the mortgage loans that many of the mortgage loans were made to borrowers who had either not submitted or had altered the required documentation.    Moreover, in many instances the income/employment verifications that were purportedly completed by the originators were insufficient because the lenders' clerical staff typically did not have proper verification skills, the mortgage brokers or their agents often completed verifications that were suspect, and oftentimes verifications were provided by inappropriate contacts at the borrower's place of employment (*e.g.*, a friend of the borrower would complete the verification instead of human resources).    Unbeknownst to investors, these factors had the effect of dramatically increasing the risk profile of the Certificates.

64.     Similarly, those borrowers who were actually required to submit stated income applications would include income levels which were routinely inflated to extreme levels, relative to their stated job titles, in order to get the mortgage loans approved and funded.    For instance, the former MSMC employee recalled MSMC purchasing loans extended to people whose stated occupation could not possibly provide the income stated on the loan application.    The former MSMC employee provided a hypothetical but typical example of a borrower whose stated occupation was pre-school teacher but whose stated income was $200,000 per year.    According to the former MSMC employee, when red flags such as these were raised, MSMC would often ignore them and purchase

the loan anyway. Indeed, the existence of this type of extreme stated income inflation was corroborated in a study cited by the Mortgage Asset Research Institute which found that almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, and more than half increased the amount by more than 50 percent.

65. The originators' lack of underwriting controls essentially encouraged this type of income inflation. For instance, many stated income borrowers were actually wage earners who could have supplied W-2s or other income-verifying documentation, but did not. Numerous mortgages transferred to the Trusts were issued without requiring the borrowers to execute a Form 4506, which would have allowed the lender to access the borrower's tax returns from the Internal Revenue Service ("IRS"), out of fear that the lender would be put on notice that the borrower's true income level was less than the income level the borrower stated on his or her loan application.

**The Registration Statement and Prospectus Supplements Misrepresented and Omitted Material Facts Regarding the Appraisals Conducted by or for the Loan Originators**

66. The March 14, 2006 amendment to the Registration Statement and each of the Prospectus Supplements also contained representations regarding the appraisals of the properties securing the mortgage loans that MSMC purchased. The Registration Statement and each of the Prospectus Supplements stated:

> The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. ***All appraisals conform to the Uniform Standards of Professional Appraisal Practice*** adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to FNMA and/or FHLMC. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator.

> The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially

completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

67. Accurate real-estate appraisals are essential to the entire mortgage lending and securitization process, providing borrowers, lenders, and investors in MBS with supposedly independent and accurate assessments of the value of the mortgaged properties. Accurate appraisals ensure that a mortgage or home equity loan is not under-collateralized, thereby protecting borrowers from financially over-extending themselves and protecting lenders and investors in MBS in the event a borrower defaults on a loan and a foreclosure results. Accurate appraisals also provide investors with a basis for assessing the price and risk of MBS.

68. An accurate appraisal is also critical in determining an accurate LTV ratio, which is a financial metric that Wall Street analysts and investors commonly use when evaluating the price and risk of MBS. The LTV ratio is a mathematical calculation that expresses the amount of a mortgage as a percentage of the total appraised value of the property. For example, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000, or 90%. If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).

69. A high LTV ratio is riskier because a borrower with a small equity position in a property has less to lose if he/she defaults on the loan. What is worse, particularly in an era of falling housing prices, is that a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may exceed the value of the property.

70. The accuracy of a property's appraisal and corresponding LTV ratio becomes even more important for reduced documentation loans where the loan is originated based largely or exclusively upon the appraised value of the mortgaged property and the LTV ratio at origination – as

opposed to being originated based upon the borrower's income or assets. Indeed, as noted in the Registration Statement, MSMC's "loan purchasing decisions for such mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination."

71.     To ensure the accuracy of appraisals, the USPAP imposes certain requirements on appraisers. With respect to real estate appraisals, the USPAP provides:

(a)     An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests;

(b)     In appraisal practice, an appraiser must not perform as an advocate for any party or issue;

(c)     An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions; and

(d)     It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

(i)     The reporting of a predetermined result (*e.g.*, opinion of value);

(ii)     A direction in assignment results that favors the cause of the client;

(iii)     The amount of a value opinion;

(iv)     The attainment of a stipulated result; or

(v)     The occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

72.     The representations in the Registration Statement and Prospectus Supplements regarding appraisals were materially false and misleading in that they omitted to state that the appraisals were false, inflated and inaccurate. The Registration and Prospectus Supplements also failed to disclose that the appraisals were false, inflated and inaccurate because: (i) there were a

complete lack of controls at the originators; and (ii) contrary to USPAP, the appraisers were not independent from the lenders and/or their agents, as the lenders and their agents exerted pressure on appraisers to come back with pre-determined, preconceived, inflated and false appraisal values.

73.     For instance, in retail or in-house mortgage loan originations, many lenders allowed the sales personnel or account executives to order and control the appraisals. These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible. These sales personnel and account executives would accordingly pressure appraisers to appraise properties at artificially high levels under threat of not being hired again.

74.     As a result of this conduct, loans were systematically based on inflated appraisals stating that the home securing the loan was worth more than it in fact was.

75.     Numerous appraisers have confirmed that the inflation of appraisals was common place. For example, the owner of a small Midwest residential real estate appraisal firm in Illinois – who was approved and/or utilized by originators including American Home Mortgage Corp. ("AHM") (a key originator of loans in many of the Trusts) in over 100 transactions – stated that mortgage brokers would call him and say "I need this number." This appraiser also stated that he was frequently threatened with, "either give us this home value or you will never do business for us again."

76.     An independent appraiser from Florida who was approved by AHM and other originators stated that she was told by brokers and/or lenders that: "WE NEED THIS NUMBER, OR YOU WILL NEVER WORK FOR US AGAIN." In order to stay in business, she gave the valuations the brokers and lenders demanded, even if it required driving 20 miles away for a purportedly "comparable" sale. During the relevant period, this appraiser completed over one hundred appraisals for AHM and other originators that were inflated.

77. Another independent appraiser who performed appraisals for AHM and other originators stated that loan officers demanded inflated numbers from him. Lenders told him to either give them the numbers they wanted, or the appraiser would be "done" and blackballed by every lender doing business in California. In some cases the appraiser was appraising houses – that he described as "crack houses" that should have been bulldozed – for $100,000 more than they were worth. The appraiser stated that the neighborhoods were so bad, that he would sometimes never get out of his car, and would merely drive by and take pictures of the house and give the broker or the lender the number they demanded.

**The Registration Statement and Prospectus Supplements Contained False and Misleading Statements About the Originators' Underwriting Practices**

### American Home Mortgage Corp.

78. The Registration Statement and Prospectus Supplements made false and misleading statements about the underwriting practices of AHM, which was a key originator for the following Trusts:

| | |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-4SL | Morgan Stanley Mortgage Loan Trust 2006-15XS |
| Morgan Stanley Mortgage Loan Trust 2006-5AR | Morgan Stanley Mortgage Loan Trust 2006-16AX |
| Morgan Stanley Mortgage Loan Trust 2006-6AR | Morgan Stanley Mortgage Loan Trust 2006-17XS |
| Morgan Stanley Mortgage Loan Trust 2006-11 | Morgan Stanley Mortgage Loan Trust 2007-15AR |

79. For example, the Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2006-5AR, dated March 27, 2006 stated:

(a) American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations. Exceptions to the underwriting standards may be permitted where compensating factors are present. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have

been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes. Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

***Omitted Information***:  Contrary to AHM's stated underwriting policy, AHM was not weighing all risk factors inherent in a loan file, nor did it encourage underwriters to use professional judgment based on their experience.  Instead, according to a former Level 5 Underwriter who worked at AHM from 2004 until December 2006, the professional judgments of AHM's underwriters were often overridden by automated underwriting software – an automated program that approved loans that made no financial sense and thus were not likely to be paid back.  The former Underwriter said that many of the loans approved by the underwriting software were ones on which he "would not have lent a dime."  In addition, on many occasions AHM management overruled the former Underwriter's professional judgment and approved risky loans.

