UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                 :

In re Morgan Stanley Mortgage Pass-    :
Through Certificates Litigation          :

                                 :     MASTER FILE
-------------------------------------------------------:     09 Civ. 2137 (LTS) (MHD)
                                 :

This Document Relates To:         :

                                 :

    ALL ACTIONS           :

                                 :
-------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Attorneys for Defendants Morgan Stanley
  Capital I Inc., Morgan Stanley Mortgage
  Capital Holdings LLC, Morgan Stanley &
  Co. Incorporated, Morgan Stanley, David
  R. Warren, Anthony B. Tufariello,
  William J. Forsell, and Steven S. Stern

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ..................................................................................................................3

ARGUMENT ......................................................................................................................7

I.     WVIMB Lacks Constitutional and Statutory Standing to Assert Claims Arising from the Certificates Issued by Trusts Other Than 2007-11AR ...................................................7

II.    WVIMB Has Not Alleged Any Actionable Misrepresentations or Omissions ..................9

      A.     The Prospectus Supplement Does Not Contain Any Representations Regarding the Underwriting and Appraisal Criteria of AHM, Fifth Third, FNBN, Greenpoint, or MSCC ...............................................................10

      B.     The Prospectus Supplement Was Not Misleading Regarding The Underwriting for the Loans In The Trust ...........................................................10

            1.     The Complaint Mischaracterizes the Disclosures Regarding the Loan Purchasing Guidelines ..............................................................10

            2.     The Disclosures Were Not Rendered Misleading By the Purchasing Practices of MSMCH .................................................................13

            3.     The Disclosures Were Not Rendered Misleading By the Underwriting Practices of the Correspondent Originators ...............................................14

      C.     The Prospectus Supplement Was Not Misleading Regarding Appraisals ............17

      D.     The Prospectus Supplement Was Not Misleading With Respect to LTVs............18

      E.     The Prospectus Supplement Was Not Misleading With Respect to Ratings.........18

III.    WVIMB Has Not Alleged Any Injury Cognizable Under the Securities Act ..................20

IV.    WVIMB Has Failed to Plead Compliance With the Statute of Limitations .....................22

V.     WVIMB's Section 15 "Control Person" Allegations Fail to State a Claim ......................25

CONCLUSION....................................................................................................................26

## TABLE OF AUTHORITIES

C<small>ASES</small>

P<small>AGE</small>

In re AIG Advisor Group Sec. Litig.,
  No. 06 CV 1625 (JG), 2007 U.S. Dist. LEXIS 30179 (E.D.N.Y. Apr. 25, 2007)....................7

In re AllianceBernstein Mut. Fund Excessive Fee Litig.,
  No. 04 Civ. 4885 (SWK), 2005 U.S. Dist. LEXIS 24263 (S.D.N.Y. Oct. 19, 2005),
  vacated in part on other grounds, No. 04 Civ. 4885 (SWK),
  2006 U.S. Dist. LEXIS 939 (S.D.N.Y. Jan. 11, 2006) ........................................................8, 9

Armstrong v. McAlpin, 699 F.2d 79 (2d Cir. 1983)......................................................................23

Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009)......................................................................... 15-16, 18

In re Authentidate Holding Corp. Sec. Litig.,
  No. 05 Civ. 5323 (LTS)(DFE), 2006 U.S. Dist. LEXIS 47971
  (S.D.N.Y. July 14, 2006) ............................................................................................... 7-8, 24

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) .......................................................................16

Berman v. Sugo, 580 F. Supp. 2d 191 (S.D.N.Y. 2008)..................................................................4

Blum v. Yaretsky, 457 U.S. 991 (1982) .......................................................................................22

In re Broderbund/Learning Co. Sec. Litig., 294 F.3d 1201 (9th Cir. 2002) ..................................21

Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398 (S.D.N.Y. 2007) ............................................9

In re Chaus Sec. Litig., 801 F. Supp. 1257 (S.D.N.Y. 1992).......................................................23

In re Citigroup Auction Rate Sec. Litig.,
  No. 08 Civ. 3095 (LTS) (FM), 2009 U.S. Dist. LEXIS 83046 (S.D.N.Y. Sept. 11, 2009).......8

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994).................................21

In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871 (W.D.N.C. 2001).................................21

Garber v. Legg Mason, Inc.,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008),
    aff'd, No. 08-1831-cv, 2009 U.S. App. LEXIS 21404 (2d Cir. Sept. 30, 2009) ....................17

Hoffman v. UBS-AG, 591 F. Supp. 2d 522 (S.D.N.Y. 2008) ........................................................8

In re Hyperion Sec. Litig.,
    No. 93 Civ 7179 (MBM), 1995 U.S. Dist. LEXIS 10020 (S.D.N.Y. July 12, 1995),
    aff'd, 98 F.3d 2 (2d Cir. 1996)....................................................................................................11

In re Initial Pub. Offering Sec. Litig., 544 F. Supp. 2d 277 (S.D.N.Y. 2008) ........................ 20-21

Leone v. Advest, Inc., 624 F. Supp. 297 (S.D.N.Y. 1985) ............................................................24

Lewis v. Casey, 518 U.S. 343 (1996) ..........................................................................................7, 9

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ....................................................................7

In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig., 434 F. Supp. 2d 233 (S.D.N.Y. 2006) ............8

In re N2K Inc. Sec. Litig.,
    82 F. Supp. 2d 204 (S.D.N.Y. 1999), aff'd, 202 F.3d 81 (2d Cir. 2000)................................20

Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996) .............................................9

O'Shea v. Littleton, 414 U.S. 488 (1974) ....................................................................................22

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,
    No. 08-10446-RGS, 2009 U.S. Dist. LEXIS 91789 (D. Mass. Sept. 30, 2009)............8, 18, 19

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004).........................................................................25

In re Salomon Smith Barney Mut. Fund Fees Litig.,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006)........................................................................................8

In re Time Warner Inc. Sec. Litig., 9 F.3d 259 (2d Cir. 1993)....................................................20

In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678 (S.D.N.Y. 2000) .............................................9

Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1991)....................................................19

In re WRT Energy Sec. Litig.,
    Nos. 96 Civ 3610 (JFK) & 96 Civ. 3611 (JFK),
    1997 WL 576023 (S.D.N.Y. Sept. 15, 1997), vacated on other grounds,
    75 F. App'x 839 (2d Cir. 2003) ..................................................................................................9

Warth v. Seldin, 422 U.S. 490 (1975)............................................................................9

In re Xinhua Fin. Media, Ltd. Sec. Litig.,
    No. 07 Civ. 3994 (LTS)(AJP), 2009 U.S. Dist. LEXIS 14838 (S.D.N.Y. Feb. 25, 2009) ........9

### STATUTES & RULES

17 C.F.R. § 229.1110(a)...........................................................................................6

17 C.F.R. § 229.1110(b) ......................................................................................6, 10

17 C.F.R. § 229.1120...............................................................................................20

17 C.F.R. § 230.436(g)(1)........................................................................................19

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k.................................... passim

Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2) ................................ passim

Section 13 of the Securities Act of 1933, 15 U.S.C. § 77m.................................... passim

Fed. R. Civ. P. 8(a)(2)...............................................................................................15

Fed. R. Civ. P. 12(b)(1)..........................................................................................1, 26

Fed. R. Civ. P. 12(b)(6)..........................................................................................1, 26

### OTHER AUTHORITIES

Asset-Backed Securities, 70 Fed. Reg. 1506 (Jan. 7, 2005) .................................4, 20, 21

Disclosure of Security Ratings, 59 Fed. Reg. 46,304 (Aug. 31, 1994)........................................20

Defendants Morgan Stanley Capital I Inc. ("Morgan Stanley Capital"), Morgan Stanley Mortgage Capital Holdings LLC ("MSMCH"), Morgan Stanley & Co. Incorporated ("MS&Co"), Morgan Stanley, David R. Warren, Anthony B. Tufariello, William J. Forsell, and Steven S. Stern (collectively, the "defendants") respectfully submit this memorandum of law in support of their motion to dismiss the September 15, 2009 consolidated amended complaint (the "Complaint" or "CAC") in this action pursuant to Federal Rule 12(b)(1), for lack of standing, and Federal Rule 12(b)(6), for failure to state a claim.

## PRELIMINARY STATEMENT

Even though plaintiff West Virginia Investment Management Board ("WVIMB") invested in mortgage pass-through certificates issued by only one Morgan Stanley mortgage loan trust, it seeks to assert claims relating to certificates issued by 30 other trusts. WVIMB's claims relating to trusts from which it never purchased any certificates must obviously be dismissed. As numerous cases have held, WVIMB does not have constitutional or statutory standing to bring federal securities law claims involving certificates that it did not purchase and which have not, therefore, caused it any injury in fact.

WVIMB also fails to state a claim with respect to the only certificates that it did purchase; i.e., Class 2-A-3 certificates issued by Morgan Stanley Mortgage Loan Trust 2007-11AR. Those certificates are backed by residential mortgages and entitle the purchaser to a stream of payments from the mortgage loan trust. WVIMB asserts claims pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 alleging that the June 26, 2007 prospectus supplement for the certificates contained misleading statements about the underwriting and appraisal practices of the third party originators who originated the loans contained in the trust. The five loan originators referred to in the complaint are American Home Mortgage Corp. ("AHM"), Fifth Third

1

Mortgage Company ("Fifth Third"), First National Bank of Nevada ("FNBN"), GreenPoint Mortgage Funding, Inc. ("Greenpoint"), and Morgan Stanley Credit Corporation ("MSCC"). Remarkably, none of the alleged misrepresentations relating to the practices of these loan originators actually appear in the offering documents for the certificates that WVIMB purchased. Plaintiff's counsel has merely copied the allegations regarding these five originators from complaints that plaintiff's counsel previously filed against other defendants on behalf of other plaintiffs who presumably purchased certificates from offering documents that in fact discussed these originators.[1]

In addition to this glaring and fatal deficiency in plaintiff's complaint, WVIMB fails to allege that the relevant offering documents contained any other misrepresentations or omissions at all.  WVIMB claims that the certificates it purchased "were secured by assets [residential mortgage loans] that had a much greater risk profile than represented in the" offering materials. The offering documents, however, informed investors such as WVIMB that the trust would contain loans by borrowers with "impaired or unsubstantiated credit history" who, "for one reason or another, are not able, or do not wish, to obtain financing from traditional sources" and that the loans were non-traditional, low documentation and no-documentation loans that involved little or no verification of borrower information.  These allegations – and WVIMB's other

---

[1] The allegations concerning these originators' variance from their stated underwriting and appraisal criteria are copied directly from plaintiff's counsel's complaints in the following actions:  Massachusetts Bricklayers & Masons Trust Funds v. Deutsche Alt-A Sec., Inc., No. 08-cv-3178 (E.D.N.Y. amended complaint filed June 18, 2009)(AHM and GreenPoint); NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co., No. 08-cv-10783 (S.D.N.Y. amended complaint filed May 15, 2009) (GreenPoint and Fifth Third); City of Ann Arbor Employees' Retirement System v. Citigroup Mortgage Loan Trust Inc., No. 08-cv-1418 (E.D.N.Y amended complaint filed Apr. 6, 2009) (American Home); Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., No. 08-10446-RGS (D. Mass. consolidated amended complaint filed Jan. 20, 2009) (FNBN).

allegations concerning appraisals, loan-to-value ratios, and ratings – fail because they misstate or overstate what the offering documents say and depend on generalized allegations about practices in the industry without tying them to any of the loans at issue here.

WVIMB's claims also suffer from an independent deficiency that requires dismissal; namely, WVIMB has not suffered a cognizable loss. It does not allege that it has failed to receive in a timely fashion every payment to which it is entitled under the certificates it owns. WVIMB alleges a "risk" that these payments might dry up in the future, but that assertion is not sufficient to state a claim. In fact, plaintiff seeks nothing more than an advisory opinion that – if it were to suffer a loss in the future – it would be entitled to damages or rescission.

Finally, WVIMB fails to plead the time and circumstances relating to its "discovery" of these supposed misleading statements, as it is required to do by Section 13 of the Securities Act. This is because, if WVIMB did so plead, it would be plain to the Court that the facts upon which WVIMB bases its claims were available to it well more than a year before it filed its claims, rendering the claims time-barred. In fact, the rating downgrades cited by WVIMB as disclosing the "truth" about the trust's underlying mortgage loans began <u>before</u> WVIMB even made its second of two purchases of certificates in December 2007.

<u>**BACKGROUND**</u>

WVIMB alleges that it purchased certain mortgage pass-through certificates issued by Morgan Stanley Mortgage Loan Trust 2007-11AR (the "trust" or "2007-11AR"). (CAC ¶ 9.) The certificates give holders the right to income flowing from a pool of residential mortgages owned by the trust. (CAC ¶ 37.) Specifically, the trust was initially comprised of 1,203 hybrid adjustable-rate mortgage loans with an aggregate principal balance of approximately $405,052,663, each secured by first-lien mortgages on residential real properties (the "trust

loans"). "When [the] mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash-flow is distributed to the holders of the . . . certificates in order of priority based on the specific tranche held by the . . . investors." (CAC ¶ 38.)

The 2007-11AR certificates were offered to investors pursuant to a June 26, 2007 prospectus supplement, which relates to a December 23, 2005 shelf registration statement amended on February 17, 2006 and March 14, 2006. (CAC ¶ 3.) The prospectus supplement[2] contained extensive disclosure regarding the loans that were backing the certificates being offered, including mortgage rates, principal balances, level of documentation, credit scores, loan-to-value ratios ("LTVs"), purposes of the loans, types of mortgaged properties, occupancy types, adjustable rate features, and other information as well. (Ex. A at S-31-S-35.) The prospectus supplement followed (and accompanied) the December 1, 2006 prospectus which described the offering in more general terms. (Ex. B, December 1, 2006 Prospectus.)

