**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE MORGAN STANLEY MORTGAGE PASS-THROUGH CERTIFICATES LITIGATION<br><br>This Document Relates to All Actions | Master File No. 09 CV 2137 (LTS)(MHD)<br>ECF Case<br><br><u>CLASS ACTION</u> |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................... ii

I.    INTRODUCTION ................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................... 3

III.  ARGUMENT ........................................................................................... 5

      A.   The Inclusion Of New Plaintiffs Is Permissible Under The Court's
           Order And The Liberal Rules For Amending Complaints ...................... 5

      B.   PERS' Claims Are Timely ....................................................................... 6

      C.   New Plaintiffs' Claims Are Timely ......................................................... 9

           1.   *American Pipe* Tolling Applies To Statutes Of Repose ................ 10

           2.   *American Pipe* Tolling Applies Despite The Court's
                Previous Findings With Regard To Standing ................................ 11

           3.   *American Pipe* Does Not Prevent The New Plaintiffs From
                Asserting Class Claims ................................................................. 12

           4.   The New Plaintiffs' Claims Relate Back To PERS'
                Complaint ...................................................................................... 13

      D.   Plaintiffs Have Adequately Alleged Cognizable Injury ...................... 14

      E.   Plaintiffs Adequately Allege Section 12(a)(2) Standing ...................... 16

      F.   The SAC Adequately Alleges Untrue Statements And Omissions ...... 17

           1.   Untrue Statements And Omissions Concerning
                Underwriting ................................................................................. 18

           2.   Untrue Statements And Omissions Concerning Appraisals,
                LTV Ratios And Ratings ............................................................... 22

IV.   CONCLUSION ...................................................................................... 25

# **TABLE OF AUTHORITIES**

Case                                                                                     Page(s)

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
    651 F. Supp. 2d 155 (S.D.N.Y. 2009)................................................................24, 25

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
    106 F.3d 11 (2d Cir. 1997)....................................................................................14

*In re AES Corp. Sec. Litig.*,
    825 F. Supp. 578 (S.D.N.Y. 1993)........................................................................24

*Am. Pipe and Constr. Co. v. Utah*,
    414 U.S. 538 (1974)................................................................................9, 10, 11, 12

*In re AOL Time Warner Sec. and ERISA Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004)...................................................................25

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010)...........................................................................17, 21

*Arivella v. Lucent Techs., Inc.*,
    623 F. Supp. 2d 164 (D. Mass. 2009) ...................................................................10

*Bano v. Union Carbide Corp.*,
    361 F.3d 696 (2d Cir. 2004)....................................................................................6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................17

*Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates*,
    2010 WL 3815796 (W.D. Wash. Sept. 28, 2010)............................................15, 20

*Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*,
    2002 WL 33934282 (D.N.J. June 26, 2002).........................................................11

*In re CitiGroup Inc. Bond Litig.*,
    2010 WL 2772439 (S.D.N.Y. Jul. 12, 2010).........................................................24

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
    701 F. Supp. 2d 506 (S.D.N.Y. 2010)...................................................................16

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................12

*Dorchester Investors v. Peak Int'l Ltd.*,
    134 F. Supp. 2d 569 (S.D.N.Y. 2001)...................................................................8

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005).........................................................10, 12, 13

*In re Flag Telecom Holdings, Ltd., Sec. Litig.*,
  618 F. Supp. 2d 311 (S.D.N.Y. 2009)..................................................................25

*Flaherty v. Filardi*,
  2007 U.S. Dist. LEXIS 4595 (S.D.N.Y. Jan. 24, 2007) .........................................5

*Garber v. Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008),
  *aff'd* 347 Fed. Appx. 665 (2d Cir. NY 2009).................................................21, 22

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995).............................................................................................16

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983).......................................................................................17, 18

*In re Hyperion Sec. Litig.*,
  1995 WL 422480 (S.D.N.Y. July 14, 1995),
  *aff'd*, 98 F.3d 2 (2d Cir. 1996)...........................................................................21

*In re IBM Corporate Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998).................................................................................25

*In re IndyMac Mortgage-Backed Sec. Litig.*,
  2010 WL 2473243 (S.D.N.Y. June 21, 2010) .............................................. passim

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*,
  32 F.3d 697 (2d Cir. 1994)...................................................................................11

*Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*,
  815 F.2d 240 (2d Cir. 1987)...................................................................................4

*Johnson v. Constantellis*,
  2005 U.S. Dist. LEXIS 44656 (S.D.N.Y. Aug. 10, 2005)
  *aff'd*, 221 Fed. Appx. 48 (2d Cir. 2007) ...............................................................6

*Kassner v. 2nd Ave. Delicatessen, Inc.*,
  496 F.3d 229 (2d Cir. 2007)................................................................................17

*Korwek v. Hunt*,
  827 F.2d 874 (2d Cir. 1987).................................................................................12

*Lampf v. Gilbertson*,
  501 U.S. 350 (U.S. 1991)...............................................................................10, 11

*In re Lehman Bros. Sec. & Erisa Litig.*,
  684 F. Supp. 2d 485 (S.D.N.Y. 2010)..................................................................20

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)...............................................................................8, 9

*Levine v. AtriCure, Inc.*,
    508 F. Supp. 2d 268 (S.D.N.Y. 2007)..................................................................15

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    597 F.3d 84 (2d Cir. 2010).............................................................................11

*McMahon & Co. v. Wherehouse Entm't*,
    65 F.3d 1044 (2d Cir. 1995)...........................................................................15

*Merck & Co. v. Reynolds*,
    130 S. Ct. 1784 (2010)...................................................................................7

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ..................................................................12

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
    2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010)............................................... passim

*N.J. Carpenters Health Fund* v. *DLJ Mortg. Capital, Inc.*,
    2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010).........................................5, 15, 20, 22

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    2010 WL 125752 (S.D.N.Y. Mar. 31, 2010) ...........................................5, 20

*N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Group, PLC*,
    2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010).........................................5, 8, 20, 22

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*,
    840 F. Supp. 243 (S.D.N.Y. 1993).................................................................7

*Official Comm'n of Asbestos Claimants of G-I Holding, Inc., v. Heyman*,
    277 B.R. 20 (S.D.N.Y. 2002).......................................................................9, 10

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004)..........................................................................11, 21

*Polson v. Grant*,
    2010 U.S. Dist. LEXIS 94371 (N.D.N.Y. Sept. 10, 2010) ....................................6

*Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*,
    714 F. Supp. 2d 457 (S.D.N.Y. 2010)..................................................5, 8, 12, 20

*Randall v. Loftsgaarden*,
    478 U.S. 647 (1986)...................................................................................18

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).........................................................................24

*Rosner v. Bank of China*,
    2008 U.S. Dist. LEXIS 105984 (S.D.N.Y. Dec. 18, 2008)
    *aff'd* 349 Fed. Appx. 637 (2d Cir. 2009) ....................................................6

*In re Scottish Re Group Sec. Litig.*,
 524 F. Supp. 2d 370 (S.D.N.Y. 2007)..................................................................17

*Shah v. Meeker*,
 435 F.3d 244 (2d Cir. 2006)..............................................................................7

*Smellie v. Mount Sinai Hosp.*,
 2004 U.S. Dist. LEXIS 24006 (S.D.N.Y. Nov. 24, 2004) ......................................5

*Soto v. Brooklyn Corr. Facility*,
 80 F.3d 34 (2d Cir. 1996) ............................................................................13, 14

*Take-Two Interactive Software, Inc. v. Brant*,
 2010 WL 1257351 (S.D.N.Y. Mar. 31, 2010) ......................................................11

*In re Time Warner Inc. Sec. Litig.*,
 9 F.3d 259 (2d Cir. 1993) ..................................................................................24

*Trief v. Dun & Bradstreet Corp.*,
 144 F.R.D. 193 (S.D.N.Y. 1992) ..............................................................11, 12, 13

*Tsereteli v. Residential Asset Securitization Trust*,
 692 F. Supp. 2d 387 (S.D.N.Y. 2010)
 *reaff'd* 2010 U.S. Dist. LEXIS 28139 (S.D.N.Y. Mar. 25, 2010) ....................20, 22

