UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

IN RE MORGAN STANLEY MORTGAGE
PASS-THROUGH CERTIFICATES LITIGATION

------------------------------------------------------x

This Document Relates to All Actions

------------------------------------------------------x

Master File No. 09 Civ. 2137 (LTS)(MHD)

**OPINION AND ORDER**

APPEARANCES:

BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP
   By:  David R. Stickney, Esq.
       Timothy A. DeLange, Esq.
       Matthew P. Jubenville, Esq.
12481 High Bluff Drive, Suite 300
San Diego, CA 92130

*Counsel for Public Employees'*
*Retirement System of Mississippi*
*and Co-Lead Counsel for the Class*

ROBBINS GELLER
RUDMAN & DOWD LLP
   By:  Arthur C. Leahy, Esq.
       Scott H. Saham, Esq.
655 West Broadway, Suite 1900
San Diego, CA 92101

   By:  Samuel H. Rudman, Esq.
58 South Service Road, Suite 200
Melville, NY 11747

*Co-Lead Counsel for the Class*

DAVIS POLK & WARDWELL LLP
   By:  James P. Rouhandeh, Esq.
       William J. Fenrich, Esq.
450 Lexington Avenue
New York, NY 10017

*Counsel for Defendants*

LAURA TAYLOR SWAIN, UNITED STATES DISTRICT JUDGE

On December 2, 2008, Plaintiff Public Employees' Retirement System of Mississippi ("MissPERS") filed suit in California state court, asserting securities fraud claims relating to the marketing and sale of mortgage-backed security ("MBS") pass-through certificates issued by Morgan Stanley Dean Witter Capital I Inc. and several Morgan Stanley Mortgage Loan Trusts. (Class Action Compl. ¶¶ 17, 23.) MissPERS' action was subsequently removed to the United States District Court for the Central District of California, then transferred to this Court in March 2009, and consolidated with another action. On September 15, 2009, then-lead Plaintiff West Virginia Investment Management Board ("WVIMB"), which had commenced a separate action against in this District on May 7, 2009, filed the Consolidated Amended Complaint ("CAC").

On August 17, 2010, the Court granted in part Defendants' motion to dismiss the CAC. The August 17, 2010, Memorandum Opinion and Order ("MS I") granted Plaintiffs leave to amend the CAC "to demonstrate [Miss]PERS' standing with respect to any of the claims that [were] dismissed pursuant to Rule 12(b)(1) and to augment and clarify the pleading of the claims asserted by [Miss]PERS." On September 10, 2010, MissPERS timely filed the Second Consolidated Amended Complaint for Violation of the Federal Securities Laws ("SAC"). On September 28, 2010, the Court granted MissPERS' and WVIMB's joint application to appoint MissPERS as co-Lead Plaintiff.

The SAC alleges violations Securities Act of 1933 ("Securities Act") by Defendants.[1] The SAC contains allegations arising out of MissPERS' purchase of certificates

---

[1]     The Registration Statement and Prospectus Supplements are referred to herein collectively as "the Offering Documents." The Defendants are as follows: Morgan Stanley, the parent corporation, which, created and controls Morgan Stanley Capital ("MSC") (SAC ¶ 20); Morgan Stanley Mortgage Capital Inc.

from Morgan Stanley Mortgage Loan Trust 2006-14SL ("2006-14SL"), as well as allegations

concerning purchases of certificates from Morgan Stanley Mortgage Loan Trust 2006-16AX

("2006-16AX") by newly-added Plaintiff Members United Corporate Federal Credit Union

("Members"); purchases of certificates from Morgan Stanley Mortgage Loan Trust 2006-7

("2006-7") by newly-added Plaintiff NECA-IBEW Health and Welfare Fund ("NECA");

purchases of certificates from Morgan Stanley Mortgage Loan Trust 2006-AR ("2006-AR") by

newly-added Plaintiff United Western Bank ("Western"); purchases of certificates from Morgan

Stanley Mortgage Loan Trust 2006-15XS ("2006-15XS") by newly-added Plaintiff Pompano

Beach Police and Firefighters' Retirement System ("Pompano"); and purchases of certificates

from Morgan Stanley Mortgage Loan Trust 2006-11 ("2006-11") and Morgan Stanley Mortgage

Loan Trust 2006-12XS ("2006-12XS") by newly-added Plaintiff Pension Fund of West Virginia

---

("MSMCI"), which originated mortgage loans or otherwise acquired residential
loans (which were then securitized by MSC) and served as the sponsor and seller
in the securitization of the Trusts (id. ¶ 21); Morgan Stanley Mortgage Capital
Holdings LLC ("MSMCH"), the successor in interest of MSMCI and a subsidiary
of Morgan Stanley, which carried on MSMCI's role as the sponsor and seller in
the securitization of the Trusts (id.) (MSMCI and MSMCH are hereinafter
referred to collectively as "MSMC"); Morgan Stanley Capital, which was an
issuer of the certificates, the depositor, and controlled the Trusts (id. ¶ 22); the
Trusts, which, along with Morgan Stanley Capital, issued the certificates at issue
(id. ¶ 23); Morgan Stanley & Co. Incorporated ("MS&Co."), owned by Morgan
Stanley and an affiliate of MSC and MSMC, which acted as sole lead manager,
and sole bookrunner with respect to the certificates at issue, acted as an
underwriter in the sale of the certificates, and drafted and disseminated the
Offering Documents (id. ¶ 24); David R. Warren, a director of the trusts and the
President of MSC at the time (id. ¶¶ 25, 29); Anthony B. Tufariello, a director of
the trusts and the Principal Executive Officer of MSC at the time (id. ¶¶ 26, 29);
William J. Forsell, a director of the trusts and the treasurer and controller of MSC
at the time (id. ¶¶ 27, 29); and Steven S. Stern, a director of the trusts at the time
(id. ¶¶ 28-29).  David R. Warren, Anthony B. Tufariello, William J. Forsell, and
Steven S. Stern are hereinafter referred to collectively as the "Individual
Defendants."

("West Virginia").[2] Plaintiff Members withdrew from this action voluntarily on November 1, 2010 (docket entry no. 95). Plaintiffs[3] bring this action on behalf of all persons or entities who acquired Certificates of the Trusts "pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-130684) and Prospectus Supplements" (SAC ¶ 30). The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

Defendants now move to dismiss the SAC, arguing that (1) the Court did not grant leave to file an amended complaint asserting the claims of New Plaintiffs, (2) Plaintiffs' claims are time-barred by the applicable statute of limitations,[4] (3) New Plaintiffs' claims are time-barred by the applicable statute of repose, (4) Plaintiffs have failed to allege any cognizable injury, (5) MissPERS lacks statutory standing to bring its Section 12(a)(2) claims, (5) Plaintiffs have failed to allege any actionable misrepresentation or omission, and (6) Plaintiffs' Section 15 allegations fail to state a claim. For the following reasons, Defendants' motion is granted in part and denied in part.

<u>BACKGROUND</u>

The following facts are taken from the SAC, the documents incorporated by reference therein, and other documents of which the Court may properly take judicial notice. Plaintiffs' factual allegations are taken as true for purposes of this motion practice.

---

[2]    The aforementioned trusts, excluding 2006-16AX, from which only Members purchased certificates, are collectively referred to as "the Trusts."

[3]    MissPERS, NECA, Western, Pompano, and West Virginia are referred to collectively as "Plaintiffs." NECA, Western, Pompano, and West Virginia are referred to collectively as "New Plaintiffs."

[4]    In their motion to dismiss the CAC, Defendants did not argue that MissPERS' claims were untimely. <u>MS I</u> therefore assumed, without deciding, that MissPERS' claims were timely.

MSC established the Trusts, acquired the mortgage loans that were transferred to the Trusts, and issued certificates pursuant to the Offering Documents. (SAC ¶ 36.) The Offering Documents contained false information, or omitted information, regarding the underwriting, quality control, due diligence, loan approval and funding practices and policies of the Trusts and their loan originators, appraisal processes, loan-to-value ("LTV") ratios,[5] credit ratings, and the likelihood that borrowers would repay the mortgage loans. (Id.) These omissions and misstatements are alleged to have caused the Offering Documents to be materially false and misleading. (Id.)

