UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x
In re MORGAN STANLEY MORTGAGE   :   Civil Action No. 1:09-cv-02137-LTS
PASS-THROUGH CERTIFICATES       :
LITIGATION                 :   CLASS ACTION
—————————————————————  :
                                    :
This Document Relates To:         :
                                    :
     ALL ACTIONS.           :
————————————————————— x

**THIRD AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS**

RECEIVED

SEP 3 0 2011

U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF ACTION

1.      This is a securities class action on behalf of all persons or entities who acquired Mortgage Pass-Through Certificates (the "Certificates") of Morgan Stanley Capital I Inc. ("Morgan Stanley Capital" or the "Depositor") pursuant and/or traceable to the false and misleading Registration Statement and Prospectus Supplements ("Offering Documents") issued in connection therewith, by Morgan Stanley Capital and the Trusts identified in ¶21.  This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.      Defendant Morgan Stanley Capital is a Delaware corporation formed in 1985 for the purpose of acquiring and owning mortgage loan assets and selling interests in them.  Morgan Stanley Capital is an affiliate of defendant Morgan Stanley & Co. Incorporated ("MS&Co.") and is a direct, wholly-owned subsidiary of defendant Morgan Stanley.  The issuers of the various offerings are Morgan Stanley Capital and the Trusts identified in ¶21 (the "Issuers") established by Morgan Stanley Capital to issue hundreds of millions of dollars worth of Certificates.

3.      On December 23, 2005 (with amendments on February 17, 2006 and March 14, 2006), the Issuers caused a Registration Statement to be filed with the Securities and Exchange Commission ("SEC") in connection with and for the purpose of issuing hundreds of millions of dollars worth of Certificates.   The Issuers issued the Certificates pursuant to Prospectus Supplements, each of which was incorporated by reference into the Registration Statement.  The Certificates were supported by pools of mortgage loans generally secured by liens on residential properties, including conventional, adjustable-rate, hybrid adjustable-rate, and negative amortization mortgage loans.

4.      Defendants made the following false and misleading statements in the Offering Documents:

- Underwriting standards used by the originators to originate the loans supporting the Certificates evaluated a prospective borrower's ability to repay the loan;

- Property appraisals conformed to the Uniform Standards of Professional Appraisal Practice ("USPAP"); and

- The loans underlying the Certificates had certain, specific, loan-to-value ("LTV") ratios.

5.      According to reports of governmental investigations and statements of former executives and employees of the key originators who were responsible for ensuring that the underwriting practices were as stated, the true, material facts, which defendants omitted from the Offering Documents, were that:

- Borrowers were not evaluated on their ability to repay the loans; instead, loans were made regardless of a borrower's ability to repay; loan originators made as many loans as possible regardless of repayment ability since they were selling the loans to defendants at a profit; in addition, borrowers and loan originators were routinely inflating borrowers' incomes to falsely high levels to qualify borrowers for loans they could not afford to repay;

- Property appraisers' future compensation was contingent upon providing loan originators with false, pre-determined, inflated property appraisals which allowed borrowers to qualify for loans; in addition, appraisals were not based on recent sales of comparable properties; and appraisals did not conform to USPAP; and

- Because the specified LTV ratios contained in the Offering Documents were based on false and inflated property appraisals, the LTV ratios specified in the Offering Documents were false, inaccurate and understated.

**The Certificates Purchased by Plaintiffs and the
Class Have Declined in Value as a Result of the Offering
Documents' Misrepresentations and Omissions**

6.      Plaintiffs suffered injury as the direct result of defendants' misrepresentations and omissions contained in the Offering Documents as the loans backing the Certificates sold to plaintiffs were not originated utilizing the underwriting and appraisal practices described in the Offering Documents.  As a result, the Certificates at issue were secured by assets that had a much

greater risk profile than represented in the Offering Documents.  In this way, defendants were able to obtain superior ratings on the tranches or classes[1] of Certificates, when, in fact, these tranches or classes were not equivalent to other investments with the same credit ratings.

7.      As a result of defendants' misrepresentations and omissions, the Certificates have not performed consistent with the ratings which they received.  According to the August 2010 Trustee distribution reports for the Trusts at issue, the total percentage of delinquent and foreclosed loans ranged from 24%-46%.  This extraordinarily high number of delinquent and foreclosed loans was a direct result of the loan originators' systematic disregard of their stated loan underwriting guidelines, their undisclosed practices of lending to anyone they could regardless of whether the borrowers could repay the loan, and their disregard for the stated appraisal practices.

8.      At present, all of the Certificates purchased by the named plaintiffs have been downgraded from their original top-rated "AAA" or "Aaa" investment grade status, with many being downgraded to "CCC" or lower, commonly referred to as "junk" status.

9.      The Certificates are no longer marketable at or near the prices paid by plaintiffs and the Class, and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Offering Documents represented.  According to Bloomberg, as of December 2, 2008, the Certificates purchased by the plaintiffs had substantially declined in value from their offering price.  According to Bloomberg, the trading price, or value of the Certificates purchased by the plaintiffs as of December 2, 2008, the date this action was filed, was as follows:

---

[1]  The Certificates were divided into tranches or classes depending on, among other things, credit risk and priority of payment.

| Certificate | Value | Approximate % Decline in Value |
|-------------|-------|-------------------------------|
| Trust 2006-7 5A2 | 64-11 | -35% |
| Trust 2006-11 1A6 | 74-09 | -25% |
| Trust 2006-15XS A6B | 57-21 | -42% |
| Trust 2006-12XS A6A | 85-08 | -14% |
| Trust 2006-14SL A1 | 24-21 | -75% |

10.     There has been a market for the resale of investments like the Certificates since at least 2006.  The trading volume of Certificates like those at issue was at least $750 million during December 2008, the time at which the first of the actions asserting the claims herein was filed.

