**Robbins Geller Rudman & Dowd LLP**

Atlanta · Boca Raton · Chicago · Melville · New York · Philadelphia · San Diego · San Francisco · Washington, DC

Daniel S. Drosman
DDrosman@rgrdlaw.com

August 20, 2013

VIA ELECTRONIC MAIL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09/06/13

The Honorable Sarah Netburn
United States Magistrate Court
Thurgood Marshall United States Courthouse
40 Foley Square, Courtroom 219
New York, NY 10007

Re: *In re Morgan Stanley Mortgage Pass-Through Certificates Litig.*
Case No. 09-cv-02137

Dear Judge Netburn:

Plaintiffs submit this brief in support of their proposed protocol governing defendants' search for relevant documents. Although the parties agree on the search terms, they do not agree on the custodians or the search period. Defendants refuse to include as custodians a number of individuals that structured and sold the Offerings, purchased and monitored the underlying loans, and evaluated the relevant Originators. Defendants also limit their search for important "post-closing" documents. Plaintiffs address each of these deficiencies in turn. Plaintiffs also further support their motion to compel documents concerning Morgan Stanley's shorting of the securities by explaining that the employees in the Securitized Products Group ("SPG") that did the shorting were the same as those that structured and sold the securities to plaintiffs and the Class.

### I. Defendants' Refusal to Search Relevant Custodians Is Arbitrary and Unjustified

In refusing to search plaintiffs' proposed custodians, defendants focus mainly on total numbers. But these numbers cannot be assessed in a vacuum.[1] This case involves 13 Offerings put together and sold by at least 11 different groups at Morgan Stanley.[2] As discussed below and detailed in Ex. 2, plaintiffs' proposed custodians had extensive involvement in the Offerings. These custodians are likely to have relevant documents, and their files should be searched and documents produced, especially given the Court's admonition that defendants are required to conduct broad searches in light of their refusal to turn over documents produced in other cases.

- <u>SPG Trading</u> – reviewed due diligence results to make loan purchasing decisions, monitored loan performance, structured the Certificates, drafted the prospectus supplements, and sold the Offerings to investors. *See* Ex. 2.

- <u>Conduit Loan Production</u> – sourced originators and assisted them through the seller-approval and recertification process. *Id.*

---

[1] Plaintiffs' proposed search protocol is attached as Ex. 1. The disputed custodians are identified in Ex. 2, which provides each custodian's title and provides a brief description of their duties at Morgan Stanley and relevance to this case.

[2] In a prior Morgan Stanley case involving only *one* offering, Morgan Stanley searched more than 40 custodians.

866857_1

655 West Broadway   Suite 1900   San Diego, CA 92101   Tel 619 231 1058   Fax 619 231 7423   www.rgrdlaw.com

**Robbins Geller**
**Rudman & Dowd LLP**

The Honorable Sarah Netburn
August 20, 2013 – Page 2

- Due Diligence – conducted data validation, compliance, valuation and credit re-underwriting, which included reviewing loans for conformance with guidelines and determining whether appraisal values were realistic. *Id.*

- SPG Principal Transaction/Finance – tied out defective loans identified during the due diligence process, worked with the trading desks to purchase loans, and received due diligence reports during the securitization process. *Id.*

- Servicer Oversight Group – monitored loan performance and flagged loans for repurchases.

- Repurchase Group – handled requests that Originators repurchase problem loans. *Id.*

- SPG Collateral – worked with originators and the trading desks to ensure loan tapes were accurate, helped the trading desks structure the securities, and created the summary collateral tables in the free writing prospectuses and prospectus supplements. *Id.*

- Warehouse Lending – evaluated Originators to determine whether to provide them with temporary financing. *Id.*

- Syndicate – marketed offerings to investors. *Id.*

- SPG Finance – assisted SPG Trading to create bonds to distribute to investors, worked with rating agencies to get credit enhancement levels, and put together the free writing prospectus and prospectus supplements. *Id.*

- Controller – reported profit and loss relating to SPG Trading. *Id.*

**Non-Subprime.** Defendants object to some of the proposed custodians because those custodians worked on "sub-prime" securitizations and there are no subprime deals at issue. That argument ignores several indisputable facts.

