```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/11/2013
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

IN RE MORGAN STANLEY MORTGATE
PASS-THROUGH CERTIFICATES
LITIGATION

09-CV-02137 (LTS)(SN)

**OPINION & ORDER**

------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge:**

    This is a securities action brought on behalf of a putative class in which the plaintiffs assert claims relating to the marketing and sale of mortgage-backed security pass-through certificates issued by Morgan Stanley Capital I, Inc. The case involves 13 Offerings, which occurred between March 27, 2006 and October 26, 2006. It alleges strict liability and negligence claims brought pursuant to the Securities Act of 1933 (the "1933 Act"). The Court assumes the parties' familiarity with the issues.

    Following a conference at which multiple discovery disputes were addressed, the Court directed the parties to submit letter motions related to any outstanding matters that were not resolved by the Court or agreed to by the parties following the conference. Among other letter motions, the plaintiffs filed an application concerning the scope of defendants' electronic search protocol. The parties have reached agreement on the search terms (more than 30,000 search term combinations, a list spanning over 1,600 pages), but are unable to agree on the custodians or the search period.

    This dispute is governed by both Rule 1 and Rule 26 of the Federal Rules of Civil Procedure. Rule 1 guides the Court's application of all the federal rules, and directs that such rules "should be construed and administered to secure the just, speedy, and inexpensive

determination of every action and proceeding." Fed. R. Civ. P. 1. Rule 26 extends that concept to the specific issues raised in discovery disputes. That rule provides:

> the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>
> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C). "The 'metrics' set forth in Rule 26(b)(2)(C)(iii) provide courts significant flexibility and discretion to assess the circumstances of the case and limit discovery accordingly to ensure that the scope and duration of discovery is reasonably proportional to the value of the requested information, the needs of the case, and the parties' resources." The Sedona Conference, The Sedona Conference Commentary on Proportionality in Electronic Discovery, 11 Sedona Conf. J. 289, 294 (2010); accord Chen–Oster v. Goldman, Sachs & Co., 285 F.R.D. 294, 303 (S.D.N.Y. 2012).

Mindful of the requirements of Rule 1 and Rule 26, the Court rules as follows:

Custodians

Plaintiffs have identified 80 custodians who should be subject to the search protocol. Defendants have agreed to 33 custodians and object to 47. Of those 47, defendants object to eight custodians because they "largely, if not entirely, worked on subprime offerings" and no subprime securitizations are at issue here. Defendants object to the remaining 39 custodians as

"unnecessary and duplicative because they were too senior to have been involved in the day-to-day of the securitization process or because they are duplicative of already proposed custodians."

The defendants have agreed to search the files of all but one of the individuals identified on any of the working group lists for any of the Offerings or disclosed by defendants in their initial disclosures or responses to interrogatories. The exception is Kris Gilly, Executive Director, SPG-Collateral. Defendants contend that Ms. Gilly "focused" on subprime offerings and therefore is not an appropriate custodian. But Ms. Gilly appears on the working group lists for the Offerings. Defendants cannot say with certainty that she would not have relevant information; to the contrary, her inclusion on the working group lists suggests she does. Accordingly, defendants must include Ms. Gilly as a custodian in their search protocol.

This does not, however, mean that all custodians who worked entirely in the subprime business are appropriate custodians. The Offerings at issue are non-subprime, and defendants, through counsel, have represented to the Court that there are no subprime offerings in this case. Plaintiffs' counsel does not contest this. Defense counsel has further represented that, to the extent there is any overlap in the "due diligence process and procedures" between subprime loans and originators and the loans and originators at issue in these Offerings, documents concerning the due diligence process and procedures employed with respect to the loans and originators *in this case* will be produced. Thus, a search of the files of additional custodians who work primarily, if not exclusively, on subprime loans or with subprime originators will not generate new relevant documents. Moreover, plaintiffs have not made a particularized showing that specific subprime custodians will be the exclusive custodian of relevant information; the fact that such custodians may have generally "performed work on the Offerings or with the originators whose loans are in the Offerings" is not a sufficient basis to justify the substantial

work and expense of expanding the scope of custodians. Accordingly, the files of the remaining seven subprime custodians identified by plaintiffs and objected to by defendants should not be included in the search protocol.[1]

The remaining disputed custodians are split into two categories: individuals who defendants assert are unlikely to have relevant documents by virtue of their level of seniority; and individuals who are likely to be duplicative custodians and for whom at least one custodian (and often multiple) has been identified to have responsive documents. While it is true that seniority, standing alone, is not a basis to preclude the search for responsive documents, plaintiffs have not demonstrated that these custodians are likely to be the exclusive holders of responsive documents. Thus, with the exception of Ms. Gilly, custodians rejected by defendants on the basis of seniority shall not be searched.

