UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

In re Morgan Stanley Mortgage Pass-Through    :
Certificates Litigation                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :   MASTER FILE
                              :   09 Civ. 2137 (LTS)(SN)

This Document Relates to:               :
                              :

    ALL ACTIONS                    :
                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS <u>REPRESENTATIVES AND CO-CLASS COUNSEL</u>

## [REDACTED]

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Attorneys for Defendants Morgan Stanley
Capital I Inc., Morgan Stanley Mortgage
Capital Holdings LLC, Morgan Stanley &
Co. Incorporated, Morgan Stanley, David R.
Warren, Anthony B. Tufariello, William J.
Forsell, and Steven S. Stern

# TABLE OF CONTENTS

PAGE

**PRELIMINARY STATEMENT** ..................................................................................1

**STATEMENT OF FACTS** .......................................................................................5

    A.   The Proposed Class Representatives ......................................................5

        1.   Lead Plaintiff PERS ..................................................................5

        2.   New Plaintiff NECA ..................................................................7

        3.   New Plaintiff Pompano ..............................................................8

        4.   New Plaintiff West Virginia .......................................................9

    B.   Putative Class Members Purchased at Different Times
       When Different Information Was Publicly Available............................9

    C.   Putative Class Members Have Widely Varied Investment Strategies,
       Sophistication Levels, Due Diligence Practices, and Litigation Strategies ........12

        1.   Differing Investment Strategies.................................................12

        2.   Differing Levels of Sophistication and Experience ......................13

        3.   Differing Due Diligence Practices .............................................15

        4.   Differing Litigation Strategies...................................................16

    D.   The Offerings Differ Substantially In Terms of Credit Risk and Structure ........17

**ARGUMENT** ......................................................................................................19

    I.   PLAINTIFFS HAVE NOT SATISFIED RULE 23 WITH RESPECT TO THE
       EIGHT OFFERINGS FROM WHICH NO PLAINTIFF PURCHASED............19

        A.   Plaintiffs Have Made No Showing—Nor Could They—That
           They Can Adequately Represent Purchasers From the Eight
           Offerings From Which No Plaintiff Purchased Certificates .........................20

        B.   Individualized Knowledge Precludes Certification of a Class
           of Purchasers That Includes Purchasers From the Eight Offerings
           From Which No Plaintiff Purchased Certificates............................................24

    II.   PLAINTIFFS HAVE NOT SATISFIED RULE 23 WITH RESPECT TO
       THE FIVE OFFERINGS FROM WHICH PLAINTIFFS PURCHASED...........25

A.   Plaintiffs Have Not Satisfied Rule 23(b)(3) Because
Individual Issues Predominate Over Common Issues ...................................26

   1.   Individual Issues of Knowledge Will Predominate ...............................26

      (a)   Different Dates of Purchase Give Rise to
Differing Levels of Knowledge...........................................26

      (b)   Different Investment Strategies, Sophistication,
Due Diligence Practices, and Investment Types
Demonstrate Different Levels of Knowledge ...................................28

   2.   Plaintiffs Have Failed to Show that Damages Can Be
Measured on a Classwide Basis............................................31

   3.   Plaintiffs' Superficial Attempt to Demonstrate Predominance Fails......32

B.   No Plaintiff Has Satisfied, Nor Can Any Plaintiff Satisfy,
Rule 23's Adequacy or Typicality Requirements..........................................33

   1.   PERS Has Not Satisfied, and Cannot Satisfy,
Rule 23(a)(3)'s Typicality Requirement ................................33

      (a)   PERS' Claims Are Atypical Because PERS
Is Subject to a Unique Statute of Limitations Defense ....................33

      (b)   PERS' Claims Are Atypical Because PERS
Is Subject to a Unique Knowledge Defense......................................36

      (c)   PERS' Claims Are Atypical Because PERS
Purchased from a Second Lien Securitization...................................37

   2.   PERS Has Not Satisfied, and Cannot Satisfy,
Rule 23(a)(4)'s Adequacy Requirement...............................................37

   3.   New Plaintiffs Have Not Satisfied, and Cannot
Satisfy, Rule 23(a)(3)'s Typicality Requirement .................................38

   4.   New Plaintiffs Have Not Satisfied, and Cannot
Satisfy, Rule 23(a)(4)'s Adequacy Requirement .................................39

C.   Plaintiffs Have Not Satisfied, and Cannot Satisfy, Rule 23(b)(3)
Because A Class Action Is Not Superior to Other Available Methods ........40

D.   Plaintiffs Have Not Satisfied Rule 23(a)'s Commonality Requirement
Because Their Claims Do Not Give Rise to Common Answers .................42

ii

E.  Plaintiffs Have Not Established that the Class
Is Sufficiently Numerous Under Rule 23(a)(1) ...........................................44

**CONCLUSION** ........................................................................................................45

## TABLE OF AUTHORITIES

CASES

PAGE(S)

Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,
   269 F.R.D. 252 (S.D.N.Y. 2010) ........................................................................45

Amchem Prods., Inc. v. Windsor,
   521 U.S. 591 (1997).................................................................................40, 44

American Pipe & Construction Co. v. Utah,
   414 U.S. 538 (1974)................................................................................39, 43

Ansari v. N.Y. Univ.,
   179 F.R.D. 112 (S.D.N.Y. 1998) ........................................................................40

Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,
   222 F.3d 52 (2d Cir. 2000)..............................................................................33

Bd. of Trs. of. S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon
   Corp., 287 F.R.D. 216 (S.D.N.Y. 2012) ...............................................................44

City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mort. Loan Trust Inc.,
   703 F. Supp. 2d 253 (E.D.N.Y. 2010) .................................................................43

Comcast Corp. v. Behrend,
   133 S. Ct. 1426 (2013)...........................................................................31, 32

Deposit Guar. Nat'l Bank v. Roper,
   445 U.S. 326 (1980).......................................................................................40

Duling v. Gristede's Operating Corp.,
   267 F.R.D. 86 (S.D.N.Y. 2010) .........................................................................21

Edge v. C. Tech Collections, Inc.,
   203 F.R.D. 85 (E.D.N.Y. 2001)..........................................................................45

In re Frito-Lay N. Am., Inc. All Natural Litig.,
   No. 12-2413, 2013 U.S. Dist. LEXIS 123824 (E.D.N.Y. Aug. 29, 2013) ............................20

Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
   903 F.2d 176 (2d Cir. 1990)..............................................................................35

In re Initial Pub. Offerings Sec. Litig.,
    471 F.3d 24 (2d Cir. 2006)........................................................................30

Kottler v. Deutsch Bank AG,
    No. 05-7773, 2010 U.S. Dist. LEXIS 30590 (S.D.N.Y. Mar. 29, 2010) ................................41

Larson v. AT&T Mobility LLC,
    687 F.3d 109 (3d Cir. 2012)........................................................................22

In re Lehman Bros. Sec. & ERISA Litig.,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011) ...............................................................19

Leroy v. Paytel III Mgmt. Assocs., Inc.,
    No. 91-1933, 1992 U.S. Dist. LEXIS 17864 (S.D.N.Y. Nov. 24, 1992)................................35

In re Literary Works in Elec. Databases Copyright Litig.,
    654 F.3d 242 (2d Cir. 2011)....................................................................21, 22

Meisel v. Grunberg,
    651 F. Supp. 2d 98 (S.D.N.Y. 2009)................................................................29

In re Monster Worldwide, Inc. Sec. Litig.,
    251 F.R.D. 132 (S.D.N.Y. 2008) .............................................................37, 38, 40

In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,
    No. 09-2137, 2010 U.S. Dist. LEXIS 84146 (S.D.N.Y. Aug. 17, 2010)............................7, 19

In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,
    No. 09-2137, 2011 U.S. Dist. LEXIS 104280 (S.D.N.Y. Sept. 15, 2011) .............................36

In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,
    No. 09-2137, 2012 U.S. Dist. LEXIS 98669 (S.D.N.Y. July 16, 2012)...............................33

In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,
    No. 09-2137, 2013 U.S. Dist. LEXIS 5285 (S.D.N.Y. Jan. 11, 2013) ...............................35

Myers v. Hertz Corp.,
    624 F.3d 537 (2d Cir. 2010)........................................................................25

NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,
    693 F.3d 145 (2d Cir. 2012)................................................................... passim

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    259 F.3d 154 (3d Cir. 2001)........................................................................30

N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.,
    No 08-5653, 2011 U.S. Dist. LEXIS 92597 (S.D.N.Y. Aug. 16, 2011)................................43

N.J. Carpenters Health Fund v. RALI Series 2006-QO1 Trust,
    477 F. App'x 809 (2d Cir. 2012) .................................................................... passim

N.J. Carpenters Health Fund v. Residential Capital, LLC,
    No. 08-8781, 2010 U.S. Dist. LEXIS 32058 (S.D.N.Y. Mar. 31, 2010)................................19

N.J. Carpenters Health Fund v. Residential Capital, LLC,
    272 F.R.D. 160 (S.D.N.Y. 2011) ..........................................................14, 25, 28, 29

N.J. Carpenters Health Fund v. Residential Capital, LLC,
    No. 08-8781, 2012 U.S. Dist. LEXIS 148865 (S.D.N.Y. Oct. 15, 2012)...................27, 28, 29

N.J. Carpenters v. Residential Capital, LLC,
    288 F.R.D. 290 (S.D.N.Y. 2013) ................................................................................28

Okla. Police Pension and Ret. Sys. v. U.S. Bank Nat'l Ass'n,
    291 F.R.D. 47 (S.D.N.Y. 2013) .................................................................................20

Police & Fire Retirement System of Detroit v. IndyMac MBS, Inc.,
    721 F.3d 95 (2d Cir. 2013)...........................................................................4, 39, 41

Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.,
    280 F.R.D. 130 (S.D.N.Y. 2012) ..........................................................................23, 43

Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.,
    277 F.R.D. 97 (S.D.N.Y. 2011) ............................................................................23, 24