80.     This practice was confirmed by a former Level 3 Underwriter who worked at AHM from June 2004 to August 2007.  According to this former Underwriter, the automated underwriting software routinely approved "awful loans" that would not have been approved under AHM's stated underwriting guidelines.

81.     Further, in order to achieve desired loan production, AHM was as a matter of course making loans even where "compensating factors" did not exist.   AHM routinely found "compensating factors" purportedly justifying loans even where there were ***no*** "compensating factors."  This was so because AHM's business relied on making a large number of loans, as it was paid a fee for each loan it made when transferring securitization of these mortgages.  In addition, by selling the loans, AHM also did not have to retain the mortgage loans as assets on its own balance

sheet and thereby could make additional loans, while avoiding the risk of defaults posed by its risky loans.

82.    It has subsequently come to light that AHM's loan programs were very questionable and risky, and the underwriting standards were commensurately lax.  According to one AHM District Manager, the loan pools sold to Wall Street banks such as MSMC were of extremely low quality.  According to the former employee, managers were "told to ignore the issues which should not be ignored, such as the borrower's ability to repay, and just sell these programs."

83.    AHM was a mortgage banker that used its line of credit to fund residential mortgage loans, create a loan pool, and then, to replenish its funds, it would sell the loans in bulk as soon as possible to "investors."  The investors were Wall Street firms such as Morgan Stanley Capital that sought the loan pools for their Certificates.  These Wall Street firms initiated the lending process by designing and delivering the loan programs to AHM.

84.    Representatives of the Wall Street firms that purchased AHM's loans essentially told AHM, "Take our product and sell it."  Wall Street firms did not want to miss out on the housing boom and needed investment opportunities to soak up the funds coming in from their investors. AHM ignored issues such as the borrower's ability to repay, and just made loans which could then be resold to MSMC and the other Wall Street banks.  Wall Street firms fed off each other, and could not get enough of these loan pools – the Wall Street firms were packaging these pools and securitizing them as fast as they could.

85.    AHM sales representatives would contact independent loan brokers (and others who facilitated loans for borrowers) and would arrange with the loan brokers to offer whatever loan programs the AHM representatives were pushing at the time.  One former AHM District Manager referred to this effort as "selling the loan programs."  The AHM sales reps pushed the loan products

sponsored by "investors" (the Wall Street firms such as defendants that eventually would buy AHM's loan pools). AHM's loan programs were so questionable and risky that crossing the line was hardly an issue "unless you were talking about something truly criminal," according to a former AHM employee. The underwriting standards were commensurately lax, in that they required very little in the way of documentation to qualify borrowers for the loan programs.

86.     In addition to using the services of outside brokers who sold AHM's loan products, AHM had a Retail Lending group that sold loans directly to consumers. Those in the Retail Lending group were compensated, in part, based upon the type and number of loans they closed. However, in order to close a loan, the loan had to be approved by AHM's underwriters. Thus the Retail Lending group's compensation was determined, in part, by whether the underwriter approved the loans the Retail Lending group was attempting to sell to a potential customer. Similarly, pay raises for the underwriters were determined by the Retail Lending group. Accordingly, the underwriters' compensation was directly affected by decisions made by the Retail Lending group, and the Retail Lending group's compensation was directly affected by decisions made by the underwriters. This symbiotic relationship provided powerful incentives for the underwriters to approve as many loans as possible regardless of the borrowers' ability to repay, thereby financially rewarding the Retail Lending group, who in turn would approve pay raises for the underwriters.

87.     As noted by a former AHM employee, even loan pools that were ultimately rated AAA were made up of "nothing but junk." AHM continued to sell these pools to MSMC and other Wall Street banks, who sold the Certificates to plaintiff and the Class.

88.     The Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2006-5AR, dated March 27, 2006, further stated:

(b)     American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

**Omitted Information**: AHM was not underwriting loans based upon a borrower's creditworthiness and repayment ability. Rather, AHM was lending to anyone that it could regardless of the borrowers' ability to repay the loan. According to a former AHM Executive Vice President who worked at the company from 1999 through April of 2007, AHM's underwriting practices became increasingly lax during the 2005 to 2007 time frame. This resulted in AHM granting a larger and larger number of loans to people unlikely to repay them. According to this former employee, AHM "followed Countrywide" (a competitor) in offering "fast and sleazy products" that had very questionable underwriting requirements and were of low quality. A former AHM Wholesale Account Executive, who worked at AHM from January 2005 through July 2007, stated that at AHM "anybody could buy a house with zero percent down and **no proof of ability to pay it [the loan] back**."

89.     The Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2006-5AR, dated March 27, 2006, further stated:

(c)     Non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac, in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. For these Alt-A products, the borrower may not be required to verify employment income, assets required to close or both. For some other Alt-A products, the borrower is not required to provide any information regarding employment income, assets required to close or both. Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

**Omitted Information**: AHM allowed the "higher credit score" referenced in the Prospectus Supplement to be artificially manipulated higher by borrowers, who would become an approved user

on another person's credit card or other account which had better credit ratings. In addition, LTV

ratios were not truly "lower" because the appraisals being used by AHM, particularly in Texas and

Illinois in 2005 and 2006, were based on falsely inflated appraisals, as alleged above. The same

defective appraisals methodologies were also being used in California and Florida.

90.     The Prospectus Supplement for Morgan Stanley Mortgage Trust 2006-5AR, dated

March 27, 2006 also stated:

> (d)     In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter, Freddie Mac's Loan Prospector automated underwriting systems, a customized form of Fannie Mae's Desktop Underwriter called Custom Desktop Underwriter, or they have been manually underwritten by American Home's underwriters. American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

***Omitted Information***: This statement was misleading because AHM was not nearly as meticulous

with evaluating borrowers as portrayed. In an effort to keep loan volume up despite a slowdown in

activity, AHM made loans to borrowers who could not afford the payments. In addition, AHM's

brokers became so aggressive that borrowers were given loans with different terms than they were

originally promised. Borrowers have in fact complained that loans were switched on them by AHM,

leaving them with mortgages they could not pay. Further evidence of AHM's poor underwriting

practices appeared when IndyMac Bank hired over 1,400 of AHM's former employees. According

to a former IndyMac employee, some of the AHM employees that IndyMac took in operated a "fraud shop" within IndyMac.

91. The Prospectus Supplement for Morgan Stanley Mortgage Trust 2006-5AR, dated March 27, 2006 also stated:

> (e) Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter.
>
> The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value. American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction, loans on second homes or loans on investment properties. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher coverage levels. For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

**Omitted Information**: Appraisals conducted for AHM were not based upon the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis and judgment. Instead, contrary to USPAP standards, AHM's appraisals were based upon

predetermined inflated values insisted upon by brokers. As alleged above, AHM appraisers succumbed to brokers' demands to appraise at predetermined inflated values. Indeed, as described by a former AHM Vice President from March 2003 through May 2007, appraisal fraud was a common problem at AHM. This former Vice President recounted how loan officers pressured appraisers to come up with the "right number," *i.e.*, the inflated number the loan officers wanted to justify a loan (or a larger loan). Due to the inflated appraisals, the LTV ratios for loans were false and inaccurate because these ratios were calculated based on the false appraisals.

92.     The Prospectus Supplement for Morgan Stanley Mortgage Trust 2006-5AR, dated March 27, 2006 also stated:

> (f)     American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

***Omitted Information***:  AHM was using anything but "common sense" in granting mortgages to customers. Instead, AHM was granting mortgages solely for the sake of lending money so that it could sell the loans and profit. In addition, loans were approved even though there were no "compensating factors" justifying the loans.

### Fifth Third

93.     The Registration Statement and Prospectus Supplements made false and misleading statements about the underwriting practices of Fifth Third Mortgage Company ("Fifth Third"), which was a key originator for the following Trusts:

| | |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2007-13 | Morgan Stanley Mortgage Loan Trust 2007-15AR |
| Morgan Stanley Mortgage Loan Trust 2007-14AR | |

94.    For example, the Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2007-13, dated September 26, 2007, stated:

> (a)    Fifth Third's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations. Exceptions to the underwriting standards may be permitted where compensating factors are present. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes. Because each loan is different, Fifth Third expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.
>
> Fifth Third underwrites a borrower's creditworthiness based solely on information that Fifth Third believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

***Omitted Information***:  Fifth Third was not following its purported lending practices, which increased its volumes but also dramatically increased the risk of default. Fifth Third made loans to borrowers irrespective of the borrowers' willingness or ability to pay the loans. When Fifth Third announced its September 30, 2008 results, one analyst, Richard Bove of Ladenburg Thalman, commented that the results "showed the bank was pursuing poor lending habits and that is why it got into so much trouble."