In the parlance of asset-backed securitizations, defendant MSMCH was the "sponsor" of the trust. (CAC ¶ 42.) See generally Asset-Backed Securities, 70 Fed. Reg. 1506, at 1508 (Jan. 7, 2005). As such, MSMCH purchased the loans from third-party originators, and then pooled and conveyed those loans to the "depositor," defendant Morgan Stanley Capital. (CAC ¶ 42.) Morgan Stanley Capital then conveyed the loan pool to the trust. (Id.) In exchange for the loan pool, the trust transferred the certificates to Morgan Stanley Capital. (Id.) Morgan Stanley Capital then sold the certificates to investors through an underwriter, defendant MS&Co. (Id.)

---

[2] A copy of the prospectus supplement is attached as Exhibit A to the accompanying November 16, 2009 Declaration of James P. Rouhandeh in Support of Defendants' Motion to Dismiss. References herein to "Ex. _" are to the exhibits attached to that declaration. The Court may consider on this motion any documents that are appended to the complaint, that are incorporated therein by reference, or that plaintiff either possessed or knew about and that are integral to the complaint. See Berman v. Sugo, 580 F. Supp. 2d 191, 200 (S.D.N.Y. 2008).

On June 20, 2007, WVIMB allegedly purchased $5,430,000 face amount of certificates from the 2007-11AR trust pursuant to the prospectus supplement.  (Ex. C, WVIMB's Certification of Named Plaintiff Pursuant to Federal Securities Laws, Apr. 28, 2009, at Schedule A.)  WVIMB allegedly made a second purchase of $935,938 face amount of certificates from this same trust on December 11, 2007, despite the fact that S&P began downgrading this trust's subordinate certificates almost two months earlier on October 17, 2007.  (Id.; Ex. D, MSMLT 2007-11AR, Rating Changes.)  On May 7, 2009, WVIMB filed a purported class action complaint, which was amended and filed as the Consolidated Amended Complaint on September 15, 2009.  The proposed class consists of not only all purchasers of certificates issued by the 2007-11AR trust, but all holders of any certificates issued by that trust or any of 30 other trusts. (CAC ¶ 1.)

Although the other trusts share a common "shelf registration" statement with the 2007-11AR trust, they are comprised of different mortgage loan pools originated by different mixes of third-party originators.  It is the prospectus supplement for each trust, not the shelf registration statement, which contains disclosure regarding the loans backing the certificates issued by the relevant trust, as well as the originators of those loans.

The bulk of the complaint focuses on the alleged underwriting practices of loan originators AHM, Fifth Third, GreenPoint, and MSCC.  (CAC ¶¶ 75-98, 108-122.)  Plaintiff does not and cannot allege, however, that any loans originated by these entities were contained in the trust.  Instead, as described in the prospectus supplement, the trust contained loans purchased from three categories of originators:  (1) correspondent originators which originated approximately three-quarters of the loans; (2) FNBN, which originated less than one-fifth of the

loans; and (3) unnamed originators who originated the remaining loans.[3]  (Ex. A at S-27.)

The prospectus supplement stated that the bulk of the loans had been underwritten by correspondent originators "generally in accordance with MSMCH's loan purchasing guidelines" (Ex. A at S-27), and set forth a two-page summary of those guidelines.  (Ex. A at S-47-48.) These guidelines explained that the correspondent originators originated various non-traditional low-documentation and no-documentation loans, including loans in which "no verification of a mortgagor's income or assets is undertaken by the originator and such information may not even be stated by the mortgagor."  (Ex. A at S-48.)  As for the remaining categories of loans – those originated by FNBN and others – the prospectus supplement did not (per regulation) describe the underwriting or appraisal criteria of FNBN (with respect to the FNBN loans) or of other originators (with respect to the remaining mortgage loans).[4]

The complaint generically alleges that the 2007-11AR prospectus supplement contained materially misleading statements regarding the loans underlying the trust.  According to the complaint, the prospectus supplement contained misrepresentations regarding (1) the underwriting criteria of loan originators, (2) the appraisal processes of loan originators, and (3) the LTV ratios of the loans.  (CAC ¶ 5; 56-75.)  The complaint, however, does not identify who these originators were, explain how their practices varied from what was disclosed in the offering documents, or allege that their practices affected the loans at issue in this case.  The complaint also alleges that the prospectus supplement was misleading because it included the ratings assigned to the certificates by the rating agencies (S&P and Moody's), though the

---

[3] Under SEC Regulation AB, only originators who originated 10% or more of the trust's assets (like FNBN did here) must be identified.  <u>See</u> 17 C.F.R. § 229.1110(a).

[4] Regulation AB requires a description of an originator's underwriting criteria only if that originator originated 20% or more of the trust's assets.  <u>See</u> 17 C.F.R. § 229.1110(b).

complaint does not allege that the assigned ratings were misstated in the prospectus supplement or that they were not the genuinely held opinions of the rating agencies when they were assigned.

## **ARGUMENT**

I.    WVIMB Lacks Constitutional and Statutory Standing to Assert Claims
      Arising from the Certificates Issued by Trusts Other Than 2007-11AR

Plaintiff's claims concerning trusts other than 2007-11AR should be dismissed because the Court lacks Article III subject matter jurisdiction over those claims.  There is no "case or controversy" to resolve where, as here, the plaintiff seeking judicial review lacks constitutional standing to sue.  See Lewis v. Casey, 518 U.S. 343, 349 (1996).  Constitutional standing requires that the plaintiff itself have suffered an "injury in fact" caused by the conduct it is seeking to challenge in court.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  WVIMB lacks standing because it does not and cannot allege that it suffered any injury – statutory or otherwise – in connection with trusts other than 2007-11AR.

All that WVIMB alleges (albeit inadequately) is that other, unnamed purchasers of certificates issued by these other trusts suffered statutory injuries as a result of defendants' alleged violations of the Securities Act with respect to those certificates.  WVIMB does not and cannot allege, however, that it suffered any Securities Act injuries, as WVIMB never acquired or purchased certificates issued by these other trusts.  Section 11 limits the right it creates to the "person acquiring such security," 15 U.S.C. § 77k(a), and Section 12(a)(2) limits the right it creates to the "person purchasing such security."  15 U.S.C. § 77l(a)(2).  Because WVIMB "can allege no injury from the purchase [of certificates it] never invested in," WVIMB has "no standing to ask [this Court] to remedy injuries related to those [certificates]."  In re AIG Advisor Group Sec. Litig., No. 06 CV 1625 (JG), 2007 U.S. Dist. LEXIS 30179, at *12 (E.D.N.Y. Apr. 25, 2007).  This Court has reached the same result on similar facts.  See In re Authentidate

Holding Corp. Sec. Litig., No. 05 Civ. 5323 (LTS)(DFE), 2006 U.S. Dist. LEXIS 47971, at *20-22 (S.D.N.Y. July 14, 2006); see also In re Citigroup Auction Rate Sec. Litig., No. 08 Civ. 3095 (LTS) (FM), 2009 U.S. Dist. LEXIS 83046, at *31 (S.D.N.Y. Sept. 11, 2009).