*Weaver v. Derichebourg ICS Multiservices*,
 2010 U.S. Dist. LEXIS 11018 (S.D.N.Y. Feb. 3, 2010)...........................................6

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
 712 F. Supp. 2d 958 (N.D. Cal. 2010) ..............................................................8, 20

*Wigand v. Flo-Tek, Inc.*,
 609 F.2d 1028 (2d Cir. 1979)............................................................................15

*In re WorldCom, Inc. Sec. Litig.*,
 2004 U.S. Dist. LEXIS 4240 (S.D.N.Y. Mar. 19, 2004)...................................12

## Statutes, Rules & Regulations

15 U.S.C.
 § 77k(e) ..................................................................................14, 15, 16, 17
 § 77l(a)........................................................................................15, 16, 17
 § 77m ....................................................................................................6
 § 77o.....................................................................................................18

17 C.F.R.
 § 230.408(a) .........................................................................................24
 § 230.436 (g) ........................................................................................23

Federal Rules of Civil Procedure

Rule 4(m) ................................................................................................................13
Rule 9(b) .................................................................................................................21
Rule 15(a) .................................................................................................................5
Rule 15(c)(1) ..........................................................................................................13
Rule 17(a)(3) ....................................................................................................13, 14
Rule 41(a) .................................................................................................................4

I.    INTRODUCTION

This action brings strict liability and negligence-based claims under §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") related to the sale of hundreds of millions of dollars worth of mortgage-backed securities (the "Certificates").  Defendant Morgan Stanley was a key figure in the mortgage securitization meltdown and through its various entities sold the Certificates to Plaintiffs and the Class through offering documents that contained untrue statements and omitted material facts about the nature and overall quality of the Certificates.  As the truth about these misstatements began to be revealed, the value of the Certificates dropped dramatically, and Plaintiffs suffered significant losses.  Virtually every Certificate is now rated as "junk," after being initially offered at "investment-grade."

The Second Amended Complaint For Violation Of The Federal Securities Laws ("SAC") alleges that Defendants falsely represented that loan originators were following specific lending guidelines.  In reality, originators had completely abandoned their guidelines and were making loans without regard to repayment ability simply so they could sell them to Defendants, who were re-packaging the loans as securities.[1]   The SAC also alleges that while the offering documents represented that appraisals would be performed in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP") and would be based on the true value of the properties, they were not.   Rather, appraisers were systematically providing inflated appraisals, which in turn led to false loan-to-value ("LTV") ratios reported in the offering documents.  ¶¶86-94.  The SAC also alleges that because of this faulty data, and for other reasons, the credit ratings assigned to the Certificates were false.  ¶¶99-124.  As a result, the Certificates were far more risky than represented.  ¶¶5, 6, 9, 46, 96, 98.

---

[1]  ¶¶40-47, 51-57, 60-67, 70-73, 76-79.  Unless otherwise noted, references to "¶__" are to the SAC.

Defendants now seek to avoid liability for their material misstatements, asserting for the first time that the PERS Complaint was untimely.[2]  Defendants are wrong.  Securities Act claims on behalf of Morgan Stanley Certificate purchasers were not probable until, at the earliest, August 26, 2008, when the first Certificate in the 2006-14SL Offering Trust was downgraded to below investment-grade.[3]  The PERS complaint was filed on December 2, 2008 – well within one year from the downgrade of AAA Certificates to below investment-grade.

Defendants further assert that the New Plaintiffs' claims should be dismissed because, according to Defendants, the Court did not specify that such amendments were permissible.  The Court clearly granted "plaintiffs" leave to amend "to augment and clarify the pleading of the claims asserted by PERS."[4]  The addition of the New Plaintiffs does precisely what the Court anticipated – it augments and clarifies claims on behalf of PERS and previously unnamed class members who purchased Certificates from five trusts named in PERS' original complaint.

Contrary to Defendants' contentions, the SAC amply alleges Plaintiffs' injuries.  Defendants' motion ignores that Section 11(e) of the Securities Act governs damages in this case, and requires only diminished value of the securities at the time suit was brought.  Here, as detailed further below, the SAC alleges such facts.

Defendants' contention that they are not liable because the offering documents disclosed all untrue and misstated information is wrong.  Despite citing numerous purported "disclosures," nowhere did Defendants disclose the actual information the SAC alleges to have been omitted –

---

[2] *See* Memorandum Of Law In Support Of Defendants' Motion To Dismiss The Second Amended Complaint (ECF No. 89) ("Defs.' Mem.") at 5-12.

[3] ¶¶8, 125-27.  *See* "Ex. A" to Declaration Of James P. Rouhandeh In Support Of Defendants' Motion To Dismiss The Second Amended Complaint ("Rouhandeh Decl.") (ECF No. 90) (Certificates downgraded to "B" on August 26, 2008).

[4] *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2010 WL 3239430, at *10 (Aug. 17, 2010) ("*Morgan Stanley I*" or "*Order*").

namely, that loans were made solely for the sake of making them, without regard to borrowers' ability to repay; that appraisals were systematically inflated in violation of USPAP; that the LTV ratios set forth in the offering documents were false; and that the ratings assigned to the Certificates were also false because they were based on inaccurate information and unreliable models.  Because this information was never disclosed to investors, Defendants are liable under §§ 11, 12(a)(2) and 15 of the Securities Act.

II.    STATEMENT OF FACTS

Defendant Morgan Stanley Capital Inc. ("MSC") filed the Registration Statement with the SEC on December 23, 2005, as amended on February 17, 2006 and March 14, 2006.[5]  The Certificates were issued to investors, through Trusts, pursuant to Prospectus Supplements, each of which were incorporated into the Registration Statement.  ¶¶3, 23.  The Certificates were supported by pools of mortgage loans securitized by MSC.  ¶3.

Defendants represented that each loan was originated pursuant to underwriting standards intended "to evaluate the prospective borrower's credit standing and ability to repay the loan." *E.g.*, ¶¶4, 39, 50, 59, 69, 75.  Defendants also represented that appraisals of the mortgaged properties were performed in accordance with USPAP requirements (¶¶80-85), that the underlying loans had specific LTV ratios, and that the Certificates had certain "investment-grade" credit ratings by Standard & Poor's Rating Services ("S&P"), Moody's Investors Services, Inc. ("Moody's") or Fitch Rating (collectively, the "Rating Agencies").  ¶¶95, 97.

---

[5]  ¶3. Defendant Morgan Stanley is the parent company who created and controlled every entity involved in the transaction.  ¶20.  Morgan Stanley Mortgage Capital Inc. (collectively with Morgan Stanley Capital Holdings LLC, "MSMC") originated or acquired residential mortgage loans to be securitized by MSC, and worked with defendant Morgan Stanley & Co. Incorporated ("MS&Co") and the Rating Agencies to structure the transactions.  *Id.*  Defendant MS&Co was the sole lead manager, the sole bookrunner and a key underwriter for the Certificates.  ¶24.

In truth, however, loan originators systematically disregarded the stated lending guidelines, and simply made as many loans as possible regardless of a borrower's ability to repay.  ¶¶40-47, 51-57, 60-67, 70-73, 76-79.  In addition, the appraisals were inflated and were not performed in accordance with USPAP, causing the LTV ratios to be false.  Moreover, the investment-grade credit ratings assigned to the Certificates were false.[6]

Plaintiffs acquired Certificates pursuant and traceable to the Registration Statement and the Prospectus Supplements for the following Morgan Stanley Mortgage Loan Trusts – Trust 2006-7, Trust 2006-11, Trust 2006-12XS, Trust 2006-14SL, Trust 2006-15XS, and Trust 2006-6AR.[7]  The Certificates were inflated in price at the time they were purchased due to the materially untrue statements and omissions contained in the offering documents.  ¶5.