MSC and the Trusts (collectively, the "Issuers") filed the Registration Statement with the SEC and thereafter amended that document. (Id. ¶ 37.) The Registration Statement represented that the mortgage loans contained in the mortgage pools were made to creditworthy borrowers whose documentation was not subject to as rigorous a set of standards as those applied to other borrowers and that the loans were made based on the value of the underlying properties, as confirmed by appraisals. (Id.)

*Misrepresentations and Omissions Regarding Underwriting Standards*

Plaintiffs allege that the Offering Documents misrepresented and omitted material facts regarding the underwriting standards applied by the loan originators. MSMC, American Home Mortgage Corp. ("AHM"), First National Bank of Nevada ("FNBN"), GreenPoint Mortgage Funding, Inc. ("Greenpoint"), and Morgan Stanley Credit Corp. ("MSCC") originated or purchased loans held by the Trusts. (Id. ¶¶ 38, 50, 58, 69, 75.)

---

[5]     An LTV ratio is the amount of a mortgage as a percentage of the total appraised value of a property. For example, a transaction in which a mortgagor borrows $90,000 to purchase a $100,000 house has an LTV ratio of 90%. (SAC ¶ 96.)

MSMC was an originator for the 2006-7, 2006-11, 2006-12XS, 2006-14SL, 2006-15XS, 2006-16AX (from which only Members made purchases), and 2006-6AR trusts.  The Offering Documents included the following language regarding MSMC's lending practices:

> Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.

(Id. ¶ 39.)  The original lenders, such as MSMC, did not determine whether borrowers could afford the loan payments.  (Id. ¶ 40.)  The original lenders made loans regardless of ability to repay.  (Id.)  MSMC also purchased loans for which the mortgagor had provided the original lender with patently false information regarding the mortgagor's financial condition and where the original lender had failed to determine that the mortgagor's income was sufficient to enable the mortgagor to repay the loan.  (Id.)

An unnamed former MSMC employee who was responsible for reviewing loans that MSMC was considering acquiring for securitization indicates that MSMC failed to comply with the loan purchasing guidelines in the Offering Documents.  (Id. ¶ 41.)  According to this former employee, MSMC ignored information indicating that the loans it was considering purchasing were not originated pursuant to MSMC's loan purchasing guidelines.  (Id. ¶ 42.)  The former employee indicates that MSMC purchased the loans despite her warning that numerous houses for which certain suspicious loans were purportedly made did not actually exist.  (Id.)  MSMC also purchased loans that were riskier than its guidelines permitted, as they exceeded MSMC's limit for LTV ratios.  (Id. ¶ 43.)  According to the former employee, MSMC was more

concerned with acquiring loans for securitization than with determining whether borrowers' income was sufficient to repay the loans. (Id. ¶ 44.) MSMC's failure to adhere to its loan purchasing guidelines was motivated by a fear of losing the loans in question to a competitor. (Id.)

MSMC failed to disclose that the originators implemented policies designed to extend mortgages to borrowers regardless of their ability to meet their obligations under the mortgage. (Id. ¶ 45.) These policies included coaching borrowers to artificially inflate their income, directing borrowers to "no-doc" loan programs when they failed to qualify for full-documentation loans, steering borrowers to loans that exceeded their borrowing capacity, approving borrowers based on temporary rates despite knowing that the borrower would not be able to afford the higher rate when the adjustable loan rate adjusted, and allowing non-qualifying borrowers to be approved for loans under exceptions to underwriting standards based on "compensating factors" without requiring documentation for or determining the validity of such factors. (Id.)

MSMC's loan purchasing guidelines also failed to disclose how aggressive originators of loans purchased by MSMC were in approving and funding loans made to borrowers who had either not submitted or had altered the required documentation. (Id. ¶ 46.) These practices and factors had the effect of dramatically increasing the risk profile of the trust certificates. (Id.) Borrowers would also routinely inflate their stated income to implausible levels in order to get their mortgage loans approved and funded. (Id. ¶ 47.) MSMC would often ignore such red-flags and purchase the loans despite these inflated income figures. (Id.)

AHM was an originator for the 2006-15XS, 2006-16AX (from which only Members made purchases), 2006-11, and 2006-6AR trusts. The Prospectus Supplements for the

2006-15XS and 2006-11 trusts stated:

> The Originator's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations. . . . Because each loan is different, the Originator expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.
> The Originator underwrites a borrower's creditworthiness based solely on information that the Originator believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

(Id. ¶ 50.) AHM was not underwriting loans based on creditworthiness and repayment ability. Instead, it was systematically disregarding its own underwriting guidelines and lending to anyone it could regardless of the borrower's ability to repay. (Id. ¶ 51.) According to a former AHM Executive Vice President, AHM's lending practices became increasingly lax from 1999 through April 2007, resulting in the granting of an increasing number of loans to people unlikely to repay them. (Id.) Contrary to AHM's stated policy, it was not weighing all risk factors inherent in a loan file, nor did it encourage underwriters to use professional judgment based on experience. (Id. ¶ 52.) According to former employees, the professional judgment of underwriters was often overridden by automated underwriting software. (Id. ¶¶ 52-53.) In order to achieve its desired loan production volume, AHM routinely granted exceptions even where "compensating factors" did not exist. (Id. ¶ 54.) According to a former AHM district manager, loans were made without regard to the borrower's ability to pay. (Id. ¶ 55.) Those employed in AHM's Retail Lending group were compensated in part based on how many and what kind of loans they closed. (Id. ¶ 56.) In order to close a loan, AHM's underwriters needed to approve it. (Id.) However, the underwriters' own compensation was determined in part by the Retail

Lending group.  (Id.)  Thus, both the underwriters and the Retail Lending group were incentivized to approve as many loans as possible without regard to whether a borrower could afford to repay the loan.  (Id.)

FNBN was an originator for the 2006-12XS trust.  The Prospectus Supplement issued in connection with that trust stated:

> FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral.  A prospective buyer applying for a mortgage loan is required to complete an application, which elicits pertinent information about the prospective borrower including, depending upon the loan program, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired.

(Id. ¶ 59.)  In an effort to originate as many loans as possible, FNBN routinely and systematically violated its stated underwriting practices.  (Id. ¶ 60.)  It was FNBN's practice to make residential mortgage loans to borrowers who qualified on the basis of obviously false information and could not reasonably be expected to repay their loans.  (Id.)  Borrowers who did not strictly qualify for a loan under FNBN's guidelines were coached by FNBN to falsify their loan applications to make it appear that they did qualify.  (Id. ¶ 61.)  FNBN funded such falsified loan applications.  (Id.)  According to a former FNBN underwriter, FNBN management pressured underwriters to fund any loan possible.  (Id. ¶ 62.)

Both outside, independent mortgage loan brokers and FNBN in-house account executives received commissions based on the number of loans they closed.  (Id. ¶ 63.)  FNBN account executives (and loan coordinators and loan managers) were incentivized to, and did, coach independent brokers on how to set up loans so that they would qualify.  (Id.)  FNBN had a

process by which it "scrubbed" loan applications, finding and eliminating from a loan package information that would disqualify the potential borrower from FNBN's loan program. (Id. ¶ 64.) FNBN loan coordinators were fired for failing to "scrub" disqualifying information from loan packages. (Id.) In its quest to make as many loans as possible, FNBN ignored unreasonable statements of income on loan applications and approved loans regardless of such implausible information. (Id. ¶ 66.) FNBN relied on an automated underwriting software process which allowed it to avoid a manual examination of loan applications by skilled and experienced underwriters. Such manual examinations would have detected many instances where the borrower's self-reported financial information was implausible. (Id. ¶ 67.) Third-party investment banks such as MSMC, which purchased loan pools from FNBN, received information that revealed the lack of proper underwriting and the resulting problems with the underlying loans. (Id.)