11.     Because of the downgrades, as well as other information that was unknown to investors at the time the Certificates were issued, the value of the Certificates has diminished greatly since their original offering, as has the price at which plaintiffs and members of the Class did or could have disposed of them.

## JURISDICTION AND VENUE

12.     The claims alleged herein arise under §§ 11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by § 22 of the 1933 Act and venue is proper pursuant to § 22 of the 1933 Act.

13.     The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements in this District.  Defendants conduct business in this District.

## PARTIES

14.     Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi") acquired Certificates pursuant and traceable to the Registration Statement and the Prospectus Supplements and has been damaged thereby.  Specifically, on August 18, 2007, Mississippi purchased 1,325,000 Series 2006-14SL Mortgage Pass-Through Certificates at a price of $95.38.  On

- 4 -

September 26, 2008, Mississippi sold the 14SL Certificates at a price of $24.50, suffering a loss of $939,094.00.

15.     Plaintiff NECA-IBEW Health and Welfare Fund ("NECA") acquired Certificates pursuant and traceable to the Registration Statement and the Prospectus Supplements and has been damaged thereby. Specifically, on September 12, 2006, NECA purchased 145,000 Series 2006-7 Mortgage Pass-Through Certificates at a price of $99.68. Morgan Stanley acted as a broker and seller in these transactions.

16.     Plaintiff Pompano Beach Police and Firefighters' Retirement System ("Pompano") acquired Certificates pursuant and traceable to the Registration Statement and the Prospectus Supplements and has been damaged thereby. Specifically, on October 31, 2006, Pompano purchased 40,000 Series 2006-15XS Mortgage Pass-Through Certificates at a price of $100.00. Morgan Stanley acted as a broker and seller in this transaction. On September 4, 2008, Pompano sold the Certificates at a price of $55.63 suffering a loss of $17,750.00.

17.     Plaintiff Carpenters Pension Fund of West Virginia ("West Virginia") acquired Certificates pursuant and traceable to the Registration Statement and the Prospectus Supplements and has been damaged thereby. Specifically, on July 17, 2006, West Virginia purchased 40,000 Series 2006-11 Mortgage Pass-Through Certificates at a price of $100.00. And on September 22, 2006, West Virginia purchased 25,000 Series 2006-12XS Mortgage Pass-Through Certificates at a price of $100.00. Morgan Stanley acted as a broker and seller in these transactions. On October 2, 2007, West Virginia sold its 2006-11 Certificates at a price of $96.00 suffering a loss of $1,599.35 and sold its 2006-12XS Certificates at a price of $95.50 suffering a loss of $1,125.00. The 2006-11 Certificates have already suffered a current interest shortfall.

18.     Defendant Morgan Stanley is a Delaware corporation headquartered in New York, New York.  Morgan Stanley, through its subsidiary Morgan Stanley Mortgage Capital Inc. and later through defendant Morgan Stanley Mortgage Capital Holdings LLC,[2] created and controls Morgan Stanley Capital, a limited purpose, wholly-owned finance subsidiary designed to facilitate the issuance and sale of the Certificates.

19.     Defendant Morgan Stanley Mortgage Capital Inc. was a New York corporation based in New York, New York, until, as alleged above, it was merged into defendant Morgan Stanley Capital Holdings LLC in 2007.  Morgan Stanley Mortgage Capital Inc. was an indirect wholly-owned subsidiary of Morgan Stanley, and the parent of Morgan Stanley Capital.  Morgan Stanley Mortgage Capital Inc. was also an affiliate of defendant MS&Co.  Morgan Stanley Mortgage Capital Inc. originated mortgage loans, or otherwise acquired residential mortgage loans to be securitized by the Depositor – Morgan Stanley Capital.  Morgan Stanley Mortgage Capital Inc. served as the Sponsor and Seller in the securitization of the Trusts and worked with MS&Co., the rating agencies, loan sellers and servicers in negotiating the principal securitization transaction documents and structuring the securitization transactions.  As alleged above, in 2007, defendant Morgan Stanley Mortgage Capital Holdings LLC became Morgan Stanley Mortgage Capital Inc.'s successor in interest and carried on Morgan Stanley Mortgage Capital Inc.'s role as the Sponsor and Seller in the securitization of the Trusts.  Morgan Stanley Mortgage Capital Holdings LLC is a direct, wholly-owned subsidiary of Morgan Stanley, and an affiliate of defendants MS&Co. and Morgan Stanley

---

[2]  In 2007, Morgan Stanley Mortgage Capital Inc. merged with Morgan Stanley Mortgage Capital Holdings LLC.  By way of this merger, Morgan Stanley Mortgage Capital Holdings LLC became Morgan Stanley Mortgage Capital Inc.'s successor in interest.

Capital.  Morgan Stanley Mortgage Capital Inc. and Morgan Stanley Mortgage Capital Holdings

LLC are collectively referred to herein as "MSMC."