*First*, each of the witnesses that plaintiffs identified performed work on the Offerings or with originators whose loans are in the Offerings. *See* Ex. 2. *Second*, there was significant overlap between defendants' "non-subprime" and subprime business. *Third*, the prospectus supplements for some of the Offerings contained descriptions of subprime loans and guidelines. *Fourth*, Morgan Stanley lumped Alt-A and subprime together as "non-prime" because "the line between subprime and Alt A/Alt B collateral became increasingly blurry." *See* Ex. 3. *Fifth*, "the subprime and the Alt-A bulk business" used the same due diligence processes and procedures. *See* Ex. 4 at 41:4-12; 87:7-11. *Sixth*, Morgan Stanley grouped together Alt-A and subprime lenders, and listed among its "Top 20 Non-Prime Originators" New Century, Decision One and Aegis, all of which are Originators in the Offerings. Ex. 5. And *finally*, Morgan Stanley's subprime due diligence manual listed as clients many Originators that contributed loans to the Offerings, including Aames, Decision One, First NLC, MILA, and New Century. An example of a highly probative communication, obtained from public sources, which would be excluded under defendants' proposal, is the attached email in which Morgan Stanley's Brad Davis admits internally to the deterioration of appraisals for originators in our case. Ex. 6. Defendants' arbitrary "non-subprime" categorization would exclude an entire category of relevant custodians and documents related directly to many of the Originators at issue in this case.

**Robbins Geller Rudman & Dowd LLP**

The Honorable Sarah Netburn
August 20, 2013 – Page 3

**Seniority.** Defendants also object to certain custodians because of their "level of seniority." But as Judge Cote made clear recently in an RMBS case in which defendants here also are defendants, "executives, people with management responsibilities, people who are members of special committees and make reports for the institution with fact finding about what happened, in a way that could be binding on the defendants at trial or certainly highly relevant to a jury's analysis of the defenses that are being put forward at trial, they have to be searched." *See Federal Housing Finance Agency v. J.P. Morgan, et al.*, No. 11-cv-05201-DLC (S.D.N.Y. Oct. 15, 2012) ("*FHFA*"), ECF No. 223 at 69-70.

Here, the management-level custodians that plaintiffs propose all were either part of SPG, worked closely with SPG relating to the Offerings, or sat on committees that approved loans or originators related to the Offerings. Thus, there is no reason they should not be custodians.

**Duplicative.** Defendants' last objection is that many of the proposed custodians are duplicative of other custodians that defendants have agreed to include. While tacitly admitting that these custodians likely would have relevant documents, defendants nonetheless argue that they should not be included as custodians because other employees working in the same business unit likely would have the same documents. There are several fundamental flaws in this argument.

*First*, the supposedly duplicative custodians that defendants contend should be excluded all worked on many of the specific Offerings at issue – many of them on seven or more deals. Thus, they have relevant documents. *Second*, to the extent that the inclusion of multiple custodians from the same business unit results in the same documents being located, the "de-duping" across custodians that the parties have agreed to will alleviate any concern that such duplication will unreasonably increase the burden on defendants. *Third*, many of the rejected custodians had different roles and responsibilities than other designated custodians in the same business group because they covered or were responsible for different Originators or geographic regions, or worked on different loan pools or securitizations (*see* Ex. 2 for custodians and reason for inclusion).

## II. Defendants' Proposed Search Periods End Too Soon

While the parties have agreed on the start dates of the searches, they disagree on the end dates. Plaintiffs' proposed end date for Search A (December 31, 2010) is appropriate because the Search A terms are narrowly-tailored to the specific Offerings, resulting in no false hits. *See* Ex. 1 at 1-8. Plaintiffs have proposed a somewhat narrower end date for Search B (June 30, 2009), which is somewhat broader and contains terms aimed at identifying relevant documents. *Id.* at 9-16. Plaintiffs' dates provide for production of a reasonable number of documents, while minimizing burden.