The Court has also reviewed defendants' Exhibit D, which identifies those custodians deemed "irrelevant" and/or "duplicative," against plaintiffs' Exhibit 2, which identifies each "rejected custodian" and the reason plaintiffs seek inclusion of that custodian. Based on these charts, the Court cannot discern any specialized documents or information that the rejected custodians will hold that is not likely to be held by defendants' proposed (or agreed to) custodians identified in defendants' Exhibit E. Plaintiffs' counsel contends that "many of the rejected custodians had different roles and responsibilities than other designated custodians in the same business group because they covered or were responsible for different Originators or geographic regions, or worked on different loan pools or securitization." Based on the record presented, the Court cannot predict who these custodians are or why, specifically, they are likely to have unique responsive documents. Moreover, the fact that a rejected custodian's role was

---

[1] The Court believes that these custodians are: Howard Hubler, SPG-Trading; Steven Shapiro, SPG-Finance; Frank Telesca, SPG-Finance; Vanessa Vanacker, SPG-Repurchases & Structuring; Eric Kaplan, SPG-Collateral; James Supple, SPG-Collateral; and Tom Daula, Chief Risk Officer.

immaterially different than a designated custodian's role is not a legitimate basis to justify expanding the list of custodians. Plaintiffs do not need, and are not entitled under the rules of proportionality, to every single document related to the loans and originators involved in the Offerings. Accordingly, plaintiffs have not made a sufficient showing that the burden of review – including the burden of reviewing false search hits – would justify expanding the search to include these dozens of additional custodians.

Search Periods

The parties also disagree on the appropriate search periods. With respect to the agreed "Search A Terms," the most narrowly-tailored list of terms, which will result in the fewest false hits, plaintiffs seek to search from January 1, 2005 through December 31, 2010 (plaintiffs also seek to apply these searches to custodians that the Court has rejected above). Defendants propose the date range for Search A Terms of January 1, 2005 through December 2, 2008 (the date the first complaint was filed in this action). Defendants have further agreed to extend the date range for Search A terms of 11 custodians, effectively searching these custodians' files from January 1, 2005 through June 30, 2010 (defendants' so-called "Search C").

Like other courts, I conclude that the post-closing period can prove to be fertile ground for relevant discovery. See Assured Guar. Mun. Corp. v. UBS Real Estate Securities Inc., 12 Civ. 1579 (HB) (JCF), 2012 WL 5927379, at *2 (S.D.N.Y. Nov. 21, 2012). Accordingly, and in light of the Court's substantial limiting of the number of custodians to be searched and the fact that Search A Terms are Offering-specific and therefore will produce few, if any, false hits, discovery through December 31, 2010 is appropriate for Search A.

By contrast, Search B includes more than 30,000 search term combinations. Plaintiffs seek to search custodians' files using these terms from January 1, 2005 through June 30, 2009;

whereas defendants agree to search through only June 30, 2007, approximately six months after the last Offering closed. Neither side makes a particularly persuasive argument as to why the cut-off date should be in 2007 or 2009, though at least defendants tether their proposal to a relevant event. The Court is mindful that it has limited the number of custodians to be searched and has otherwise limited plaintiffs' access to discovery they have sought that has been produced in other litigation. But, the extraordinary scope of Search B Terms gives the Court pause. Accordingly, defendants shall search those 34 custodians identified above for Search B Terms from January 1, 2005 through June 30, 2008.

Shorting Activities

Finally, plaintiffs seek documents related to Morgan Stanley's purported shorting of its own residential mortgage-backed securities ("RMBS"). Such activity is not relevant to plaintiffs' claims, which assert strict liability and negligence claims under the 1933 Act. Defendants' state of mind is simply not an element of plaintiffs' claims. See Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983).

Plaintiffs further argue that if a trader or traders at Morgan Stanley shorted one of the Offerings at issue here, such conduct would be relevant to rebut defendants' due diligence defense. Defendants respond with the somewhat conclusory statement that "[a]lleged 'shorting activity' does not speak to the nature of defendants' due diligence, nor does it mean that" the trader who shorted the security did so "because of a subjective belief that an offering document for [the] particular security was materially misstated."

Based on the information submitted to me, I agree with defendants. A trader's decision whether to short an offering might depend on market factors entirely unrelated to the accuracy of material included in the offering document (in other words, everything in the prospectus could be

true, but a trader still might short the offering). Moreover, plaintiffs have failed to articulate a sufficient basis for the Court to conclude that a trader would have been aware of the underwriting process for a particular offering or that a trader would have had communications with any person responsible for exercising due diligence in preparing the offering statement. Accordingly, the Court holds that even if traders at Morgan Stanley shorted one or more of the Offerings, such conduct is not properly subject to discovery given the claims alleged in this case. (Of course, if discovery reveals that one of the custodians involved in the Offerings at issue was in contact with Morgan Stanley traders regarding the nature or adequacy of the due diligence process, then Plaintiffs are free to renew their request for discovery on this issue.)

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED: New York, New York
           September 11, 2013