Rios v. Marshall,
    100 F.R.D. 395 (S.D.N.Y. 1983) ...............................................................................37

Sosna v. Iowa,
    419 U.S. 393 (1975)..................................................................................................20

Steinmetz v. Bache & Co.,
    71 F.R.D. 202 (S.D.N.Y. 1976) ................................................................................41

Stoudt v. E.F. Hutton & Co.,
    121 F.R.D. 36 (S.D.N.Y. 1988) ................................................................................40

Tiro v. Pub. House Invs., LLC,
    288 F.R.D. 272 (S.D.N.Y. 2012) ...............................................................................44

Tsereteli v. Residential Asset Sec. Trust 2006-A8,
    283 F.R.D. 199 (S.D.N.Y. 2012) ...................................................................24, 43

UFCW Local 1776 v. Eli Lilly & Co.,
    620 F.3d 121 (2d Cir. 2010)..............................................................................26

In re Wachovia Equity Sec. Litig.,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011).................................................................19

Wal-Mart Stores, Inc. v. Dukes,
    131 S. Ct. 2541 (2011)...........................................................................1, 42, 44

Wilson v. Toussie,
    No. 01-4568, 2008 U.S. Dist. LEXIS 25469 (E.D.N.Y. Mar. 31, 2008)................30

Zimmerman v. Thompson McKinnon Sec., Inc.,
    No. 88-8019, 1989 U.S. Dist. LEXIS 12029 (S.D.N.Y. Oct. 11, 1989)................40

STATUTES & RULES

17 C.F.R. 229.1105 ..................................................................................................10

15 U.S.C. § 77k(a) ...................................................................................................24

15 U.S.C. § 77l(a)(2)................................................................................................24

15 U.S.C. § 77m.............................................................................................27, 33, 39

Fed. R. Civ. P. 23 .......................................................................................... passim

Sec. 11 of the Sec. Act ................................................................................... passim

Sec. 12 of the Sec. Act ................................................................................... passim

Sec. 13 of the Sec. Act .................................................................................33, 39, 40, 42

OTHER AUTHORITIES

Restatement (Third) of Agency § 5.03 (2006)...........................................................29

## PRELIMINARY STATEMENT

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) (internal quotation marks omitted).  To fall within this exception, a class action plaintiff must prove by a preponderance of the evidence each requirement of Federal Rule of Civil Procedure 23 ("Rule 23").  Id.  A district court can certify a class only after it has satisfied itself, following a "rigorous analysis," that Rule 23's requirements have been satisfied.  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (internal quotation marks omitted).  Those requirements have not been met here.

Plaintiffs[1] seek to certify a class of investors who purchased any one of 302 different certificates on any day spanning an almost 3-year period—between March 2006 and December 2, 2008—in connection with 13 separate Morgan Stanley Mortgage Loan Trust ("MSM") residential mortgage-backed securities ("RMBS") offerings.[2]  Of the 13 MSM offerings at issue, however, plaintiffs purchased certificates from only 5.  No plaintiff purchased from the other eight.  Following the Second Circuit's decision in NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145 (2d Cir. 2012) ("Goldman"), the question of whether a class action plaintiff can assert claims on behalf of investors in a RMBS offering from which the plaintiff did not purchase shifted from a question of standing at the motion to dismiss stage to a

---

[1] Plaintiffs here are Public Employees' Retirement System of Mississippi ("PERS"), NECA-IBEW Health and Welfare Fund ("NECA"), Pompano Beach Police and Firefighters' Retirement System ("Pompano"), and Carpenters Pension Fund of West Virginia ("West Virginia").  NECA, Pompano, and West Virginia are collectively referred to as "new plaintiffs" and, together with PERS, as "plaintiffs."

[2] The offerings are MSM 2006-4SL, MSM 2006-5AR, MSM 2006-6AR, MSM 2006-7, MSM 2006-8AR, MSM 2006-9AR, MSM 2006-10SL, MSM 2006-11, MSM 2006-12XS, MSM 2006-13ARX, MSM 2006-14SL, MSM 2006-15XS, and MSM 2006-16AX.

question of adequacy and typicality under Rule 23 at the class certification stage.  Id. at 158 n.9, 159.

For the same reasons that this Court initially held that plaintiffs did not have standing to assert claims based upon offerings from which the plaintiffs did not purchase, plaintiffs are inadequate class representatives and their claims are atypical, particularly with respect to the certificates from the eight offerings from which no plaintiff here purchased.  Plaintiffs have no incentive to litigate claims based upon such offerings—as plaintiffs here have conceded.

Because no class can be certified that includes the eight representative-less offerings, plaintiffs are left to try to certify a class of investors in the five RMBS offerings from which at least one named plaintiff purchased.  Plaintiffs cannot do this because they cannot satisfy the most basic elements of Rule 23.  In order to prevail here, the class representatives must prove that they did not know of the alleged misrepresentations under Section 12 and must overcome defendants' knowledge defense under Section 11.  Given the inherently individual nature of the inquiry as to what an investor knew at the time of purchase, even if one or more class representatives were to succeed in proving this element or overcoming this defense, they would do so only for themselves.  Conversely, if a class were certified and the class representatives were unsuccessful with respect to this issue, then the claims of all investors would fail, even though some class members otherwise might have been able to satisfy the knowledge element or overcome the knowledge defense.

This issue is particularly acute given the evidence in the record, which demonstrates myriad reasons why different putative class members had different knowledge at the time of their respective purchases.  For example, putative class members purchased their certificates at varied times over a nearly three-year period.  Accordingly, some class members had access to months'

or years' worth of performance data at the time of their purchases, while others did not.  Putative

class members also had divergent levels of sophistication and familiarity with RMBS; indeed,

some class members issued RMBS themselves, while many others did not.  Certain purchasers

generally avoided securitizations backed by certain types of loans, such as second liens, while

others did not.  Some class members purchased their certificates at par, while others bought at a

significant discount.  Some class members had dedicated investment divisions that monitored the

investment environment, while others employed no internal investment staff.  Some class

members conducted extensive due diligence on securitization issuers and loan pools, while

others did nothing more than review the securitization offering documents.  And at least one

class member was actively involved in the structuring of the certificate it purchased, while others

were not.  It is for these precise reasons that the Second Circuit affirmed the district court's

denial of class certification in N.J. Carpenters Health Fund v. RALI Series 2006-QO1 Trust, 477

F. App'x 809, 813-14 (2d Cir. 2012) ("RALI II"), the only RMBS class certification decision on

which the Circuit has ruled.

        In addition, lead plaintiff PERS has not demonstrated, nor can it demonstrate, that its

claims are typical of the claims of the putative class.  Not only is PERS subject to a unique

statute of limitations defense that threatens to become the focus of this litigation, but the

timeliness of each and every putative class member's claims also rises and falls with the

timeliness—or untimeliness—of PERS' claims.  Thus, even if PERS were to be deemed an

appropriate class representative at this time, a subsequent determination that PERS' claims would be

time-barred would require dismissal of the entire case on the merits.  Furthermore, PERS is

subject to a unique knowledge defense because it purchased its certificates nearly 10 months

after the initial offering date of the securitization, ████████████████████████████

████████████████████████████████████   Moreover, PERS purchased from an

offering that, unlike 10 of the 13 offerings at issue, was backed by second lien loans, which

posed unique risks not borne by certificate holders in first lien offerings.  PERS also has failed to

show that it is an adequate class representative.  ████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

New plaintiffs, like PERS, also have not demonstrated, nor can they demonstrate, that

their claims are typical of the claims of the putative class or that they are adequate class

representatives.  As defendants argued in their pending motion for reconsideration following the

Second Circuit's decision in Police & Fire Retirement System of Detroit v. IndyMac MBS, Inc.,

721 F.3d 95, 109 (2d Cir. 2013) ("IndyMac"), new plaintiffs are subject to a unique statute of

repose defense that bars their claims in their entirety.  New plaintiffs, like PERS, also know

nothing about this litigation and have no control over how it is handled.

Finally, plaintiffs fail to satisfy the rest of Rule 23's requirements.  Their attempt to

exclude originators from the class creates an ascertainability problem because class members

who would be excluded are not readily identifiable.  That problem would only be compounded

were plaintiffs to seek belatedly to exclude sophisticated investors, as some plaintiffs have done

in other cases.  Moreover, in contravention of recent Supreme Court authority, plaintiffs do not

show how the class action they propose would give rise to "common answers" that would

resolve the putative class' claims.  Plaintiffs similarly fail to carry their burden with respect to

superiority—having already conceded that class members "have the financial incentive to pursue

litigation whether or not the class is certified"—and with respect to numerosity—putting forth

evidence that mistakenly assumes that an overbroad class is appropriate.

## STATEMENT OF FACTS

Plaintiffs seek to certify a class of investors who purchased certificates from any one of 13 MSM offerings over a nearly 3-year period starting in March 2006.  (See Pls.' Mem. of Law in Supp. of Mot. to Certify Class and Appoint Class Representatives and Co-Class Counsel at 3, Aug. 30, 2013, ECF 235 ("Pls. Mem.").)  Even though plaintiffs purchased from only 5 of the 13 MSM offerings, they seek to certify a class of all investors who acquired certificates from any one of 13 offerings as late as December 2, 2008 "and were damaged thereby." (Id.)  This plaintiffs cannot do.

**A.      The Proposed Class Representatives**

**1.         Lead Plaintiff PERS**

Lead plaintiff PERS purchased a certificate with a face amount of $1,325,000 from MSM 2006-14SL on July 18, 2007, and sold that certificate on September 26, 2008.  (Private Securities Litigation Reform Act Certification of PERS, attached to Second Am. Compl. for Violation of the Fed. Sec. Laws, Sept. 10, 2010, ECF No. 84 ("SAC").)  PERS purchased its certificate at a discount.  (Fourth Am. Compl. for Violation of the Fed. Sec. Laws at ¶ 14, Jan. 31, 2013, ECF No. 177 ("FAC").)  PERS claims a loss of $939,094.00 in connection with its certificate.  (SAC at ¶ 14.)  PERS filed its initial complaint in this action on December 2, 2008 and then filed the SAC on September 10, 2010.