95.    The Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2007-13, dated September 26, 2007, also stated:

> (b)    In addition to reviewing the borrower's credit history and credit score, Fifth Third underwriters closely review the borrower's housing payment history. In general, for non-conforming loans the borrower should not have made any mortgage payments over 30 days after the due date for the most recent twelve months. In general, for Alt-A loans, the borrower may have no more than one payment that was made over 30 days after the due date for the most recent twelve months.
>
> In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter, Freddie Mac's

Loan Prospector automated underwriting systems, or they have been manually underwritten by Fifth Third's underwriters, or by contract underwriters provided by certain mortgage insurance companies. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter is required to be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

*Omitted Information*: Fifth Third did not seek to ensure that a borrower's income would support the housing expense but primarily sought to increase loan volume irrespective of the borrower's ability to pay. Fifth Third Management frequently overruled underwriters to allow non-qualifying, risky loans to close.

96.     The Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2007-13, dated September 26, 2007, also stated:

(c)     Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by an underwriter of Fifth Third or a mortgage insurance company contract underwriter.

*Omitted Information*: Fifth Third did not have adequate controls in place to ensure that appraisals were performed to the standards represented. As a result, the appraisals did not conform to USPAP standards. Instead, the appraisals were false and inflated because appraisers were pressured into providing inflated appraisals.

# First National Bank of Nevada

97.     The Registration Statement and Prospectus Supplements contained false and misleading statements about the loans originated by First National Bank of Nevada ("FNBN") which was the key originator in the following Trusts:

| | |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-9AR | Morgan Stanley Mortgage Loan Trust 2007-3XS |
| Morgan Stanley Mortgage Loan Trust 2006-12XS | Morgan Stanley Mortgage Loan Trust 2007-6XS |
| Morgan Stanley Mortgage Loan Trust 2007-1XS | Morgan Stanley Mortgage Loan Trust 2007-11AR |

98.     For example, the Prospectus Supplement issued in connection with Morgan Stanley Mortgage Loan Trust 2006-12XS, dated September 26, 2006, made false and misleading statements about the underwriting standards of FNBN, stating:

(a)     FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. A prospective borrower applying for a mortgage loan is required to complete an application, which elicits pertinent information about the prospective borrower including, depending upon the loan program, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. FNBN employs or contracts with underwriters through Mortgage insurance Companies to scrutinize the prospective borrower's credit profile. If required by the underwriting guidelines, employment verification is obtained either from the prospective borrower's employer or through analysis of copies of borrower's federal withholding (IRS W-2) forms and/or current payroll earnings statements. With respect to every prospective borrower, a credit report summarizing the prospective borrower's credit history or non-traditional credit history is obtained. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources, if applicable. With respect to mortgaged property consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes.

Based on the data provided in the application and certain verifications (if required), a determination will have been made that the borrower's monthly income (if required to be stated or verified) should be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the mortgaged property (such as property taxes, standard hazard insurance and other fixed obligations other than housing expenses). Generally, scheduled payments on a

mortgage loan during the first year of its term plus taxes and insurance and other fixed obligations equal no more than a specified percentage of the prospective borrower's gross income. The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria including, but not limited to, the loan-to-value ratio of the mortgage loan or the amount of liquid assets available to the borrower after origination.

***Omitted Information***: FNBN's underwriting guidelines were not intended to evaluate its borrowers' credit standing and repayment ability, but rather to originate as many loans as possible. In doing so, FNBN routinely violated its stated underwriting practices. FNBN was routinely lending to borrowers who did not have the ability to repay their loans. In addition, it was FNBN's practice to make residential mortgage loans to borrowers who qualified on the basis of obviously false information and thus could not reasonably be expected to repay their loans. FNBN's business model was simply to make as many loans as possible and then sell them as quickly as possible.

99.     According to a former Underwriter who worked at FNBN from July 2006 to July 2007, the rule at FNBN was that "if they [the borrowers] qualify," then FNBN would approve and fund the loan. "Qualify," however, did not have the traditional meaning as was commonly used in connection with the "qualifying" for a loan, *i.e.*, the borrower met FNBN's lending guidelines. Rather, "qualify" meant the borrower's application needed to "just somehow" appear to meet the qualification standards whether it actually did or not. Borrowers who did not actually qualify for a loan under the guidelines were coached by FNBN to falsify their loan applications to make it appear they did qualify and then their loans were funded by FNBN.

100.     As time went on, the "risk-taking became more and more brazen," at FNBN, according to the former Underwriter. FNBN wanted to fund, *i.e.*, make a loan to, anything or anyone they could. There were "huge pressures from management in Arizona to fund any loan possible." FNBN had a practice of throwing "junk" in with "A paper" and hoping that it would not be discovered.

101.     The former Underwriter explained that in implementing its business model, FNBN maintained relationships with a large number of independent mortgage loan brokers throughout the United States.  FNBN's Wholesale Account Executives managed the relationships with the brokers and worked with the brokers to help the brokers structure the loan applications.  The outside brokers and in-house Account Executives both received a commission based on the number of loans they closed.  The Account Executives went to the brokers' offices, reviewed the loan applications, and decided with the brokers on the figures to include for items such as income and assets in order to make it appear that the loan application met the qualifications.  The Account Executives also coached the brokers on how to set up the loans in order to get them qualified even when such loans should not have qualified.  FNBN's Loan Coordinators, who worked with the Account Executives, would act as coaches with the brokers when an Account Executive was unavailable.  The brokers, Account Executives, Loan Coordinators and Loan Managers all received bonuses based on the dollar amount of loans that were closed.  They received no bonuses for loans which were rejected.  Thus, they were incentivized to coach borrowers to falsify loan applications in order to receive their bonuses.

102.     The former FNBN Underwriter also confirmed that FNBN had a process in place to "scrub" loan applications.  There were eight or nine Loan Coordinators in the Warm Springs, Nevada office whose job was to "scrub" the applications.  Loan scrubbing referred to the practice of finding and eliminating information from the loan package that would disqualify the potential borrower from FNBN's loan programs.  As an example, loan scrubbing was designed to find differences in the amount of "stated" (unverified) income and inconsistent payroll information on the application so that the inconsistencies were fixed in order to obtain loan approval.  The information was harmonized to make it appear that the higher level of income was correct to get the loan

approved even though the purported higher level of income was false and inflated. FNBN Loan Coordinators were fired for failing to "scrub" disqualifying information from a loan package.

103.     Alt-A loans were FNBN's niche. According to the former FNBN Underwriter, Alt-A loans were made to borrowers who were "obviously unqualified to be able to repay them," and FNBN and its brokers "qualified" borrowers by "creating the numbers to make things work." There was great tension between the underwriters on the one hand and those who brought the loan packages to FNBN (*i.e.*, the brokers, Account Executives, Loan Coordinators and Loan Managers, all of whom received bonuses based on the dollar amount of loans that were closed). Supervisors would not support challenges by underwriters to unqualified applicants, and income and asset numbers were "just made up" in order to ensure borrowers appeared to qualify for FNBN's loan programs.

104.     FNBN ignored that the incomes stated on its borrowers' loan applications were unreasonable. As but one example, according to the former FNBN Underwriter, FNBN underwrote the loan application of a person working in a motel as a housekeeper with "stated" (i.e., unverified) monthly income of $5,000. The former Underwriter took that loan application to her Underwriting Supervisor, Kari Stansel, and told Stansel that she was going to deny the loan. Stansel replied with words to the effect that "we can work this out" or "we can back into this," meaning that it was possible to qualify the applicant by calculating a combination of hourly pay, over-time pay, and the number of hours of regular work and overtime work that would generate a $5,000 monthly income. Stansel calculated the amounts for the wage rate, the amount of overtime, and the number of double shifts the applicant would have to perform during a month to earn $5,000. The former Underwriter told Stansel that it was "absolutely impossible" for any of that data to be true but Stansel would not "back-down." The former Underwriter refused to sign the Form 1008 (the Fannie Mae transmittal

form that accompanies the loan when the loan is sold) on this loan application (by signing that form, the underwriter affirms that the loan meets the underwriting standards). Nonetheless, the loan was closed and funded by FNBN.