Other courts in this district have repeatedly held that named plaintiffs in purported class actions lack standing to assert Securities Act claims with respect to securities they never acquired or purchased and which caused them no injury under the statute or otherwise.  For example, in Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 530-32 (S.D.N.Y. 2008), the Honorable Leonard B. Sand held that plaintiffs lacked Article III standing to bring section 12(a)(2) class-action claims relating to "funds in which they did not personally invest," noting that they could not "meet the injury requirement for claims relating to funds in which they ha[d] not purchased shares because they [could not] claim to be personally injured by the violations relating to those funds." Similarly, in In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F. Supp. 2d 579, 604-07 (S.D.N.Y. 2006), the Honorable Paul A. Crotty held that plaintiffs who had invested in 20 of 88 funds lacked constitutional standing with regard to the 68 funds that they had not purchased.  See also In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig., 434 F. Supp. 2d 233, 236 (S.D.N.Y. 2006); In re AllianceBernstein Mut. Fund Excessive Fee Litig., No. 04 Civ. 4885 (SWK), 2005 U.S. Dist. LEXIS 24263, at *36 (S.D.N.Y. Oct. 19, 2005), vacated in part on other grounds, No. 04 Civ. 4885 (SWK), 2006 U.S. Dist. LEXIS 939 (S.D.N.Y. Jan. 11, 2006).  Most recently, in the Nomura case brought by the same plaintiff's counsel as this case, the court followed this rule and held that the "overwhelming weight of authority" required it to dismiss claims with respect to mortgage pass-through certificates issued by trusts in which the named plaintiff had never invested.  See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., No. 08-10446-RGS, 2009 U.S. Dist. LEXIS 91789, at *13 (D. Mass. Sept. 30, 2009).

Each of these cases was a purported securities class action.  Each recognized that the presence of class allegations "adds nothing to the question of standing."  Lewis, 518 U.S. at 357 (citations omitted). To establish standing, named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  Warth v. Seldin, 422 U.S. 490, 502 (1975).  These cases also reflect that "in the arena of securities litigation" standing requirements are "considered particularly important 'in order to curb the risks of vexatious litigation and abuse of discovery.'"  AllianceBernstein, 2005 U.S. Dist. LEXIS 24263, at*35-36.[5]

II.    WVIMB Has Not Alleged Any Actionable Misrepresentations or Omissions

A plaintiff seeking recovery under the federal securities laws must do more than complain in hindsight about the poor performance and riskiness of its investments.  See Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 8 (2d Cir. 1996).  To state a claim, a plaintiff must allege that there were representations in the relevant offering documents that, "taken together and in context, would have misled a reasonable investor."  In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678, 697 (S.D.N.Y. 2000).  WVIMB's Securities Act claims fail on this fundamental level. The complaint does not "plausibly identify [a] statement in the prospectus [supplement] that, when considered in context of the prospectus [supplement] as a whole, was rendered misleading by [material] omissions."  In re Xinhua Fin. Media, Ltd. Sec. Litig., No. 07 Civ. 3994 (LTS)(AJP), 2009 U.S. Dist. LEXIS 14838, at *25-26 (S.D.N.Y. Feb. 25, 2009).

---

[5] WVIMB's Section 12(a)(2) claim with respect to its December 11, 2007 purchase of certificates must be dismissed because it fails to allege (see CAC ¶ 9) that it purchased those certificates in the public offering, as opposed to the aftermarket.  See 15 U.S.C. § 77l(a)(2); Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 407-08 (S.D.N.Y. 2007); In re WRT Energy Sec. Litig., Nos. 96 Civ. 3610 (JFK) & 96 Civ. 3611 (JFK), 1997 WL 576023, at *5-6 & n.3 (S.D.N.Y. Sept. 15, 1997), vacated on other grounds, 75 F. App'x 839 (2d Cir. 2003).

A.     The Prospectus Supplement Does Not Contain Any
       Representations Regarding the Underwriting and Appraisal
       Criteria of AHM, Fifth Third, FNBN, Greenpoint, or MSCC

The centerpiece of WVIMB's complaint consists of its allegations that the offering

documents' descriptions of the underwriting and appraisal criteria of five particular originators –

AHM, Fifth Third, FNBN, Greenpoint, and MSCC – were rendered misleading because of those

originators' underwriting and appraisal practices.  (CAC ¶¶ 78-92 (AHM), ¶¶ 93-96 (Fifth Third),

¶¶ 97-107 (FNBN), ¶¶ 108-15 (GreenPoint), and ¶¶ 116-22 (MSCC).)  These allegations are

completely irrelevant to WVIMB's claims because none of the underwriting and appraisal

criteria for any of these five originators appears in the 2007-11AR prospectus supplement, which

is the operative document relating to WVIMB's purchases.  FNBN is the only one of these five

originators alleged to have contributed loans to 2007-11AR, and because it supplied less than

20% of the trust's loans, its underwriting and appraisal criteria were not required by federal

regulation to be stated in the prospectus supplement.  See 17 C.F.R. § 229.1110(b).  Obviously,

WVIMB cannot state a claim based upon statements that do not appear in the relevant

registration statement and prospectus.

B.     The Prospectus Supplement Was Not Misleading Regarding The
       Underwriting for the Loans In the Trust

       1.     The Complaint Mischaracterizes the Disclosures
              Regarding the Loan Purchasing Guidelines

WVIMB alleges that the prospectus supplement's description of the MSMCH loan

purchasing guidelines – which were applicable to the loans originated by the correspondent

originators – was misleading with respect to borrowers' true ability to repay the loans and the

true level of documentation and verification used by originators to gauge borrowers' ability to

repay the loans.  (CAC ¶¶ 5 (first bullet point), 56-65.)  The loan purchasing guidelines, however,

10

left no doubt about the kinds of loans that MSMCH was purchasing from its correspondent

originators for inclusion in the trust.  See, e.g., In re Hyperion Sec. Litig., No. 93 Civ. 7179

(MBM), 1995 U.S. Dist. LEXIS 10020, at *14 (S.D.N.Y. July 12, 1995) (dismissing Securities

Act claims because "the Trusts' strategy and risks were either disclosed or truthfully

represented" in the offering documents alleged to be misleading), aff'd, 98 F.3d 2 (2d Cir. 1996).

The description (at pages S-47-48 of the prospectus supplement) which WVIMB attacks at

paragraphs 56 to 65 of the complaint revealed "the performance of the mortgage loans [that

MSMCH was purchasing] may reflect higher delinquency rates and/or credit losses" because:

> the standards applicable to the purchase of mortgage loans by [MSMCH] typically differ
> from, and are, with respect to a substantial number of mortgage loans, generally less
> stringent than, the underwriting standards established by Fannie Mae or Freddie Mac,
> primarily with respect to original principal balances, loan-to-value ratios, borrower
> income, required documentation, interest rates, borrower occupancy of the mortgaged
> property and/or property types.  (Ex. A at S-47.)