---

[6]  ¶¶98-124.  While Plaintiffs believe that the SAC adequately alleges §§ 11, 12 and 15 violations, if the Court is inclined to grant any portion of Defendants' motion, Plaintiffs respectfully request leave to amend to include recently-discovered evidence.  *Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 243 (2d Cir. 1987).  On September 23, 2010, current and former officers of Clayton Holdings, a provider of risk analysis and loss mitigation solutions to Defendants, testified before the United States Congress's Financial Crisis Inquiry Commission ("FCIC").  According to Clayton's former President, D. Keith Johnson, "almost **half** the mortgages Clayton sampled from the beginning of 2006 through June 2007 **failed to meet crucial quality benchmarks that banks had promised to investors.**"  *N.Y. Times*, "Raters Ignored Proof of Unsafe Loans Panel is Told," September 26, 2010.  Additionally, Vicki Beal, a senior V.P. at Clayton, testified that "28 percent of the loans sampled over the period were **outright failures** – that is, they were unable to meet numerous underwriting standards and did not have positive factors that compensated for their failings.  And yet, 39 percent of these troubled loans still went into mortgage pools sold to investors during the period."  *Id.*  Clayton reviewed over 62,000 Morgan Stanley loans between 2006-07.  A "trending report" submitted to the FCIC demonstrates that Morgan Stanley "waived back" (*i.e.*, purchased) **56%** of the loans that Clayton "rejected" as not complying with underwriting guidelines.  *See* Declaration Of Timothy A. Delange In Opposition To Defendants' Motion To Dismiss The Second Amended Complaint ("DeLange Decl."), Ex. 1 ("All Clayton Trending Reports for 1st Quarter 2006 – 2nd Quarter 2007"), at 8.

[7]  ¶¶14-19, 23.  The SAC erroneously alleges West Virginia's purchase of the 2006-12XS Certificates was on July 17, 2006, rather than the correct date of September 22, 2006.  *See* West Virginia's Certification, ECF No. 84-1 at 25.  Also, on November 1, 2010, Plaintiff Members United Corporate Federal Credit Union withdrew from this action pursuant to Fed. R. Civ. P. 41(a).  Accordingly, its claims relating to MSMLT 2006-16AX are withdrawn.

III.   ARGUMENT

A.   The Inclusion Of New Plaintiffs Is Permissible Under The
Court's Order And The Liberal Rules For Amending Complaints

This Court granted "plaintiffs" leave to amend "to augment and clarify the pleading of claims asserted by PERS."  *Morgan Stanley I*, 2010 WL 3239430, at *10.  That is exactly what the addition of the New Plaintiffs has done.  Because the Order held for the first time that PERS does not have standing to assert claims on behalf of the 2006-7, 2006-6AR, 2006-15XS, 2006-11 and 2006-12XS Trusts, it was necessary to include New Plaintiffs to assert standing on behalf of themselves and unnamed class members who purchased Certificates from these Trusts.  New Plaintiffs thus augmented and clarified the pleading of claims asserted by PERS pursuant to the Court's Order.  Defendants' assertion that the New Plaintiffs' claims should be dismissed because the Court did not specify that such amendments were permissible is wrong.

Under Fed. R. Civ. P. 15(a), "the court should freely give leave to amend when justice so requires."  *See Flaherty v. Filardi*, 2007 U.S. Dist. LEXIS 4595, at *21 (S.D.N.Y. Jan. 24, 2007) ("leave to amend a complaint shall be freely given when justice so requires").  Thus, unless Defendants can show "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to [defendants] by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely granted.  *Smellie v. Mount Sinai Hosp.*, 2004 U.S. Dist. LEXIS 24006, at *4 (S.D.N.Y. Nov. 24, 2004).  Defendants offer no reason except that permission to amend was not expressly requested.[8]  But permission was not necessary since the Court itself had already

---

[8] Defendants' contention that amendment would be futile ignores recent authority denying similar motions to dismiss.  *See, e.g.*, *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 125752 (S.D.N.Y. Mar. 31, 2010) (Baer, J.) ("*ResCap MBS*"); *Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 457 (S.D.N.Y. 2010) (Rakoff, J.) ("*Merrill MBS*"); *N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Group, PLC*, 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010) (Baer, J.) ("*RBS MBS*"); *N.J. Carpenters Health Fund v. DLJ Mortg.*

granted leave to amend in the Order. *See Morgan Stanley I*, 2010 WL 3239430, at *10. This is consistent with the liberal standards for amendment.[9]

B.    PERS' Claims Are Timely

An action brought under §§ 11 or 12 of the Securities Act must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," and no more than three years after the security was offered to the public. 15 U.S.C. § 77m. As this Court previously acknowledged, PERS filed suit on December 2, 2008, well within the one and three-year periods. *Morgan Stanley I*, 2010 WL 3239430, at *7 (holding that WVIMB's claims would be timely if they were "deemed to relate back to PERS' original filing date."). In their original motion to dismiss, Defendants did not argue that PERS' claims were untimely. *Id*. at 6 n.7 ("Defendants do ***not*** argue that PERS' lawsuit was untimely") (emphasis added). Yet, Defendants now assert PERS' action was untimely.

The statute of limitations is "an affirmative defense . . . on which the defendant has the burden of proof." *See Bano v. Union Carbide Corp*., 361 F.3d 696, 710 (2d Cir. 2004). Even

_____

*Capital, Inc.*, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) (Crotty, J.) ("*DLJ MBS*"); *In re IndyMac Mortgage-Backed Sec. Litig.*, 2010 WL 2473243 (S.D.N.Y. June 21, 2010) (Kaplan, J.) ("*IndyMac MBS*").

[9] *Rosner v. Bank of China*, 2008 U.S. Dist. LEXIS 105984, at *46-47 (S.D.N.Y. Dec. 18, 2008) *aff'd* 349 Fed. Appx. 637 (2d Cir. 2009) (allowing amendments to a pleading even though prior permission not sought due to the liberal standards for amendment). Defendants' claim that *Johnson v. Constantellis*, 2005 U.S. Dist. LEXIS 44656 (S.D.N.Y. Aug. 10, 2005) *aff'd*, 221 Fed. Appx. 48 (2d Cir. 2007), and *Polson v. Grant*, 2010 U.S. Dist. LEXIS 94371 (N.D.N.Y. Sept. 10, 2010), ***require*** dismissal of the new plaintiffs' claims is misplaced. *Polson* simply states the standard for Rule 21 joinder, noting that a court has the discretion to add parties "***at any stage of the action and on such terms as are just***," or when the presence of a party ***"is later found necessary or desirable.***" *Polson*, 2010 U.S. Dist. LEXIS 94371, at *2; *see also Weaver v. Derichebourg ICS Multiservices*, 2010 U.S. Dist. LEXIS 11018, at *8 (S.D.N.Y. Feb. 3, 2010) ("it is within the sound discretion of the court whether to grant leave to amend."). In *Johnson*, the court recognizes that ***leave should be freely given*** unless there is undue delay, bad faith, futility, etc. 2005 U.S. Dist. LEXIS 44656, at *67.

before the Supreme Court's recent decision in *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1798-99 (2010), Defendants had a "heavy burden" in establishing a timeliness defense on a motion to dismiss.[10]  In *Merck*, the Supreme Court raised the bar higher for defendants, holding that the statute of limitations runs from actual discovery, or when a "reasonably diligent plaintiff" would have discovered the "violation."  130 S. Ct. at 1798-99.  A plaintiff is on notice only "when the circumstances would suggest to an investor of ordinary intelligence the probability" that he or she has a claim.  *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006).

Here, the Certificates were sold with "AAA" ratings – "investment-grade" ratings.  ¶¶8, 97, 125.  A reasonably diligent investor would not have discovered the probability of a claim until, at the earliest, when the Certificates were first downgraded to below investment-grade.[11]  The AAA Certificates in the 2006-14SL Offering were not downgraded to below investment-grade until August 26, 2008.  ¶¶8, 125-27; Rouhandeh Decl., at Ex. A.  Indeed, the Complaint alleges that investors "could not have reasonably discovered [the facts concerning the wrongful conduct] prior to late 2008."  ¶136.  The PERS complaint was timely filed on December 2, 2008 – well within one year from the downgrade of AAA Certificates to below investment-grade.

Defendants mischaracterize the downgrade history for the 2006-14SL Certificates.  *See* Defs.' Mem. at 6.  Contrary to Defendants' assertion, however, S&P's November 16, 2007 "negative watch" is ***not*** a downgrade.[12]  Minor downgrades do not and cannot, as a matter of

---

[10]  *See, e.g., Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993) ("defendants bear a 'heavy burden' in establishing that the plaintiff was on inquiry notice as a matter of law").