GreenPoint was an originator for the 2006-7, 2006-12XS, and 2006-15XS trusts. The Prospectus Supplement for the 2006-7 trust stated:

> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

(Id. ¶ 69.) GreenPoint's underwriting guidelines were not systematically applied to evaluate the prospective borrower's credit standing, repayment ability or the value and adequacy of the mortgaged property as collateral. (Id. ¶ 70.) Instead, GreenPoint applied guidelines supplied by investment banks that reflected the minimum standards that the investment banks were willing to accept for loans they would purchase and securitize. (Id.) A former GreenPoint Account Executive and former GreenPoint Senior Vice President of Branch Operations indicated that,

beginning in 2005 and continuing throughout 2006, GreenPoint's underwriting standards became increasingly lenient, especially toward higher-risk borrowers.  (Id. ¶ 71.)  In 2005-06, GreenPoint significantly relaxed requirements involving documentation of repayment ability, minimum LTV ratios, and minimum credit scores.  (Id.)

GreenPoint systematically granted exceptions in circumstances where compensating factors did not exist.  (Id. ¶ 72.)  GreenPoint exercised limited oversight or control over the brokers that were approved to transact with it.  (Id.)  These brokers were interested mainly in generating upfront fees triggered by making loans, and did not pay attention to whether borrowers were qualified for the loans or for exceptions due to compensating factors.  (Id.)  GreenPoint did not verify the income of borrowers.  (Id. ¶ 73.)

MSCC was an originator for the 2006-7 and 2006-11 trusts.  The Prospectus Supplements for the 2006-7 and 2006-11 trusts stated:

> MSCC's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. . . . MSCC employs underwriters to scrutinize the prospective borrower's credit profile.

(Id. ¶ 75.)  MSCC's underwriting guidelines were not intended to evaluate the prospective borrower's credit standing and ability to repay the loan, nor the value and adequacy of the proposed mortgaged property as collateral.  (Id. ¶ 76.)  MSCC's underwriting guidelines were systematically intended to originate as many loans as possible without regard to repayment ability.  (Id.)  MSCC's underwriters did not scrutinize prospective borrowers' credit profiles. (Id.)

According to a former MSCC underwriter, MSCC's goal was for underwriters to

approve and close as many loans as possible rather than determine whether a borrower could repay the loan. (Id. ¶ 77.) The same former underwriter stated that, because most of MSCC's applicants were already Morgan Stanley clients, it accommodated them by approving loans so as to keep applicants from withdrawing already-invested assets and moving them to another company. (Id.) The former underwriter indicated that it was considered unprofessional to question an applicant's stated income relative to his or her job title, and therefore underwriters who had questions or concerns about a borrower's information remained quiet and took no action. (Id. ¶ 78.) MSCC put its underwriters on a quota system; if a certain number of loans were not approved in a given time period, the underwriters would be terminated. (Id. ¶ 79.) In addition, approving a certain number of loans above the quota would result in a bonus, thus incentivizing the underwriters' rapid, unverified approval of loan applications. (Id.)

*Misrepresentations and Omissions Regarding Appraisals*

The Registration Statement and each of the Prospectus Supplements stated:

> The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. ***All appraisals conform to the Uniform Standards of Professional Appraisal Practice*** ["the USPAP"] adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

(Id. ¶ 80.)  To ensure the accuracy of real estate appraisals, the USPAP imposes the following requirements: (1) an appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests; (2) in appraisal practice, an appraiser must not perform as an advocate for any party or issue; (3) an appraiser must not accept an assignment that includes the reporting of pre-determined opinions and conclusions; and (4) it is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following: the reporting of a pre-determined result, a direction in assignment results that favors the cause of the client, the amount of a value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.  (Id. ¶ 85.)

Accurate appraisals provide investors with a basis for assessing the price and risk of mortgage-backed securities, as appraisals are supposed to provide independent assessments of the value of a mortgaged property.  (Id. ¶ 81.)  The accuracy of an appraisal is critical to the accuracy of an LTV ratio, which is used to evaluate the price and risk of mortgage-backed securities.  (Id. ¶ 82.)  A high LTV ratio is riskier because a borrower with a small equity position in a property has less to lose if she defaults on the loan.  (Id. ¶ 83.)  A high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may exceed the value of the property.  (Id.)  Assessments of reduced documentation loans, where the loan is originated based largely or exclusively upon the appraised value of the mortgage property and the LTV ratio, depend even more heavily on appraisals.  (Id. ¶ 84.)

The statements in the Offering Documents regarding appraisals failed to disclose that the appraisals were false, inflated, and inaccurate.  (Id. ¶ 86.)  The Offering Documents failed to disclose that the appraisers were not independent from the lenders and/or their agents,

as the lenders and their agents forced appraisers to arrive at pre-determined, pre-conceived, inflated, and false appraisal values.  (Id.)  Those in charge of appraisers were on a commission-only pay structure and were therefore motivated to close as many loans as possible, a goal accomplished by pressuring appraisers to appraise properties at artificially high levels under threat of losing business.  (Id.)  As a result of this conduct, loans were systematically based on false appraisals stating that the home securing the loan was worth more than it in fact was.  (Id. ¶ 87.)

Contrary to the USPAP, many of AHM's appraisals were based on pre-determined values demanded by brokers.  (Id. ¶ 88.)  A former AHM Vice President indicated that from March 2003 through May 2007, appraisal fraud was a common problem at AHM in that loan officers pressured appraisers to come up with a pre-determined number.  (Id.)  As a result of the inflated appraisals, the LTV ratios in the Offering Documents were false.  (Id.)  Appraisers who worked for AHM state that AHM pressured them to arrive at pre-determined figures or risk losing work.  (Id. ¶¶ 89-91.)

Contrary to the USPAP, FNBN's appraisals were based on pressure to arrive at inflated figures.  (Id. ¶ 92.)  Appraisers succumbed to the pressure applied by FNBN and falsely inflated appraisals of properties supporting FNBN's mortgage loans.  (Id.)  FNBN's underwriting supervisors also inflated the appraised value of properties through the use of comparable properties that were not actually comparable, but rather were superior, thus supporting a higher property value.  (Id.)

Contrary to the USPAP, MSCC did not require or conduct physical inspections of properties to be appraised.  (Id. ¶ 93.)  The Offering Documents did not mention that MSCC allowed the realtor selling a property to also serve as the property's appraiser, despite the realtor

not being a licensed appraiser, and even though this was contrary to the USPAP. (Id. ¶ 94.) In such a situation, the realtor/appraiser had an incentive to appraise the property at an inflated value so that the borrower would be able to obtain the loan necessary to complete the purchase and there would be a higher commission for the realtor. (Id.)

The Offering Documents contain information about the LTV ratios of the loans underlying the trusts. (Id. ¶ 95.) The SAC contains LTV ratio information representative of that included in the prospectus supplements for the Trusts. (Id.) The artificially inflated appraisals resulted in artificially low LTV ratios, giving the appearance that the loans underlying the Trusts were better collateralized, and therefore safer, than they actually were. (Id. ¶ 96.)

*Misrepresentations and Omissions Regarding Investment Ratings*

The Offering Documents stated that "It is a condition of the issuance of the Certificates that they receive the respective ratings set forth [in the] prospectus supplement[s]." (Id. ¶ 97.) Each prospectus supplement set forth ratings for the Certificates. (Id.) S&P rated certificates in each of the Trusts, and Moody's and Fitch each rated certificates in several of the Trusts. (Id.) The overwhelming majority of the ratings set forth in the prospectus supplements were within the "investment grade" range of Moody's (Aaa through Baa3), S&P (AAA through BBB), and Fitch (AAA through BBB). (Id.) The ratings set forth in the prospectus supplements were based on (1) outdated assumptions, (2) relaxed rating criteria, (3) and inaccurate loan information. (Id. ¶ 98.) These flaws produced artificially high credit ratings, making the certificates appear less risky than they really were. (Id.)

The rating agencies used models to produce ratings for the certificates that were based on loan performance prior to 2000. (Id. ¶ 99.) The post-2000 decline in lending standards and concomitant increase in riskier, exotic mortgage products during the years 2001 through

2005 rendered the rating agencies' pre-2000 loan data obsolete.  (Id. ¶ 100.)  However, the rating

agencies did not update their models to reflect these changes.  (Id.)  The continued use of

outdated versions of the rating models resulted in the failure of ratings to capture changes in

performance of the new products.  (Id. ¶¶ 101-03.)  The outdated models employed by the rating

agencies were often constructed by people who were unfamiliar with the housing markets in the

areas that they were rating.  (Id. ¶ 104.)