20.     Defendant Morgan Stanley Capital is a Delaware corporation headquartered in New

York, New York and formed in 1985.  Defendant Morgan Stanley Capital was an Issuer of the

Certificates, the Depositor and controlled the Trusts.

21.     The Issuers of the various Certificates are defendant Morgan Stanley Capital and the

below-listed New York common law trusts (the "Trusts"):

> Morgan Stanley Mortgage Loan Trust 2006-7
> Morgan Stanley Mortgage Loan Trust 2006-11
> Morgan Stanley Mortgage Loan Trust 2006-12XS
> Morgan Stanley Mortgage Loan Trust 2006-14SL
> Morgan Stanley Mortgage Loan Trust 2006-15XS

Defendants Morgan Stanley Capital and the Trusts issued hundreds of millions of dollars worth of

Certificates pursuant to the same Registration Statement.

22.     Defendant MS&Co. is owned by Morgan Stanley and is an affiliate of Morgan

Stanley Capital and MSMC.  MS&Co. acted as sole lead manager and sole bookrunner with respect

to the Certificates.  Additionally, MS&Co. acted as an underwriter in the sale of the Certificates and

in doing so drafted and disseminated the Offering Documents.  MS&Co. failed to perform adequate

due diligence to ensure the statements incorporated into the Registration Statement were not false or

misleading.

23.     Defendant David R. Warren ("Warren") was President of Morgan Stanley Capital

during the relevant time period.  Defendant Warren signed the December 23, 2005 Registration

Statement.

24.     Defendant Anthony B. Tufariello ("Tufariello") was President (Principal Executive Officer) of Morgan Stanley Capital during the relevant time period.  Defendant Tufariello signed the December 23, 2005, February 17, 2006, and March 14, 2006 Registration Statements.

25.     Defendant William J. Forsell ("Forsell") was Treasurer (Principal Financial Officer) and Controller of Morgan Stanley Capital during the relevant time period.  Defendant Forsell signed the December 23, 2005, February 17, 2006, and March 14, 2006 Registration Statements.

26.     Defendant Steven S. Stern ("Stern") was a director of Morgan Stanley Capital during the relevant time period.  Defendant Stern signed the December 23, 2005, February 17, 2006, and March 14, 2006 Registration Statements.

27.     The defendants identified in ¶¶23 through 26 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors to the Trusts as they were directors of Morgan Stanley Capital and signed the Registration Statement for the registration of the securities issued by the Trusts.

## CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired Certificates of the Trusts identified herein pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-130684) and Prospectus Supplements (the "Class"). Excluded from the Class are defendants, the officers and directors and affiliates of the defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds of

members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Morgan Stanley Capital and/or MSMC or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. The Registration Statement issued hundreds of millions of dollars worth of Certificates.

30.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the 1933 Act;

(b)     whether statements made by defendants to the investing public in the Registration Statement and Prospectus Supplements misrepresented or omitted material facts about the Certificates and/or the underlying mortgage loans held by the Trusts; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

34.     Morgan Stanley Capital established the Trusts, acquired the mortgage loans that were transferred to the Trusts, and then issued Certificates of various classes or tranches that were sold to investors pursuant to the Registration Statement and Prospectus Supplements. While these Offering Documents contained data about the mortgage loans, some of the most important information for plaintiffs and the other members of the Class was false or was omitted from the Registration Statement and Prospectus Supplements. This misrepresented or omitted information related to the most important aspect of the Certificates – the loan underwriting processes and the collateral that secured the loans. Specifically, the false or omitted information involved the underwriting, quality control, due diligence, approval and funding practices and policies for the mortgage loans, the appraisal processes concerning the underlying properties, the LTV ratios, and the likelihood that borrowers would repay the mortgage loans according to the terms of the loans. These omissions caused the Registration Statement and Prospectus Supplements to be materially false and misleading.

35.     The Issuers caused the Registration Statement to be filed with the SEC on December 23, 2005, and amended the Registration Statement on February 17, 2006, and March 14, 2006. The Registration Statement discussed the mortgage loans contained in the mortgage pools, representing that the mortgage loans were made to creditworthy borrowers whose documentation was not subject to quite as rigorous a set of standards as other borrowers, and that the loans were made based on the value of the underlying properties, as confirmed by appraisals of the properties.

## THE FALSE AND MISLEADING REGISTRATION
## STATEMENT AND PROSPECTUS SUPPLEMENTS

**The Registration Statement and Each of the
Five Prospectus Supplements Misrepresented
and Omitted Material Facts Regarding the
Underwriting Standards Applied by the
Loan Originators**

### MSMC

36.    The March 14, 2006 amendment to the Registration Statement and each of the five

Prospectus Supplements at issue misrepresented the underwriting standards applied to loans

purchased or originated by MSMC.  MSMC originated or purchased more than 63.7% of the loans in

Trust 2006-7.  MSMC originated or purchased more than 24.6% of the loans in Trust 2006-11.

MSMC originated or purchased more than 40.74% of the loans in Trust 2006-12XS.  MSMC

originated or purchased 90.43% of the loans in Trust 2006-14SL.  MSMC originated or purchased

45.19% of the loans in Trust 2006-15XS.