Defendants contend that the appropriate end date for Search A is June 30, 2010 for a small number of custodians and December 2, 2008 for all others. Defendants also contend that the appropriate end for Search B is December 2, 2008. Defendants' proposed limitations are arbitrary and unreasonably narrow, and guarantee that defendants will not even search for, much less produce, large swaths of documents from the post-closing period. The documents that would not be located would include those related to: (1) Morgan Stanley's discussions, analyses, investigations and criticisms of the offerings, originators, securitization practices and/or origination practices at

**Robbins Geller**
**Rudman & Dowd** LLP

The Honorable Sarah Netburn
August 20, 2013 – Page 4

issue; (2) the performance of the offerings and loans (*i.e.*, delinquencies, downgrades, defaults, and pricing); (3) loan repurchase requests; and (4) any litigation, investigation or settlement related to the loans. Such documents are highly relevant to the claims and defenses here.[3]

Courts in recent RMBS actions have recognized the importance of post-closing searches and have ordered end dates in 2010 and beyond. One court ordered the defendants, including defendants in this action, to conduct searches into July 2010; likewise, Judge Cote noted the importance of "a meaty production for the post-closing period."[4] *FHFA*, ECF No. 223 at 69. Another ordered defendants to search for documents created through February 2012, rejecting defendants' argument about burden.

Here, plaintiffs seek the same types of documents the plaintiffs sought in the cases above, and the Offerings were issued during the same period. Furthermore, plaintiffs' proposed end dates would not cause undue burden because (1) plaintiffs' proposed search period for Search A is only six months longer than the period that defendants have already agreed is appropriate for 11 custodians (*i.e.*, from June 30, 2010 to December 31, 2010); (2) Search A uses only narrow, deal-specific terms that will result in zero false hits (thus, defendants' burden in reviewing and producing documents will be minimized);[5] (3) plaintiffs' proposed search period for Search B is only six months longer than defendants have agreed is appropriate (*i.e.*, from December 2, 2008 to June 30, 2009); and (4) the Search B terms are narrowly-tailored to minimize false hits. Accordingly, plaintiffs' proposed end dates are appropriate and should be entered.

### III.   Morgan Stanley's Shorting Activities Are Relevant

It is well-documented that Morgan Stanley routinely shorted its own RMBS.[6] Unlike hedging, which is a risk management strategy seeking to offset losses from underlying assets,

---

[3]   An internal audit dated February 14, 2008, which determined that Morgan Stanley's conduit business was "[u]nsatisfactory" and "[b]efore June 2007 . . . lacked staffing and processes to identify and report EPD loans," is just one example of audits and analyses that defendants conducted in the post-closing period. Ex. 7.

[4]   *See Cambridge Place Inv. Mgmt. v. Morgan Stanley & Co., et al.*, Civil Action Nos. 10-2741-BLS1 and 11-0555-BLS1 (Mass. Super.) ("[t]he whole industry was under a spotlight at that point, and you've got the government asking about it, you got private parties asking about it. *I would hope there was some[one] [at the Wall Street banks] looking into it, and I bet there was.*" Ex. 8 at 68 (emphasis added)); *FHFA*, ECF No. 223 at 69; *Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, No. 12 Civ. 1579 (HB) (JCF), 2012 U.S. Dist. LEXIS 167981, at *5-*6 (S.D.N.Y. Nov. 21, 2012) ("[T]here is no basis for [the bank's] imposition of a hard date limit on its production. Documents that post-date the transactions may nevertheless relate back to the state of affairs as it existed at the crucial time. For example, [the bank's] retrospective assessment of the subject mortgages . . . may well analyze the representations that [the bank] made at the time of closing.").