PERS has virtually no knowledge of the claims and allegations at issue in this litigation.



---

[3] Exhibit numbers refer to the Declaration of James P. Rouhandeh submitted herewith.





For its part, PERS' counsel is barely any more knowledgeable about this case than

PERS.

**2.     New Plaintiff NECA**

New plaintiff NECA purchased a certificate with a face amount of $145,000 from MSM

2006-7 on September 12, 2006.  (FAC ¶ 15.)  NECA has not sold its MSM 2006-7 certificate.

(See id.;                                              .)  NECA first joined this litigation on

September 10, 2010 with the filing of the SAC.

---

[4] PERS made no attempt to participate in this litigation following the filing of the consolidated amended complaint ("CAC") until expressly invited to do so by this Court's order on defendants' motion to dismiss the CAC.  See In re Morgan Stanley Mortg. Pass-Through Certificates Litig., No. 09-2137, 2010 U.S. Dist. LEXIS 84146, at *32 (S.D.N.Y. Aug. 17, 2010) (granting plaintiffs "leave to amend the CAC, to demonstrate PERS' standing with respect to any of the claims that have been dismissed pursuant to Rule 12(b)(1) and to augment and clarify the pleading of the claims asserted by PERS").

NECA also has no understanding of the allegations at issue in this litigation nor any incentive to participate in it. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

### 3.     New Plaintiff Pompano

New plaintiff Pompano purchased a certificate with a face amount of $40,000 from MSM 2006-15XS on October 31, 2006, and sold that certificate on September 4, 2008.  (FAC ¶ 16.) Pompano is claiming a loss of $17,750 in connection with that sale.  (Id.) ████████████████████████

██████████████████████████████████████████████████████ Pompano first joined this litigation on September 10, 2010 with the filing of the SAC.

Like the other plaintiffs, Pompano has no knowledge of the allegations here nor any incentive to pursue this litigation. ████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

### 4.      New Plaintiff West Virginia

West Virginia purchased a certificate with a face amount of $40,000 from MSM 2006-11 on July 17, 2006 and a certificate with a face amount of $25,000 from MSM 2006-12XS on September 22, 2006, selling both certificates on October 2, 2007.  (FAC at ¶ 17).  West Virginia is claiming a loss of less than $3,000 in connection with both purchases.  (Id.)  West Virginia first joined this litigation on September 10, 2010 with the filing of the SAC.

As with the other plaintiffs, West Virginia has no understanding of the offerings at issue in this litigation.  ███████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

### B.      Putative Class Members Purchased at Different Times
####        When Different Information Was Publicly Available

During the proposed class period, publicly available information about the offerings at issue, and about mortgage underwriting and appraisal practices, changed dramatically.  For

example, MSM 2006-14SL—the offering from which lead plaintiff PERS purchased its

certificates—was issued in October 2006.  Every month thereafter, the trustee for the

securitization made publicly available a report detailing the performance of the underlying loans.

(See, e.g., Exs. 8-12.)[5]  Shortly after the offering, in January 2007, those monthly reports

indicated that 88.69% of the loans underlying the securitization were current and cumulative

losses were 0.0%.  (Ex. 9 at 5, 12.)  By February 2008, these reports showed that the number of

current loans had dropped to 79.23% and cumulative losses had risen to 8.8% (Ex. 11 at 6, 14),

and by November 2008 the number of current loans had dropped again to 62.68% and

cumulative losses had risen further to 23.73% (Ex. 12 at 6, 14).  As PERS' own investment

manager acknowledged, ███████████████████████████████████████████████

█████████████████████████████████████████████████████████████

        Many class members also had access to rating downgrades of the MSM 2006-14SL

certificates, including an announcement by Moody's Investor Services on August 16, 2007 that it

was downgrading certificates offered in three of the offerings here—including MSM 2006-

14SL—as part of a larger downgrade of 691 securities associated with 70 different trusts on

account of "[a]ggressive underwriting combined with prolonged, slowing home price

appreciation."  (Exs. 27-28 (emphasis added).)  Standard & Poor's placed MSM 2006-14SL on a

negative credit watch on November 16, 2007, and downgraded the most senior tranche of the

offering from AAA to BBB- on December 20, 2007.  (Exs. 29-30.)

---

    [5] Monthly reports were made publicly available for each of the securitizations at issue in
this action.  (See, e.g., Exs. 13-24; █████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████  In fact, Regulation AB required issuers to produce such reports of
delinquency and loss data on a regular, periodic basis.  See 17 C.F.R. § 229.1105.

In addition to this offering-specific information, class members had access to a constantly evolving body of information concerning mortgage underwriting and appraisal practices between 2006 and 2008.  Such information included, among other things, reports concerning the increasingly substantial effect that "looser" underwriting standards were having on prime/Alt-A RMBS (Ex. 31; <u>see also</u> Exs. 32-34), as well reports of questionable appraisal practices that had risen to a level that attracted the attention of federal regulators by mid-2008 (Exs. 35-37).  It also included loan-level data ████████████████████████████████████████████

████████████████████████████████████████████████████

Plaintiffs do not contest that the information available to purchasers changed dramatically between 2006 and 2008. ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

Differing levels of publicly available information throughout the nearly three-year class period are critical because the putative class members purchased their certificates on myriad dates throughout that time.  For example, lead plaintiff PERS did not purchase its certificate until the middle of 2007, when these issues were already apparent, ████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████, but also to the investment advisors to the other purported class representatives. ██████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

## C. Putative Class Members Have Widely Varied Investment Strategies, Sophistication Levels, Due Diligence Practices, and Litigation Strategies

### 1. Differing Investment Strategies

The differences among putative class members' investment strategies will give rise to individualized issues of—among other things—knowledge, negative causation, and damages. Indeed, the four named plaintiffs alone are all differently situated because each employed a



different strategy in connection with their investments in the certificates at issue.  Although new

plaintiffs all purchased their certificates in initial offerings in 2006, West Virginia sold its

certificates one year later in October 2007; Pompano did not sell its certificate until September

2008; and NECA continues to hold that certificate today.  Unlike new plaintiffs, PERS did not

purchase its certificate in the initial offering or even in 2006, instead purchasing in the secondary

market ███████████████████████████████████████████

████████████████████████████████████████████

        These differences extend beyond the named plaintiffs.  The proposed class also includes

putative class members with unique investment strategies.  ████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

██████ after 8.5% of the underlying loans were already at least 60 days delinquent and cumulative

losses had risen to 8.8% (Ex. 11 at 14).  It has since directed the trustee for MSM 2006-14SL to

bring a breach of contract action against MSMC seeking repurchase of all loans in the trust.  See

Complaint, Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortg. Capital

Holdings LLC, No. 652763/2012 (N.Y. Sup. Ct. Aug. 8, 2012).

    2.  **Differing Levels of Sophistication and Experience**

        The putative class members also differ in their sophistication and experience in the

RMBS industry.  ████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

        Some class members have extensive experience in the RMBS market.  Others do not.

Affiliates of AIG, for example, are class members, even though AIG owned loan originator

Wilmington Finance Inc. and therefore was well aware of the underwriting and appraisal

practices employed in the origination of mortgage loans in and prior to 2006.  (Ex. 41 at 7.)

Freddie Mac, which itself issued trillions of dollars of RMBS and thus presumably "possessed at

least some knowledge of underwriting practices," is also a putative class member.  See N.J.

Carpenters Health Fund v. Residential Capital, LLC, 272 F.R.D. 160, 169 (S.D.N.Y. 2011)

("RALI I").  ████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

_____

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████

### 3.  Differing Due Diligence Practices

The knowledge of class members also varies as a result of the differing due diligence practices employed in connection with their purchases of the certificates.  Before Freddie Mac purchased its MSM 2006-16AX certificate, for example, ████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████

████████████████████   ████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

██████

      Other purchasers engaged in far less due diligence.  ████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

### 4.  Differing Litigation Strategies

In light of the myriad differences described above, numerous putative class members have opted to commence their own individual actions relating to the offerings at issue.  Putative class members have filed individual actions in courts around the country relating to 9 of the 13 offerings in this case—including actions concerning five of the eight offerings for which there is no representative plaintiff in this action.[8]  (See App. A.)  Indeed, some putative class members have not asserted claims based on the offering documents at all, but, rather, have asserted claims for breach of contract based on representations and warranties made in the securitization agreements relating to the offerings.

---

[8] Class members have filed cases in forums including the District of Massachusetts, the District of Kansas, New York state court, and Ohio state court, asserting, among other things, strict liability claims under the Securities Act of 1933, common law claims for fraud, negligent misrepresentation, and rescission, and claims under the blue sky laws of Virginia, the District of Columbia, Massachusetts, Ohio, Texas, Illinois, California, and Kansas.  (See App. A.)

**D.      The Offerings Differ Substantially In Terms of Credit Risk and Structure**

Each of the 13 offerings was backed by a distinct pool of loans, and many were structured differently.  As a result, the offerings have different credit and risk profiles.

*First Liens vs. Second Liens.*  Three of the 13 offerings are backed by second lien mortgage loans, which are mortgage loans that are subordinate to a more senior lien on a mortgaged property.  (See App. B.)  A holder of a second lien mortgage bears greater risk than a holder of a first lien mortgage because a second lien holder will lose its mortgage in the event of a foreclosure on the first lien.  (See Ex. 47 at S-12; ███████████████████.) Second lien holders also bear the risk of loss if liquidation proceeds are insufficient to satisfy the liens senior to it.  (See Ex. 47 at S-12.) Thus, although PERS purchased its certificate from a second lien offering, see supra at 5, ██████████████████ ████████████████████████████ █████████████████████████████

Indeed, in light of the risks posed by second lien loans, the offerings backed by them have performed much worse than those backed by first liens.[9]  (See Overdahl Rep. ¶ 44& Ex. 5██ █████████████████.)