105. According to FNBN's former Chief Accounting Officer ("CAO") and Executive Vice President, who worked at FNBN from January 2007 to July 2008, FNBN relied on an automated underwriting software process, which allowed it to avoid a "manual" examination of loan applications by skilled and experienced underwriters. Such examinations would have detected many instances where the borrower's financial information defied common sense and led to a denial of many of the loans that were made. FNBN avoided the risk associated with these loans by auctioning its residential mortgage loan pools to third-party investment banks such as MSMC. MSMC and other investment banks that purchased these loan pools received information in their files that revealed the lack of underwriting and the resulting problems with the underlying loans. FNBN held monthly auctions in which investors such as MSMC and other Wall Street institutions would bid for the loan pools, which ranged in amount between $100 million to $500 million, and perhaps more.

106. According to the former FNBN CAO, FNBN's goal was to originate and fund as many loans as quickly as possible, and it used three main channels to achieve that goal. One channel was the retail channel, in which loans were made through direct contact with homebuilders and realtors and their home-buying customers. The second loan generation channel was a network of correspondent lenders with letters of credit, which financed the loans they originated and then sold them immediately to FNBN. The third channel, which was larger than the first two, was FNBN's wholesale origination channel, in which independent brokers had direct contact with the borrowers, and FNBN received the loan package (application and other paperwork), and then processed, underwrote, and funded the loans. FNBN recruited brokers to drum up such business by persuading

potential borrowers to sign up for a FNBN loan program. FNBN sent these loan packages to its Underwriting Department, which was using the bogus automated underwriting process alleged above. The non-qualifying loans emerged successfully from the electronic underwriting process, receiving an electronically generated approval, and the loan was closed and the necessary documents (as required by the particular state in which the property was located) were automatically generated. This facilitated and sped up the loan process which dove-tailed with FNBN's business plan of writing as many loans as possible, as quickly as possible, regardless of whether the borrower could repay. The automated system was essential to that plan.

107. The Prospectus Supplement for the Morgan Stanley Mortgage Loan Trust 2006-12XS, dated September 26, 2006, also stated:

> (b) The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by or acceptable to the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

*Omitted Information*: Appraisals did not conform with USPAP standards. Appraisers were pressured to appraise to certain inflated levels. Appraisers knew if they appraised under such inflated levels they would not be hired again. Therefore, due to this pressure, appraisers succumbed and appraisals of properties supporting FNBN's mortgage loans were falsely inflated. Further, FNBN's Underwriting Supervisors inflated the appraised value of properties by using purported

"comps" (comparable sales) of other properties that really were not comparable, as such comps had more bedrooms, larger square footages or other characteristics that were superior to the appraised property and supported a higher value.

### GreenPoint Mortgage Funding, Inc.

108.    The Registration Statement and Prospectus Supplements included false and misleading statements about the loan underwriting practices of GreenPoint Mortgage Funding, Inc. ("GreenPoint") which was a key originator for the following Trusts:

| | |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-7 | Morgan Stanley Mortgage Loan Trust 2007-2AX |
| Morgan Stanley Mortgage Loan Trust 2006-12XS | Morgan Stanley Mortgage Loan Trust 2007-12 |
| Morgan Stanley Mortgage Loan Trust 2006-15XS | Morgan Stanley Mortgage Loan Trust 2007-13 |
| Morgan Stanley Mortgage Loan Trust 2006-17XS | |

109.    For example, the Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2006-7, dated May 25, 2006, stated:

> (a)    Underwriting Standards.  Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Exceptions to the guidelines are permitted where compensating factors are present.

***Omitted Information***:  GreenPoint's underwriting guidelines were not applied to evaluate the prospective borrower's credit standing, repayment ability or the value and adequacy of the mortgaged property as collateral.  Rather, GreenPoint used guidelines supplied by Wall Street investors, such as MSMC, that were not based upon sound loan underwriting standards, but were merely the minimum standards that Wall Street was willing to accept for loans they would purchase and securitize.  As a former GreenPoint VP/Wholesale Branch Operations Manager – who worked for GreenPoint from July 2003 to January 2008 – explained, the fact that a borrower was unlikely to

- 44 -

re-pay his or her loan was irrelevant so long as the loans were within the minimum underwriting guidelines set forth by the Wall Street firms.

110.     GreenPoint's Wall Street-driven underwriting guidelines were woefully inadequate. As described by a former GreenPoint Account Executive – who worked in the Queens, New York branch from July 2003 through September 2007 – beginning in 2005, GreenPoint's underwriting standards became increasingly lenient, especially towards higher risk borrowers. This former employee characterized GreenPoint's underwriting guidelines as "loose" and becoming progressively "looser" during the 2005 through 2006 timeframe. This former Account Executive attributed GreenPoint's loosening of its underwriting standards to its desire to remain competitive in the lending market, explaining that as other lenders relaxed their underwriting standards and began extending loans to "people who probably couldn't repay their loans" GreenPoint had to do the same in order to remain competitive.

111.     These statements were confirmed by a former GreenPoint Senior Vice President of Branch Operations for the Western Wholesale Division who worked for GreenPoint and GreenPoint's predecessor, Headlands Mortgage, from 1992 to August 2007. This former employee stated that beginning in 2005 and continuing through 2006, GreenPoint's underwriting guidelines became increasingly lenient and the loans it extended became increasingly risky. GreenPoint began to significantly relax the requirements that borrowers would have to satisfy to qualify for a given loan program, including relaxing requirements involving documentation of repayment ability, LTV ratios and credit scores.

112.     Additionally, GreenPoint did not limit its granting of exceptions to circumstances where "compensating factors" existed. Rather, it was making loans even in the absence of any compensating factors. Typically, new brokers were actively monitored for only the first five to

seven loans submitted. This lack of monitoring was particularly problematic because, as noted by many regulators, brokers were interested mainly in generating upfront fees and did not pay attention to whether borrowers were qualified for the loans or whether there were actual "compensating factors" justifying the loans.

113.    The Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2006-7, dated May 25, 2006, further stated:

> (b)    GreenPoint acquires or originates many mortgage loans under "limited documentation" or "no documentation" programs. Under limited documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower, than on verified income of the borrower. Mortgage loans underwritten under this type of program are generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion, and certain credit underwriting documentation concerning income or income verification and/or employment verification is waived.

***Omitted Information***: GreenPoint was approving loans that the borrowers did not have the ability to repay. In addition, the relaxation of income documentation made accurate and reliable appraisals essential since so much emphasis was placed on the value of the mortgaged property. However, as alleged below, the appraisals were inflated and inaccurate, thus making the loans extremely risky.

114.    The Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2006-7, dated May 25, 2006, further stated:

> (c)    In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All appraisals are required to conform [to] the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in a good condition and verify that construction, if new, has been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain cases, an analysis based on income generated by the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used. GreenPoint's

Underwriting Guidelines require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values.

***Omitted Information***: The appraisals did not conform to the USPAP standards. Appraisers were pressured to appraise to certain inflated levels. Appraisers knew if they appraised under such levels they would not be hired again. Due to this pressure, appraisals of properties supporting GreenPoint's mortgage loans were inflated and thereby also distorted and rendered inaccurate the LTV ratios referred to in the Prospectus Supplements.