It went on to disclose that the loan purchasing guidelines permitted MSMCH to purchase, and

the correspondent originators to originate, loans under programs which "require less

documentation and verification than do traditional full documentation programs," including:

- *"alternative documentation"* programs, under which "the borrower provides alternate forms of documentation to verify employment, income and assets";

- *"reduced documentation"* programs, under which "no verification of one of either a mortgagor's income or a mortgagor's assets is undertaken by the originator";

- *"no-stated-income" or "no-ratio"* programs, under which "borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken";

- *"stated income/stated assets"* programs, under which "no verification of both a mortgagor's income and a mortgagor's assets is undertaken by the originator"; and

- *"no-documentation"* programs, under which "no verification of a mortgagor's income or assets is undertaken by the originator and such information may not even be stated by the mortgagor."  (Ex. A at S-48.)

Of the 1,203 loans underlying the trust, 139 were "full/alternative" documentation loans, 603 were "limited documentation" loans, 231 were "no ratio" loans, 77 were "stated documentation" loans, and 153 were "no documentation" loans.  (Ex. A at S-32.)  The prospectus disclosed that such loans were being made to borrowers "who, for one reason or another, are not able, or do not wish, to obtain financing from traditional sources."  (Ex. B at 19.)

The loan purchasing guidelines further disclosed that a "significant number" of the MSMCH loans "may represent underwriting exceptions" involving borrowers "not strictly qualifying under [MSMCH's] loan purchasing guidelines."  (Ex. A at S-47.)  It was disclosed that MSMCH would make the determination whether such an exception was warranted on a "case-by-case" basis based upon "compensating factors" that "may include, but are not limited to, low loan-to-value ratios, low debt-to-income ratios, good credit history, stable employment, financial reserves, and time in residence at the applicant's current address."  (Id.)

Nothing in the prospectus supplement or its description of MSMCH's loan purchasing guidelines guaranteed that all of the loans made by the correspondent originators were underwritten in accordance with the loan purchasing guidelines.  The prospectus supplement states that the loans "were underwritten by various correspondents generally in accordance with MSMCH's loan purchasing guidelines."  (Ex. A at S-27 (emphasis added).)

Nor did the prospectus supplement represent that all mortgagors who were approved for loans could, in fact, afford those loans.  It fully disclosed the limited basis upon which the correspondent originators made their underwriting determinations, and was replete throughout with discussion of the possibility of delinquencies and defaults.  In fact, the prospectus supplement also disclosed that more than $12 million was set aside in anticipation of "fraud losses" sustained by reason of borrower "default[s] arising from fraud, dishonesty or

12

misrepresentation."  (Ex. A at S-82, S-102.)

           2.      The Disclosures Were Not Rendered Misleading By the
                     Purchasing Practices of MSMCH

The complaint alleges that MSMCH did not follow the loan purchasing guidelines (CAC ¶¶ 58-61, 64), but does not set forth any such specific variance.  Instead, WVIMB merely criticizes the nature of alternative loan products that MSMCH said it was purchasing.  Even if it is a legitimate criticism of low-documentation and no-documentation loans that they are not sufficiently "concerned with determining whether borrowers' income [is] sufficient to repay the loans" (CAC ¶ 61), the fact that MSMCH was purchasing such loans was fully disclosed.

WVIMB's allegation that sub-prime loans "were securitized and represented to be Alt-A loans when they in fact were not" (CAC ¶ 60) falls woefully short of stating a claim.  The loan purchasing guidelines do not describe the loans as Alt-A loans, but even if they did, plaintiff itself alleges not only that "Alt-A loans generally have hard to define characteristics" (CAC ¶ 51) but also that "lower quality Alt-A-type loans" included "sub-prime loans" (CAC ¶ 53).  Moreover, the prospectus supplement disclosed all of the parameters of the trust loans so that investors could decide for themselves where particular loans fell on the subprime/Alt-A/prime spectrum, if they chose to do so.  (Ex. A at S-31-S-35.)

There are only two allegations that MSMCH deviated in any specific way from its loan purchasing guidelines.  The first is the allegation that MSMCH purchased loans that "exceeded MSMC[H]'s limit for LTV ratios."  (CAC ¶ 60.)  Although the prospectus supplement does state that none of the trust loans had an LTV of more than 100% (Ex. A at S-29), this disclosure is consistent with the chart reflecting the LTVs for the trust loans.  (Ex. A at S-32.)  WVIMB fails to allege adequately that the LTVs in the chart were understated (see infra p. 18).

The second is the allegation that, sometime in 2003, 2004, 2005, or the beginning of 2006,

MSMCH purchased "a number of loans purportedly made for completed homes in Maricopa County, Arizona," ignoring the findings of an unidentified MSMCH employee that there were no such homes and that recent sales of the "'homes'" were "merely transactions back and forth between builders to artificially inflate their value." (CAC ¶ 59.)[6]  This allegation is irrelevant, because it is impossible that the alleged Maricopa County loans found their way into the June 2007-11AR trust and became a material part of its $406 million loan pool.  The alleged incident must have occurred in 2003, 2004, 2005, or, at the very latest, early 2006, because the "former MSMC[H] employee" allegedly worked at MSMCH "from 2003 into 2006." (CAC ¶ 58.)  There was only one loan underlying 2007-11AR that had been seasoned for more than 12 months as of June 1, 2007, and that loan is not alleged to have been from Maricopa County. (Ex. A at S-33.)

### 3. The Disclosures Were Not Rendered Misleading By the Underwriting Practices of the Correspondent Originators

WVIMB fails to allege adequately that the loan purchasing guidelines were rendered misleading by the underwriting practices of the correspondent originators.  Most of WVIMB's allegations regarding these alleged misrepresentations (CAC ¶¶ 56-65) are nothing more than criticisms of the types of alternative loan products that the prospectus supplement disclosed the correspondent originators were originating and selling to MSMCH.  WVIMB does not allege any specific variance from what was disclosed in the prospectus supplement.

For example, WVIMB claims that sometimes "the original lender failed to determine that the mortgagor's monthly income was sufficient to enable the mortgagor to repay the loan." (CAC ¶ 57.)  As described above, however, the disclosures stated that MSMCH was purchasing

---

[6] This allegation appears difficult, if not impossible, to reconcile with the complaint's express "exclu[sion] and disclaim[er]" of "any allegation that could be construed as alleging fraud or intentional or reckless misconduct." (CAC ¶¶ 156, 165.)

loan products in which "no verification of a mortgagor's income or assets is undertaken by the originator and such information may not even be stated by the mortgagor."  (Ex. A at S-48.)