[11]  S&P's and Fitch's "investment-grade" ratings are "AAA" to "BBB."  Moody's investment-grade ratings are "Aaa" to "Bbb."  Any instrument rated lower than BBB or Bbb is considered below investment-grade.

[12]  S&P's website states that "[a] CreditWatch listing, however, does not mean a rating change is inevitable, and when appropriate, a range of potential alternative ratings will be shown." Available at: http://www.standardandpoors.com/ratings/articles/en/us/?assetID=1245219848760.

law, establish that Plaintiffs were on notice or should have discovered the violations.  *See In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 968 (N.D. Cal. 2010) ("*Wells Fargo MBS*") ("[m]inor downgrades" present a factual dispute and are insufficient to constitute notice).   The 2006-14SL Certificates remained investment-grade until S&P downgraded them to "B" on August 26, 2008.[13]   Numerous courts in this District have denied motions to dismiss when similar claims were filed within one year of downgrades to below investment-grade.[14]

At best, Defendants have created a factual issue not appropriate for determination on a motion to dismiss.[15]  While Defendants contend that time began to run at some (unspecified) point, the general news articles upon which they attempt to rely never once mention Morgan Stanley or the Certificates at issue in this case.[16]  Notably, Defendants do not, and cannot, cite any information prior to December 2, 2007, indicating that these particular Certificates were not

---

[13]  Defendants' citation to delinquency rates rising to less than 8% by November 2007 does not establish as a matter of law that a plaintiff would have discovered the probability of a claim, especially when the Certificates maintained investment-grade ratings.

[14]  *See, e.g., Merrill MBS,* 714 F. Supp. 2d at 479 (it was "[t]elling[] [that] the certificates at issue were not downgraded below investment grade until April 2008"); *IndyMac MBS*, 2010 WL 2473243, at *5 ("the Court cannot conclude as a matter of law that the publicly available information was sufficiently specific to put the plaintiffs on actual or inquiry notice that a cause of action was probable"); *RBS MBS*, 2010 WL 1172694, at *9.

[15]  *See Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 577 (S.D.N.Y. 2001) (finding "the issue of whether Plaintiffs were on inquiry notice, and thus whether their claims are barred by the statute of limitations, is a factual one to be resolved by the trier of fact").

[16]  Generic documents about the ratings and subprime industry and mortgage markets generally are not sufficient to meet defendants' burden on the statute of limitations.  *See RBS MBS*, 2010 WL 1172694, at *9; *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168-71 (2d Cir. 2005) ("the triggering . . . data must be such that it relates directly to the misrepresentations and omissions" alleged in the complaint).

of "investment quality," and were not equivalent to other investments with the same ratings.[17]

PERS' claims are timely.[18]

      C.    <u>New Plaintiffs' Claims Are Timely</u>

"[T]he commencement of a class action suspends the applicable statute of limitations as to **all asserted members of the class** who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe and Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) (emphasis added). In creating this rule, the Supreme Court was guided by two fundamental principles: (i) the "litigative efficiency and economy" promoted by the class action device; and (ii) the "essential fairness" underlying statutory limitation periods. *See id.* at 553-56. A contrary rule would encourage potential class members "to file protective motions to intervene or to join in the event that a class was later found unsuitable." *Id.* at 553.

Here, the timely filing of the PERS complaint tolled the statutes of limitations and repose applicable to the New Plaintiffs' claims and provided Defendants with explicit notice of "the essential information necessary to determine both the subject matter and size of the [New Plaintiffs' claims]."[19] As in *American Pipe*, the New Plaintiffs were part of the "asserted members of the class." *Id.* at 554. As such, they were "**encouraged** to remain passive during the

---

[17] Defendants' suggestion that the January 2003 SEC report put investors on notice ignores Second Circuit law holding that time cannot begin running for Securities Act claims before the security is offered. *See Lentell*, 396 F.3d at 170.

[18] Defendants do not argue that the New Plaintiffs' claims are untimely because of rating downgrades or loan delinquencies related to the Certificates the New Plaintiffs bought. Thus, Defendants are barred from raising these arguments in their reply. *Official Comm'n of Asbestos Claimants of G-I Holding, Inc., v. Heyman*, 277 B.R. 20, 29 (S.D.N.Y. 2002).

[19] 414 U.S. at 554-55. This Court previously implied that the statute of limitations was tolled as to claims asserted in the original PERS complaint. *Morgan Stanley I*, 2010 WL 3239430, at *9 n.9 ("Because PERS class action complaint did **not** include claims regarding 2007-11AR and several other [2007] trusts mentioned in the CAC, the statute of limitations was not tolled **as to these claims**.") (emphasis added)

early stages of the class action and to 'rely on the named plaintiffs to press their claims.'"
*Heyman*, 277 B.R. at 31.

> 1. *American Pipe* Tolling Applies To Statutes Of Repose

Defendants mistakenly claim that "*American Pipe* tolling simply does not apply to section 13's three-year statute of repose." Defs.' Mem. at 8. Nearly every court to address the matter, however, including at least two from within this District, has held that *American Pipe* tolling applies equally to both statutes of limitations and repose.[20]

Defendants' reliance on *Lampf v. Gilbertson*, 501 U.S. 350 (U.S. 1991), is misplaced. *Lampf* did **not** address questions regarding *American Pipe*, or so-called "**legal** tolling." *See id.* at 363. Rather, *Lampf* addressed the separate issue of whether "**equitable** tolling" applies to claims asserted under Section 10(b) of the Securities Exchange Act of 1934 – not at issue in this case – "where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part." *Id.* The distinctions between **equitable** tolling and **legal** tolling are **not** "fiction[al]," but are very real and significant. *See* Defs.' Mem. at 9 n.4.; *see also Arivella*, 623 F. Supp. 2d at 176 n.7 ("the few courts to have specifically considered the quandary facing this Court recognize that *American Pipe* tolling is qualitatively different from equitable tolling"). Legal tolling applies **only** in circumstances – like here – where Defendants have received adequate notice of the prospective plaintiffs' claims by way of a **timely-filed** class action. The *American Pipe* doctrine ensures that the underlying purpose of the statute of repose – "to demarcate a period in which a plaintiff must place a defendant on notice of his or her

---

[20] *See, e.g., Heyman*, 277 B.R. at 31 (collecting cases and holding "[t]he *American Pipe* rule has been extended to statutes of repose."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 455 n.19 (S.D.N.Y. 2005) (same); *Arivella v. Lucent Techs., Inc.*, 623 F. Supp. 2d 164, 177-78 (D. Mass. 2009) ("The differences between the forms of tolling is crucial because the animating principles of legal tolling are compatible with tolling a statute of repose, while the reasoning behind equitable tolling is not.").

injury, regardless of whether the plaintiff himself is aware that he has suffered an injury" – is

satisfied.  Thus, "despite the broad language in *Lampf* rejecting the tolling of statutes of repose,

**all lower federal courts** . . . to examine [the issue] have found *Lampf* limited exclusively to the

concept of equitable tolling and have held that *American Pipe* **requires the tolling of statutes of**

**repose.**"[21]

### 2. *American Pipe* Tolling Applies Despite The <br> Court's Previous Findings With Regard To Standing

The Supreme Court's holding in *American Pipe* was based on its desire to preserve the

fundamental purposes underlying the class action device and statutory limitations periods.  *See*

414 U.S. at 553-56.  Here, that aim is undisturbed by this Court's previous findings regarding the

original plaintiffs' standing, or lack thereof.  Defendants erroneously contend that *American Pipe*

tolling is unavailable for the New Plaintiffs' claims because "PERS and WVIMB lacked

standing to challenge" the offerings in which the New Plaintiffs purchased.  *See* Defs.' Mem. at

10-11.