The rating agencies repeatedly eased their ratings standards in order to capture

more market share of the ratings business.  (Id. ¶¶ 105-13.)  This relaxation of standards was due

in substantial part to a conflict of interest: the facts that the rating agencies were compensated by

the same entities to which they provided ratings, and that these entities were free to take their

business to the agency that would provide the highest ratings.  (Id.)  The SEC has concluded that

analysts at rating agencies appear to be aware, when rating an issuer, of the rating agency's

business interest in securing the rating of the deal, and that rating agencies do not appear to take

steps to prevent business interests from influencing ratings.  (Id. ¶¶ 117-19.)

The ratings were also based on inaccurate information.  (Id. ¶ 114.)  The ratings

were based in large part on data about each of the mortgage loans that the defendants provided to

the agencies, including appraisal values, LTV ratios, and borrower creditworthiness and the

amount of documentation provided by borrowers to verify their assets and/or income levels.

(Id.)  Much of this information was inaccurate due to inflated appraisal values, inaccurate LTV

ratios, borrower income inflation and falsification, and other facets of defective underwriting as

described above.  (Id.)  The rating agencies did not engage in due diligence or otherwise seek to

verify the accuracy or quality of the loan data underlying the mortgage pools they rated.  (Id.)

Because the rating agencies used flawed information to generate their ratings, the

artificially high ratings, which were published in the prospectus supplements, did not reflect the certificates' true risk.  (Id. ¶¶ 123-24.)  Since the certificates were issued, the credit ratings on certificates within each of the Trusts have been downgraded because the original ratings did not accurately reflect the risk associated assets underlying the certificates.  (Id. ¶ 126.)  Because of the downgrades and information unknown to investors at the time the certificates were issued, the value of the certificates has diminished greatly since their original offering.  (Id. ¶ 127.)

Based on the foregoing, Plaintiffs assert claims for violations of Section 11, 15 U.S.C. § 77k ("Section 11")[6], Section 12(a)(2), 15 U.S.C. § 77l(a)(2) ("Section 12(a)(2)")[7], and Section 15, 15 U.S.C. § 77o ("Section 15")[8] of the Securities Act.

## DISCUSSION

Sections 11, 12(a)(2), and 15 of the Securities Act impose civil liability on certain persons when a registered securities offering contains material misstatements or omissions.  15 U.S.C. §§ 77k, 77l(a)(2), 77o; In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010).  Section 11 provides a cause of action regarding registration statements, and Section 12(a)(2) provides a cause of action regarding prospectuses and oral communications.  15 U.S.C. §§ 77k, 77l(a)(2); see also In re Morgan Stanley, 592 F.3d at 358-59.  Section 15 provides a cause of action against "[e]very person who . . . controls any person liable under [Sections 11 or 12(a)(2)] of this title."  15 U.S.C. § 77o.  A claim under Section 15, therefore,

---

[6]    Plaintiffs assert Section 11 claims against all defendants except MSMC and Morgan Stanley.

[7]    Plaintiffs assert Section 12 claims against the Issuers and MS&Co.

[8]    Plaintiffs assert Section 15 claims against Morgan Stanley, the Individual Defendants, and MSMC.

can only succeed if a plaintiff can first demonstrate liability under Section 11 or Section 12.  See In re Morgan Stanley, 592 F.3d at 358.

For a misstatement or omission to be actionable under Section 11 or 12(a)(2), a defendant must have a duty to disclose the information, and the omitted or misstated information must be material to the investor.  "[S]ections 11 and 12(a)(2) create[] three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading."  In re Morgan Stanley, 592 F.3d at 360; see also 15 U.S.C. §§ 77k(a), 77l(a)(2).

On a motion to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), the movant bears the burden of demonstrating that the complaint fails to state a claim upon which relief may be granted.  Lerner v. Fleet Bank, N.A., 318 F.3d 113, 128 (2d Cir. 2003). To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "plead enough facts to state a claim that is plausible on its face."  Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (internal quotation marks omitted) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

Defendants assert that the SAC must be dismissed for failure to plead sufficiently the timeliness of the claims asserted and argue, based on information that was publicly available and reports that were issued to investors in the 2006-14SL trust certificates more than a year before the December 2, 2008, filing date of MissPERS' original complaint, that MissPERS cannot demonstrate that its claims are timely.  Defendants also argue that the New Plaintiffs'

claims are barred by the applicable statute of repose.  Plaintiffs assert that MissPERS' claims are timely and that such timeliness has been pleaded sufficiently, and further contend that the applicable statute of repose was tolled with respect to the claims of the New Plaintiffs, and in the alternative, that the New Plaintiffs' claims should be deemed to relate back to the filing date of the original MissPERS Complaint.

The Court will first address the sufficiency of the SAC as to the timeliness of MissPERS' claims and the timeliness of MissPERS' claims, and then turn to the question of the timeliness of the New Plaintiffs' claims.

Sufficiency of MissPERS' Timeliness Allegations

Section 13 of the Securities Act requires that claims under Section 11 and Section 12(a)(2) be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C.A. § 77m (West 2009).  This same limitations period applies to Section 15 claims.  Dodds v. Cigna Sec., Inc., 12 F.3d 346, 349-50 n.1 (2d Cir. 1993).

MS I held that the CAC was deficient because, inter alia, it failed affirmatively to allege compliance with the timing requirements of section 13.[9]  In the SAC, Plaintiffs allege that they were not aware of the wrongs alleged at the time they purchased the Certificates, that those

---

[9]     WVIMB alleged that "[a]t the time of their purchases of the Certificates, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to mid-2008.  Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this action is based until the time that the first complaint was filed." (CAC ¶ 164.)  WVIMB alleged that by the middle of 2008, the cumulative impact of delinquency rates and downgrades reached a critical mass such that it was alerted to misrepresentations by Defendants concerning the quality of mortgages underlying the purchased certificates.  (Id. ¶ 6.)

matters did not begin to become known to the public until late 2008, that Plaintiffs could not reasonably have discovered the facts prior to that time, that less than one year elapsed between the time they discovered or reasonably could have discovered the facts and the time the action was filed, and that fewer than three years elapsed between the time that the relevant securities were offered to the public and the time this action was commenced. (SAC ¶¶ 8, 136.) Defendants, citing MS I, contend that the amended allegations are insufficient because they are not specific as to the "time and circumstances" of the various named plaintiffs' discovery of the fraudulent conduct upon which the claims are based.

Plaintiffs' allegation regarding discovery in "late 2008" is vague, and also appears to be inconsistent with the earliest-possible-discovery time frames posited in the earlier pleadings (e.g., as noted in MS I, Plaintiffs' allegation in the CAC of "public knowledge" cited to downgrades beginning in mid-2008). Plaintiffs have again failed to allege with the requisite specificity the time and circumstances of their discovery of the conduct that forms the basis of their claims, relying instead on general public knowledge of underwriting practices and the other conduct on which the SAC is based.

In their briefs and at oral argument, however, Plaintiffs focused on ratings downgrades to below-investment-grade levels as the key triggers for discovery, proffering that such downgrades were particularly significant for institutional investors whose investment guidelines generally required investment-grade holdings. In light of the refined allegations offered at oral argument and the presence of the New Plaintiffs, the Court will grant Plaintiffs' request for one additional opportunity to replead the time and circumstances of discovery of the alleged conduct in order to demonstrate compliance with timing requirements of section 13. Any further amended complaint must allege with reasonable specificity as to each named

plaintiff when and how the discovery occurred.

Because the dismissal on this ground will be without prejudice to one further amendment of the complaint, and in the interests of judicial economy, the Court will address the remainder of Defendants' arguments for dismissal of the SAC.

Timeliness of MissPERS' Claims

Defendants argue that MissPERS' claims are in any event barred by the applicable one-year statute of limitations because inquiry notice of the claims arose more than one year before MissPERS filed its original, December 2, 2008, complaint in California.