37.    The Registration Statement and Prospectus Supplements each stated that:

> *Based on the data provided in the application and certain verification (if
> required), a determination is made by the original lender that the mortgagor's
> monthly income (if required to be stated) will be sufficient to enable the mortgagor
> to meet its monthly obligations on the mortgage loan and other expenses related to
> the property such as property taxes, utility costs, standard hazard insurance and
> other fixed obligations other than housing expenses.*

38.    This statement was false and misleading as the original lenders did not determine

whether borrowers could afford the loan payments.  Rather, the original lenders made loans to

borrowers regardless of their ability to repay and approved borrowers for loans they could not afford

and could not repay.  For example, MSMC purchased loans where the mortgagor provided the

original lender with patently false information regarding the mortgagor's financial condition.  In

addition, MSMC purchased loans where the original lender failed to determine that the mortgagor's

monthly income was sufficient to enable the mortgagor to repay the loan.  The failure of the loan

originators to comply with the underwriting practices described in the Offering Documents are described in detail below.

39.     According to a former MSMC employee who worked as both a Quality Control Analyst and a Pre-Funding Quality Control and Fraud Investigations Manager from 2003 into 2006, MSMC negligently failed to comply with the above loan purchasing guidelines.  This former employee was responsible for reviewing loans that MSMC considered acquiring for securitization and then preparing an audit report that provided detailed pre-purchase information about the loans – including flagging any potential fraud in the origination of the loan (such as a borrower providing a salary that was excessive for a given job title) or other indicators that the loan was unlikely to be repaid.

40.     According to this former employee, MSMC management ignored information indicating that the loans MSMC was considering for purchase were not originated pursuant to MSMC's stated loan purchasing guidelines.  The former employee red-flagged a number of loans purportedly made for completed homes in Maricopa County, Arizona because the homes had been sold numerous times within a short time span for ever increasing sales prices.  When the former employee visited the purported location of these homes, she noted that there were no homes built there nor were there any other homes in the area.  The employee determined that the "sales" of these "homes" were merely transactions back and forth between builders to artificially inflate their value.  When the former employee notified her MSMC superiors of her findings, they failed to consider this information and purchased the loans (and many others) anyway.

41.     MSMC also purchased loans that were riskier, *i.e.*, less likely to be repaid, than MSMC's guidelines permitted, as the loans exceeded MSMC's limit for LTV ratios.  Further, loan originators presented MSMC with loans that the originator claimed to be Alt-A, but instead were

riskier subprime loans disguised as Alt-A loans. These loans were securitized and represented to be Alt-A loans when they in fact were not.

42.      According to the former MSMC employee, MSMC was "production-based" and *was more concerned with acquiring loans for securitization than whether borrowers could repay the loans*. Contrary to MSMC's stated loan purchasing guidelines, MSMC was not concerned with determining whether borrowers' income was sufficient to repay the loans. In fact, MSMC failed to adhere to its loan purchasing guidelines in order to purchase as many loans as possible because it was worried that if MSMC did not purchase the loans a competitor would.

43.      MSMC's stated loan purchasing guidelines also failed to disclose that the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage, such as:

- Coaching borrowers to misstate their income on loan applications to qualify for larger mortgage loans under the underwriters' underwriting standards, including directing applicants to no-doc loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting No Income No Assets ("NINA") and Stated Income Stated Assets ("SISA") loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable loan rate adjusted; and

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the underwriters' underwriting standards based on so-called "compensating factors" without requiring documentation for or determining the validity of such compensating factors.

44.      Further, MSMC's loan purchasing guidelines failed to disclose that the originators of loans purchased by MSMC and the agents of these originators – such as mortgage brokers – were so aggressive in approving and funding the mortgage loans that many of the mortgage loans were made

- 13 -

to borrowers who had either not submitted or had altered the required documentation. Moreover, in many instances the income/employment verifications that were purportedly completed by the originators were insufficient because the lenders' clerical staff typically did not have proper verification skills, the mortgage brokers or their agents often completed verifications that were suspect, and oftentimes verifications were provided by inappropriate contacts at the borrower's place of employment (*e.g.*, a friend of the borrower would complete the verification instead of human resources). Unbeknownst to investors, these factors had the effect of dramatically increasing the risk profile of the Certificates.

45.     Similarly, those borrowers who were required to submit stated income applications would include income levels which were routinely inflated to extreme levels, relative to their stated job titles, in order to get the mortgage loans approved and funded. For instance, the former MSMC employee recalled MSMC purchasing loans extended to people whose stated occupation could not possibly provide the income stated on the loan application. The former MSMC employee provided a hypothetical but typical example of a borrower whose stated occupation was pre-school teacher but whose stated income was $200,000 per year. According to the former MSMC employee, when red flags such as these were raised, MSMC would often fail to consider the information and purchase the loan anyway. Indeed, the existence of this type of extreme stated income inflation was corroborated in a study cited by the Mortgage Asset Research Institute which found that almost all stated-income loans exaggerated the borrower's actual income by 5% or more, and more than half increased the amount by more than 50%.

46.     In its most recent annual report, filed on Form 10-K with the SEC on February 26, 2010, Morgan Stanley confirmed that it is under direct investigation and is "responding to subpoenas and requests for information from certain regulatory and governmental entities concerning the

origination, purchase, securitization and servicing of subprime and non-subprime residential

mortgages and related issues including collateralized debt obligations and credit default swaps

backed by or referencing mortgage pass through certificates."