[5]   Plaintiffs recognize that defendants are entitled to review documents for privilege and to withhold or redact documents that contain privileged information. The parties have agreed, however, that no attorney-client privileged documents created after December 2, 2008 need be included on a privilege log.

[6]   *See* Jody Shenn & Michael J. Moore, *Morgan Stanley's Doomed Baldwin CDOs Thwarted 'Natural Process,'* Bloomberg (May 13, 2010, 5:27 PM), http://www.bloomberg.com/news/2010-05-14/morgan-stanley-shorted-doomed-baldwin-cdos-lacking-natural-curbs-on-risk.html; Max Abelson, *Howie Hubler of New Jersey: The Return of a Subprime Villain*, New York Observer, Mar. 24, 2010.

**Robbins Geller**
**Rudman & Dowd LLP**

The Honorable Sarah Netburn
August 20, 2013 – Page 5

Morgan Stanley's shorting was simply a bet that particular RMBS would decline and they would profit. Indeed, the firm is the subject of private litigations and government investigations relating to such activities. In at least one instance, the shorted CDOs contained Offerings in this case.

Documents related to Morgan Stanley's shorting activities are plainly relevant to the claims and defenses here. As an initial matter, such evidence would demonstrate that Morgan Stanley believed at the time what plaintiffs have alleged since the beginning of this case – that the offering documents contained false statements because the Offerings contained defective mortgage loans. Moreover, given that defendants have asserted a "due diligence" defense in this case, plaintiffs have "every reason to gather evidence concerning" shorting to rebut the contention that Morgan Stanley did not know, or could not reasonably have known, that the Offerings contained substandard loans. *In re Livent, Inc. Noteholders Sec. Litig.*, 355 F. Supp. 2d 722, 728 (S.D.N.Y. 2005). Thus, plaintiffs are entitled to evidence of Morgan Stanley's shorting activities to rebut defendants' defenses.

Such evidence is particularly probative here given that the same individuals at Morgan Stanley that shorted RMBS and CDOs played a central role in the securitization process. At the time Morgan Stanley was selling the Offerings in this case (early 2006), Howard Hubler headed Morgan Stanley's SPG Trading group, which reported to named defendant Tony Tufariello. SPG Trading was actively involved in every aspect of the securitization process, including purchasing large loan pools from originators, reviewing due diligence and structuring, marketing and selling the securities. *See* Ex. 2. Subsequently, SPG was reorganized to take advantage of trading opportunities in CDOs and RMBS (including shorting). The new team reported to Hubler and, although it relocated, it continued to buy loans from originators, visit originators, work with the due diligence teams and obtain ratings for the Certificates.[7] This intimate involvement in the securitization process provided Hubler's group and other trading desks with access to non-public information related to the Offerings, originators and mortgage loans and enabled it to decide which CDOs and RMBS were appropriate for shorting.

Respectfully submitted,

*Daniel Drosman /DJA*          *David Stickney /DJA*
Daniel S. Drosman              David R. Stickney
Robbins Geller Rudman          Bernstein Litowitz Berger
& Dowd LLP                     & Grossmann LLP
Co-Lead Counsel for the Class  Co-Lead Counsel for the Class

---

[7] In April 2006, Hubler and team worked with S&P to analyze impact of modeling change on New Century and Decision One loans. Ex. 9. Telesca reviewed New Century due diligence information. Ex. 10. In May 2006, Telesca worked with due diligence and collateral analysis team on loans. Ex. 11. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 12. In August 2006, Hubler and team worked on a New Century trade. Ex. 13. In November 2006, Shapiro and Telesca worked with due diligence, collateral analysts and transaction management on First NLC. Ex. 14. In November 2006, Telesca expressed concern about high LTVs to due diligence team. Ex. 15. In March 2007, Shapiro visited New Century with warehouse team Ex. 16; *see also* Ex. 2 (describing relevance of Hubler, Telesca, Shapiro, and other SPG personnel).