*Fixed Rate Mortgages vs. Adjustable Rate Mortgages ("ARMs").*  Fixed rate mortgages back 7 of the 13 offerings, ARMs back 5, and 1 offering is backed by both fixed rate mortgages and ARMs.  (See App. B.)  Here, too, class members viewed the two types of offerings

---

[9] First liens and second liens also differ in numerous other ways that will give rise to different proof in this action.  For example, second lien offering documents included unique disclosures concerning the risks posed by second liens.  (See, e.g., Ex. 47 at S-12.) ███████ ██████████████████████████████████ █████████████████████████

differently based on the type of underlying loans. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████[10]

*Different Credit Enhancement Structures.* The 13 offerings also differ in their credit

enhancement structure. RMBS offerings can be structured in such a way that they provide

additional protection—or credit enhancement—to certificateholders against shortfalls in

payments received on the mortgage loans. (See Ex. 47 at S-5; ██████████████████

██████████████████████████████████████████

█████████████████████████████) Certain of the offerings have an

overcollateralized ("OC") structure (see, e.g., Ex. 50, at S-8), while certain others have a shifting

interest structure (see, e.g., Ex. 51, at S-8). ██████████████████████████

████████████████████████████████████████████████████

---

[10] The prospectus supplements for ARM offerings included unique disclosures
concerning how macroeconomic factors could impact ARMs. (See, e.g., Ex. 49, at S-157.)

███████████████████████████████████████

████████████████████████

**ARGUMENT**

**I.     PLAINTIFFS HAVE NOT SATISFIED RULE 23 WITH RESPECT TO
THE EIGHT OFFERINGS FROM WHICH NO PLAINTIFF PURCHASED**

Plaintiffs' motion raises a threshold issue of first impression as a result of a recent

development in Second Circuit RMBS class certification law:  whether a RMBS class action

plaintiff can represent a class of purchasers of certificates that the plaintiff itself did not

purchase.  Given the facts and circumstances of this case, the answer to that question is no.

Prior to the Second Circuit's recent ruling in <u>Goldman</u>, the question of whether a plaintiff

could assert class claims on behalf of purchasers of certificates from a particular RMBS offering

was largely, if not entirely, adjudicated as a question of standing at the motion to dismiss stage.[11]

Under <u>Goldman</u>, however, a class plaintiff in this Circuit presently has standing to pursue claims

based on certificates that it did not purchase so long as those certificates give rise to the "same

set of concerns" as the certificates that it did purchase, <u>Goldman</u>, 693 F.3d at 148-49, which, in

this context, hinges on the identity of the originators whose loans back the certificates, <u>id.</u> at 164.

In reaching this conclusion, the <u>Goldman</u> court decided that the "variation" between a named

plaintiff's claims and the claims of putative class members in the RMBS context was a question

for class certification, shifting what had been a threshold standing analysis to the class

certification stage:

---

[11]  <u>See, e.g.,</u> <u>In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,</u> 2010 U.S.
Dist. LEXIS 84146, at *15-19; <u>In re Lehman Bros. Sec. & ERISA Litig.,</u> 799 F. Supp. 2d 258,
274 (S.D.N.Y. 2011); <u>In re Wachovia Equity Sec. Litig.,</u> 753 F. Supp. 2d 326, 368-70 (S.D.N.Y.
2011); <u>N.J. Carpenters Health Fund v. Residential Capital, LLC,</u> No. 08-8781, 2010 U.S. Dist.
LEXIS 32058, at *16-17 (S.D.N.Y. Mar. 31, 2010).

> Th[e] conclusion [that a named plaintiff has a case or controversy] does not automatically establish that [the plaintiff] is entitled to litigate the interests of the class [it] seeks to represent, but it does shift the focus of examination from the elements of justiciability to the ability of the named representative to fairly and adequately protect the interests of the class.

Id. at 159 (first and second alterations in original) (quoting Sosna v. Iowa, 419 U.S. 393, 403 (1975)); see also id. at 158 n.9 ("NECA's standing to assert claims on others' behalf is an inquiry separate from its ability to represent the interests of absent class members under Fed. R. Civ. P. [] 23(a) . . . . What the district court thought was a 'standing' issue was in reality a class certification issue.").[12]  Consequently, the scrutiny applied by courts, including this Court, to the standing issue at the motion to dismiss stage is necessarily equal, if not greater, at the class certification stage in order to ensure that the requirements of Rule 23 are met by a preponderance of the evidence.

> **A.    Plaintiffs Have Made No Showing—Nor Could They—That They Can Adequately Represent Purchasers From the Eight Offerings From Which No Plaintiff Purchased Certificates**

Under long-standing class action jurisprudence, no class can be certified absent a representative that can "fairly and adequately protect the interests" of absent class members.  See Fed. R. Civ. P. 23(a)(4).  That is the case here, including with respect to the eight offerings from which no plaintiff purchased a certificate.[13]  Plaintiffs contend otherwise because there

---

[12] Courts in this Circuit recently have recognized these same principles.  In re Frito-Lay N. Am., Inc. All Natural Litig., No. 12-2413, 2013 U.S. Dist. LEXIS 123824, at *40 (E.D.N.Y. Aug. 29, 2013) ("[Goldman] instructs that, because plaintiffs have satisfied the Article III standing inquiry, their ability to represent putative class members who purchased products plaintiffs have not themselves purchased is a question for a class certification motion."); Okla. Police Pension and Ret. Sys. v. U.S. Bank Nat'l Ass'n, 291 F.R.D. 47, 61 (S.D.N.Y. 2013) (following Goldman, the question of whether a plaintiff can assert class claims regarding securities in which it did not invest "go[es] to the adequacy of representation by the plaintiff").

[13] These eight offerings are MSM 2006-4SL, MSM 2006-5AR, MSM 2006-6AR, MSM 2006-8AR, MSM 2006-9AR, MSM 2006-10SL, MSM 2006-13ARX, and MSM 2006-16AX.

supposedly is no "fundamental conflict [of interest]" between plaintiffs and those class members that purchased from the eight offerings. (Pls. Mem. at 14.) That is not so, but, even if it were, plaintiffs' factually unsupported assertion in no way satisfies their burden under Rule 23. Adequacy is comprised of two distinct elements: class representatives not only "must have no interests antagonistic to the interests of other class members," but they <u>also</u> must demonstrate "an interest in vigorously pursuing the claims of the class." <u>In re Literary Works in Elec. Databases Copyright Litig.</u>, 654 F.3d 242, 249 (2d Cir. 2011); <u>see also</u> <u>Duling v. Gristede's Operating Corp.</u>, 267 F.R.D. 86, 99 (S.D.N.Y. 2010). The latter element is particularly salient after <u>Goldman</u>, as illustrated by the circumstances here.[14]

Plaintiffs have failed to carry their burden with respect to both showings. As an initial matter, they offer nothing to support their conclusory assertion that there is no conflict of interest between plaintiffs and the class members that purchased from the eight offerings from which plaintiffs did not purchase. (Pls. Mem. at 14.) Moreover, plaintiffs themselves have conceded that they have no incentive to litigate claims based upon offerings from which no plaintiff purchased. <u>See</u> <u>supra</u> at 7, 8, 9. Because plaintiffs stand to benefit economically only from proving that the offering documents for the offerings from which they purchased were misleading, each plaintiff is inherently interested in vigorously pursuing its own claims, but has no interest in the claims of absentee class members that purchased from entirely different

---

[14] Indeed, the <u>Goldman</u> court itself "emphasize[d] that it is by no means a foregone conclusion" that a plaintiff's standing to assert Securities Act claims on behalf of purchasers of certificates that the plaintiff did not purchase means "a putative class comprised of such Certificate-holders should be certified." 693 F.3d at 165; <u>see also</u> Order Granting Mot. for Recons. 3, <u>In re IndyMac Mort.-Backed Sec. Litig.</u>, No. 09-4583, ECF No. 450 (S.D.N.Y. July 23, 2013) (granting post-<u>Goldman</u> reconsideration motion while recognizing the possibility that "differences in time periods, loan products, and disclosures are significant enough to preclude certification of a class comprised of investors in all of the offerings at issue").

offerings.  See In re Literary Works, 654 F.3d at 254 (class representation inadequate where "[n]amed plaintiffs . . . had no incentive to maximize recovery" for all class members); cf. Larson v. AT&T Mobility LLC, 687 F.3d 109, 132-33 (3d Cir. 2012) ("[I]t is difficult to understand how the Class Representatives, none of whom were Sprint customers at the time the Settlement Agreement was executed, had the interest, much less the incentive, to stop Sprint from enforcing flat-rate [early termination fees] against [the] current customers" in the class.).

Plaintiffs' lack of incentive is particularly acute due to the unique pools of loans backing each of the offerings.  PERS, for instance, stands to gain nothing from proving that first lien loans were not originated in compliance with applicable underwriting standards.  PERS likewise has no incentive to demonstrate that originators did not comply with applicable underwriting guidelines if those originators did not originate second lien loans—which were originated pursuant to entirely different underwriting guidelines than first lien loans—that backed the MSM 2006-14SL offering.  Similarly, PERS has no incentive to demonstrate that loans—second lien or otherwise—backing offerings other than MSM 2006-14SL were not originated in compliance with applicable guidelines.  Nor would PERS be able to use evidence that any loan underlying MSM 2006-14SL was not underwritten in compliance with applicable guidelines to prove the non-compliance of any loan underlying any other offering.

Plaintiffs themselves have admitted as much. ███████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████████

██████████████████████   In fact, NECA has affirmatively argued in another RMBS litigation that allowing lead plaintiff PERS to represent purchasers of certificates PERS itself did not purchase "would turn Rule 23 on its head."  Mem. of Law in Supp. of NECA-IBEW Health & Welfare Fund's Mot. for Appointment as Lead Pl. 8, NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co., No. 08-10783 (S.D.N.Y. Feb. 25, 2009), ECF No. 13 (emphasis added).  Yet, that is precisely what plaintiffs seek to do here.