115. The Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2006-7, dated May 25, 2006, further stated:

> (d) As part of its evaluation of potential borrowers, GreenPoint generally requires a description of the borrower's income. If required by its underwriting guidelines, GreenPoint obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Employment verification may be obtained through analysis of the prospective borrower's recent pay stubs and/or W-2 forms for the most recent two years or relevant portions of the borrower's most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the borrower's length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

***Omitted Information***: GreenPoint did not verify the income of borrowers as represented but had a reputation in the industry for cutting corners on underwriting. GreenPoint was one of the first innovators of Alt-A mortgages. However, many of GreenPoint's Alt-A loans were actually subprime loans in disguise, a practice later copied by others. GreenPoint's practice of disguising subprime loans as Alt-A loans was confirmed by the former GreenPoint Account Executive identified in ¶110. According to this former Account Executive, GreenPoint offered loans it represented to be Alt-A even though their qualifying requirements were those of "junk" loans.

## Morgan Stanley Credit Corporation

116.    The Registration Statement and Prospectus Supplements included false statements about the loan underwriting practices of Morgan Stanley Credit Corporation ("MSCC") which was a key originator for the following Trusts:

| | |
|---|---|
| Morgan Stanley Mortgage Loan Trust 2006-8AR | Morgan Stanley Mortgage Loan Trust 2007-12 |
| Morgan Stanley Mortgage Loan Trust 2006-11 | Morgan Stanley Mortgage Loan Trust 2007-13 |
| Morgan Stanley Mortgage Loan Trust 2006-6AR | Morgan Stanley Mortgage Loan Trust 2007-14AR |
| Morgan Stanley Mortgage Loan Trust 2006-7 | Morgan Stanley Mortgage Loan Trust 2007-15AR |

117.    For example, the Prospectus Supplement issued in connection with the Morgan Stanley Mortgage Loan Trust 2007-14AR, dated October 29, 2007, made false and misleading statements about the underwriting standards of MSCC, stating:

> (a)    Origination.  MSCC's origination guidelines for Mortgage Loans use a combination of automated and judgmental underwriting criteria to evaluate credit risk, and this risk assessment may affect documentation requirements.  MSCC's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral.  A prospective borrower applying for a mortgage loan is required to submit an application in writing or via telephone, which elicits pertinent information about the prospective borrower including, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired.  MSCC employs underwriters to scrutinize the prospective borrower's credit profile.  If required by the underwriting guidelines, employment verification is obtained either from the prospective borrower's employer or through analysis of copies of borrower's federal withholding (IRS W-2) forms and/or current payroll earnings statements.  With respect to every prospective borrower, a credit report summarizing the prospective borrower's credit history is obtained.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources, if applicable.

***Omitted Information***:    MSCC's underwriting guidelines were not intended to evaluate the prospective borrower's credit standing and ability to repay the loan, nor the value and adequacy of

the proposed mortgaged property as collateral. Rather, MSCC's underwriting guidelines were intended to originate as many loans as possible without regard to repayment ability. Contrary to the above representations, MSCC's underwriters did not "scrutinize the prospective borrower's credit profile" but rather would grant almost any loan.

118. According to a former MSCC Underwriter who worked at MSCC from January 2006 to October 2007, an underwriter's role at MSCC was a "joke" because MSCC's goal for underwriters was to approve and close as many loans as possible rather than determine whether a borrower could repay the loan. The former Underwriter explained that because most of MSCC's applicants were already Morgan Stanley clients with assets invested in Morgan Stanley, MSCC was "bending over backwards" to make sure the clients' loans were approved. MSCC was not concerned with the ability of these existing clients to repay their loans but merely wanted to retain them as clients. According to the former Underwriter, MSCC feared that if MSCC did not approve loan applications submitted by its existing clients, the clients would withdraw the assets they had invested with Morgan Stanley and put them with another company such as Lehman Brothers or Goldman Sachs. Due to these concerns, MSCC was incredibly lax in its underwriting and did not scrutinize the prospective borrower's credit profile.

119. MSCC's loan underwriting policies were very problematic, according to the former Underwriter. Once a loan application reached the underwriter, it was considered "unprofessional" to question the applicant's stated income relative to the applicant's stated job title. Thus, far from scrutinizing a borrower's information, underwriters who had reservations about an applicant's stated income level remained quiet and did not even check the applicant's stated income against information contained in publicly available websites such as salary.com. The former Underwriter

explained that stated income loans would close within three hours of application submission because there was nothing in the application to verify.

120.    To ensure that loans were approved, MSCC put its underwriters on a strict quota system.  According to the former Underwriter, MSCC underwriters were expected to approve a certain number of loans each day, week and month.  If they did not, the underwriters would be terminated.  In addition, MSCC underwriters were incentivized to approve as many loans as possible as opposed to detecting bad loans.  For instance, an underwriter who approved 25% more loans than required by his or her quota would receive a bonus equal to 25% of his or her salary.  Given this incentive system, the underwriters at MSCC rarely denied a loan application.

121.    The Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2007-14AR, dated October 29, 2007 also stated:

> (b)    The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator.  The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

***Omitted Information***:  The appraisals did not conform to USPAP standards.  Contrary to the above representations, MSCC did not require or conduct physical inspections of the appraised property.  According to the former Underwriter described in paragraph ¶118 above, MSCC rarely required or paid for appraisals that included a physical inspection of the property.  Instead, MSCC only required

a "field asset verification" – where the appraiser merely drove by the property in a vehicle and looked at the home's exterior – or an "estimated appraisal value" – where the appraiser merely reviewed the sales price of homes purportedly comparable to the home being "appraised" without ever seeing the property.

122.     The Registration Statement and Prospectus Supplements were further false and misleading because they did not disclose that MSCC allowed the realtor who was selling the property to also serve as the property's appraiser, even though this created a conflict of interest and even though the realtor was not a licensed appraiser.  This practice was contrary to USPAP standards which require an appraiser to "perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."  In this situation, the realtor/appraiser has an incentive to appraise the property at a value greater than or equal to the amount of the loan.  If not, the borrower will not be able to obtain the loan necessary to complete the purchase and the realtor/appraiser will not receive his or her sales commission.  Further, increasing the appraised value of a home permits the home to sell for a higher price.  This higher price translates to higher commissions for the realtor.  Due to this conflict of interest, and due to the fact that MSMC permitted unlicensed appraisers to conduct appraisals, the above representations regarding MSMC's appraisal guidelines were false and misleading.

**The Registration Statement and Prospectus Supplements Misstated**
**the True LTV Ratios Associated with the Underlying Mortgages**

123.     The Registration Statement and Prospectus Supplements contained detailed information about the LTV ratios of the loans underlying the trusts.  In a series of charts, investors were provided with LTV ratio data, including information about the number of loans containing LTV ratios within a given range.  The following chart, taken from the Prospectus Supplement for the

2006-4SL Trust is representative of the type of LTV ratio information provided in the other Prospectus Supplements:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Weighted | |
| | | Aggregate | | Average | | | Average | |
| | | Principal | | Principal | | Percent Full and | Combined | Weighted |
| Range of Original Combined Loan-to-Value | Number of | Balance | Percent of | Balance | Weighted | Alternative | Original LTV | Average Credit |
| Ratios (%) | Mortgage Loans | Outstanding | Mortgage Pool | Outstanding | Average Coupon | Documentation | | Score |
| 15.01 - 20.00 | 2 | $ 322,095.18 | 0.11% | $ 161,047.59 | 11.479% | 8.67% | 16.15% | 684 |
| 20.01 - 25.00 | 1 | 38,150.00 | 0.01 | 38,150.00 | 11.125 | 100.00 | 20.45 | 707 |
| 45.01 - 50.00 | 2 | 141,510.79 | 0.05 | 70,755.40 | 9.768 | 0.00 | 46.41 | 631 |
| 50.01 - 55.00 | 5 | 254,487.36 | 0.08 | 50,897.47 | 9.891 | 35.27 | 53.52 | 653 |
| 55.01 - 60.00 | 4 | 423,814.27 | 0.14 | 105,953.57 | 10.270 | 0.00 | 59.20 | 726 |
| 60.01 - 65.00 | 4 | 557,065.64 | 0.18 | 139,266.41 | 9.674 | 0.00 | 63.19 | 680 |
| 65.01 - 70.00 | 15 | 1,185,723.22 | 0.39 | 79,048.21 | 10.092 | 7.50 | 68.21 | 683 |
| 70.01 - 75.00 | 26 | 2,640,204.13 | 0.87 | 101,546.31 | 10.009 | 7.96 | 72.03 | 682 |
| 75.01 - 80.00 | 100 | 11,477,980.25 | 3.78 | 114,779.80 | 9.757 | 1.01 | 79.38 | 697 |
| 80.01 - 85.00 | 112 | 7,334,236.76 | 2.42 | 65,484.26 | 10.360 | 10.26 | 84.12 | 679 |
| 85.01 - 90.00 | 632 | 37,668,412.57 | 12.41 | 59,601.92 | 10.789 | 9.19 | 89.64 | 695 |
| 90.01 - 95.00 | 844 | 45,433,276.34 | 14.97 | 53,819.05 | 11.199 | 19.26 | 94.71 | 695 |
| 95.01 - 100.00 | 3,648 | 195,983,810.42 | 64.59 | 53,726.37 | 10.885 | 28.61 | 99.93 | 680 |
| Total: | 5,395 | $ 303,460,766.93 | 100.00% | $ 56,248.52 | 10.880% | 22.94% | 96.06% | 685 |