Similarly, WVIMB complains that the correspondent originators had a "lack of underwriting controls" because "stated" products allowed borrowers to provide false or exaggerated information regarding their income and assets without supplying income-verifying documentation.  (CAC ¶¶ 57, 64-65.)  The prospectus supplement, however, disclosed that the nature of the "stated" loans that MSMCH was purchasing was such that "no verification of both a mortgagor's income and a mortgagor's assets is undertaken by the originator."  (Ex. A at S-48.)  Moreover, as WVIMB alleges (CAC ¶ 64), a study cited by the Mortgage Asset Research Institute "found that almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, and more than half increased the amount by more than 50 percent."  The Mortgage Asset Research Institute cited that study in April 2006, more than a year before WVIMB first purchased its certificates.  (Ex. E.)

Further, with respect to those loan products that did require some verification, WVIMB complains that verification was "insufficient" if it did not come from a traditional source or was otherwise "suspect" in some unidentified way.  (CAC ¶ 63.)  As described above, however, the prospectus supplement disclosed that MSMCH was purchasing loan products from "alternative documentation program[s]" under which the borrower provides "alternate forms of documentation to verify employment, income, and assets."  (Ex. A at S-48.)

To the extent that WVIMB's allegations can be construed as something more than mere criticism of the alternative loan products at issue, and to the extent they describe conduct and loans that contravened the loan purchasing guidelines in some specific way, they are nonetheless inadequate to "show[]" that WVIMB is entitled to relief.  Fed. R. Civ. P. 8(a)(2); Ashcroft v.

15

Iqbal, 129 S. Ct. 1937, 1949 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).

First, WVIMB fails to identify any of the correspondent originators that supposedly originated loans which deviated from the loan purchasing guidelines.  WVIMB makes sweeping, unadorned allegations regarding the practices of correspondent originators – that they accepted "altered" documentation (CAC ¶ 63) and "patently false" information (CAC ¶ 57) from borrowers and "implemented policies" of "[c]oaching borrowers to misstate their incomes," "[s]teering [them] to loans that exceeded their borrowing capacity," and "[e]ncouraging [them] to borrow more than they could afford" (CAC ¶ 62).  Such allegations nowhere identify the originators.  If WVIMB cannot make its allegations against identified originators, it is merely speculating about the possibility that practices which may have occurred at some originators somewhere in the country, could have also occurred at the correspondent originators.  "[W]ithout some further factual enhancement [such allegations] stop short of the line between possibility and plausibility of 'entitle[ment] to relief.'"  Twombly, 550 U.S. at 557.

Second, WVIMB fails to allege that a single non-conforming loan originated by one of the unnamed correspondent originators was included as one of the 1,203 loans underlying 2007-11AR.  It is equally, if not more, plausible that such a hypothetical loan might have been securitized into another trust, retained by MSMCH, or put back to the correspondent originator.

Third, WVIMB fails to allege that any supposedly non-conforming loan included in 2007-11AR is not accounted for by the "significant number" of "underwriting exceptions" which MSMCH disclosed it was making on a case-by-case basis.  Similarly, to the extent any supposedly non-conforming loans were non-conforming because of borrower fraud, that possibility was also accounted for in the offering documents, which contemplated the possibility of more than $12 million in losses sustained by reason of borrower "default[s] arising from fraud,

dishonesty or misrepresentation." (Ex. A at S-82, S-102.)

Finally, WVIMB fails to allege that the trust contained any non-conforming loans, let alone a material number of such loans. See Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 613-14 (S.D.N.Y. 2008) (dismissing Section 11 and 12(a)(2) claims where "[t]he pleadings are simply too conclusory, as they offer no possibility at all of assessing materiality"), aff'd, No. 08-1831-cv, 2009 U.S. App. LEXIS 21404 (2d Cir. Sept. 30, 2009). Stated differently, WVIMB fails to allege that the loans underlying the trust were not underwritten "generally" in accordance with the MSMCH loan purchasing guidelines, which is all that was represented. (Ex. A at S-27.)

C.       The Prospectus Supplement Was Not Misleading Regarding Appraisals

The loan purchasing guidelines contained a description of the appraisals used by the correspondent originators to determine the value of the mortgaged property. (Ex. A at S-48.) This description, which WVIMB alleges was misleading (CAC ¶¶ 66-71), disclosed that appraisals would be conducted by either "staff appraisers employed by the originator" or "independent appraisers" "generally" in accordance with "pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator" and would, in form, "conform to the Uniform Standards of Professional Appraisal Practice" and come on "forms acceptable to Fannie Mae and/or Freddie Mac." (Ex. A at S-48.)

WVIMB tries (CAC ¶¶ 66-74), but fails to allege that this description was rendered misleading by the appraisal practices of the correspondent originators. WVIMB does not allege any specific way in which appraisals deviated from what was stated. Moreover, as with WVIMB's allegations regarding underwriting practices (see supra pp. 15-17), these allegations fail to allege (1) who the offending correspondent originators or appraisers were, (2) that any supposedly non-conforming appraisal concerned a loan incorporated into the trust, and (3) that

there were a material number of non-conforming appraisals incorporated into the trust (or, stated differently, that appraisals were not "generally" conforming).  WVIMB cannot state a claim on the basis that there are appraisers somewhere in the country who inflated appraisals.  See Iqbal, 129 S. Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); Nomura, 2009 U.S. Dist. LEXIS 91789, at *24 ("That questionable appraisal practices were a common problem in the industry as a whole, without more, tells nothing about the Trusts' underlying loans.").

     D.     The Prospectus Supplement Was Not Misleading With Respect to LTVs

WVIMB alleges that "inflated appraisals" by originators resulted in artificially low LTVs for the trust loans reported in the prospectus supplement's LTV charts.  (CAC ¶ 123.)  This allegation is entirely derivative of WVIMB's allegation that appraisals were inflated, which is inadequate for the reasons explained above (see supra pp. 17-18).  This allegation is also based on the erroneous premise that the "value" used to calculate LTVs for home purchases was the appraised value.  (CAC ¶¶ 68, 123.)  The prospectus supplement disclosed that the value used was the lesser of the property's selling price and its appraised value. (Ex. A at S-29.)  WVIMB does not allege that this disclosure was false.  Finally, WVIMB ignores the disclosure that "the determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the mortgage loans may differ from the appraised value of such mortgaged properties or the actual value of such mortgaged properties."  (Ex. A at S-17.)

     E.     The Prospectus Supplement Was Not Misleading With Respect to Ratings

Moody's and S&P assigned a rating to each class of 2007-11AR certificates.  (Ex. A at iv.)  Investors were told that the ratings "address[ed] the likelihood of the receipt of all payment on the Mortgage Loans" as determined by Moody's and S&P at the time of securitization, but

were "subject to revision or withdrawal [by Moody's and S&P] at any time," with "no assurance" of "what rating would be assigned by [any] other rating agency," and with recognition that any "rating assigned by such other rating agency . . . could be lower than the respective ratings assigned by [Moody's and S&P]." (Ex. A at S-110.)  Investors were warned that the ratings did "not address the possibility that holders of the offered certificates may suffer a lower than anticipated yield" (Ex. A at S-11), were "not a recommendation to buy, sell or hold securities" (Ex. A at S-11), and "should be evaluated independently from similar ratings on other types of securities" (Ex. A at S-110).