"Several courts have held that *American Pipe* is appropriately applied to motions to

intervene or amended complaints filed to substitute a proper class representative with standing

prior to a decision on class certification."  *Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*, 2002 WL

33934282, at *29 (D.N.J. June 26, 2002).  A contrary rule would force members of the alleged

class to flood the court with duplicative protective motions to intervene or join.[22]  This is

---

[21]  *Id.* at 177-78 (collecting cases).  Defendants' remaining cases similarly involve matters of
"equitable tolling," not *American Pipe* tolling.  Defs.' Mem at 9 (relying on, *e.g.*, *P. Stolz Family
P'ship L.P. v. Daum*, 355 F.3d 92, 102-03 (2d Cir. 2004); *Ma v. Merrill Lynch, Pierce, Fenner &
Smith, Inc.*, 597 F.3d 84, 88 n.4 (2d Cir. 2010); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch &
Co.*, 32 F.3d 697, 704 (2d Cir. 1994); *Take-Two Interactive Software, Inc. v. Brant*, 2010 WL
1257351, at *5 (S.D.N.Y. Mar. 31, 2010).

[22]  *See Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 202-03 (S.D.N.Y. 1992) ("The
American Pipe tolling rule allows putative class members to wait on the sidelines, rather than

particularly true where, as here, the question of standing is novel and unresolved.[23]  As such,

***courts in this Circuit*** find *American Pipe* tolling appropriate under the circumstances here.[24]

> 3. *American Pipe* Does Not Prevent The
> New Plaintiffs From Asserting Class Claims

Defendants' final contention, that "*American Pipe* applies only to toll limitations periods

for individual claims, not class claims," is incorrect.  Defs.' Mem. at 11.  In *Korwek v. Hunt*, 827

F.2d 874, 876-79 (2d Cir. 1987), the Second Circuit held that, "following a ***definitive***

***determination of the inappropriateness of class certification***," putative class members may not

rely on *American Pipe* to commence a "subsequent class action nearly identical in scope."  Here

there has been ***no*** class certification ruling.  The Second Circuit stressed its concern that allowing

a subsequent class action after a determination on class certification might allow putative class

members to "piggyback one class action onto another and thus toll the statute of limitations

indefinitely."  *Id.* at 878.  Recognizing the significance of this distinction, numerous courts have

---

forcing them to congest the courts with defensively filed suits designed solely to guarantee that such plaintiff's claims are not arbitrarily precluded by the running of a statute of limitations.").

[23]  *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 4240, at *6-7 (S.D.N.Y. Mar. 19, 2004) (finding purchasers of one type of debt security had standing to pursue claims on behalf of purchasers of a second type of debt security issued pursuant to the same registration statement); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1165 (C.D. Cal. 2008) (finding § 11 standing for all offerings pursuant to an "initial shelf registration statement contain[ing] an actionable statement or omission that is common to more than one issuance"); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 911 (D.N.J. 1998) (finding § 11 standing for stock purchasers to represent note purchasers where the different types of securities were both issued pursuant to the same registration statement)

[24]  *See, e.g., Flag Telecom*, 352 F. Supp. 2d at 455 n.20 ("the failure to apply the *American Pipe* rule to cases where a class action complaint was dismissed for lack of standing undermines the policies underlying Rule 23 and is inconsistent with the Court's reasoning in *American Pipe*"); *Trief*, 144 F.R.D. at 203 (finding that intervening class representative seeking to cure potential standing deficiencies raised by Defendants "is the type of plaintiff that the *American Pipe* tolling rule is designed to protect.").  The court in *Merrill MBS* was not presented with, and clearly did not rule on, any arguments regarding tolling.  *See* 714 F. Supp. 2d at 484-86.  Defendants' remaining cases are either factually inapposite or from non-binding out-of-circuit district courts, and thus fail to undermine the more on-point, in-circuit authority discussed *supra*.

rejected the same argument advanced by Defendants here, and held that *American Pipe* tolling ***may*** apply to subsequently filed class claims where, as here, those claims do ***not*** seek to reargue a previously denied motion for class certification.[25]

4.   The New Plaintiffs' Claims Relate Back To PERS' Complaint

The New Plaintiffs' claims also "relate back" to PERS' original complaint pursuant to Fed. R. Civ. P. 15(c)(1) and 17(a).  Amended complaints that add new parties relate back to the date of the original filing if the following three elements are satisfied: (1) the amendment "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading"; (2) within 120 days, the defendants "received such notice of the action that [they] will not be prejudiced in defending on the merits"; and (3) within 120 days, the defendants "knew or should have known that the action would have been brought against [them], but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1), and 4(m); *see also Soto v. Brooklyn Corr. Facility*, 80 F.3d 34 (2d Cir. 1996).  Here, all three elements are satisfied.

The allegations in the SAC are nearly identical to those alleged in the original complaint and unquestionably arise out of the "conduct, transaction, or occurrence set out in the original pleading."  Fed. R. Civ. P. 15(c)(1).  The Trusts that form the basis of the New Plaintiffs' claims were in the original pleading.[26]  Defendants received adequate notice of those claims within 120 days of the original complaint's filing.  Fed. R. Civ. P. 15(c)(1) and 4(m).  Finally, the New

---

[25] *IndyMac MBS*, 2010 WL 2473243, at *4 ("The concerns about repose, inefficiency, and wasteful litigation expressed in *Korwek*, however, are inapposite where, as here, there never has been a definitive class certification determination."); *Trief*, 144 F.R.D. at 202-03 (rejecting defendants' reliance on *Korwek*'s "narrow" holding, which the court found to apply only where "the original class action [] was denied certification."); *Flag Telecom*, 352 F. Supp. 2d at 455 n.20 (same).

[26] *See Morgan Stanley I*, 2010 WL 3239430, at *9 (noting that the WVIMB complaint, which, unlike the SAC, asserted some claims that were ***not*** explicitly included in the original complaint "arguably arises out of the same 'conduct, transaction, or occurrence'").

Plaintiffs' omission from the original complaint was clearly the result of a mistake – a mistake of law – and Defendants were aware of this mistake at the time the PERS complaint was filed.[27]

"Relation back" is also justified under Fed. R. Civ. P. 17(a)(3), which provides:

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

Rule 17 allows an amended complaint that adds plaintiffs with proper standing to relate back to an earlier filing in which standing was found to be deficient.[28]

### D.   Plaintiffs Have Adequately Alleged Cognizable Injury

Defendants argue that Plaintiffs have no injury because they are receiving all payments due from the Trusts. Defendants are wrong.[29] Under the Securities Act, damages are **statutorily** calculated based on the difference between the purchase price and sales price (or, if the plaintiff does not sell, the difference between the purchase price and the "value" of the security at the time the case is filed). 15 U.S.C. § 77k(e). This statutory damages calculation framework does

---

[27]  *Soto*, 80 F.3d at 36 ("'mistake' as used in Rule 15(c) applies to mistakes of law as well as fact."); *accord Morgan Stanley I*, 2010 WL 3239430, at *9; *see also* Lead Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motion To Dismiss The Consolidated Amended Complaint (ECF No. 61) at 8-9 (setting forth the basis for plaintiffs' mistake of law regarding § 11 standing for securities offerings made pursuant to a common registration statement).

[28]  *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 19-21 (2d Cir. 1997). In *Advanced Magnetics*, the Second Circuit reversed a district court decision dismissing plaintiff's claims as untimely because the original plaintiff "lacked standing to sue." 106 F.3d at 13. The Second Circuit held that, because the substitution of proper plaintiffs was "made within a reasonable time" and the court did not "see any unfairness to defendants in allowing [the] substitution," "the amendment should have been found to relate back pursuant to Rule 17(a)." *Id.* at 19, 21. Here, there will be no "unfairness to defendants" because they were given notice of the New Plaintiffs' claims in the PERS complaint and the addition of the New Plaintiffs was made "within a reasonable time" of this Court's order regarding standing. *Id.* at 21.