It is proper to dismiss a complaint on the basis of inquiry notice when the complaint and "uncontroverted evidence clearly" support such a finding. Lentell v. Merrill Lynch & Co, Inc., 396 F.3d 161, 167-68 (2d Cir. 2005). Inquiry notice exists where sufficient facts would suggest to a plaintiff of normal intelligence that wrongdoing is "probable, not merely possible." Newman v. Warnaco Group, 335 F.3d 187, 193 (2d Cir. 2003). However, a plaintiff need not know all of the details of the conduct or know about the entire fraud being perpetrated to be on inquiry notice, but instead merely must be aware of the general fraudulent scheme. In re Integrated Res. Real Estate Ltd. P'ships Sec., 815 F. Supp. 620, 637 (S.D.N.Y. 1993).

MS I held that inquiry notice had arisen with respect to WVIMB's claims, which were asserted for the first time in a May 2009 complaint, "well before May 2008." Finding no basis for relation back of the claims to the earlier MissPERS' complaint, the timeliness of which had not been challenged, the Court dismissed with prejudice the sole claim as to which WVIMB had demonstrated that it had standing. Defendants now challenge the timeliness of MissPERS'

original complaint.[10]

MS I held that, taken as a whole, (1) downgrades, beginning in December 2007, of the ratings of specific certificates that WVIMB had purchased, (2) news reports of questions regarding the integrity of ratings of subprime instruments, (3) monthly reports to investors indicating climbing delinquency rates, and (4) a 2003 SEC report and news articles regarding rating agency conflicts of interest gave rise to inquiry notice before May 2008. MS I at 16. Defendants now argue that inquiry notice arose before December 2007 with respect to certificates of the 2006-14SL Trust from which MissPERS made purchases. Defendants' argument is premised on (1) downgrades of the 2006-14SL trust certificates by S&P beginning on November 16, 2007, and by Moody's on August 16, 2007 (see Decl. James P. Rouhandeh Supp. Defs.' Mot. Dismiss Second Consol. Am. Compl. ("Rouhandeh Decl.") Ex. A); (2) monthly reports disclosing that delinquency and foreclosure rates for the 2006-14SL trust were on the rise throughout 2007, including an increase from 2.6% in March 2007 to 7.8% in November 2007 (see Rouhandeh Decl. Exs. C–G); and (3) the issuance of news items and other reports questioning the integrity of ratings of subprime instruments beginning in 2007 (see Rouhandeh Decl. Exs. H–N).

*Downgrades/Negative Watches*

Plaintiffs respond that inquiry notice only arose when the certificates at issue were downgraded to below "investment grade." Plaintiffs argue that the pre-August 2008 "downgrades" cited by Defendants were relatively minor "negative watch" alerts, and as such, were insufficient to trigger inquiry notice. At oral argument, Plaintiffs represented that the

---

[10]     Although Defendants principally direct their statute of limitations arguments against MissPERS, a determination that the December 2008 complaint was untimely would also require the dismissal of the New Plaintiffs' claims.

change from investment to non-investment grade was the relevant one for purposes of triggering

inquiry notice because Plaintiffs are institutional investors and their risk-related investment

criteria are often driven substantially by the investment/non-investment-grade distinction. (Jan.

25, 2011, Oral Arg. Tr. 17.)

Defendants have submitted the ratings change report for the Trust from which

MissPERS purchased, 2006-14SL. (Rouhandeh Decl. Ex. A.) Defendants also submit a news

article that illustrates the rating grades used by S&P and Moody's to denote the default risks of

bonds, indicating the threshold between "investment grade" and "speculative grade."

(Rouhandeh Decl. Ex. K at 8.) While ratings for the 2006-14SL Trust began sliding earlier, the

first non-investment quality, "speculative" grade from Moody's did not come until October 28,

2008, and the first "speculative" grade from S&P was not issued until August 26, 2008. While

S&P had placed the 2006-14SL Trust just above the cusp for "speculative" on December 20,

2007 (within one year prior to the filing of the original complaint), Moody's still gave the 2006-

14SL Trust a rating far from the "speculative" grade on April 17, 2008.[11]

S&P gave the 2006-14SL Trust a rating of "AAA*-"[12] on November 16, 2007.

This was the rating that most closely preceded December 2, 2007, the date one year prior to the

filing of the original complaint in this action. According to S&P, a credit rating of AAA

indicates an "[e]xtremely strong capacity to meet financial commitments;" it is S&P's "[h]ighest

---

[11]     Indeed, according to Defendant's Exhibit K, this April 2008 grade put the 2006-
14SL Trust on par with the Government of Malaysia, and above corporations
including Sprint-Nextel and Whole Foods.

[12]     Regarding the minus, S&P states "[t]he ratings from 'AA' to 'CCC' may be
modified by the addition of a plus (+) or minus (-) sign to show relative standing
within the major rating categories." See Pls.' Submission Concerning Definitions
of Credit Ratings, docket entry no. 108, Ex B.

Rating." See Pls.' Submission Concerning Definitions of Credit Ratings, docket entry no. 108, Ex B. In light of the maintenance of investment-grade ratings on the 2006-14SL Trust well into the one-year limitation period notwithstanding rising delinquency rates and attention to the integrity of the subprime market, the cited delinquency rates and ratings changes are insufficient to warrant dismissal of MissPERS' claim as untimely as a matter of law.

*News Articles/Public Reports*

Nor are the media news items and SEC report proffered by Defendants (see Rouhandeh Decl. Exs. H–N) sufficient to establish as a matter of law that MissPERS' claim is untimely. The cited articles and report were not specifically about Morgan Stanley and were therefore too general to provide inquiry notice. The SEC report and news articles deal primarily with the three rating agencies: S&P, Moody's, and Fitch. The 2003 SEC report makes clear that potential conflicts of interest in the credit rating business had existed for "many years," although concern about them had increased given, inter alia, the "continued rise in importance of rating agencies in the U.S. securities markets." (Ex. H at 40.) The news articles (Exs. I–N) described and speculated as to the rating agencies' role in the subprime crisis, focusing on the potential conflict of interest arising from their close coordination with and competition for the business of issuers who serve as their clients (and thus pay their bills). The news articles address only tangentially, and the SEC report neglects entirely, the question of the adequacy of the rating agencies' models for assessing collateralized debt instruments like the mortgage-backed securities at issue. None of these pieces addresses, even at a speculative level, the disregard of underwriting practices, neglect of appraisal standards, or consequent LTV ratio misrepresentations alleged in the SAC.

Some of the news articles are more critical of the ratings agencies than others, and

some provide greater insight into the iterative process by which the rating agencies consult with and give feedback to clients before securities are even issued (see especially Ex. M).  However, even the pieces that focus on the cooperation of the rating agencies and their clients and portray this relationship as fundamentally flawed do not address the allegedly systematic disregard of published standards upon which Plaintiffs base their claims.  The absence of information about the underlying conduct, combined with the reassuring statements by and defenses of the rating agencies in the articles and the speculative manner in which the criticisms of the ratings agencies were presented render these materials insufficient, standing alone or in combination with the pre-December 2007 ratings changes, to constitute the requisite clear showing that MissPERS can be charged as a matter of law with inquiry notice as of a time prior to December 2007.

Accordingly, Defendants' motion is denied insofar as it seeks dismissal of MissPERS' claim as untimely.

Timeliness of New Plaintiffs' Claims

*Scope of Leave to Amend/Augment*

Defendants argue that MS I did not give MissPERS leave to add the New Plaintiffs, and that addition of those parties without court authorization was improper under Federal Rule of Civil Procedure 21.  However, the penultimate paragraph of MS I clearly authorized the amendment and augmentation of the CAC, granting Plaintiffs leave to amend the CAC "to demonstrate [Miss]PERS standing with respect to any of the claims that [were] dismissed pursuant to Rule 12(b)(1) and to augment and clarify the pleading of the claims asserted by [Miss]PERS."  The addition of the New Plaintiffs was within the scope of the amendment leave granted by MS I.

*American Pipe* and the Statute of Repose

Although the parties agree that the applicable three-year statue of repose ran prior to the filing of the SAC, Plaintiffs argue that the New Plaintiffs' claims are timely under the tolling doctrine articulated in American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974). Defendants counter that American Pipe tolling does not apply to statutes of repose, nor to cases in which the original class representatives lacked standing to assert the claims. The Court concludes that American Pipe tolling applies to the New Plaintiffs' claims.