### American Home Mortgage Corp.

47.     The Offering Documents made false and misleading statements about the

underwriting practices of American Home Mortgage Corp. ("AHM"), which was an originator for

the following Trusts:

> Morgan Stanley Mortgage Loan Trust 2006-15XS
> Morgan Stanley Mortgage Loan Trust 2006-11

48.     AHM originated 23.45% of the loans for Trust 2006-15XS.  AHM originated more

than 19% of the loans for Trust 2006-11.  The Prospectus Supplement for Morgan Stanley Mortgage

Loan Trust 2006-15XS and 2006-11 stated:

> *The Originator's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations. . . . Because each loan is different, the Originator expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.*
>
> *The Originator underwrites a borrower's creditworthiness based solely on information that the Originator believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.*

49.     The foregoing representations were false and misleading because AHM was not

underwriting loans based upon a borrower's creditworthiness and repayment ability.  Instead, AHM

was systematically ignoring its loan underwriting guidelines and was lending to anyone it could

regardless of whether borrowers could repay the loans.  According to a former AHM Executive Vice

President who worked at the company from 1999 through April of 2007, AHM's underwriting

practices became increasingly lax during the relevant timeframe.  This resulted in AHM granting a

larger and larger number of loans to people unlikely to repay them. According to this former Vice President, AHM "followed Countrywide" in offering "fast and sleazy products" that had very questionable underwriting requirements and were of low quality. A former Wholesale Account Executive, who worked at AHM from January 2005 through July 2007, stated that at AHM "anybody could buy a house with zero percent down and *no proof of ability to pay it [the loan] back*." According to this person, AHM regularly extended loans that are now classified as predatory.

50.     Contrary to AHM's stated underwriting policy, AHM was not weighing all risk factors inherent in a loan file, nor did it encourage underwriters to use professional judgment based on their experience. Instead, as discussed by a former Level 5 Underwriter who worked at AHM from 2004 until December 2006, the professional judgment of AHM's underwriters was often overridden by automated underwriting software. This person pointed to a number of instances where the automated program approved loans that made no sense and were not likely to be paid back. Despite these misgivings, AHM management overruled the Underwriter's human judgment and approved the risky loans. The former Underwriter said that many of the loans approved by the underwriting software were ones on which the former Underwriter "would not have lent a dime."

51.     AHM's failure to comply with stated underwriting practices was confirmed by a former Level 3 Underwriter who worked at AHM from June 2004 to August 2007. According to this Underwriter, the automated underwriting software approved "awful loans" that would not have been approved under AHM's manual underwriting guidelines.

52.     Further, in order to achieve desired loan production, AHM was, as a matter of course, granting exceptions even where "compensating factors" did not exist. AHM's business was dependent on continually increasing volume. AHM granted exceptions as a matter of course even

where not warranted because its business relied on volume as it was paid a fee for its loans and it did not retain them as assets on its own balance sheet.

53.    According to one former AHM district manager, the loan pools sold to defendants and other Wall Street banks were made up of "nothing but junk." Managers were "told to ignore the issues which should not be ignored, such as the *borrower's ability to repay*, and just sell these programs."

54.    AHM had a Retail Lending group that sold loans directly to consumers. Those in the Retail Lending group were compensated, in part, based upon the type and number of loans they closed. However, in order to close a loan, the loan had to be approved by AHM's underwriters. Thus, the Retail Lending group's compensation was determined, in part, by whether the underwriter approved the loans the Retail Lending group was attempting to sell to a potential customer. Similarly, pay raises for the underwriters were determined by the Retail Lending group. Accordingly, the underwriters' compensation was directly affected by decisions made by the Retail Lending group, and the Retail Lending group's compensation was directly affected by decisions made by the underwriters. This symbiotic relationship provided powerful incentives for the underwriters to approve as many loans as possible *notwithstanding whether a borrower could afford to repay the loan* or whether the loan complied with underwriting guidelines, thereby financially rewarding the Retail Lending group, who in turn would approve pay raises for the underwriters.

55.    As noted by a former AHM employee, even loan pools that were ultimately rated AAA were made up of "nothing but junk." But AHM, continued to sell these pools to Wall Street banks, who sold the Certificates which were backed by these questionable loan pools to plaintiffs

and the Class.  According to a former AHM district manager, "They distributed this toxic waste throughout the worldwide system."

### First National Bank of Nevada

56.     The Offering Documents contained false and misleading statements about the loans originated by First National Bank of Nevada ("FNBN") which was the key originator in the following Trust, originating 25.47% of the loans:

Morgan Stanley Mortgage Loan Trust 2006-12XS

57.     The Prospectus Supplement issued in connection with Morgan Stanley Mortgage Loan Trust 2006-12XS, dated September 26, 2006, made false and misleading statements about the underwriting standards of FNBN, stating:

> ***FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral.***  A prospective borrower applying for a mortgage loan is required to complete an application, which elicits pertinent information about the prospective borrower including, depending upon the loan program, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired.

58.     In fact, FNBN's underwriting guidelines were not intended to evaluate its borrowers' credit standing and repayment ability, but rather to originate as many loans as possible.  In doing so, FNBN routinely and systematically violated its stated underwriting practices.  FNBN was routinely lending to borrowers who did not have the ability to repay their loans.  In addition, it was FNBN's practice to make residential mortgage loans to borrowers who qualified on the basis of obviously false information and thus could not reasonably be expected to repay their loans.  FNBN's business model was simply to make as many loans as possible and then sell them as quickly as possible.