Plaintiffs attempt to sidestep this issue by relying upon pre-Goldman decisions that found that differences across tranches do not preclude a finding of adequate representation.[15]  (See Pls. Mem. at 14-15.)  But, here, the differences span not only across tranches but also across offerings, which were backed by different loans originated by different originators and from which putative class members purchased certificates at different times.  None of the pre-Goldman RMBS class action cases on which plaintiffs rely address such differences, and none analyze adequacy where, as here, the named plaintiffs did not purchase certificates from the majority of offerings at issue.  See, e.g., Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., 277 F.R.D. 97, 110 (S.D.N.Y. 2011) (finding that plaintiffs satisfied Rule 23's adequacy requirement because their "interests [were] directly aligned with the interests of all the class members, who collectively purchased Certificates in each of the Offerings pursuant to the same material untrue statements and omissions in the Offering Documents").  Accordingly, plaintiffs

---

[15] Contrary to plaintiffs' argument, the differences among the 302 tranches of certificates at issue here do, in fact, preclude certification of a class of purchasers from any of the 297 tranches from which plaintiffs did not purchase.  Among other reasons, claims based on certain of those tranches are not subject to common proof, as they were backed by unique loan groups which did not back any of the tranches from which a plaintiff purchased.  (See, e.g., Ex. 53, at S-7-S-8; Ex. 54, at S-8-S-9.)  Such circumstances were not present in the cases upon which plaintiffs rely.  See, e.g., Pub. Employees' Ret. Syst. Of Miss. v. Goldman Sachs Group, Inc., 280 F.R.D. 130, 135 (S.D.N.Y. 2012) (noting that "all cash flows to the different tranches of the Offering are based on the performance of the same collateral").

have not satisfied, and cannot satisfy, Rule 23(a)(4) with respect to the eight offerings from which no plaintiff purchased certificates. [16]

**B.      Individualized Knowledge Precludes Certification of a Class of Purchasers That Includes Purchasers from the Eight Offerings From Which No Plaintiff Purchased Certificates**

Plaintiffs also cannot satisfy Rule 23(b)(3) with respect to the eight offerings from which no plaintiff purchased certificates.  To do so would excise from the law the individualized issue of each putative class member's knowledge at the time of its purchase.

A defendant cannot be held liable under Sections 11 or 12(a)(2) of the Securities Act if the investor knew about the alleged false statement at the time of its purchase.  See 15 U.S.C. §§ 77k(a) (precluding recovery where "it is proved that at the time of such acquisition [the purchaser] knew of such untruth or omission"), 77l(a)(2) (permitting recovery where "the purchaser [did] not know[] of such untruth or omission").  Defendants bear the burden of demonstrating the requisite knowledge under Section 11, but plaintiffs must affirmatively disprove knowledge as an affirmative element of their Section 12(a)(2) claims.  RALI II, 477 F. App'x at 813 & n.1.

Where, as here, putative class members have "different levels of knowledge" regarding the alleged misstatements and omissions at the heart of the putative class claims, individual

---

[16] Plaintiffs also cannot satisfy Rule 23(a)(3)'s typicality requirement with respect to such offerings.  In fact, in those RMBS actions where a class has been certified, the fact that plaintiffs purchased certificates from the same offerings as the putative class members has often been a driving factor underlying courts' determination that Rule 23's typicality requirement was satisfied.  See, e.g., Merrill Lynch, 277 F.R.D. at 106-07 (finding that typicality was satisfied because the class was limited to investors who had purchased the same certificates as the named plaintiffs); see also Tsereteli v. Residential Asset Sec. Trust 2006-A8, 283 F.R.D. 199, 208 (S.D.N.Y. 2012) (emphasizing in a single-offering case that the typicality requirement had been satisfied because the claims at issue arose from "a common series of events"—namely, "the offering at issue [and] the issuance of the Offering Documents that accompanied it").

knowledge issues predominate and preclude satisfaction of Rule 23(b)(3).  See RALI I, 272

F.R.D. at 168-69.  This is particularly so with respect to the eight offerings from which no

plaintiff purchased.  Without a class representative that actually purchased certificates from a

given offering, therefore, plaintiffs will be unable to satisfy an affirmative element of their

Section 12(a)(2) claims.  And, likewise, defendants will be deprived entirely of the opportunity

to litigate their knowledge defense as to even a single investor under Section 11 for the majority

of the offerings at issue—a result that unduly prejudices defendants and requires denial of

plaintiffs' class certification motion.  See Myers v. Hertz Corp., 624 F.3d 537, 551 (2d Cir.

2010) (observing that "it is . . . well established that courts must consider potential defenses in

assessing the predominance requirement").

## II.   PLAINTIFFS HAVE NOT SATISFIED RULE 23 WITH RESPECT TO THE FIVE OFFERINGS FROM WHICH PLAINTIFFS PURCHASED

As demonstrated above, no class can be certified that includes the eight offerings from

which no plaintiff purchased certificates.  As to the remaining five offerings from which

plaintiffs did purchase certificates, plaintiffs also have not satisfied, and cannot satisfy, Rule

23.[17]  And, even if class certification as to the other eight offerings was not inappropriate for the

reasons explained above—which it is—the deficiencies set forth below apply equally to those

eight offerings.  Accordingly, plaintiffs' motion for class certification must be denied in its

entirety.

---

[17] These five certificates are MSM 2006-14SL (PERS), MSM 2006-7 (NECA), MSM
2006-11 (West Virginia), MSM 2006-12XS (West Virginia), and MSM 2006-15XS (Pompano).

A.      **Plaintiffs Have Not Satisfied Rule 23(b)(3) Because
        Individual Issues Predominate Over Common Issues**

Plaintiffs have not demonstrated, and cannot demonstrate, that "resolution of some of the

legal or factual questions that qualify each class members' case as a genuine controversy can be

achieved through generalized proof," or that "these particular issues are more substantial than the

issues subject only to individualized proof."  RALI II, 477 F. App'x at 812 (quoting UFCW

Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 131 (2d Cir 2010)).  In RALI II—the only RMBS

case in which the Second Circuit has issued a decision on class certification—the Circuit

affirmed the district court's denial of class certification for failure to demonstrate predominance

under Rule 23(b)(3) because "[d]efendants' evidence of knowledge . . . indicated that individual

knowledge inquiries might be necessary."  Id. at 813-15.  RALI II is squarely on point here.

1.      **Individual Issues of Knowledge Will Predominate**

The evidentiary record in this action demonstrates that the knowledge element of

plaintiffs' Section 12 claim and the knowledge defense under Section 11 are not susceptible to

common proof but instead will be the subject of individual, fact-intensive inquiries.

(a)     **Different Dates of Purchase Give
        Rise To Differing Levels of Knowledge**

Plaintiffs' proposed class definition includes investors who purchased over a period of

nearly three years, during which time the publicly available information regarding underwriting

and appraisal practices throughout the mortgage industry changed dramatically.  This is the very

basis on which the Second Circuit affirmed the district court's denial of class certification in

RALI II:

> Because public information could constitute circumstantial
> evidence of individual purchaser knowledge, the defendants would
> have stronger or weaker evidence of purchaser knowledge
> depending on purchase timing.  Such predicted variation supported
> the judge's conclusion that individual knowledge inquiries would

> be required.  Furthermore, because of the differences in purchase
> timing, the chosen class definition also removed the possibility that
> the knowledge defense could be adjudicated on a class basis using
> common publicly available evidence.  This further tipped the
> balance away from common issues and toward individual ones.

Id. at 814 (internal citations omitted).  Here, as in RALI II, the level of information available to a

putative class member at the time it purchased its certificates varied significantly depending on

when that class member's purchase was made.  Not surprisingly, putative class members who

acquired their securities in late 2008—after the financial collapse—knew far more about the

RMBS market than putative class members who purchased in early 2006, as plaintiffs' own

investment managers have admitted.  See supra at 9-12.  Accordingly, as in RALI II, the parties

will have "stronger or weaker evidence of purchaser knowledge depending on purchase

timing."[18]  RALI II, 477 F. App'x at 814.

Indeed, class certification is even less appropriate in this action than it was in RALI II.

Although the district court in that case later certified a narrower class upon an expanded

evidentiary record following the Second Circuit's decision, it found that plaintiffs' proposed

class definition was still "cumbersome" in light of the expansive time period during which

putative class members purchased their certificates.  N.J. Carpenters Health Fund v. Residential

Capital, LLC, No. 08-8781, 2012 U.S. Dist. LEXIS 148865, at *24 (S.D.N.Y. Oct. 15, 2012)

("RALI III").  The court therefore narrowed the class definition to include only purchasers who

bought the security on the date of offering directly from the issuers because "most of" or "ninety

---

[18] The ever-changing landscape of publicly available information between 2006 and 2008
also will require individualized inquiries into putative class members' compliance with the
applicable statute of limitations.  See 15 U.S.C. § 77m  (claims under Sections 11 and 12(a)(2)
must be "brought within one year after the discovery of the untrue statement or the omission, or
after such discovery should have been made by the exercise of reasonable diligence").

percent" of the purchasers of each security bought from the issuers on the date of issue.[19]  Id.
(internal quotation marks omitted).  ███████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████ including lead plaintiff PERS, the only putative class member to have filed

claims in this action within the Securities Act's 3-year repose period, see supra at 5-9.

Accordingly, to narrow the class definition here as it was narrowed in RALI III would have the

same effect as a denial of class certification:  no class can be certified under Rule 23(b)(3).

> **(b)    Different Investment Strategies, Sophistication,
>         Due Diligence Practices, and Investment Types
>         Demonstrate Different Levels of Knowledge**

Different levels of sophistication among putative class members was another reason that

the Second Circuit affirmed Judge Baer's ruling denying class certification in RALI I.  See RALI

II, 477 F. App'x at 813; RALI I, 272 F.R.D. at 169 (denying class certification where "many

putative class members are sophisticated investors with significant experience in asset-backed

securities" and "had the benefit of different levels of information about the lending practices

relevant to investment in mortgage backed securities").  Following the Second Circuit's

affirmance, Judge Baer certified a narrower class only after the record before him was

supplemented and he determined that "class members were similarly situated with respect to

Defendants' due diligence results and access to loan files."  RALI III, 2012 U.S. Dist. LEXIS

148865, at *20.  Plaintiffs have made no such showing here.