Original Combined Loan-to-Value Ratio[1]

(1)  The Original Combined Loan-to-Value Ratios of the Mortgage Loans range from approximately 16.00% to approximately 100.00%, with a weighted average Original Combined Loan-to-Value Ratio by Aggregate Cut-off Date Balance of approximately 96.06%.

***Omitted Information***: As alleged above, the appraisals of the properties underlying the mortgage loans were inaccurate and inflated. These inflated appraisals were used to form the LTV ratios listed in the Prospectus Supplements. Incorporating an inflated appraisal into the LTV calculation will result in an artificially lower LTV ratio. For instance, as alleged above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90 percent. If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75 percent ($90,000/$120,000). Due to the inflated appraisals, the LTV ratios listed in the Prospectus Supplements were false – they were artificially low, making it appear that the loans underlying the Trusts were safer and less risky than they really were. Such understated LTV

ratios also made it falsely appear that the properties were better collateralized then they actually were.

**The Registration Statement and Prospectus Supplements**
**Misstated the Certificates' True Investment Ratings**

124. The Registration Statement and the Prospectus Supplements stated "It is a condition of the issuance of the Certificates that they receive the respective ratings set forth … [in the] prospectus supplement[s]." Each of the Prospectus Supplements set forth credit ratings for the Certificates. S&P rated Certificates in each of the Trusts. Moody's rated Certificates in each of the Trusts except three. Fitch rated Certificates in five of the Trusts. The overwhelming majority of the ratings set forth in the Prospectus Supplements were within the "Investment Grade" range of Moody's (Aaa through Baa3), S&P (AAA through BBB) and Fitch (AAA through BBB).

125. ***Omitted Information***: The ratings stated in the Prospectus Supplements were based, as alleged below, on outdated assumptions, relaxed ratings criteria, and inaccurate loan information. These flaws produced artificially high credit ratings for the Certificates, making them appear safer and less risky than they really were.

**The Models that Produced the Certificates' Ratings Were Based**
**upon Outdated Assumptions Regarding Loan Performance**

126. The Rating Agencies used models to produce the ratings for the Certificates. These models were based upon loan performance ***prior*** to the year 2000. However, an unprecedented decline and deterioration in mortgage lending standards occurred ***after*** 2000. For instance, from 2001 through 2005: (i) the percentage of "sub-prime" mortgage loans tripled; (ii) the combined LTV ratio of loans in excess of 90% tripled; (iii) "limited documentation" loans (or "liar loans") nearly quadrupled; (iv) "interest only" and "option" ARMs quintupled; (v) "piggy back" or second-lien mortgages doubled; (vi) the amount of equity U.S. homeowners stripped out of their homes tripled; (vii) the volume of loans originated for "second homes" more than tripled; (viii) the percentage of

loans including "silent seconds" – a nearly non-existent phenomenon a few years prior to the issuance of the Certificates – experienced over a 16,000% increase; and (ix) the volume of nontraditional mortgages more than quintupled.

127.    This decline in lending standards and an increase in riskier exotic mortgage products during the 2001 through 2005 time period rendered the Rating Agencies' pre-2000 loan performance data obsolete. However, the agencies did not update their models to reflect these changes. Thus, by the time the agencies provided "investment grade" ratings to the Certificates, their historical data no longer reflected the reality that mortgage credit quality was rapidly deteriorating.

128.    The Rating Agencies continued to use these models even though more current and accurate models were available. According to Frank Raiter ("Raiter") – the Managing Director and Head of RMBS Ratings at S&P from March 1995 to April 2005 – S&P had developed models that accounted for the new type of mortgage products available after 2000 (particularly Alt-A type loans). These models better captured the changes in the post-2000 mortgage landscape and were, therefore, better at determining default risks posed by these new mortgages. However, S&P did not implement these models due to their cost and because improving the model would not add to S&P's revenues (as S&P's RMBS group already enjoyed the largest market share amongst the three major rating agencies). As Raiter explained, the unfortunate consequences of continuing to use outdated versions of the rating model included "the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market." The current President of S&P, Deven Sharma, agreed, noting "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work. . . . [E]vents

have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

129.     Executives at Moody's also acknowledged a lack of investment in Moody's rating models and the failure of Moody's rating models to capture the deterioration in lending standards. In an internal e-mail, Raymond McDaniel ("McDaniel"), the current Chairman and Chief Executive Officer of Moody's, noted that a lack of investment in updating the rating models can put ratings' accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment." McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape. Brian Clarkson – the former President and Chief Operating Officer of Moody's – also recognized Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job monitoring that [decline in underwriting standards]."

130.     Fitch also used outdated models that did not adequately capture the changed mortgage landscape. In his April 22, 2008 testimony before the United States Senate's Committee on Banking, Housing and Urban Affairs, Fitch President and CEO, Stephen Joynt ("Joynt"), admitted that Fitch's rating models did not account for "the dramatic shift in borrower behavior brought on by changing practices in the market." Joynt explained that since the subprime meltdown, Fitch had to "reassess[] our structured finance criteria and models" and "stop rating new issues in some structured finance markets … until we can assure the market and ourselves that we have adequately updated our models and criteria to reflect what we have observed through the turmoil."

131.     Not only were the Rating Agencies' models based on outmoded data, but they were often constructed by people who were not familiar with the housing markets in the areas that they were rating. And in some instances real estate investments were graded by analysts who never

actually reviewed the investment and who merely relied upon ratings assigned by a competitor rating agency.

**The Rating Agencies' Relaxing of Ratings Criteria Led to**
**Artificially High Ratings for the Certificates**

132.    In addition to using flawed models to generate ratings, the Rating Agencies repeatedly eased their ratings standards in order to capture more market share of the ratings business. This easing of ratings standards was due in large part to the fact that the Rating Agencies were compensated by the very entities that they provided ratings to, and the fact that those entities were free to shop around for the rating agency that would provide them with the highest ratings.  As former S&P Managing Director, Richard Gugliada ("Gugliada"), explained, the easing of standards was a "***market-share war where criteria were relaxed***" and admitted "***I knew it was wrong at the time . . . [i]t was either that or skip the business***.  That wasn't my mandate.  My mandate was to find a way.  Find the way."  According to Gugliada, when the subject of tightening S&P's rating criteria came up, the co-director of CDO ratings, David Tesher ("Tesher"), said "Don't kill the golden goose."  This comment reflected Tesher's belief that if S&P implemented more stringent rating criteria than its competitors (and thereby began assigning lower ratings to investments that it rated), then entities that needed their investments rated – such as the defendants herein – would avoid S&P.  Instead, these entities would seek ratings from S&P's competitors who, because they had weaker rating criteria, would assign a higher rating to the investment.

133.    The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney") – two S&P analysts describing S&P's rating of an investment similar to the Trusts:

Shah: btw – that deal is ridiculous

Mooney: i know right . . . **[model def does not capture half of the rish]**

Mooney: *risk*

Shah: *we should not be rating it*

Mooney: *we rate every deal*

Mooney: *it could be structured by cows and we would rate it*

Shah: but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

134.    In another e-mail, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager and stated that the "[r]ating agencies continue to create and [sic] *even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters*."