WVIMB's allegation that the prospectus supplement was somehow misleading because it reported the Moody's and S&P ratings (CAC ¶¶ 124-52) falls short for a number of reasons. First, under regulations duly promulgated by the SEC, ratings are not even considered part of the offering documents and cannot give rise to Securities Act liability.  See 17 C.F.R. § 230.436(g)(1) (ratings "shall not be considered a part of the registration statement prepared or certified by a person within the meaning of Sections 7 and 11 of the [Securities] Act").

Second, plaintiff does not allege that the prospectus supplement inaccurately conveyed the actual ratings assigned by S&P and Moody's.  Thus, there is no misstatement.  See Nomura, 2009 U.S. Dist. LEXIS 91789, at *28 (dismissing ratings-based claim because plaintiffs did not allege that defendants "inaccurately reported the actual ratings awarded by Moody's and S&P").

Third, because the ratings were the subjective opinions of S&P and Moody's regarding the likelihood of future performance – and disclosed as such in the prospectus supplement – they are actionable against S&P and Moody's only if they did not genuinely hold the opinions when they expressed them.  See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1095 (1991). Although WVIMB complains, with the benefit of hindsight, about the rating agencies'

19

assumptions, standards, and alleged conflicts (CAC ¶¶ 126-52), it does not purport to allege that they did not genuinely believe the ratings they assigned to the 2007-11AR certificates.  More importantly, plaintiff does not allege that defendants knew that the rating agencies did not hold those opinions or that the ratings suffered from any of the deficiencies cited by plaintiff.

Finally, although plaintiff now claims that it would like to have known more about the assumptions and methodologies used by the rating agencies and how they were compensated – topics which the prospectus supplement did not address – "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."  In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993).  "Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."  Id.  "The relevant SEC regulations answer the question as to what material facts are required to be stated in an issuer's [offering documents]."  In re N2K Inc. Sec. Litig., 82 F. Supp. 2d 204, 207 (S.D.N.Y. 1999) aff'd, 202 F.3d 81 (2d Cir. 2000).  Item 1120 of Regulation AB, the regulation which "comprehensively" provides "tailored disclosure requirement and guidance for [1933 Act] filings involving asset-backed securities," Asset-Backed Securities, 70 Fed. Reg. at 1581, does not require disclosure of the information which plaintiff claims was "omitted."  See 17 C.F.R. § 229.1120.  Moreover, the SEC has also rejected proposals "to require disclosure in the prospectus on the method of compensating the rating organization" and "whether issuers should be required to disclose activities that could be viewed as 'rating shopping.'"  Disclosure of Security Ratings, 59 Fed. Reg. 46,304 (Aug. 31, 1994).

III.    WVIMB Has Not Alleged Any Injury Cognizable Under the Securities Act

WVIMB has also failed to plead that it has suffered a cognizable economic loss, another essential element of Securities Act claims.  See 15 U.S.C. §§ 77k(e), 77l(a)(2); In re Initial Pub.

Offering Sec. Litig., 544 F. Supp. 2d 277, 299 (S.D.N.Y. 2008); In re Broderbund/Learning Co. Sec. Litig., 294 F.3d 1201, 1203-05 (9th Cir. 2002).

As alleged in the complaint, investors in mortgage pass-through certificates "acquire rights in the income flowing from the [underlying] mortgage pools" and receive distributed cash-flow when "mortgage borrowers make interest and principal payments as required by the underlying mortgages." (CAC ¶¶ 37-38.) Thus, valuation of mortgage-backed certificates such as those at issue here "essentially is an exercise in estimating expected future cash flows." In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 894 n.22 (W.D.N.C. 2001). As explained by the SEC, asset-backed securities investors are "generally interested in the characteristics and quality of the underlying assets, the standards for their servicing, the timing and receipt of cash flows from those assets and the structure for distribution of those cash flows." Asset-Backed Securities, 70 Fed. Reg. at 1506, 1510-11. Because the value of mortgage-backed certificates is derived from the timing and receipt of the stream of payments, investors can suffer damages only when they do not receive the pass-through cash flow payments to which they are entitled.

WVIMB does not allege that there has been a single late or missed payment, let alone any default, on its certificates. WVIMB alleges only that investors are exposed to "more risk with respect to both the timing and absolute cash flow to be received than the Registration Statement represented." (CAC ¶ 6 (emphasis added).) A plaintiff "does not allege actual injury by simply claiming that it incurred additional risk of loss as a consequence of the fraud." First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir. 1994) ("[W]e reject [the plaintiff's] novel theory that it was damaged simply by being undersecured when, with respect to those loans not yet foreclosed, the actual damages it will suffer, if any, are yet to be determined."). "It is not inconceivable that [WVIMB] will one day confront [the] eventuality [that it fears], but assessing

21

the possibility now would '[take] us into the area of speculation and conjecture.'" Blum v.

Yaretsky, 457 U.S. 991, 1001 (1982) (quoting O'Shea v. Littleton, 414 U.S. 488, 497 (1974)).

WVIMB asserts that "the Certificates are no longer marketable at prices anywhere near

the price paid by Plaintiffs [sic] and the Class," as if the certificates at issue were stock intended

to trade on a major exchange.  (CAC ¶ 6.)  WVIMB cannot establish, however, that it has a

Securities Act suit ripe for adjudication by citing to an alleged lack of liquidity in the certificates

it purchased.  The prospectus supplement stated, in no uncertain terms, that "[a] secondary

market for the offered certificates may not develop or, if it does develop, it may not provide you

with liquidity of investment or continue while your certificates are outstanding," that "[t]he

secondary market for mortgage-backed securities has experienced periods of illiquidity and can

be expected to do so in the future," and that "[i]lliquidity means that there may not be any

purchasers for your class of certificates."  (Ex. A at S-22, S-23 (emphasis added).)

Finally, WVIMB's illiquidity allegation lacks any of the factual amplification required by

Iqbal and Twombly.  WVIMB has not pleaded a single fact which suggests that the certificates it

purchased were ever marketable in the secondary market, let alone that their "market value" has

fallen.  WVIMB cites to rating downgrades as if they were the equivalent of drops in market

price.  (CAC ¶ 153.)  The ratings, however, are opinions on "the likelihood of the receipt of all

payments on the Mortgage Loans" (Ex. A at S-110), not the certificates' "market value."

IV.     WVIMB Has Failed to Plead Compliance With the Statute of Limitations

Section 13 of the Securities Act provides:

"No action shall be maintained to enforce any liability created under section 11 or section
12(a)(2) unless brought within one year after the discovery of the untrue statement or the
omission, or after such discovery should have been made by the exercise of reasonable
diligence . . . ."

15 U.S.C. § 77m.  This one-year limitations period is an "essential, substantive element of a

claim under Sections 11 and 12[(a)](2)," and thus the plaintiff must plead and ultimately prove facts showing compliance.  In re Chaus Sec. Litig., 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992).  A plaintiff must make "'distinct averments as to the time when the . . . misrepresentation was discovered, and what the discovery [was], so that the court may clearly see, whether, by the exercise of ordinary diligence, the discovery might not have been made before.'"  Id. (quoting Armstrong v. McAlpin, 699 F.2d 79, 80 (2d Cir. 1983)).  WVIMB fails to make these averments.