[29]  Defendants ignore that the SAC specifically alleges that class members who bought Certificates in the 2006-11 Trust and who currently hold them are in fact not receiving payments: "***The 2006-11 Certificates have already suffered a current interest shortfall.***" (emphasis added). SAC ¶19.

not consider whether or not payments are being made.  *See id.*  Thus, "a plaintiff need only allege that he purchased a security pursuant to a false or misleading registration statement, and that … the value of the security ha[s] declined."  *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 276 (S.D.N.Y. 2007).  That is precisely what Plaintiffs allege – "the Certificates purchased by the plaintiffs had substantially declined in value."  SAC ¶9; *see also* ¶¶11, 127.[30]

Judge Crotty rejected the same argument Defendants make here in *DLJ MBS*.  There, as here, the plaintiffs bought mortgage-backed securities and sued under §§ 11, 12 and 15, alleging a decline in the market value of the certificates.  2010 U.S. Dist. LEXIS 47512, at *12-13.  There, as here, defendants claimed that plaintiffs suffered no cognizable injury because they failed to allege they did not receive principal and interest payments.  *Id.* at *13.  Judge Crotty rejected defendants' argument, holding that it was "too cramped a reading of damages" under the Securities Act.  *Id.* at *14.  The court reasoned that "market value [was] the critical valuation marker" under the Securities Act and thus "Plaintiff's market value allegations [we]re sufficient."  *Id.*  This Court should similarly reject Defendants' argument.[31]

Defendants further contend that NECA and United Western – the two Plaintiffs that continue to hold their Certificates − cannot allege § 11 injury under the "factual amplification

---

[30]  *McMahon & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048 (2d Cir. 1995) ("decline in market value permits plaintiffs to recover damages under [§ 11's] statutory scheme"); *DLJ MBS*, 2010 WL 1473288, at *12 ("Plaintiff's alleged injury is the loss of market value.").  Defendants also incorrectly argue that Plaintiffs have no loss because Defendants warned that the Certificates might face liquidity issues.  *See* Defs.' Mem. at 14 n.6.  But "[t]he mere fact that Plaintiffs may have difficulty substantiating the exact nature of their loss in an illiquid market does not necessitate dismissal."  *Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates*, 2010 WL 3815796 (W.D. Wash. Sept. 28, 2010).

[31]  Plaintiffs also assert claims under § 12(a)(2) of the Securities Act, which expressly allows for the equitable remedy of rescission, *see* 15 U.S.C. § 77l(a), thus rendering Defendants' damages/injury argument moot.  Under § 12, if a plaintiff retains the security at issue (which NECA and United Western do), rescission may be had upon tender of the security (which Plaintiffs did, *see* ¶141), rendering injury irrelevant since "[t]he value of the [security] itself is irrelevant" in such a situation.  *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1036 (2d Cir. 1979).  The Court should reject Defendants' "injury" argument for this reason as well.

required by *Iqbal* and *Twombly*." Defs.' Mem. at 15. According to Defendants, Plaintiffs did not allege a specific enough "value" of their Certificates at the time this action was filed.[32] The SAC clearly alleges that United Western bought its 2006-6AR class 3A4 Certificates at $100.11, and its 2006-6AR class 3A1 Certificates at $99.25 (¶17; ECF No. 84-1 at 22), and at the time this action was filed such Certificates had declined in value to $53.12 and $54.09, respectively. ¶9. Similarly, NECA purchased its 2006-7 class 5A2 Certificates for $99.68 (¶16; ECF No. 84-1 at 28) and at the time this action was filed the Certificates were selling at $64.11. ¶9. These allegations properly plead a decline in the value of the securities under 15 U.S.C. § 77k(e).[33]

E.     Plaintiffs Adequately Allege Section 12(a)(2) Standing

Courts in the Second Circuit and elsewhere have consistently held that in order to have standing to assert claims under § 12(a)(2), a plaintiff need only generally allege that it purchased securities in a public offering directly pursuant to a ***false and misleading prospectus***. 15 U.S.C. § 77l(a)(2); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 577-78 (1995); *Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 511-12 (S.D.N.Y. 2010). Here, the SAC satisfies the pleading requirements for § 12(a)(2), setting forth the details regarding Plaintiffs' purchases of Certificates. *See* ¶¶17-19 (detailing the Certificate purchases for United Western, Pompano and West Virginia). Contrary to Defendants' assertions, the allegations that Defendants "promoted and sold the Certificates to plaintiffs and other member of the Class" are sufficient to support § 12(a)(2) standing. ¶138; *IndyMac MBS*, 2010 WL 2473243, at *3 (finding allegations nearly identical to those alleged in the SAC to be sufficient to establish standing pursuant to § 12(a)(2));

---

[32] Defendants concede that a proper measure of damages under § 11 for holders of securities is the difference between the purchase price and the "'value of the [security] at the time of suit.'" *See* Defs.' Mem. at 15 n.7.

[33] Defendants do not, and cannot, challenge the allegations for those Plaintiffs that sold their Certificates at a loss. *See, e.g.*, ECF No. 84-1 at 21 (PERS lost over $900,000); ¶18; ECF No. 84-1 at 34 (Pompano lost over $17,000); ¶19; ECF No. 84-1 at 25 (West Virginia lost $1,500 and $1,125).

*see also In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 400 (S.D.N.Y. 2007) (finding sufficient standing under § 12(a)(2) where plaintiffs "alleged[d] that defendants, including the Underwriter Defendants, sold the securities as part of the Offerings, and plaintiffs acquired securities in the Offerings").[34]

### F.   The SAC Adequately Alleges Untrue Statements And Omissions

In assessing Defendants' motion, the SAC's factual allegations are accepted as true and all inferences are drawn in Plaintiffs' favor. *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint is sufficient as long as it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[T]he notion that *Twombly* imposed a heightened standard that requires a complaint to include specific evidence, factual allegations in addition to those required by Rule 8 … is belied by the *Twombly* opinion itself." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010).

Section 11 liability exists when the offering documents "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein *or* necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 provides a "stringent standard of liability" that is "virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). A plaintiff "need only show a material misstatement or omission to establish his *prima facie* case," which "places a relatively minimal burden on a plaintiff."[35]

Here, the offering documents misrepresented and failed to disclose that: (1) mortgage loans were underwritten to increase the volume of loans, rather than to evaluate the borrower's

---

[34] To the extent the Court is inclined to grant Defendants' motion, Plaintiffs are prepared to amend the pleadings with additional facts to explicitly demonstrate § 12 standing.

[35] *Id.* at 382. Section 12(a)(2) of the Securities Act provides similar liability for untrue statements and omissions in a prospectus. *See* 15 U.S.C. § 77l(a)(2)*; Randall v. Loftsgaarden*, 478 U.S. 647 (1986).

ability to repay, ¶¶40-47, 51-57, 60-67, 70-73, 76-79; (2) contrary to USPAP, appraisers were not impartial, objective or independent and appraisals were inflated, ¶¶86-94; (3) LTV ratios were false and artificially low, *id.*; and (4) the Certificates' ratings were false because they were based on inaccurate loan information and outdated models.   ¶¶99-124.   Numerous courts evaluating nearly identical allegations of "systematic disregard" for underwriting standards have recently found such allegations sufficient to state a Securities Act claim.   Accordingly, Defendants' motion to dismiss should be denied.[36]

1.     Untrue Statements And Omissions Concerning Underwriting

MSMC originated or purchased a material number of loans underlying the Certificates.[37] The offering documents represented that "a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property."[38]  In truth, MSMC, in an effort to securitize as many loans as possible, purchased and originated loans without regard for the borrower's ability to meet its monthly obligations.  ¶¶40-48.  For example, the SAC alleges that:

- MSMC was "production-based" and was more concerned with acquiring loans for securitization than the borrower's ability to repay, ¶44;

- MSMC management ignored information indicating that purchased loans were not originated in accordance with stated purchasing guidelines, ¶42;

---

[36] Because the SAC alleges actionable misrepresentations and violations under Sections 11 and 12 of the Securities Act, Defendants' assertion that Plaintiffs' Section 15 claims must be dismissed should be rejected.  15 U.S.C. § 77o.

[37]  MSMC originated or purchased 63.7% of the loans in MSML 2006-7; 24.6% in MSML 2006-11; 40.74% in MSML 2006-12XS; 90.43% in MSML 2006-14SL; 45.19% in MSML 2006-15XS; 79.93 % in MSML 2006-6AR.  ¶38.

[38]  ¶39. This untrue statement appeared in **each** Prospectus Supplement at issue.  Therefore, Defendants' contention that PERS and United Western do not identify any actionable misrepresentations is without merit.  *See* Defs.' Mem at 16, 21.