In American Pipe, proposed class members sought to intervene in an antitrust action after a district court denied class certification for failure to satisfy Rule 23's numerosity requirement. Id. at 544. The motions to intervene were filed after the running of a statute of limitations that, in the style of a statute of repose, declared that suits brought outside a four-year period would be "forever barred." Id. at 541-42 (citing 15 U.S.C. § 16(b)). The district court thus denied the intervention motions as untimely. On review, the Supreme Court reversed, concluding that "the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." Id. at 554. The Court noted that the outcome of the class certification process is often far from certain and cautioned that a rule requiring potential class members to "successful[ly] anticipat[e]" the outcome or risk their claims being time-barred would "induce[] [them] to file protective motions to intervene or to join in the event that a class was later found unsuitable." Id. Such a rule "would deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure." Id. at 553.

Defendants countered, in an argument that should be familiar to the parties here,

that "irrespective of the policies inherent in Rule 23 and in statutes of limitations, the federal courts are powerless to extend the limitation period beyond the period set by Congress because that period is a 'substantive' element of the right conferred on antitrust plaintiffs and cannot be extended or restricted by judicial decision or by court rule." Id. at 556.  The Supreme Court rejected this formalist position, holding that "[t]he proper test is not whether a time limitation is 'substantive' or 'procedural,' but whether tolling the limitation in a given context is consonant with the legislative scheme." Id. at 557-58.

The Court emphasized that "[t]his rule is in no way inconsistent with the functional operation of a statute of limitations." Id.  The function of a statute of limitations is to prevent plaintiffs from "sleep[ing] on [their] rights" and forcing defendants to defend against "stale claims." Id. at 554.  Such purposes "are satisfied, when . . . a named plaintiff who is found to be representative of a class commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." Id. at 554-55.  The American Pipe rule has since been expanded to cover class members who filed separate suits after class certification was denied for, inter alia, lack of typicality.  See Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 350 (1983); In re WorldCom Sec. Litig., 496 F.3d 245, 254 (2d Cir. 2007) (extending American Pipe tolling to potential class members who file separate suits before disposition of class certification).

Defendants here argue that American Pipe cannot save claims brought outside the temporal scope of a statute of repose.  They refer the Court to the inflexible statutory language, which provides (much like the statute at issue in American Pipe) that "in no event shall any action be brought" under Section 11 or Section 12(a)(1) more than three years after the relevant

offering.  15 U.S.C.A. § 77m (emphasis added) (West 2009).  Furthermore, as Defendants point

out, it is settled law that statutes of repose are not susceptible to equitable tolling.  See Lampf v.

Gilbertson, 501 U.S. 350 (1991).  As the Second Circuit more recently explained:

> [Statutes of limitations] bear on the availability of remedies and, as such, are
> subject to equitable defenses . . . , the various forms of tolling, and the potential
> application of the discovery rule.  In contrast, statutes of repose affect the
> availability of the underlying right: That right is no longer available on the
> expiration of the specified period of time.  In theory, at least, the legislative bar to
> subsequent action is absolute, subject to legislatively created exceptions.

P. Stolz Family Partnership L.P. v. Daum, 355 F.3d 92, 102 (2d Cir. 2004).  Thus, the

applicability of the American Pipe rule to the statute of repose here hinges on whether its tolling

principle is equitable or legal in nature.  Neither the Supreme Court nor the Second Circuit has

addressed this question.  A minority of lower courts – including two judges in this District –

have held that the American Pipe rule is a species of equitable tolling and thus inapplicable to

statutes of repose.  See Footbridge Ltd. Trust v. Countrywide Financial Corp., 770 F. Supp. 2d

618, 624-27 (S.D.N.Y. 2011); In re Lehman Bros. Securities and ERISA Litigation, 09 MD 2017

(LAK), 2011 WL 1453790, *2-3 (S.D.N.Y. April 13, 2011).  However, the Court finds more

persuasive the view of a majority of the lower courts, which holds that American Pipe tolling "is

a species of legal tolling, in that it is derived from a statutory source, in this case Rule 23," and

that, consequently, it applies to statutes of repose.  See, e.g., Arivella v. Lucent Techs., Inc., 623

F. Supp. 2d 164, 176 (D. Mass. 2009).  See also 28 U.S.C. §§ 2072, 2074 (Supreme Court power

to promulgate procedural rules, effectiveness of rules absent contrary legislative action).

Equitable tolling is rooted in common law principles and permits a court – after

weighing the equities in the discrete case before it – to authorize plaintiffs to bring actions

outside a limitations period.  See Hallstrom v. Tillamook County, 493 U.S. 20, 27 (1989) (a

"traditional equitable tolling principle" should not be applied to a statutory limitations period

when "the equities do not weigh in favor of modifying statutory requirements").  American Pipe

tolling, by contrast, does not "extend equitable relief" based on an individualized assessment of

fairness.  Rather, the "theoretical basis on which American Pipe rests is the notion that class

members are treated as parties to the class action" and that, "[b]ecause members of the asserted

class are treated for limitations purposes as having instituted their own actions . . . the limitations

period does not run against them during that time."  In re WorldCom Securities Litigation, 496

F.3d 245, 255 (2d Cir. 2007).  See also Official Committee of Asbestos Claimants of G-I

Holding, Inc. v. Heyman, 277 B.R. 20, 31-32 (S.D.N.Y. 2002) ("[P]utative class members . . .

have effectively [been] a party to an action against [Defendants] since a class action covering

[them] was requested.")

     The distinction between legal and equitable tolling is not an academic point.

Rather, as one court has explained:

> The difference[] between the forms of tolling is crucial because the animating
> principles of legal tolling are compatible with tolling a statute of repose, while the
> reasoning behind equitable tolling is not. . . .  [T]he purpose of a statute of repose
> is to demarcate a period in which a plaintiff must place a defendant on notice of
> his or her injury, regardless of whether the plaintiff himself is aware that he has
> suffered an injury.  The filing of a class action, which is the only conduct that can
> trigger American Pipe tolling, accomplishes the exact same goal, rendering the
> statute of repose superfluous for the period of time that the class action is
> pending.  In this sense, "application of the American Pipe tolling doctrine to cases
> such as this one does not involve 'tolling' at all."  In contrast to legal tolling,
> equitable tolling would frequently work to frustrate statutes of repose by
> extending the time in which a plaintiff could file suit without providing the
> defendants with any notice of the potential claims against them.

Arivella, 623 F. Supp. 2d at 176-77 (quoting Joseph v. Wiles, 223 F.3d 1155, 1167-68 (10th Cir.

2000)).

The Footbridge Court held that a tolling principle is classified as legal (and thus properly applied in the context of a statute of repose) only if it appears in the text of a statute. Tolling that is read into a statute to promote considerations of fairness and judicial economy is, under this view, equitable. Footbridge, 770 F. Supp. 2d at 626. The Footbridge Court concluded that, because Rule 23 does not explicitly provide for tolling in connection with putative class actions, and because "American Pipe tolling is a judicially-created rule premised on 'traditional equitable considerations' of fairness, judicial economy and needless multiplicity of lawsuits," it must be a species of equitable tolling. Id. This Court respectfully disagrees.

When choosing between competing conceptions of the equitable-legal tolling divide, a court must consider "whether tolling the limitation in a given context is consonant with the legislative scheme." American Pipe, 541 U.S. at 557-58. Here, the view articulated in Footbridge is no more compatible with the purposes served by the statute of repose than is the conclusion that American Pipe is a legal doctrine. The Footbridge view is, moreover, directly at odds with the purposes of Rule 23. Indeed, the risk that potential class members would flood the courts with duplicative motions is acute in the securities context. If American Pipe did not apply to Section 77m's statute of repose, plaintiffs would have only three years in which to uncover the actionable conduct, file suit, and secure class certification. Offending conduct often comes to light years after the fact, class certification can be a lengthy process, and there is always a risk that certification would be denied. Thus, putative class members would have significant incentives to file protective motions to secure their claims. Because American Pipe tolling is both rooted in the statutorily-authorized class action procedure and is consistent with the Rule 23 goals of efficiency and judicial economy, the Court holds that American Pipe tolling may

properly be applied to statutes of repose as well as to statutes of limitation.