59.     According to a former Underwriter who worked at FNBN from July 2006 to July 2007, the rule at FNBN was that "if they [the borrowers] qualify," then FNBN would approve and

fund the loan. "Qualify," however, did not have the traditional meaning as was commonly used in connection with the "qualifying" for a loan, *i.e.*, the borrower met FNBN's lending guidelines. Rather, "qualify" meant the borrower's application needed to "just somehow" appear to meet the qualification standards whether it actually did or not. Borrowers who did not actually qualify for a loan under the guidelines were coached by FNBN to falsify their loan applications to make it appear they did qualify and then their loans were funded by FNBN.

60.     As time went on, the "risk-taking became more and more brazen" at FNBN, according to the former Underwriter. FNBN wanted to fund, *i.e.*, make a loan to, anything or anyone they could. There were "huge pressures from management in Arizona to fund any loan possible." FNBN had a practice of throwing "junk" loans in with "A paper" loans and hoping that it would not be discovered.

61.     The former Underwriter explained that in implementing its business model, FNBN maintained relationships with a large number of independent mortgage loan brokers throughout the United States. FNBN's Wholesale Account Executives managed the relationships with the brokers and worked with the brokers to help the brokers structure the loan applications. The outside brokers and in-house Account Executives both received a commission based on the number of loans they closed. The Account Executives went to the brokers' offices, reviewed the loan applications, and decided with the brokers on the figures to include for items such as income and assets in order to make it appear that the loan application met the qualifications. The Account Executives also coached the brokers on how to set up the loans in order to get them qualified even when such loans should not have qualified. FNBN's Loan Coordinators, who worked with the Account Executives, would act as coaches with the brokers when an Account Executive was unavailable. The brokers, Account Executives, Loan Coordinators and Loan Managers all received bonuses based on the dollar

amount of loans that were closed.  They received no bonuses for loans which were rejected.  Thus, they were incentivized to coach borrowers to falsify loan applications in order to receive their bonuses.

62.     The former FNBN Underwriter also confirmed that FNBN had a process in place to "scrub" loan applications.  There were eight or nine Loan Coordinators in the Warm Springs, Nevada office whose job was to "scrub" the applications.  Loan scrubbing referred to the practice of finding and eliminating information from the loan package that would disqualify the potential borrower from FNBN's loan programs.  As an example, loan scrubbing was designed to find differences in the amount of "stated" (unverified) income and inconsistent payroll information on the application so that the inconsistencies were "fixed" in order to obtain loan approval.  The information was harmonized to make it appear that the higher level of income was correct to get the loan approved even though the purported higher level of income was false and inflated.  FNBN Loan Coordinators were fired for failing to "scrub" disqualifying information from a loan package.

63.     According to the former FNBN Underwriter, Alt-A loans were made to borrowers who were "obviously unqualified to be able to repay them," and FNBN and its brokers "qualified" borrowers by "creating the numbers to make things work."  There was great tension between the underwriters on the one hand and those who brought the loan packages to FNBN (*i.e.*, the brokers, Account Executives, Loan Coordinators and Loan Managers, all of whom received bonuses based on the dollar amount of loans that were closed).  Supervisors would not support challenges by underwriters to unqualified applicants, and income and asset numbers were "just made up" in order to ensure borrowers appeared to qualify for FNBN's loan programs.

64.     FNBN ignored that the incomes stated on its borrowers' loan applications were unreasonable.  As but one example, according to the former FNBN Underwriter, FNBN underwrote

the loan application of a person working in a motel as a housekeeper with "stated" (*i.e.*, unverified) monthly income of $5,000. The former Underwriter took that loan application to her Underwriting Supervisor, Kari Stansel, and told Stansel that she was going to deny the loan. Stansel replied with words to the effect that "we can work this out" or "we can back into this," meaning that it was possible to qualify the applicant by calculating a combination of hourly pay, over-time pay, and the number of hours of regular work and overtime work that would generate a $5,000 monthly income. Stansel calculated the amounts for the wage rate, the amount of overtime, and the number of double shifts the applicant would have to perform during a month to earn $5,000. The former Underwriter told Stansel that it was "absolutely impossible" for any of that data to be true but Stansel would not "back-down." The former Underwriter refused to sign the Form 1008 (the Fannie Mae transmittal form that accompanies the loan when the loan is sold) on this loan application (by signing that form, the underwriter affirms that the loan meets the underwriting standards). Nonetheless, the loan was closed and funded by FNBN.

65.     According to FNBN's former Chief Accounting Officer ("CAO") and Executive Vice President, who worked at FNBN from January 2007 to July 2008, FNBN relied on an automated underwriting software process, which allowed it to avoid a "manual" examination of loan applications by skilled and experienced underwriters. Such examinations would have detected many instances where the borrower's financial information defied common sense and led to a denial of many of the loans that were made. FNBN avoided the risk associated with these loans by auctioning its residential mortgage loan pools to third-party investment banks such as MSMC. MSMC and other investment banks that purchased these loan pools received information in their files that revealed the lack of underwriting and the resulting problems with the underlying loans. FNBN held

monthly auctions in which investors such as MSMC and other Wall Street institutions would bid for the loan pools, which ranged in amount between $100 million to $500 million, and perhaps more.