---

[19] The court later further modified the class definition to include "initial purchasers who
bought the securities directly from the underwriters or their agents no later than ten trading days
after the offering date" to account for the fact that the offerings were "firm commitment"
underwritings in which the initial distribution of securities did not always occur on the offering
date.  N.J. Carpenters v. Residential Capital, LLC, 288 F.R.D. 290, 296 (S.D.N.Y. 2013).

Also relevant to Judge Baer's decision to certify a narrower class was plaintiffs' modification of the class definition to exclude sophisticated investors, such as Fannie Mae and Freddie Mac.  Id. at *21.  Plaintiffs' proposed class here, however, includes Freddie Mac, which purchased certificates from one of the offerings at issue.  (Overdahl Rep. ¶ 35.)  Here, as in RALI I, Freddie Mac was "extensively involved in the structuring" of that offering, 272 F.R.D. at 169, ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████  More generally, as Judge Baer recognized, "[g]overnment sponsored entities including Freddie . . . issued trillions of dollars of residential mortgage backed securities and this gives rise to a reasonably reliable inference that they possessed at least some knowledge of underwriting practice."  RALI I, 272 F.R.D. at 169.

Plaintiffs' proposed class further includes many other entities with significant experience in RMBS markets and differing investment strategies, such as investors advised by sophisticated investment managers;[20] ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████.  Each of

_____

[20] Any knowledge obtained by a putative class member's investment manager is attributable to that class member under long-standing principles of agency law.  See Meisel v. Grunberg, 651 F. Supp. 2d 98, 110 (S.D.N.Y. 2009) ("If an agency relationship exists, knowledge acquired by an agent acting within the scope of its agency is imputed to the principal even if the information was never actually communicated." (internal quotation marks omitted)); see also Restatement (Third) of Agency § 5.03 (2006) ("[N]otice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal.").

these categories of investors had significant knowledge of the lending and appraisal practices

regarding the loans underlying the offerings.  Moreover, a number of purchasers had extensive

knowledge of the specific offerings from which they purchased as a result of their own pre-

investment due diligence, including through individual discussions with Morgan Stanley, see

supra at 15-16.  By contrast, other class members ███████████████████████████

████████████████████████████████ may have had little or no experience in the

mortgage industry and may not have been advised by an investment manager or conducted any

due diligence at all.  Accordingly, individualized questions of investor knowledge will

predominate over common ones.[21]

Presumably recognizing this issue, plaintiffs excluded from their proposed class all

originators of the mortgage loans underlying the 13 offerings (Pls. Mem. at 3 n.5), which renders

the class unascertainable.  See Wilson v. Toussie, No. 01-4568, 2008 U.S. Dist. LEXIS 25469, at

*10-11 (E.D.N.Y. Mar. 31, 2008) (explaining that plaintiffs seeking to represent a class "must

show that [the class members] are readily identifiable so that the court can determine who is in

the class and, therefore, bound by the ruling").  A class is sufficiently ascertainable if objective

criteria could be applied to "eliminate the necessity for mini-trials to determine" the members of

the class.  Id. at *13.  No such criteria could be employed to carve originators out of the class, as

the originators' "successors and assigns"—whom plaintiffs make no attempt to identify—also

_____

[21] Indeed, the individualized communications that gave rise to many putative class members' purchases differentiates this case from an ordinary Securities Act claim in which "a court can usually find" that common factual issues predominate.  (Pls. Mem. at 17-18.)  Where, as here, plaintiffs' claims turn on investor- and transaction-specific issues, those claims are not suitable for class treatment.  See In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 43-44 (2d Cir. 2006); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 187 (3d Cir. 2001) (need for trade-by-trade inquiries meant "individual issues overwhelmed common questions").

would need to be carved out.  (See Pls. Mem. at 3 n.5.)  This problem would only be compounded if plaintiffs were to attempt to exclude the droves of sophisticated investors.

In addition, given the significant differences in the structure and risks of the various offerings, the knowledge inquiry will also turn on the various plaintiffs' investment strategies and expertise with respect to the various types of securitizations at issue.  For example, some investors had little-to-no experience in investing in second lien offerings, while others were quite familiar with such investments.  See supra at 17.  Others were more or less comfortable with offerings backed by fixed-rate versus adjustable-rate mortgages.  See supra at 17-18.  Still others invested based on the type and extent of credit enhancements that were available or could be negotiated.  See supra at 18-19.  These differences will also impact the proof relevant to each purchaser's knowledge, as different purchasers had different understandings of and tolerances for the risks posed by different types of offerings.

### 2.     Plaintiffs Have Failed to Show that Damages Can Be Measured on a Classwide Basis

Plaintiffs also have failed to meet their burden of demonstrating that "[q]uestions of individual damage calculations [do not] overwhelm questions common to the class."  Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013).  As the Supreme Court recently made clear in Comcast, class action plaintiffs must adduce proof that the damages they allege on behalf of the putative class are susceptible to common measurement.  Id. at 1432-33.  Plaintiffs do nothing more here to meet this burden than to cite to the statutory formula for calculating damages in Securities Act cases.  (See Pls. Mem. at 22; Expert Report of Joseph R. Mason attached to Pls. Mem. ("Mason Report") ¶¶ 105-09.)  Pointing to some method of measuring damages on a classwide basis is not enough.  The statutory formula on which plaintiffs rely says nothing about how to calculate and discount those "damages that are not the result of the [alleged]

31

wrong." <u>Comcast</u>, 133 S. Ct. at 1434; <u>see</u> <u>id.</u> (rejecting the contention that just "<u>any</u> method of [measuring damages] is acceptable so long as it can be applied classwide"). Nor does it account for the fact that class members' potential damages are necessarily varied since, as described above, they purchased their certificates at different times, in different market conditions, and at different prices. Accordingly, plaintiffs have not demonstrated that damages questions common to the class predominate. <u>See</u> Fed. R. Civ. P. 23(b)(3); <u>see also</u> <u>Comcast</u>, 133 S. Ct. at 1434-35.

### 3. Plaintiffs' Superficial Attempt to Demonstrate Predominance Fails

Plaintiffs purport to show predominance by relying upon the incorrect assertions that "Morgan Stanley used the same process and personnel for mortgage-loan acquisition and securitization across the Offerings" and "[t]he mortgage loans underlying <u>all</u> of the Offerings were originated by common Originators." (Pls. Mem. at 19.) This is not so, as made plain by the testimony plaintiffs themselves took of defendant Morgan Stanley & Co.'s Rule 30(b)(6) witness. But even if it were so, plaintiffs' unsubstantiated assertions cannot carry their Rule 23(b)(3) burden, particularly in the face of the actual record:

- █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- The originators disclosed in the prospectus supplements for the offerings do not overlap to the extent plaintiffs claim they do. (<u>See</u> Pls. Mem. at 19.) For example, based upon the prospectus supplements, Wachovia Mortgage Corporation was an originator unique to MSM 2006-8AR (<u>see</u> Ex. 52, at x); Sovereign Bank, Terwin Advisors, and UBS Real Estate Securities were originators unique to MSM 2006-11 (<u>see</u> Ex. 54 at S-2); and Opteum Financial Services was an originator unique to MSM 2006-12XS (<u>see</u> Ex. 50 at xiii).

**B.      No Plaintiff Has Satisfied, Nor Can Any Plaintiff Satisfy,
          Rule 23's Adequacy or Typicality Requirements**

**1.      PERS Has Not Satisfied, and Cannot Satisfy,
          Rule 23(a)(3)'s Typicality Requirement**

PERS' claims are not typical of those of the proposed class for at least two reasons.  First,

PERS' claims are subject to "unique defenses which threaten to become the focus of the

litigation."  Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59-60 (2d Cir. 2000)

(internal quotation marks omitted).  Second, PERS' claims will require substantially different

proof because PERS purchased from a second lien offering.

**(a)      PERS' Claims Are Atypical Because PERS Is
          Subject to a Unique Statute of Limitations Defense**

Not only is PERS subject to a unique statute of limitations defense, but that defense, if

successful, also will require dismissal of this entire action.  Section 13 of the Securities Act

requires that claims under Sections 11 and 12(a)(2) be "brought within one year after the

discovery of the untrue statement or the omission, or after such discovery should have been made

by the exercise of reasonable diligence."  15 U.S.C. § 77m.  PERS' initial complaint, filed on

December 2, 2008, fails to comply with this one-year statute of limitations.