135.    The loosening of ratings criteria due to market share considerations was evident at Moody's also.  Jerome Fons ("Fons"), a former Managing Director for Credit Quality at Moody's, indicated that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

136.    Fons explained that the originators of structured securities were free to shop around for the rating agency that would give them the highest rating and "*typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality*."  Fons noted that the rating agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  Fons said it was this business model that "*prevented analysts from putting investor interests first*."

137.     Recently, Fons further explained the deep conflicts at Moody's. Fons was a frequent in-house critic of Moody's overly-optimistic letter ratings, but was not able to persuade Moody's to change its policies. In a March 16, 2009 opinion editorial for *The New York Times*, Fons stated that "one of us worked at Moody's and was a frequent in-house critic of how the agencies put troubled companies on artificial 'watch lists' while they maintained overly optimistic letter ratings."

138.     McDaniel of Moody's also acknowledged the degradation of ratings standards. In a presentation to Moody's Board of Directors in October 2007, McDaniel told his Board "The real problem is not that the market . . . underweight[s] ratings quality but rather that in some sectors, it actually penalizes quality. . . . It turns out that ***ratings quality has surprisingly few friends***." He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'" In fact, *The Wall Street Journal* found that in at least one instance, Moody's increased the amount of a mortgage deal that was rated triple-A after its client complained and said it might go with a different rating firm.

139.     As McDaniel noted, this degradation of ratings quality was not limited to Moody's: "What happened in '04 and '05 with respect to subordinated tranches is that our competition, ***Fitch and S&P, went nuts. Everything was investment grade. It didn't really matter***."

140.     Serious conflicts of interest at the Rating Agencies have been revealed recently. Such conflicts undermined the credibility of the ratings at the time they were issued. One former Moody's employee testified on April 22, 2008, to the Senate Banking, Housing and Urban Affairs Committee, that "[t]here is a far more serious conflict of interest than is commonly believed at the root of the current rating agency business model." This same witness went on to say that "one could make the case that whenever a rating analyst is supervised by a manager whose compensation is determined

by market share or revenue growth (rather than ratings accuracy) the objectivity of ratings is compromised."

141.    As reported on April 11, 2008, in *The Wall Street Journal*, a former Moody's analyst further stated that while there was no explicit directive to abandon ratings objectivity to earn business from investment banks such as defendant Morgan Stanley, there was "'a palpable erosion of institutional support for rating analysis that threatened market share.'"

142.    The former Chairman of the SEC, Christopher Cox, provided a statement to Congress on April 22, 2008, that said:

> The rating agencies' performance in rating these structured credit products has called into question their credit ratings generally as well as the integrity of the ratings process as a whole.

### Due to Defects in the Underwriting Process, Inaccurate Data was Entered into the Ratings Models Thereby Yielding Inaccurate Ratings

143.    In addition to the eroding rating standards and the flawed rating models alleged above, the Rating Agencies' ratings were also based on inaccurate information. The rating agencies rated the Certificates based in large part on data about each of the mortgage loans that the defendants provided to them – including appraisal values, LTV ratios, and borrower credit-worthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels. As alleged above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation and falsification, and the other facets of defective underwriting alleged herein. The Rating Agencies did not engage in any due diligence or otherwise seek to verify the accuracy or quality of the loan data underlying the RMBS pools they rated (and specifically disclaimed any due diligence responsibilities). Nor did they seek representations from sponsors that due diligence was performed. During a "Town Hall Meeting" hosted by Moody's McDaniel,

executives at Moody's acknowledged that the Rating Agencies used inaccurate data to form their ratings:

> "We're on notice that a lot of things that we relied on before just weren't true . . . [W]e relied on reps and warrantees that no loans were originated in violation of any state or federal law. We know that's a lie."

> \* \* \*

> "There's a lot of fraud that's involved there, things that we didn't see . . . We're sort of retooling those to make sure that we capture a lot of the things that we relied on in the past that we can't rely on, on a going forward basis."

> \* \* \*

> "[W]e're being asked to figure out how much everyone lied. . . . [If] all of the information was truthful and comprehensive and complete, we wouldn't have an issue here."

> \* \* \*

> What we're really being asked to do is figure out how much lying is going on and bake that into a credit [rating] . . . which is a pretty challenging thing to do. I'm not sure how you tackle that from a modeling standpoint.

144. In response to the "Town Hall Meeting," a Moody's employee noted:

> [W]hat really went wrong with Moody's subprime ratings leading to massive downgrades and potential more downgrades to come? We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets. As for #1, it seems to me that *we had blinders on and never questioned the information we were given*. Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan? As for #2, *it is our job to think of the worst case scenarios and model for them. . . . Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both*.

145. Similarly, in his October 22, 2008 testimony before the U.S. House of Representatives, Fitch's CEO Stephen Joynt acknowledged that in issuing ratings, Fitch did not "appreciate the extent of shoddy mortgage origination practices and fraud in the 2005-07 period."

146. On July 8, 2008, following a ten-month investigation, the SEC released a report concerning the Rating Agencies (the "July 8 SEC Report"). In summarizing its "factual findings,

observations and recommendations from the examinations," the SEC stated: "***Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal***."

147.    The SEC stated that "[i]n some instances, analysts discussed fees for a rating."  The SEC gave the following examples of this problem:

> At one firm, an analyst wrote to his manager asking about whether the firm would be charging a fee for a particular service and what the fee schedule will be.

> At another firm, a business manager in the RMBS group wrote to several analysts: ". . . if you have not done so please send me any updates to fees on your transactions for this month.  It is your responsibility to look at the deal list and see what your deals are currently listed at."

> At two rating agencies, there were indications that analysts were involved in fee discussions with employees of the rating agency's billing department.

On information and belief, the SEC's findings set forth above are based on evidence obtained from defendant S&P, Moody's, and/or Fitch.

148.    The July 8, 2008 SEC Report also stated that: "Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."  The SEC provided the following examples of this problem:

> For instance, a senior ***analytical manager*** in the Structured Finance group wrote "I am trying to ascertain whether we can determine at this point if we will suffer any loss of business because of our decision [on assigning separate ratings to principal and interest] and if so, how much?"  "Essentially, [names of staff] ended up agreeing with your recommendations but ***the CDO team didn't agree with you because they believed it would negatively impact business***."

> In another example, after noting a change in a competitor's ratings methodology, an employee stated: "[w]e are meeting with your group this week to discuss ***adjusting criteria for rating CDOs of real estate assets this week because of the ongoing threat of losing deals***."  In another email, following a discussion of a competitor's market share, an employee of the same firm states that ***aspects of the firm's ratings methodology would have to be revisited to recapture market share from the competing rating agency***.  An additional email by an employee stated,

following a discussion of losing a rating to a competitor, "*I had a discussion with the team leaders here and we think that the only way to compete is to have a paradigm shift in thinking, especially with the interest rate risk*."

Another rating agency reported to the Staff that one of its foreign ratings surveillance committees had knowledge that the rating agency had issued ratings on almost a dozen securities using a model that contained an error. The rating agency reported to the Staff that, as a result, the committee was aware that the *ratings were higher than they should have been*. Nonetheless, the committee agreed to continue to maintain the ratings for several months, until the securities were downgraded for other reasons. Members of the committee, all analysts or analytical managers, considered the rating agency's reputational interest in not making its error public, according to the rating agency.

149.    The July 8, 2008 SEC Report made the following observations with respect to all three agencies:

> At one firm, internal communications appear to expose analytical staff to this conflict of interest by indicating concern or interest in market share when firm employees were discussing whether to make certain changes in ratings methodology. In particular, employees discussed concerns about the firm's market share relative to other rating agencies, or losing deals to other rating agencies. While there is no evidence that decisions about rating methodology or models were made based on attracting or losing market share, in most of these instances, it appears that rating agency employees who were responsible for obtaining ratings business (i.e., marketing personnel) would notify other employees, including those responsible for criteria development, about business concerns they had related to the criteria.