For the "time" of alleged discovery, WVIMB alleges "mid-2008."  (CAC ¶¶ 6, 164.) WVIMB fails to allege, however, what happened in mid-2008 that revealed the truth about the mortgage loans underlying the trust.  That date has no apparent significance other than the fact that it is less than a year before plaintiff filed its original complaint.  The "mid-2008" allegation is also directly contrary to WVIMB's statement in its original complaint that the truth about the loans began to be revealed to the public "[b]y the summer of 2007."  (Orig. Compl. ¶ 10.)

WVIMB alleges that the "disclosures" that revealed the truth about the loans underlying the trust consisted of delinquency reports and rating downgrades.  (CAC ¶¶ 153-54, 6.)  WVIMB carefully avoids alleging, however, when this "discovery" occurred.  There is a reason for this evasion.  As explained below – and as suggested by WVIMB's original complaint – the delinquencies and rating actions began in the second half of 2007, well before "mid-2008."

In essence, WVIMB attempts to evade the requirements of Section 13 by pleading either (a) the "time" of discovery without pleading what the discovery was or (b) what the discovery was without pleading the "time."  Neither approach comes close to what is required.  A plaintiff must plead, in non-conclusory fashion, both "the time and circumstances" of discovery, so that it can be determined whether that discovery could have been made earlier.  In re Chaus, 801 F. Supp. at 1265 (emphasis added).  Because the complaint does not do this, it should be dismissed.

See, e.g., Leone v. Advest, Inc., 624 F. Supp. 297, 303-04 (S.D.N.Y. 1985).

Any request for leave to replead compliance with Section 13 should be denied as futile.
The delinquency rates and rating actions that WVIMB alleges revealed the alleged
"misrepresentations" regarding the trust loans were, as a matter of law, known to certificate
investors well prior to May 2008.  See In re Authentidate, 2006 U.S. Dist. LEXIS 47971, at *8-9.

*Delinquency Rates.*  WVIMB uses a "60+ day delinquency rate" as its metric, defined to
include "loans that are foreclosures, loans that are 60 days or more delinquent, and loans in
which the real estate collateral was retaken by the lender."  (CAC ¶ 154.)  By the end of October
2007, that metric for 2007-11AR was at almost 9%; by the end of November 2007 (before
WVIMB even purchased its second batch of certificates on December 11, 2007) it was at almost
10%; by the end of December 2007 it was more than 13%; by the end of January 2008 it was
almost 16%; by the end of February 2008 it was close to 19%; and by the end of March 2008 it
exceeded 20%.[7]  WVIMB states that, by the time it filed the CAC on September 15, 2009, most
of the trusts had "skyrocketed" to 60+ delinquency rates in excess of 20% (CAC ¶ 154), but
2007-11AR passed that milestone in March 2008, more than a year before WVIMB filed suit.

*Rating Downgrades*.  In view of the mounting delinquencies in the second half of 2007, it
should come as no surprise that S&P and Moody's began rating downgrades on 2007-11AR
certificates in October 2007 (again, before WVIMB even purchased its second set of certificates).
(Ex. D.)  S&P began downgrading 2007-11AR subordinated certificates, including "investment
grade" certificates, on October 17, 2007, and Moody's followed suit on January 15, 2008.  (Id.)

---

[7] As indicated in the prospectus supplement, the delinquency and foreclosure rates were
included in monthly reports made to investors.  (Ex. A at S-83-S-84.)  Relevant excerpts of the
monthly reports for October 2007 through March 2008 are attached to the accompanying
Rouhandeh Declaration as Exhibits F-K.

Moody's began putting more senior certificates on negative watch on January 15, 2008.  (Id.)  If it is true – as plaintiff alleges – that negative rating actions (and delinquencies) disclosed the truth about the loans underlying the trusts, that disclosure with respect to 2007-11AR occurred more than a year before WVIMB brought suit.

*Other Information.*  WVIMB would not be able to point to any other information as the "mid-2008" "discovery."  WVIMB's allegations regarding FNBN (the only one of the five specified originators alleged to have originated any 2007-11AR loans) were available when plaintiff's counsel filed the Nomura complaint (which is based on the same FNBN allegations as this complaint) on January 31, 2008 (Ex. L).  Moreover, general information that there are originators, appraisers, and borrowers who do the kinds of things alleged in the complaint was undeniably available, as demonstrated by the allegations in the January 31, 2008 Nomura complaint (id.) and the April 2006 MARI report (Ex. E) cited by WVIMB in paragraph 64 of the complaint.  Finally, the "omitted" information regarding ratings was also available before 2008.[8]

V.    WVIMB's Section 15 "Control Person" Allegations Fail to State a Claim

WVIMB's "control person" claims against Morgan Stanley, MSMCH, and the Individual Defendants must be dismissed because, as set forth above, WVIMB fails to plead a primary violation of the Securities Act.  See Rombach v. Chang, 355 F.3d 164, 177-78 (2d Cir. 2004).

---

[8] Prior to mid-2008, there was widespread public discussion of the rating agencies' alleged use of outdated assumptions, loosened standards due to alleged rating shopping, and the alleged issuer-pays conflict of interest.  See, e.g., Ex. M, U.S. Securities & Exchange Commission, Report on the Role and Function of Credit Rating Agencies in the Operation of Securities Markets 40 (January 2003); Ex. N, Failing Grades?, Fin. Times, May 16, 2007; Ex. O, Measuring the Measurers; Rating Agencies, Economist, June 2, 2007; Ex. P,  Credit & Blame: How Ratings Firms' Calls Fueled Subprime Mess, Wall St. J., Aug. 15, 2007; Ex. Q, Europeans Plan to Investigate Rating Agencies and Their Warnings, N.Y. Times, Aug. 17, 2007; Ex. R, Overrated, Conde Nast Portfolio, Sept. 2007; Ex. S, Ratings Firms' Practices Get Rated – SEC Probes if Conflicts Fueled Subprime Trouble, Wall St. J., Sept. 7, 2007.

## <u>CONCLUSION</u>

For the reasons set forth above, defendants respectfully request that the Court dismiss the

Consolidated Amended Complaint with prejudice pursuant to Rules 12(b)(1) and 12(b)(6).

Dated: November 16, 2009
       New York, New York

DAVIS POLK & WARDWELL LLP

By:    <u>s/ James P. Rouhandeh</u>
       James P. Rouhandeh
       William J. Fenrich
       Hayward H. Smith

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Attorneys for Defendants Morgan Stanley
  Capital I Inc., Morgan Stanley Mortgage
  Capital Holdings LLC, Morgan Stanley &
  Co. Incorporated, Morgan Stanley, David
  R. Warren, Anthony B. Tufariello,
  William J. Forsell, and Steven S. Stern