- Originators from whom MSMC purchased loans **coached borrowers to misstate their income**, allowed exceptions to underwriting standards in the absence of compensating factors and approved loans for borrowers who altered required documentation, ¶45;

- MSMC purchased loans where the **borrower's income or other financial income was patently false**, such as a pre-school teacher whose stated income was $200,000 per year; and

- A former MSMC employee flagged numerous loans from Maricopa County, AZ after determining that there were no homes built at the addresses. ¶42. The former employee's superiors ignored the information and purchased the loans. *Id.*

The offering documents also represented that certain originators evaluated the borrower's "ability to repay."[39] In truth, these originators systematically disregarded the borrower's ability to repay. ¶¶51, 60, 70, 72, 76. For example:

- American Home's automated underwriting software consistently overruled the professional judgment of its underwriters, resulting in the approval of risky loans which were unlikely to be paid back, ¶¶52-53;

- First Bank of Nevada ("FNBN") coached borrowers and mortgage brokers on how to falsify loan applications to enable them to "qualify." ¶61. In one instance, a housekeeper's income was so exaggerated that an FNBN Underwriter refused to affirm its compliance with underwriting standards. ¶66. Nevertheless, FNBN closed and funded the loan.[40]

- Starting in 2005, GreenPoint's underwriting standards became progressively "looser," especially towards higher risk borrowers. ¶71.

- An underwriter's role at MSCC was a "joke" because MSCC's goal was to approve and close as many loans as possible. ¶77. In fact, it was considered "unprofessional" at MSCC to question an applicant's stated income. ¶78.

---

[39] *See* ¶50 (American Home, "**willingness and ability to pay** the debt"); ¶59 (FNBN, "**credit standing and ability to repay** the loan"); ¶69 (GreenPoint, "**credit standing and repayment ability**"); ¶75 (MSCC "**credit standing and ability to repay** the loan") (emphasis added).

[40] *Id.* Defendants' assertion that the timing of the FNBN employees' statements renders them irrelevant is without merit. Defs.' Mem. at 24 n.17. The former underwriter's employment began in July 2006, and loans included in the 2006-12XS pool were originated between July 2006 and September 1, 2006. *See* Rouhandeh Decl. Ex. T at S-27 (latest stated maturity listed as September 1, 2036).

Numerous courts have found similar allegations of "systematic disregard" for underwriting standards sufficient to allege material misrepresentations.[41]  Indeed, three courts have denied motions to dismiss in cases containing nearly identical allegations related to the *exact originators* at issue here.[42]

In response, Defendants largely do not contest falsity.   Rather, they contend that boilerplate disclosures in the offering documents inoculate them from liability.  Defs.' Mem. at 17-19, 22-24.  Defendants are wrong.  The SAC alleges that the loans at issue – even those for the low- and no-documentation loan programs – were purchased and originated to increase volume, rather than to evaluate the borrower's ability to repay.  Defendants do not – and cannot – point to any specific "disclosure" that the originators were systematically ignoring the borrower's ability to repay.  Clearly, none of these disclosures absolve Defendants of liability.[43]  Disclosures that certain loans may have been purchased or originated pursuant to "alternative" loan programs are immaterial if even those "less stringent" guidelines were systematically

---

[41]   *See Merrill MBS*, 714 F. Supp. at 483 ("the alleged repeated deviation from established underwriting standards is enough to render misleading the assertion in the registration statements that underwriting guidelines were generally followed"); *Tsereteli v. Residential Asset Securitization Trust*, 692 F. Supp. 2d 387, 392-93 (S.D.N.Y. 2010) *reaff'd* 2010 U.S. Dist. LEXIS 28139 (S.D.N.Y. Mar. 25, 2010); *DLJ MBS*, 2010 WL 1473288, at *7; *ResCap MBS*, 2010 WL 1257528, at *4-7; *IndyMac MBS*, 2010 WL 2473243, at *5; *Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates*, 2010 WL 3815796, at *6 (W.D. Wash. Sept. 28, 2010).

[42] *See, e.g., In re Lehman Bros. Sec. & Erisa Litig.*, 684 F. Supp. 2d 485, 493-94 (S.D.N.Y. 2010) ("Lehman MBS") (sustaining complaint containing allegations of GreenPoint's systematic disregard for underwriting standards); *RBS MBS*, 2010 WL 1172694, at *10-11 (sustaining complaint containing allegations of American Home's systematic disregard for underwriting standards); *Wells Fargo MBS*, 712 F. Supp. at 972 (same).

[43]   *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("the cautionary language must … **warn[] of the specific contingency** that lies at the heart of the alleged misrepresentation") (emphasis added).  Defendants cite similar "disclosures" related to American Home, GreenPoint, FNBN, and MSCC.  Defs.' Mem. at 22-25.  None of these disclosed that these originators systematically disregarded underwriting standards and did not evaluate borrower ability to repay.

disregarded.[44]   Likewise, disclosures that underwriting "exceptions" were made are immaterial when the standards for making exceptions (*i.e.*, the presence of legitimate compensating factors such as good credit history, stable employment, etc.) were ignored.  *See, e.g.*, ¶¶54, 72.

Defendants' contention that Plaintiffs must allege that each loan pool contained a material number of non-conforming loans is meritless.  *See* Defs.' Mem. at 18.  The SAC includes detail regarding the skyrocketing delinquency and default rates, the ratings collapse from "AAA" to below investment-grade, and numerous witness accounts and corroborating investigations.[45]   Courts in recent mortgage-backed securities cases have held that nearly identical allegations create a sufficient nexus to the loan pools to support a plausible inference that the offering documents contained untrue statements or omissions.[46]   Rule 8 requires allegations that suggest ***plausibility***, but does not demand the level of particularity Defendants seek.[47]

---

[44]   ¶¶39-40, 50-51, 59-60, 69-70, 75-76.  Defendants' contention that the SAC merely "criticizes the nature of alternative loan products" and the "kinds of loans" MSMC purchased is incorrect.  Defs.' Mem. at 17, 18, 18 n.10.   The SAC alleges that the borrower's ability to repay was systematically disregarded ***regardless of the type of loan.***   The single case Defendants cite in support of their contention is distinguishable.  Defs.' Mem. at 17-18 (citing *In re Hyperion Sec. Litig.*, 1995 WL 422480 (S.D.N.Y. July 14, 1995), *aff'd*, 98 F.3d 2 (2d Cir. 1996)).  In *Hyperion* − where the court evaluated the allegations under Fed. R. Civ. P. 9(b)'s heightened pleading standard − a standard which is irrelevant here since fraud is not being alleged − the offering documents disclosed the exact facts plaintiffs claimed were misrepresented.  1995 WL 422480, at *5.  Here, "disclosures" related to the "kinds of loans" in the pools do not relate to the alleged misrepresentations.

[45]   *See, e.g.*, ¶¶7, 8, 57, 97, 125-27.  In any event, Plaintiffs can allege a material percentage of loans were non-conforming in light of the recent revelations by Clayton Holdings.  *See supra*, n.5.

[46]   *See, e.g., Lehman MBS*, 684 F. Supp. 2d 485, 494 (plaintiffs need not identify "the volume of loans that departed from the stated underwriting guidelines"); *ResCap MBS*, 2010 WL 1257528, at *6 (same); *Tsereteli*, 692 F. Supp. 2d at 392 (same); *Wells Fargo MBS*, 712 F. Supp. at 971-72 (same); *DLJ MBS*, 2010 WL 1473288, at *7; *RBS MBS*, 2010 WL 1172694, at *12-13.

[47]   *Arista Records*, 604 F.3d at 119.  Defendants' single case in support of their contention, *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd* 347 Fed. Appx. 665 (2d Cir. NY 2009), is factually inapposite.  In *Garber*, the plaintiffs alleged a failure to disclose

> ### 2. Untrue Statements And Omissions Concerning Appraisals, LTV Ratios And Ratings

The offering documents stated that "[a]ll appraisals conform to the Uniform Standards of Professional Appraisal Practice [USPAP]."  USPAP imposes strict requirements including that an appraiser: (1) must perform assignments with impartiality, objectivity, and independence; (2) cannot act as an advocate for any party or issue; (3) must not accept an assignment that includes the reporting of predetermined values and conclusions; and (4) cannot have his/her compensation contingent on the value or a pre-determined result.