*American Pipe Applies Where the Original Plaintiffs Lacked Standing*

Defendants further contend that American Pipe tolling is inoperative where the original plaintiff who brought the class action lacked standing.  As with the statute of repose question, there is no conclusive Supreme Court or Second Circuit authority and lower courts are divided.  Courts that have declined to apply tolling in such circumstances have cited its potential for abuse (specifically, that it would encourage placeholder plaintiffs to file lawsuits first and locate appropriate representatives later) and have also raised concerns about the court's constitutional authority to toll a claim over which it had no subject matter jurisdiction.  See, e.g., Palmer v. Stassinos, 236 F.R.D. 460, 465-66, n.6 (N.D. Cal. 2006).  Courts that have applied tolling where the original plaintiff lacked standing have emphasized its furtherance of the policies of economy and efficiency that underpin American Pipe.  On the facts of this case, the Court finds the latter consideration more compelling.

As explained above, the purpose of American Pipe tolling is to disincentivize putative class members from undermining the efficiency and economy policies underlying Rule 23 by flooding the court with duplicative, protective motions.  While the immediate concern in American Pipe was that potential class members, unable to predict the outcome of class certification, would make protective applications, its logic applies with equal force to cases in which the ultimate viability of the putative class action hinges on the question of whether the named representative has standing.  See In re IndyMac Mortg.-Backed Sec. Litig., 09 Civ. 4583 (LAK) 2011 WL 2508254, *5 (S.D.N.Y., June 21, 2011) ("[If American Pipe did not apply in such circumstances], [p]utative class members in movants' position would be unable to rely on their purported representatives.  They instead would be forced to make protective filings to

preserve their claims in the event that those representatives were determined not to have standing."). See also Griffin v. Singletary, 17 F.3d 356, 360 (11th Cir. 1994) ("If we were to hold otherwise, class members uncertain of the district court's standing analysis – and there is much uncertainty in this area of the law – would have every incentive to file a separate action prior to the expiration of his own period of limitations.") (internal quotations and citations omitted).

Moreover, applying American Pipe in this context is fully consistent with the purposes of the statute of repose. Defendants are not being blindsided or forced to defend against stale claims. Whether or not the appropriate party initiated the suit, the complaint unquestionably apprised them "[w]ithin the period set by the statute of limitations . . . [of] the essential information necessary to determine both the subject matter and the size of the prospective litigation." American Pipe, 414 U.S. at 555. It is worth noting that the Supreme Court has extended American Pipe even to cases where class certification is denied for lack of typicality. See Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 350 (1983).

Nor is the Court swayed by the argument that the absence of subject matter jurisdiction with respect to a named plaintiff who lacks standing precludes application of the American Pipe tolling doctrine to preserve the viability of the claims of putative class members who have standing. This argument misapprehends the theory behind American Pipe. As explained above, under American Pipe, "members of the asserted class are treated for limitations purposes as having instituted their own actions." In re WorldCom, 496 F.3d at 255. Thus, as far as the statute of repose is concerned, the New Plaintiffs – whose standing is not questioned here – are deemed by virtue of the invocation of Rule 23 to have commenced this action on the date the original complaint was filed.

The result that Defendants urge would be unduly harsh.  American Pipe "is predicated on the proposition that an intervenor that reasonably expected to be represented in the originally filed action" should be able to rely on the representatives to vindicate his rights.  Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 202 (S.D.N.Y. 1992).  "American Pipe tolling does not merely allow putative class members 'to wait on the sidelines.'  As the Second Circuit has recognized, such parties 'are expected and encouraged to remain passive during the early stages of the class action.'"  In re IndyMac, 2011 WL 2508254, *5 (emphasis in original) (quoting Cullen v. Margiotta, 811 F.2d 698, 719 (2d Cir. 1987)).  Embracing Defendants' position regarding standing and subject matter jurisdiction would rob potential class members of much of the repose American Pipe aims to bestow and undermine the judicial economy goals of the doctrine.  Subject matter jurisdiction can be raised at any time by a party or sua sponte by the court, even on appeal.  See Fed. R. Civ. P. 12(h); Lyndonville Sav. Bank & Trust Co. v. Lussier, 211 F.3d 697, 700-01 (2d Cir. 2000).  In cases where the law on standing was anything less than crystal clear, potential class members would be taking a tremendous risk by delaying intervention.

The Court is mindful that a blanket application of American Pipe tolling to cases where purported representatives lack standing holds the potential for abuse.  There may be circumstances where the representative so clearly lacks standing that no reasonable class member would have relied.  However, this is not such a case.  The original complaint contained allegations that the harms of which Plaintiffs complain flowed from the registration statement as well as other offering documents.  While this Court ultimately found that the original plaintiffs lacked standing to bring the claims in question, there was at least some authority as of December 2008 that indicated that a reasonable class member could have believed that MissPERS had

standing to sue on behalf of purchasers from other trusts.  See, e.g., In re Countrywide Financial

Corp. Securities Litigation, 588 F. Supp. 2d 1132, 1165-66 (C.D. Cal. 2008) (plaintiffs have

standing regarding later offerings from which they did not purchase securities because those

offerings were based on the same initial registration statement); In re Dreyfus Aggressive

Growth Mut. Fund Litig., No. 98 Civ. 4318 (HB), 2000 WL 1357509, at *3-5 (S.D.N.Y. Sept.

20, 2000) ("Courts have repeatedly certified classes where the class representatives had not

invested in all of the subject securities.") (citing cases); In re Franklin Mut. Funds Fee Litig., 388

F. Supp. 2d 451, 461-62 (D. N.J. 2005) (class action permissible against defendant funds in

which no plaintiff owed shares; see also Plumbers' Union Local No. 12 Pension Fund v.

Nomura Asset Acceptance Corp., 632 F.3d 762, 768-73 (1st Cir. 2011) (characterizing the

question of whether class representatives can bring claims regarding offerings in which they did

not participate as "difficult" and summarizing authority that suggested an affirmative answer).

   Accordingly, the Court finds that the claims brought by the New Plaintiffs in the

SAC are timely under the American Pipe doctrine.  In light of this conclusion, Defendants'

argument regarding relation back is moot.  The New Plaintiffs' claims were brought, for statute

of repose purposes, with those of MissPERS.

Section 12(a)(2) Statutory Standing

   Defendants also argue that Plaintiffs lack statutory standing to bring their Section

12(a)(2) claim because they have not alleged that they purchased certificates in a public offering

as opposed to on the aftermarket.  Section 12(a)(2) only provides a cause of action to persons

who have purchased a security from an offeror or seller.  15 U.S.C. § 77l(a)(2); see also In re

Morgan Stanley, 592 F.3d at 359.  It is well established that a Section 12(a)(2) complaint must

allege such a purchase.  See, e.g., In re WorldCom, Inc. Securities Litigation, Nos. 02 Civ. 3288

(DLC), 03 Civ. 9499 (DLC), 2004 WL 1435356, at *5 (S.D.N.Y. June 28 2004).

Plaintiffs assert Section 12(a)(2) claims against the Issuers (defined in SAC ¶23 as Morgan Stanley Capital and the Trusts) and MS&Co. Defendants argue that the SAC is inadequate to demonstrate MissPERS' Section 12(a)(2) statutory standing because it fails to allege that MissPERS purchased from an offeror or a seller rather than in an aftermarket transaction. The SAC alleges that all Plaintiffs "acquired Certificates pursuant and traceable to the Registration Statement and the Prospectus Supplements and ha[ve] been damaged thereby" and that "defendant Issuers and MS&Co. promoted and sold the Certificates to plaintiffs and other class members." (SAC ¶¶ 14, 138.) Although courts have held that allegations of purchases "pursuant" or "traceable" to a registration statement are inadequate to establish section 12(a)(2) statutory standing, see In re WRT Energy Sec. Litig., Nos. 96 Civ. 3610 (JFK), 96 Civ. 3611 (JFK), 1997 WL 576023, at *5-6 (S.D.N.Y. Sept. 15, 1997) (rejecting the language "issued pursuant to, or traceable to the [Notes Offering and] Registration Statement" as satisfying the 12(a)(2) requirement), vacated on other grounds, 75 F. App'x 839 (2d Cir. 2003); Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. Inc., 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (same), the allegation of promotion and sale to Plaintiffs is sufficient to plead standing with respect to the Section 12(a)(2) claim.