### GreenPoint Mortgage Funding, Inc.

66.     The Registration Statement and Prospectus Supplements included false and misleading statements about the loan underwriting practices of GreenPoint Mortgage Funding, Inc. ("GreenPoint") which was a key originator for the following Trusts:

> Morgan Stanley Mortgage Loan Trust 2006-7
> Morgan Stanley Mortgage Loan Trust 2006-12XS
> Morgan Stanley Mortgage Loan Trust 2006-15XS

67.     GreenPoint originated more than 11.9% of the loans for Trust 2006-7.  GreenPoint originated 14.93% of the loans for Trust 2006-12XS.  GreenPoint originated 15.71% of the loans for Trust 2006-15XS.  The Prospectus Supplement for Morgan Stanley Mortgage Loan Trust 2006-7, dated May 25, 2006, stated:

> *Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.*

68.     The foregoing representation was false and misleading because GreenPoint's underwriting guidelines were systematically not applied to evaluate the prospective borrower's credit standing, repayment ability or the value and adequacy of the mortgaged property as collateral. Rather, GreenPoint used guidelines supplied by Investment Banks that were not based upon sound loan underwriting standards but were merely the minimum standards that the Investment Banks were willing to accept for loans it would purchase and securitize.  As a former GreenPoint VP/Wholesale Branch Operations Manager – who worked for GreenPoint from July 2003 to January 2008 – explained, the fact that a borrower was unlikely to repay his or her loan was irrelevant so long as the loans were within the underwriting guidelines set forth by the Wall Street firms.

69.     GreenPoint's investor-driven underwriting guidelines were woefully inadequate. As described by a former GreenPoint Account Executive – who worked in the Queens, New York branch from July 2003 through September 2007 – beginning in 2005, GreenPoint's underwriting standards became increasingly lenient, especially towards higher risk borrowers. This Account Executive characterized GreenPoint's underwriting guidelines as "loose" and becoming progressively "looser" during the 2005 through 2006 timeframe. This Account Executive attributed GreenPoint's loosening of its underwriting standards to its desire to remain competitive in the lending market, explaining that as other lenders relaxed their loan underwriting standards and began extending loans to people who probably could not repay their loans, GreenPoint had to do the same in order to remain competitive. These statements were corroborated by a former GreenPoint Senior Vice President of Branch Operations for the Western Wholesale Division who worked for GreenPoint and GreenPoint's predecessor, Headlands Mortgage, from 1992 to August 2007. This Senior Vice President stated that beginning in 2005 and continuing through 2006, GreenPoint's underwriting guidelines became increasingly lenient and the loans it extended became increasingly risky. GreenPoint began to significantly relax the requirements that borrowers would have to satisfy to qualify for a given loan program, including relaxing requirements involving documentation of repayment ability, minimum LTV ratios and minimum credit scores.

70.     Additionally, GreenPoint did not limit its granting of exceptions to circumstances where actual compensating factors existed. Rather, it was systematically granting exceptions even in the absence of compensating factors. Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any degree of realistic control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved. This lack

- 23 -

of monitoring was particularly problematic because, as noted by many regulators, brokers were interested mainly in generating upfront fees triggered by making the loans, and did not pay attention to whether borrowers were actually qualified for the loans or for exceptions due to compensating factors.

71.    GreenPoint did not verify the income of borrowers as represented but had a reputation in the industry for cutting corners on loan underwriting.  In addition, many of GreenPoint's loans were actually subprime loans in disguise, a practice later copied by others.  GreenPoint's practice of disguising subprime loans was confirmed by the former GreenPoint Account Executive identified above.  This former Account Executive stated that GreenPoint offered loans it represented to be of higher quality even though their qualifying requirements were those of "junk" loans.

## MSCC

72.    The Prospectus Supplements for the two trusts listed below included false statements about the loan underwriting practices of Morgan Stanley Credit Corp. ("MSCC"):

> Morgan Stanley Mortgage Loan Trust 2006-7
> Morgan Stanley Mortgage Loan Trust 2006-11

73.    The Prospectus Supplements issued in connection with Morgan Stanley Mortgage Loan Trust 2006-7 and 2006-11, made false and misleading statements about the underwriting standards of MSCC, stating:

> ***MSCC's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. . . . MSCC employs underwriters to scrutinize the prospective borrower's credit profile.***

74.    MSCC's underwriting guidelines were not intended to evaluate the prospective borrower's credit standing and ability to repay the loan, nor the value and adequacy of the proposed mortgaged property as collateral.  Rather, MSCC's underwriting guidelines were systematically intended to originate as many loans as possible without regard to repayment ability.  Contrary to the

above representations, MSCC's underwriters did not "scrutinize the prospective borrower's credit profile" but rather would grant almost any loan.

75.     According to a former MSCC Underwriter who worked at MSCC from January 2006 to October 2007, an underwriter's role at MSCC was a "joke" because MSCC's goal for underwriters was to approve and close as many loans as possible rather than determine whether a borrower could repay the loan.  The former Underwriter explained that because most of MSCC's applicants were already Morgan Stanley clients with assets invested in Morgan Stanley, MSCC was "bending over backwards" to make sure the clients' loans were approved.  MSCC was not concerned with the ability of these existing clients to repay their loans but merely wanted to retain them as clients.  According to the former Underwriter, MSCC feared that if MSCC did not approve loan applications submitted by its existing clients, the clients would withdraw the assets they had invested with Morgan Stanley and put them with another company such as Lehman Brothers or Goldman Sachs.  Due to these concerns, MSCC was incredibly lax in its underwriting and did not scrutinize the prospective borrower's credit profile.