The Court in this action has held that Section 13's statute of limitations will commence

when "a plaintiff could have pled '33 Act claims with sufficient particularity to survive a

12(b)(6) motion."  In re Morgan Stanley Mortg. Pass-Through Certificates Litig., No. 09-2137,

2012 U.S. Dist. LEXIS 98669, at *6 (S.D.N.Y. July 16, 2012) (internal quotation marks

omitted).  Based upon discovery obtained in this action thus far and from publicly available

information, PERS could have pled the facts underlying its claims well before December 2,

2007. ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████

████████████████████

████████████████████████████████████

████ the information that then became public about the specific offerings and originators at issue here indisputably would have allowed PERS to plead the alleged facts underlying its claims months before December 2, 2007.  Among other information, PERS had access to monthly trustee reports for MSM 2006-14SL, which reflected increasing delinquencies throughout 2007. (Exs. 8-12.)  On August 16, 2007, Moody's issued a press release announcing the downgrade of certificates offered in three of the offerings at issue in this action—including MSM 2006-14SL— on account of "[a]ggressive underwriting combined with prolonged, slowing home price appreciation."  (Exs. 27-28.)  Just one day later on August 17, 2007, Aegis Mortgage Corporation, which originated loans underlying MSM 2006-14SL, filed for Chapter 11 bankruptcy protection (Ex. 56), and on November 16, 2007 Standard & Poor's placed MSM 2006-14SL on a negative credit watch (Ex. 29).  Throughout 2007, PERS had access to public reports concerning financial troubles faced by the originators of many of the loans underlying the offerings at issue.[22] ████████████████████████████████████

---

[22] For example, American Home Mortgage Corp. ("AHM"), which originated loans underlying 10 of the other 12 offerings at issue, filed for Chapter 11 bankruptcy protection on August 6, 2007.  (Ex. 57.)  And the parent company of First National Bank of Nevada, which originated loans underlying 9 of the other 12 offerings, began laying off employees in August 2007 as a result of "[t]he widening mortgage slump."  (Ex. 58.)  According to public reports, the layoffs related to "credit problems that have spread from subprime lenders to 'Alt-A' financiers," whose "looser underwriting standards now are coming back to haunt many in the industry."  (Id. (emphasis added).)  In addition to these originator-specific reports, PERS had access to
(….continued)

████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████

The foregoing is only a portion of the information that would have enabled PERS to

plead its claims with sufficient particularity on or before December 2, 2007.  It nevertheless is

enough to demonstrate the very real threat to this litigation that PERS itself poses.  A finding that

PERS is an inadequate or improper class representative is fatal to class certification.  See Gary

Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 179-80

(2d Cir. 1990) (affirming denial of class certification on the ground that named plaintiff was an

inappropriate class representative where it was subject to several unique defenses, including that

it continued to purchase the certificates of deposit at issue despite having notice of and having

investigated the alleged fraud); Leroy v. Paytel III Mgmt. Assocs., Inc., No. 91-1933, 1992 U.S.

Dist. LEXIS 17864, at *8 (S.D.N.Y. Nov. 24, 1992) (denying certification on typicality grounds

where "a material issue of fact exist[ed] as to whether [plaintiff] was aware of the fraud" two

years before filing suit).  Further, a finding that PERS' claims are untimely is fatal to the merits

of every putative class member's claim because the timeliness of this entire action rises and falls

with the timeliness—or untimeliness—of PERS' initial complaint.  After Goldman, this Court

allowed plaintiffs to pursue claims based on the 13 offerings at issue because it found that

"[PERS'] claims on behalf of holders of certificates from all [thirteen] offerings were properly

asserted in the Initial Complaint."  In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,

---

(continued….)

innumerable reports concerning underwriting and appraisal issues more generally, which
increased in frequency as time went on.  See supra at 9-12; see also Exs. 28-41.

No. 09-2137, 2013 U.S. Dist. LEXIS 5285, at *10 (S.D.N.Y. Jan. 11, 2013).[23]  If PERS were

deemed an adequate class representative now only to have PERS' claims adjudicated as untimely

later, then this entire action will be dismissed with prejudice as to all class members.

**(b)     PERS' Claims Are Atypical Because PERS Is
          Subject to a Unique Knowledge Defense**

Because PERS purchased its certificates from the MSM 2006-14SL offering in July

2007, nearly 10 months after the initial offering in October 2006, PERS had vastly different

knowledge than initial purchasers had regarding, among other things, the performance of MSM

2006-14SL specifically and underwriting and appraisal practices throughout the mortgage

industry more generally.  See supra at 5, 9-12.  ███████████████████████

██████████████████████████████████████████████████

███████████████████████  PERS' unique knowledge of loan performance, among

other information, at the time of its purchase in July 2007 also renders its claims atypical of those

of the putative class.  ███████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████

---

[23] See also In re Morgan Stanley Mortg. Pass-Through Certificates Litig., No. 09-2137,
2011 U.S. Dist. LEXIS 104280, at *35 n.10 (S.D.N.Y. Sept. 15, 2011) ("[A] determination that
the December 2008 complaint was untimely would . . . require dismissal of the New Plaintiffs'
claims.").

### (c)     PERS' Claims Are Atypical Because PERS
### Purchased from a Second Lien Securitization

PERS' claims also are atypical for the independent reason that PERS purchased

certificates from an offering backed by second lien mortgage loans—a loan product that was not

included in any of the other four offerings from which a plaintiff purchased.  See supra at 5, 17.

Evidence as to PERS' claim, therefore, will not serve to prove or disprove the claims of

purchasers from any of the other four offerings.  For example, the evidence regarding

underwriting guidelines will be different for PERS because second lien loans were underwritten

to different sets of underwriting guidelines than first lien loans.  See supra at 17 n.9.  In addition,

witnesses with information relevant to PERS' claims would not have information relevant to the

other four offerings from which plaintiffs purchased because those witnesses did not work on

those offerings.  See supra at 32.  Because PERS' claims will "require substantially different

proof" from that of most other putative class members, its claims are not typical.  See Rios v.

Marshall, 100 F.R.D. 395, 406 (S.D.N.Y. 1983).

### 2.     PERS Has Not Satisfied, and Cannot Satisfy,
### Rule 23(a)(4)'s Adequacy Requirements

PERS also has not demonstrated that it will "fairly and adequately protect the interests of

the class."  See Fed. R. Civ. P. 23(a)(4).  A proposed class representative "must not simply lend[]

his name to a suit controlled entirely by the class attorney, as the class is entitled to an adequate

representative, one who will check the otherwise unfettered discretion of counsel in prosecuting

the suit."  In re Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 135 (S.D.N.Y. 2008)

(alteration in original) (internal quotation marks omitted).  But, that is what PERS has done here.

████████████████████████████████████████████

████████████████████████████████████████████



▮▮▮▮▮▮▮ _Cf._ _Monster_, 251 F.R.D. at 135 (denying a motion for appointment as class representative where it was clear that plaintiffs had no "meaningful involvement in th[e] case and [was] simply the pawn of counsel"). ▮▮▮▮▮▮▮ PERS' disinterest in pursuing this case, coupled with its unwillingness even to apprise itself of the alleged misrepresentations at issue in this action, belies plaintiffs' claim that PERS can be an "adequate" class representative.  Indeed, plaintiffs have made no showing that that is the case.

**3.    New Plaintiffs Have Not Satisfied, and Cannot Satisfy, Rule 23(a)(3)'s Typicality Requirement**

Like PERS' claims, new plaintiffs' claims are not typical of the putative class' claims because new plaintiffs are subject to a unique statute of repose defense.  (_See_ Defs.' Mot. for Recons. of the Court's Sept. 15, 2011 Order, July 11, 2013, ECF Nos. 222, 223 (incorporated herein by reference).)  Section 13 of the Securities Act provides that "[i]n no event shall any . . . action be brought to enforce a liability created under [Sections 11 or 12(a)1)] more than three

---

[24] The cases PERS cites in which it has been appointed as a class representative (Pls. Mem. at 15) do not address ▮▮▮▮▮▮▮.

years after the security was bona fide offered to the public, or[,] under [Section 12(a)(2),] more than three years after the sale."  15 U.S.C. § 77m.  New plaintiffs joined this action when the SAC was filed on September 10, 2010, indisputably more than three years after each new plaintiff purchased its respective certificates.  (See SAC ¶¶ 16, 18-19.)  Accordingly, new plaintiffs' claims are time-barred by Section 13's three-year statute of repose, and, as the Second Circuit recently held, neither American Pipe tolling nor any Federal Rule of Civil Procedure can toll Section 13's statute of repose.  IndyMac, 721 F.3d at 109 (discussing American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974)).

### 4. New Plaintiffs Have Not Satisfied, and Cannot Satisfy, Rule 23(a)(4)'s Adequacy Requirements

New plaintiffs, like PERS, are litigating this case solely at the behest of their counsel. See supra at 9. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████  These admissions speak for themselves—the new plaintiffs, like PERS, are not sufficiently engaged or interested in this litigation to "check the otherwise

unfettered discretion of counsel in prosecuting the suit." Monster, 251 F.R.D. at 135 (internal

quotation marks omitted).  These facts preclude plaintiffs from adequately representing any of

the class members, id. at 135-36, including those who purchased from the same certificates that

plaintiffs purchased.

### C.      Plaintiffs Have Not Satisfied, and Cannot Satisfy, Rule 23(b)(3) Because A Class Action Is Not Superior to Other Available Methods

The Supreme Court has recognized that "[t]he policy at the very core of the class action

mechanism is to overcome the problem that small recoveries do not provide the incentive for any

individual to bring a solo action prosecuting his or her rights." Amchem Prods., Inc. v. Windsor,

521 U.S. 591, 617 (1997) (internal quotations omitted); see also Deposit Guar. Nat'l Bank v.

Roper, 445 U.S. 326, 339 (1980).  "When the size of each claim is significant, and each proposed

class member therefore possesses the ability to assert an individual claim, the goal of obtaining

redress can be accomplished without the use of the class action device." Stoudt v. E.F. Hutton &

Co., 121 F.R.D. 36, 38 (S.D.N.Y. 1988).[25]  Plaintiffs essentially have conceded that they cannot

satisfy Rule 23(b)(3)'s superiority requirement, previously telling this Court that plaintiffs—

"who are all institutional investors—purchased millions of dollars in Morgan Stanley RMBS and

therefore have the financial incentive to pursue litigation whether or not the class is

certified."  (Joint Prelim. Pre-Trial Statement at 6, Feb. 21, 2013, ECF No. 180.)

---

[25]  In Stoudt, the court denied certification on superiority grounds where each class member had claims in the tens of thousands of dollars.  121 F.R.D. 36.  Here, the putative class members purchased hundreds of thousands or even millions of dollars in face value of certificates.  See, e.g., Ansari v. N.Y. Univ., 179 F.R.D. 112, 116 (S.D.N.Y. 1998) (class action not superior because potential recovery of $90,000 is sufficient incentive for individual class members to file individual suits); Zimmerman v. Thompson McKinnon Sec., Inc., No. 88-8019, 1989 U.S. Dist. LEXIS 12029, at *4 (S.D.N.Y. Oct. 11, 1989) (putative class members who invested over $75,000 had "both the incentive and capability to pursue claims individually without the benefit of a class action").