150.    International regulatory bodies have been equally disconcerted by the recent revelations concerning the Rating Agencies' conflicts. The International Organization of Securities Commissions ("IOSCO"), which includes over 100 securities regulators such as the SEC and the United Kingdom Financial Services Authority, stated in May of 2008 that rating agencies would be banned from recommending how products should be structured in order to prevent a conflict of interest. Former SEC Chairman Cox stated: "'We're going to prohibit the kinds of practices that were found to be particularly troublesome in the subprime crisis, so conflicts of interest will either be flat-out prohibited or subjected to procedures to minimize those conflicts.'"

151.     Because the Rating Agencies used flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk.  Certificates were given investment grade ratings when in reality they were not of investment grade quality.  As such, the statements regarding the ratings of the Certificates were false and misleading.

152.     The problems identified above were not disclosed to the public and resulted in artificially high ratings for the Certificates.  These artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates.

## DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS UNDERLYING THE CERTIFICATES

153.     Since the Certificates were issued, the credit ratings on Certificates within each of the Trusts have been downgraded.  In some instances, Certificates that received a rating of "AAA" (the highest available) have fallen many notches and are now rated "CCC" (the second lowest rating and far below the threshold of "junk" status).

154.     These downgrades have occurred because the original ratings did not accurately reflect the risk associated with the assets underlying the Certificates.  Further, the delinquency rates on the underlying mortgage loans have skyrocketed.  ***In all but four of the Trusts, the 60+ day delinquency rate is in excess of 20 percent*** (the "60+ day delinquency rate" includes loans that are foreclosures, loans that are 60 days or more delinquent, and loans in which the real estate collateral was retaken by the lender).  In many of the Trusts, at least ***one of every five loans has experienced foreclosure*** and the 60+ day delinquency rates are in excess of 33 percent.  The massive foreclosure rates and extraordinary delinquencies have further confirmed defendants' misrepresentations concerning the lending practices detailed above.

155. Because of the downgrades, as well as other information that was unknown to investors at the time the Certificates were issued, the value of the Certificates has diminished greatly since their original offering, as has the price at which Plaintiff and members of the Class could dispose of them. These diminutions in value and price have caused damages to the Plaintiff and the Class.

## COUNT I

### Violations of §11 of the 1933 Act
### Against All Defendants Except Morgan Stanley

156. Plaintiff repeats and re-alleges the allegations set forth above as if set forth fully herein. For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act. This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except Morgan Stanley.

157. The Registration Statement for the Certificate offerings was false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

158. The defendant Issuers are strictly liable to Plaintiff and the Class for the misstatements and omissions complained of herein.

159. The Individual Defendants signed the Registration Statement which was false due to the misstatements described above.

160. Defendants MSMC, MS&Co and the defendant Issuers were underwriters of the Certificates and sold and marketed these investments to members of the Class. None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the

statements contained in the Registration Statement were not false and misleading or did not omit material facts that rendered statements made therein not false and misleading.

161. By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

162. Plaintiff acquired the Certificates pursuant and/or traceable to the Registration Statement and Prospectus Supplements.

163. Plaintiff and the Class have sustained damages as the value of the Certificates has declined substantially subsequent to the disclosures of defendants' misconduct.

164. At the time of their purchases of the Certificates, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to mid-2008. Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this action is based until the time that the first complaint was filed. Less than three years has elapsed between the time that the securities upon which this claim is brought were offered to the public and the time this action was commenced.

## COUNT II

### Violations of §12(a)(2) of the 1933 Act Against
### Defendant Issuers, Defendant MSMC, and
### Defendant MS&Co

165. Plaintiff repeats and re-alleges the allegations above as if set forth fully herein. For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

166. By means of the defective Prospectus Supplements, defendants Issuers, MSMC, and MS&Co promoted and sold the Certificates to Plaintiff and other members of the Class.

167.     The Prospectus Supplements contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants Issuers, MSMC, and MS&Co owed Plaintiff, and the other members of the Class who purchased the Certificates pursuant to the Prospectus Supplements, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus Supplements to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants Issuers, MSMC, and MS&Co, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus Supplements as set forth above.

168.     Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Prospectus Supplements at the time it acquired the Certificates.

169.     By reason of the conduct alleged herein, defendants Issuers, MSMC, and MS&Co violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased the Certificates pursuant to the Prospectus Supplements sustained substantial damages in connection with their purchases of the Certificates. Accordingly, Plaintiff and the other members of the Class who hold the Certificates issued pursuant to the Prospectus Supplements have the right to rescind and recover the consideration paid for their shares, and hereby tender their Certificates to the defendants sued herein.  Class members who have sold their Certificates seek damages to the extent permitted by law.

## COUNT III

### Violations of §15 of the 1933 Act
### Against Morgan Stanley, the Individual Defendants, and MSMC

170.    Plaintiff repeats and re-alleges the allegations above as if set forth fully herein.  For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

171.    This Count is brought pursuant to §15 of the 1933 Act against defendant Morgan Stanley, the Individual Defendants and defendant MSMC.

172.    Each of the defendants named in this count was a control person of Morgan Stanley Capital or of the Trusts by virtue of their ownership and control over the defendants named in Counts I and II, his/her position as a director and/or senior officer of Morgan Stanley Capital or because they were responsible for the preparation of the contents of the Registration Statement and Prospectus Supplements incorporated by reference into the Registration Statement.

173.    Each of the defendants named in this count was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statement and having otherwise participated in the consummation of the offerings detailed herein.

174.    Morgan Stanley Capital was the Depositor and an Issuer for the offerings.  MSMC was the Sponsor for the offerings.  The defendants named herein were responsible for overseeing the formation of the Trusts as well as the operations of the Trusts, including routing payments from the borrowers to investors.

175.    The defendants named in this count prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action and certifying Plaintiff as Class representative;

B.   Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.   Awarding rescission or a rescissory measure of damages; and

E.   Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: September 15, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

_____
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
ARTHUR C. LEAHY
THOMAS E. EGLER
SCOTT H. SAHAM
SUSAN G. TAYLOR
COURTLAND W. CREEKMORE
NATHAN R. LINDELL
MATTHEW I. ALPERT
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that, on September 15, 2009, I caused a true and correct copy of the attached:

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to all counsel listed on the attached service list.

David A. Rosenfeld

## Counsel For Defendant(s)

Floyd Abrams
Christopher A. Gorman
Tammy Lynn Roy
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005-1702
  212/701-3000
  212/269-5420 (Fax)

William J. Fenrich
James P. Rouhandeh
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
  212/450-4000
  212/450-3800 (Fax)

Steven Cooper
Kristina M. Mentone
Reed Smith LLP
599 Lexington Avenue, 29th Floor
New York, NY 10022
  212/521-5400
  212/521-5450 (Fax)

James J. Coster
Justin E. Klein
Joshua M. Rubins
Satterlee Stephens Burke & Burke LLP
230 Park Avenue, 11th Floor
New York, NY 10169
  212/818-9200
  212/818-9606 (Fax)

Christopher B. Hockett
Davis Polk & Wardwell LLP
1600 El Camino Real
Menlo Park, CA 94025
  650/752-2000
  650/752-2111 (Fax)

David T. Biderman
Judith B. Gitterman
Perkins Coie LLP
1620 26th Street, Sixth Floor
Santa Monica, CA 90404
  310/788-9900
  310/788-3399 (Fax)

Heather B. Hoesterey
Reed Smith LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
  415/543-8700
  415/391-8269 (Fax)

Keith E. Eggleton
David A. McCarthy
Wilson Sonsini Goodrich & Rosati, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1001
  650/493-9300
  650/493-6811 (Fax)

## Counsel For Plaintiff(s)

David R. Stickney
Timothy A. DeLange
Brett M. Middleton
Bernstein Litowitz Berger & Grossmann LLP
12481 High Bluff Dr., Suite 300
San Diego, CA 92130
  858/793-0070
  858/793-0323 (Fax)

Thomas E. Egler
Scott H. Saham
Susan G. Taylor
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
  619/231-1058
  619/231-7423 (Fax)

Samuel H. Rudman
David A. Rosenfeld
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
  631/367-7100
  631/367-1173 (Fax)

John Gadow
Blake Tyler
Pond, Gadow & Tyler
502 South President Street
Jackson, MS 39201
  601/355-0654