Defendants contend that the SAC "does not allege any way in which the originators' appraisals deviated" from these standards.  Defs.' Mem. at 19-20.  To the contrary, Plaintiffs set forth detailed factual allegations showing that appraisals were systematically inflated and were rarely, if ever, conducted in accordance with USPAP.[48]  For example:

- Appraisers industry-wide were not independent, as lenders and agents forced appraisers to submit pre-determined, inflated appraisals, ¶86;

- Lenders industry-wide allowed sales personnel, who were on a commission-only pay structure, to pressure appraisers to inflate appraisals in order to close as many loans as possible, *id.*;

- Mortgage brokers in California, Illinois and Florida pressured American Home appraisers to inflate values ("WE NEED THIS NUMBER, OR YOU WILL NEVER WORK FOR US AGAIN"), ¶¶89-91;

- FNBN and MSCC appraisers used superior comparables or only performed drive-by (rather than physical) inspections, ¶¶92-93; and

- MSCC often allowed the realtor, who only received commission if the deal closed, to serve as the appraiser, ¶94.

---

immaterial facts surrounding a swap transaction.  537 F. Supp. at 612.  That is not the case here. Further, the *Garber* plaintiffs alleged the failure to disclose known trends as required by Item 303 of Regulation S-K – a provision which is inapplicable to the Certificates.

[48]  ¶¶87-94.  Because appraisals were systematically inflated, the LTV ratios in the offering documents were artificially low, making it appear as if the underlying loans were safer than they actually were.  ¶¶82-84, 88, 95-96.  Defendants' contention that the LTV ratios were not false because the "value" used was not always the appraised value is baseless.  *See* Defs.' Mem at 20 n.12.  The "value" used in the LTV ratio was ***always*** the appraised value, ***not*** the lesser of the appraised value or the sale price.  *See* Rouhandeh Decl., Ex. B. at S-23.

In sum, contrary to the factual representation in the offering documents, the appraisers were not impartial, objective or independent and in many instances the value of the appraisal was pre-determined and/or inflated.[49]

The SAC also details that Defendants failed to disclose that the Certificates' credit ratings were based on inaccurate loan information, outdated assumptions and relaxed ratings criteria.[50] Rating Agency executives have acknowledged that they "relied on reps and warrantees that no loans were originated in violation of any state or federal law.  We know that's a lie."  ¶114. Additionally, the Rating Agencies used outdated models that did not adequately capture the changed mortgage landscape.  ¶¶101-03.  As a result, the Certificates' ratings were artificially high and made the Certificates appear less risky than reality.[51]

Defendants' assertion that they had no duty to disclose the omitted facts about the ratings is incorrect.  Defs.' Mem. at 21, 21 n.14.  The offering documents included information regarding the Certificates' structure and ratings and Defendants therefore had a duty to disclose all information related to these facts.[52]  Nevertheless, the offering documents failed to disclose

---

[49] Defendants' assertion that Plaintiffs' claims should be dismissed because the SAC does not provide the identity of specific appraisers or the inflation of appraisals for particular loans in the pools fails because Plaintiffs need not provide such an exacting level of detail to adequately plead Securities Act claims under Rule 8.

[50] ¶98.  Defendants' contention that ratings are not part of the offering documents is incorrect. Defs.' Mem. at 20 (citing 17 C.F.R. 230.436 (g)).  Rule 436(g) makes clear that it only exempts **rating agencies** from liability, and only when they are experts.  *See* 17 C.F.R. § 230.436(g)(1) (emphasis added) (ratings "shall not be considered **a part of the registration statement prepared or certified by a person** within the meaning of sections 7 and 11 of the Act.")  Rule 436(g) does not exempt Defendants here.

[51] ¶98.  Subtitle C of the Dodd-Frank Wall Street Reform and Consumer Protection Act, H.R. 4173, 111th Cong. (2010) concludes, *inter alia*, that: "In the recent financial crisis, the ratings on structured financial products have proven to be inaccurate."  ¶121.

[52] *See* 17 C.F.R. § 230.408(a) ("[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they

-23-

specific information – the use of inaccurate loan data and outdated models – which directly affected the accuracy of the Certificates' ratings.[53]

Despite the fact that Section 11 does not require investors to allege scienter, *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004), Defendants contend that Plaintiffs must plead Defendants' subjective disbelief of the ratings.[54]   Defendants do not dispute, however, that ratings are actionable "if the speaker does not genuinely and reasonably believe [them] or if [they are] without a basis in fact."[55]   Here, Rating Agency personnel have admitted that: (1) "we had blinders on and never questioned the [loan] information we were given," ¶115; and (2) models failed "to capture changes in performance of the new non-prime products," ¶101. Moody's employees stated that "[c]ombined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both."  ¶115. These allegations, coupled with the SAC's allegations regarding the collapse in Certificate value

---

were made, not misleading."). *See also In re CitiGroup Inc. Bond Litig.*, 2010 WL 2772439, at *19 (S.D.N.Y. Jul. 12, 2010).  Defendants cite *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993), a case which supports Plaintiffs.  In *Time Warner*, the court found the allegations at issue were sufficient to survive a motion to dismiss and relied on case law recognizing a duty to disclose information necessary to make prior statements not misleading. *Id.* at 268.

[53]  Defendants' contention that Plaintiffs do not allege that the prospectus supplement inaccurately conveyed the actual ratings is a red herring.  Defs.' Mem. at 20.  The SAC does not allege that Defendants inaccurately "reported" the ratings, but that the ratings themselves were false.  *See* ¶¶98, 105-124.

[54]  Defs.' Mem. at 20 n.13.  The "subjective falsity standard" does not apply to the ***factual*** statements that the underlying mortgage pools had been evaluated, and – in the case of the overwhelming majority of the Certificates – designated AAA.  *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 589 (S.D.N.Y. 1993) (applying a subjective falsity standard to these statements is "tantamount to reading a scienter requirement into sections 11 and 12(2)").

[55]  *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998); *see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 155, 176 (S.D.N.Y. 2009) (credit ratings are actionable misstatements).

and ratings shortly after issuance, ¶¶9, 11, 127, 135, confirm that Defendants could not – and did

not – genuinely or reasonably believe the ratings' accuracy.[56]

IV.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.[57]

Dated: November 5, 2010                    BERNSTEIN LITOWITZ BERGER
                                             & GROSSMANN LLP


                                    _____/s/ David R. Stickney_____
                                         DAVID R. STICKNEY

                                    DAVID R. STICKNEY (admitted *pro hac vice*)
                                    TIMOTHY A. DeLANGE (admitted *pro hac vice*)
                                    MATTHEW P. JUBENVILLE
                                    12481 High Bluff Drive, Suite 300
                                    San Diego, CA  92130
                                    Tel:    (858) 793-0070
                                    Fax:    (858) 793-0323
                                    davids@blbglaw.com
                                    timothyd@blbglaw.com
                                    matthewj@blbglaw.com

                                    *Counsel for Public Employees' Retirement System*
                                    *of Mississippi and Co-Lead Counsel for the Class*


                                    ROBBINS GELLER RUDMAN
                                      & DOWD LLP


                                    _____/s/ Arthur C. Leahy_____
                                         ARTHUR C. LEAHY

                                    ARTHUR C. LEAHY
                                    SCOTT H. SAHAM
                                    655 West Broadway, Suite 1900
                                    San Diego, CA  92101-3301
                                    Tel:    (619) 231-1058

---

[56]   *Abu Dhabi*, 651 F. Supp. 2d at 175-76.  The failure to implement updated models and data and the "market-share war" were ***existing, but undisclosed***, facts at the time the Certificates were issued.  Accordingly, the ratings-related disclosures Defendants cite cannot insulate Defendants as "cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  *In re AOL Time Warner Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004).  Further, "cautionary language must be specific, prominent and must directly address the risk that plaintiffs' claim was not disclosed."  *In re Flag Telecom Holdings, Ltd., Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009).

[57]   Should the Court be inclined to dismiss any part of the SAC, Plaintiffs request leave to amend to address any concerns the Court may have.

-25-

Fax:   (619) 231-7423
artl@rgrdlaw.com
scotts@rgrdlaw.com

SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Tel:   (631) 367-7100
Fax:   (631) 367-1173
srudman@rgrdlaw.com

*Co-Lead Counsel for the Class*