Pleading of Cognizable Injury

Plaintiffs allege that the value of the certificates at issue has diminished greatly since their original offering, as has the price at which Plaintiffs and other members of the Class could dispose of them. (SAC ¶¶ 9, 127.) The time-of-purchase and time-of-filing values of the certificates that NECA and Western continue to hold are alleged specifically. (See id. ¶¶ 16, 9 (NECA); ¶¶ 17, 9 (Western).) The losses that MissPERS, Pompano, and West Virginia suffered

as a result of the sale of their certificates are also alleged specifically.  (See id. ¶¶ 14

(MissPERS), 18 (Pompano), 19 (West Virginia).)

        The diminution of value of a security is a cognizable loss under the Securities

Act.  See New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc., 08 Civ. 5653 (PAC),

2010 WL 1473288, at *4-5 (S.D.N.Y., March 29, 2010) (holding market value loss allegation

with respect to mortgage-backed securities sufficient under Securities Act); In re Countrywide

Financial, 588 F. Supp. 2d at 1169-70 (holding that a complaint is sufficient with respect to

damages if a plaintiff "allege[s] facts creating the reasonable inference that the value of the

securities on the presumptive damages date-that is, either the value at the time plaintiff sold the

securities; or the value at the time of suit, if the plaintiff still holds the securities-is less than the

purchase price."); Levine v. AtriCure, Inc., 508 F. Supp. 2d 268, 276 (S.D.N.Y. 2007)

(constitutional standing demonstrated by allegation of decline in value of security between

purchase and sale or end of class period).  The Court, therefore, denies Defendants' motion

insofar as it seeks dismissal of the SAC for failure to allege a cognizable loss.

Pleading of Actionable Misrepresentation/Omissions

        To state a claim under Section 11, a plaintiff must allege that she (1) purchased a

registered security either from the issuer or in the aftermarket; (2) defendant participated in the

offering in a manner sufficient to give rise to liability under section 11; and (3) the registration

statement "contained an untrue statement of a material fact or omitted to state a material fact

required to be stated therein or necessary to make the statements therein not misleading."  15

U.S.C. § 77k(a); In re Morgan Stanley, 592 F.3d at 358-59.  Section 12(a)(2) "provides similar

redress," "where the securities at issue were sold using prospectuses or oral communications that

contain material misstatements or omissions."  15 U.S.C. § 77 l(a)(2); In re Morgan Stanley, 592

F.3d at 359.

The Court will address Defendants' arguments that Plaintiffs have failed to state viable claims of misrepresentations or omissions as they relate to the three categories of allegations (underwriting standards, appraisals, and investment ratings) made in the SAC.

*Misrepresentations and Omissions Regarding Underwriting Standards*

Defendants contend that the Offering Documents, when read as a whole, included disclaimers as to the relevant underwriting and appraisal practices that were sufficient to put a reasonable investor on notice that, inter alia, borrower information was not always obtained or verified, and that appraisals might not be independent.  With respect to MissPERS' claims concerning the disregard of underwriting standards, Defendants argue that the relevant prospectus supplements disclosed the types of loan products that originators were allowed to deal in, including ones that required less documentation (see Exs. B at S-32, S-33; V at 20).  None of these disclosures, however, asserts that loans would be made without any regard to borrower qualifications, nor does any relate to the coaching of borrowers, or other atypical lending and valuation practices described in the SAC.  (See SAC ¶¶ 40-48.)

Defendants make a similar argument regarding the claims of the New Plaintiffs.  As to Plaintiffs Western and Members, Defendants recite the same argument advanced against MissPERS, which fails for the reasons just stated.  As to NECA, Pompano, and Carpenters, Defendants cite boilerplate disclaimers and disclosures in the relevant offering documents (see Exs. R at S-70–S-72; S at S-83, S-85; U at S-38) that, again, do not disclose the risk of a systematic disregard for underwriting standards or an effort to maximize loan originations without regard to loan quality.  (See SAC ¶¶ 51-53, 59, 69, 75.)

Plaintiffs have adequately alleged actionable misstatements or omissions in that

the relevant offering documents, including the disclosures Defendants cite, fail to disclose the

alleged systematic disregard of underwriting criteria and improper loan origination practices.

See, e.g., Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F. Supp. 2d 387, 392-

93 (S.D.N.Y. 2010); In re IndyMac Mortgage-Backed Securities Litigation, 718 F. Supp. 2d 495,

508-09 (S.D.N.Y. 2010); Merrill Lynch MBS, 714 F. Supp. 2d at 483; Wells Fargo, In re Wells

Fargo Mortgage-Backed Certificates Litigation, 712 F. Supp. 2d 958, 971-73 (N.D. Cal. 2010);

New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC, 720 F. Supp. 2d

254, 269-70 (S.D.N.Y. 2010).

*Misrepresentations and Omissions Regarding Appraisals*

Defendants argue that the SAC is insufficient because MissPERS has not

identified specifically any individual non-conforming mortgage loan and also because

MissPERS has not alleged precisely how the originators' appraisals deviated from USPAP.

Numerous passages in the SAC make such deviation allegations, specific to the originators at

issue. (See, e.g., SAC ¶¶ 86-94.) The Court concludes that the factual allegations regarding the

disregard of appraisal standards, which each prospectus supplement stated would be followed

(see SAC ¶ 80), are sufficient and, contrary to Defendants' contentions, require no further factual

amplification. Plaintiffs' detailed allegations as to the large scale, systematic practices of

originators are sufficient to satisfy the applicable plausibility standard. See Twombly, 550 U.S.

at 570. The specification of particular non-confirming loans is unnecessary at this stage of the

proceeding.

*Misrepresentations and Omissions Regarding Investment Ratings*

Defendants also argue that Plaintiffs' allegations that the prospectus supplements

were misleading with respect to ratings and ratings processes must fail. Defendants note that the

SAC alleges that the ratings process relied on outdated models, and that the ratings process was compromised by conflicts of interest, but never alleges that the offering documents conveyed the ratings inaccurately , irrespective of any problems with ratings methodologies that may have existed.  Invoking 17 C.F.R. § 230.408(a),[13] Plaintiffs argue that Defendants nonetheless had a duty to disclose flaws underlying the ratings, contending that such information was necessary to make the statements as to the ratings given not misleading.  Plaintiffs cite no authority for their broad interpretation of the duty imposed by the regulation and the Court finds that no such additional information was necessary under the circumstances of the disclosure.  The Offering Documents only stated that "it is a condition of the issuance of the Certificates that they receive the respective ratings set forth [in the] prospectus supplement[s]."  The Offering Documents did not make any representation as to the process by which the ratings were determined or as to the integrity of the ratings.

Because Plaintiffs have failed to allege facts indicative of any misrepresentation concerning the derivation or integrity of the ratings, and have failed to identify any duty to disclose the alleged underlying flaws in the rating process, their ratings-related claims under Sections 11 and 12(a)(2) will be dismissed for failure to state a claim upon which relief can be granted.

Section 15 Claim

In light of the foregoing determinations, Defendants' motion to dismiss Plaintiffs

---

[13]     Section 230.408(a) provides in relevant part that:

In addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

Section 15 claim is granted to the extent it is premised on the existence of actionable misstatements or omissions regarding ratings in the Offering Documents.

<u>CONCLUSION</u>

Defendants' motion to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6) is granted with respect to Plaintiffs' failure to allege sufficiently compliance with the timing requirements of section 13 and Plaintiffs' rating-related allegations, and is denied in all other respects.

Plaintiffs' request for leave to replead is granted as to the sufficiency of their allegations with respect to compliance with the Section 13 timing requirements and as to their rating-related allegations. Any further amended complaint must be filed by **September 30, 2011**. Failure to file timely a further amended complaint will result in the dismissal of this action with prejudice, and without further advance noticed to Plaintiffs.

This memorandum opinion and order resolves docket entry no. 88.

An initial pretrial conference will be held in this matter on **October 28, 2011, at 12:15 p.m.** The parties' attention is directed to the Court's April 2, 2009, Initial Conference Order provisions regarding consultation and submissions in preparation for the initial pretrial conference.

SO ORDERED.

Dated: New York, New York
　　　 September 15, 2011

LAURA TAYLOR SWAIN
United States District Judge