76.     MSCC's loan underwriting policies were very problematic, according to the former Underwriter.  Once a loan application reached the underwriter, it was considered "unprofessional" to question the applicant's stated income relative to the applicant's stated job title.  Thus, far from scrutinizing a borrower's information, underwriters who had reservations about an applicant's stated income level remained quiet and did not even check the applicant's stated income against information contained in publicly available websites such as salary.com.  The former Underwriter explained that stated income loans would close within three hours of application submission because there was nothing in the application to verify.

77.    To ensure that loans were approved, MSCC put its underwriters on a strict quota system.  According to the former Underwriter, MSCC underwriters were expected to approve a certain number of loans each day, week and month.  If they did not, the underwriters would be terminated.  In addition, MSCC underwriters were incentivized to approve as many loans as possible as opposed to detecting bad loans.  For instance, an underwriter who approved 25% more loans than required by his or her quota would receive a bonus equal to 25% of his or her salary.  Given this incentive system, the underwriters at MSCC rarely denied a loan application.

**The Registration Statement and Prospectus**
**Supplements Misrepresented and Omitted**
**Material Facts Regarding the Appraisals**
**Conducted by or for the Loan Originators**

78.    The March 14, 2006 amendment to the Registration Statement and each of the Prospectus Supplements also contained representations regarding the appraisals of the properties securing the mortgage loans that Morgan Stanley purchased.  The Registration Statement and each of the Prospectus Supplements stated:

> The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  *All appraisals conform to the Uniform Standards of Professional Appraisal Practice* adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator.  The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

79.    Accurate real estate appraisals are essential to the entire mortgage lending and securitization process, providing borrowers, lenders, and investors in mortgage-backed securities

with supposedly independent and accurate assessments of the value of the mortgaged properties. Accurate appraisals ensure that a mortgage or home equity loan is not under-collateralized, thereby protecting borrowers from financially over-extending themselves and protecting lenders and investors in mortgage-backed securities in the event a borrower defaults on a loan and a foreclosure results. Accurate appraisals also provide investors with a basis for assessing the price and risk of mortgage-backed securities.

80. An accurate appraisal is also critical in determining an accurate LTV ratio, which is a financial metric that Wall Street analysts and investors commonly use when evaluating the price and risk of mortgage-backed securities. The LTV ratio is a mathematical calculation that expresses the amount of a mortgage as a percentage of the total appraised value of the property. For example, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000, or 90%. If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).

81. A high LTV ratio is riskier because a borrower with a small equity position in a property has less to lose if he/she defaults on the loan. A high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may exceed the value of the property.

82. The accuracy of a property's appraisal and corresponding LTV ratio becomes even more important for reduced documentation loans where the loan is originated based largely or exclusively upon the appraised value of the mortgaged property and the LTV ratio at origination – as opposed to being originated based upon the borrower's income or assets. Indeed, as noted in the Registration Statement, MSMC's "loan purchasing decisions for such mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination."

83.     To ensure the accuracy of appraisals, the USPAP imposes certain requirements on appraisers.  With respect to real estate appraisals, the USPAP provides:

(a)     An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests;

(b)     In appraisal practice, an appraiser must not perform as an advocate for any party or issue;

(c)     An appraiser must not accept an assignment that includes the reporting of pre-determined opinions and conclusions; and

(d)     It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

(i)     The reporting of a pre-determined result (*e.g.*, opinion of value);

(ii)     A direction in assignment results that favors the cause of the client;

(iii)     The amount of a value opinion;

(iv)     The attainment of a stipulated result; or

(v)     The occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

84.     The representations in the Registration Statement and Prospectus Supplements regarding appraisals were materially false and misleading in that they omitted to state that the appraisals were false, inflated and inaccurate.   The Registration Statement and Prospectus Supplements also failed to disclose that the appraisals were false, inflated and inaccurate because contrary to USPAP standards, the appraisers were not independent from the lenders and/or their agents, as the lenders and their agents forced appraisers to come back with pre-determined, pre-conceived, inflated and false appraisal values.  For instance, in retail or in-house mortgage loan

originations, many lenders allowed the sales personnel or account executives to order and control the appraisals. These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible. These sales personnel and account executives would accordingly pressure appraisers to appraise properties at artificially high levels under threat of not being hired again.

85. As a result of this conduct, loans were systematically based on false appraisals stating that the home securing the loan was worth more than it in fact was.

86. Appraisals conducted for AHM were not based upon the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis and judgment. Instead, contrary to USPAP, many of AHM's appraisals were based upon pre-determined values demanded by brokers. AHM appraisers frequently succumbed to brokers' demands to appraise at pre-determined inflated values. As described by a former AHM Vice President from March 2003 through May 2007, appraisal fraud was a common problem at AHM. This former Vice President recounted how loan officers pressured appraisers to come up with the "right number." Due to inflated appraisals, the LTV ratios in the Registration Statement and Prospectus Supplements were false because these ratios were calculated using the falsely inflated appraisals.

87. Numerous appraisers have confirmed that the inflation of appraisals was common place. For example, the owner of a small Midwest residential real estate appraisal firm in Illinois – who was approved and/or utilized by originators including AHM in over 100 transactions – stated that mortgage brokers would call him and say "I need this number." This appraiser also stated that he was frequently threatened with, "either give us this home value or you will never do business for us again."