The fact that other putative class members are sufficiently incentivized to pursue individual claims is amply demonstrated by the fact that numerous class members already have chosen to pursue individual actions concerning the offerings from which they purchased.  See supra at 16.  The diverse individual actions filed by putative class members—each tailored to accommodate the chosen forum and specific theories of an individual investor—demonstrates why claims regarding these certificates are best left to individual investors.  See Steinmetz v. Bache & Co., 71 F.R.D. 202, 205 (S.D.N.Y. 1976) (refusing to certify a class where class member had already filed individual actions, "especially since these actions, except for one, are not grounded upon plaintiffs' theory"); see also Kottler v. Deutsch Bank AG, No. 05-7773, 2010 U.S. Dist. LEXIS 30590, at *13 (S.D.N.Y. Mar. 29, 2010) (certification should be denied where proposed class members had "already brought individual lawsuits").

Plaintiffs' argument that a class action is superior because purchasers who have not yet filed a separate action would now be time-barred by the Securities' Act's three-year statute of repose ignores the law.  (Pls. Mem. at 24-25.)  As both Congress and the Second Circuit have made plain, "the statute of repose in Section 13 creates a substantive right, extinguishing claims after a three-year period."  IndyMac, 721 F.3d at 109 (emphasis in original).  Therefore, to the extent putative class members' claims are now extinguished, it is because Congress intended them to be extinguished; they cannot be revived through the class certification process.  See id. at 109-10 (rejecting the argument that a failure to extend American Pipe tolling to Section 13's statute of repose could "disrupt the functioning of class action litigation" and noting that "even if the decision causes some such problem, it is a problem only Congress can address").  Plaintiffs' argument is nothing more than an attempt to end-run the Second Circuit's IndyMac decision and does not render a class action superior in this case.

41

### D.     Plaintiffs Have Not Satisfied Rule 23(a)'s Commonality Requirement Because Their Claims Do Not Give Rise to Common Answers

Plaintiffs also fail to satisfy Rule 23(a)(2)'s commonality requirement because plaintiffs do nothing more than assert that certain generalized questions are "common" to the putative class.  Commonality, however, is not satisfied by "the raising of common questions—even in droves."  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (internal quotation marks omitted).  Rather, plaintiffs must establish "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  Id. (emphasis added) (internal quotation marks omitted).  To generate "common answers," plaintiffs must demonstrate that all class claims depend upon a common contention whose "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Id.

Plaintiffs nowhere explain how their putative class claims will generate the "common answers" Dukes requires.  Instead, they identify a list of seven broadly formulated questions that they claim are common to the class, including such generalities as "whether [Morgan Stanley] violated the Securities Act by the acts and conduct alleged in the [complaint]."[26]  (Pls. Mem. at 9.)  But, "[a]ny competently crafted class complaint literally raises common questions."  Dukes, 131 S. Ct. at 2551 (alteration in original) (internal quotation marks omitted).  Without any

---

[26] Plaintiffs' attempt to construe this Court's post-Goldman reconsideration decision as evidence of commonality is unavailing.  (See Pls. Mem. at 9.)  This Court's determination that plaintiffs' allegations "implicate[] the same set of concerns" sufficient to confer class standing on PERS does not, as plaintiffs would have it, mean that plaintiffs can also satisfy Rule 23's requirements to certify a class.  (Order Granting in Part and Denying in Part Pls.' Mot. for Partial Recons. of the Court's Sept. 11, 2013, Oct. 23, 2013, ECF No. 258.)  If it did, then the Second Circuit's Goldman decision largely would be surplusage.  See Goldman, 693 F.3d at 165 ("[I]it is by no means a forgone conclusion that, because [a] plaintiff has standing to assert . . . claims on behalf of Certificate-holders . . . , a putative class comprised of such Certificate holders should be certified.").

explanation as to how or why the <u>answers</u> to those questions will be consistent for putative class members, merely "[r]eciting these questions is not sufficient to obtain class certification."  <u>Id.</u>

Reciting such questions, however, is all plaintiffs have done.  They do not and cannot meet their obligation to demonstrate common answers because, quite simply, there are none.  Ignoring the sweeping differences among the various offerings, plaintiffs ask this Court to find commonality simply by virtue of the fact that similar misrepresentations purportedly are made in each prospectus supplement.  (<u>See</u> Pls. Mem. at 7-8.)  This is not so, as each alleged misrepresentation is different depending upon the loans, originators, and appraisals to which it pertains.  Moreover, in so arguing, plaintiffs rely almost exclusively on cases involving a single offering made pursuant to a single prospectus supplement.[27]  Where, as here, the proposed class includes differently situated purchasers from diverse offerings (and a majority for which there is no purchaser), plaintiffs' burden to establish commonality is far greater.  <u>See</u> Order Granting Mot. for Recons. at 3, <u>In re IndyMac Mort.-Backed Sec. Litig.</u>, No. 09-4583, ECF No. 450 (S.D.N.Y. July 23, 2013) (recognizing the possibility that "differences in time periods, loan products, and disclosures are significant enough to preclude certification of a class comprised of investors in all of the offerings at issue").  Plaintiffs have not carried that burden here.

By way of example, a comparison of the claims of PERS, which purchased from MSM 2006-14SL, and NECA, which purchased from MSM 2006-7, illustrates plaintiffs' inability to elicit the requisite "common answers."  The evidence necessary to establish falsity as to PERS' and NECA's offerings will differ significantly because such evidence must be tied directly to the specific loan pools underlying each respective offering.  <u>See</u> <u>City of Ann Arbor Emps.' Ret. Sys.</u>

---

[27] <u>See</u> <u>Tsereteli</u>, 283 F.R.D. at 205; <u>Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.</u>, 280 F.R.D. 130, 132 (S.D.N.Y. 2012); <u>N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.</u>, No 08-5653, 2011 U.S. Dist. LEXIS 92597, at *3-4 (S.D.N.Y. Aug. 16, 2011).

v. Citigroup Mort. Loan Trust Inc., 703 F. Supp. 2d 253, 260 (E.D.N.Y. 2010) ("Plaintiffs must

be able to prove falsity with respect to statements, or omissions regarding the mortgages in

which they purchased interests.  Those statements will invariably require reference to particular

pools of mortgages contained in particular securities.").  Moreover, PERS—which sold its

certificate—and NECA—which continues to hold its certificate—have not "suffered the same

injury," as they must in order to demonstrate commonality.  See Dukes, 131 S. Ct. at 2551

(internal quotation marks omitted).  Similarly, PERS purchased its certificates from a second lien

offering while NECA did not, thus requiring different proof.  Supra at 5, 7, 17.

> ### E.    Plaintiffs Have Not Established that the Class
> ### is Sufficiently Numerous Under Rule 23(a)(1)

Finally, plaintiffs cannot meet their burden of establishing that their proposed class they

seek to certify is sufficiently numerous because they have not provided any "evidence of," or

even "[a] reasonabl[e] estimate [of,] the number of class members."  Tiro v. Pub. House Invs.,

LLC, 288 F.R.D. 272, 278 (S.D.N.Y. 2012) (citation and internal quotation marks omitted); see

Amchem, 521 U.S. at 614 ("[P]arties seeking class certification must show that the action is

maintainable under [Rule 23.]").

The only evidence the plaintiffs have adduced in support of their numerosity burden—the

report of Joseph R. Mason—purports to count the total number of "distinct investors in the

Offerings."  (Mason Report at ¶¶ 102-03.)  But, plaintiffs do not merely seek to certify a class of

persons who invested in the offerings; they seek to certify a class of persons who did so "and

were damaged thereby."  (Pls. Mem. at 3 (emphasis added).)  Plaintiffs do not even attempt to

explain, let alone offer probative evidence of, how the alleged "distinct investors" were

"damaged," which precludes a finding of numerosity here.  See Bd. of Trs. of. S. Cal. IBEW-

NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp., 287 F.R.D. 216, 223 (S.D.N.Y.

2012) (plaintiffs could not establish numerosity because there was no evidence that the identified class members fell within the class definition); cf. Edge v. C. Tech Collections, Inc., 203 F.R.D. 85, 89 (E.D.N.Y. 2001) ("Where the plaintiff's assertion of numerosity is pure speculation or bare allegations, the motion for class certification fails.").

Even if this Court were to look past this deficiency, plaintiffs still would be unable to meet their burden of demonstrating that "the class is too large to make joinder practicable." Abu Dhabi Commercial Bank v. Morgan Stanley & Co., 269 F.R.D. 252, 255 (S.D.N.Y. 2010). Plaintiffs can only claim otherwise by employing a sweepingly broad class definition that lumps together purchasers from all of the different offerings at issue. (Pls. Mem. at 3.) But there are considerable differences among the offerings, supra at 17-18, which must factor into the numerosity analysis, see Abu Dhabi, 269 F.R.D. at 255, particularly now that Goldman has opened the door for overbroad putative classes like this one to reach the class certification stage. Plaintiffs should not be permitted to claim to satisfy Rule 23's numerosity requirement by cobbling together an exceptionally broad putative class, as plaintiffs have done here.

## CONCLUSION

For all of the foregoing reasons, defendants respectfully request that plaintiffs' motion for class certification be denied.

Dated:   November 13, 2013
         New York, New York

DAVIS POLK & WARDWELL LLP

By:

James P. Rouhandeh
(rouhandeh@davispolk.com)
Dana M. Seshens
(dana.seshens@davispolk.com)
Carissa M. Pilotti
(carissa.pilotti@davispolk.com)

450 Lexington Avenue
New York, New York  10017
(212) 450-4000

Attorneys for Defendants Morgan Stanley
Capital I Inc., Morgan Stanley Mortgage
Capital Holdings LLC, Morgan Stanley &
Co. Incorporated, Morgan Stanley, David
R. Warren, Anthony B. Tufariello,
William J. Forsell, and Steven S. Stern