UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

In re MORGAN STANLEY MORTGAGE          :     Civil Action No. 1:09-cv-02137-LTS-SN
PASS-THROUGH CERTIFICATES              :
LITIGATION                             :     CLASS ACTION
                                       :
————————————————————————               :
                                       :
This Document Relates To:              :
                                       :
        ALL ACTIONS.                   :
———————————————————————— x


PLAINTIFFS' REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION AND
APPOINTMENT OF CLASS REPRESENTATIVES AND CO-CLASS COUNSEL

**[REDACTED]**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................... iii

I.   INTRODUCTION ....................................................................................1

II.  PLAINTIFFS SATISFY RULE 23(b) ...................................................3

    A.   Common Questions Predominate ...................................................4

        1.   Defendants' Misrepresentations and Omissions Were Common Across All Offerings and Are Subject to Common Proof ..........5

        2.   The Structure of the Certificates Supports Predominance ..........8

        3.   Damages Can Be Proven Classwide ........................................10

        4.   Common Questions Will Provide Common Answers .................11

        5.   Defendants' Knowledge Defense Does Not Raise Individual Issues That Predominate .................................................................11

        6.   Differences in Investor Makeup Do Not Defeat Predominance ...............15

    B.   A Class Action Is Superior to Other Methods of Adjudication .............17

III. PLAINTIFFS SATISFY RULE 23(a) .................................................18

    A.   Plaintiffs' Claims Are Typical .......................................................18

        1.   Plaintiffs' Claims Are Typical Because They Raise the Same Set of Concerns ..............................................................................19

        2.   Potential Affirmative Defenses Do Not Defeat Typicality ..............21

            a.   PERS Is Not Subject to a Unique Statute-of-Limitations Defense ................................................................................22

            b.   PERS Is Not Subject to a Unique Actual Knowledge Defense ................................................................................23

            c.   PERS' Purchase in 2006-14SL Does Not Defeat Typicality .........25

            d.   The Additional Plaintiffs Are Not Subject to a Statute-of-Repose Defense.............................................................................25

    B.   Plaintiffs Will Fairly and Adequately Represent the Class ...................27

1.      Plaintiffs Have the Same Incentive as the Class to Prove  the Falsity of Defendants' Common Misrepresentations ...............................27

2.      Plaintiffs Are Actively Participating in This Litigation and Are Supervising Experienced Counsel ...........................................................29

3.      None of Defendants' Other Attacks on Plaintiffs Are Valid ....................31

C.      Numerosity Is Satisfied............................................................................33

IV.      CONCLUSION..................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
269 F.R.D. 252, 255 (S.D.N.Y. 2010) .................................................................34, 35

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591, 614 (1997)........................................................................................34

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)......................................................................................31

*In re Bank One Sec. Litig./First Chicago S'holder Claims*,
2002 WL 989454 (N.D. Ill. May 14, 2002) .............................................................4

*Beck v. Status Game Corp.*,
1995 WL 422067 (S.D.N.Y. July 14, 1995) ..........................................................31

*Berkley v. United States*,
45 Fed. Cl. 224 (1999) ............................................................................................18

*Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y.
Mellon Corp.*,
287 F.R.D. 216 (S.D.N.Y. 2012) ............................................................................34

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013).......................................................................................10, 11

*In re Constar Int'l Inc. Sec. Litig.*,
585 F.3d 774 (3rd Cir. 2009) ...................................................................................4

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003)........................................................................4, 15, 24

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000)..................................................20, 28

*In re Dynex Capital, Inc. Sec. Litig.*,
2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) .............................................17, 20, 28

*Edge v. C. Tech Collections, Inc.*,
203 F.R.D. 85 (E.D.N.Y. 2001) ..............................................................................33

*Emps.' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*,
804 F. Supp. 2d 141 (S.D.N.Y. 2011)......................................................................8

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)................................................................................18, 20, 27

*In re FleetBoston Fin. Corp. Sec. Litig.*,
   2005 WL 3579050 (D.N.J. Dec. 28, 2005) ...........................................................34

*Freudenberg v. E\*Trade Fin. Corp.*,
   2008 WL 287373 (S.D.N.Y. July 16, 2008) .........................................................20

*Funke v. Life Fin. Corp.*,
   2003 WL 1787125 (S.D.N.Y. Apr. 3, 2003)......................................................2, 15

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   903 F.2d 176 (2d Cir. 1990)..............................................................................21, 22

*Globus v. Law Research Serv., Inc.*,
   418 F.2d 1276 (2d Cir. 1969)....................................................................................3

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ...............................................................................................3, 4

*Hevesi v. Citigroup Inc.*,
   366 F.3d 70 (2d Cir. 2004)..................................................................................18, 26

*In re IndyMac Mortg.-Backed Sec. Litig.*,
   286 F.R.D. 226 (S.D.N.Y. 2012) ...................................................................1, 16, 18

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009)......................................................................34

*In re Initial Pub. Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006)......................................................................................17

*Joseph v. Wiles*,
   223 F.3d 1155 (10th Cir. 2000) ................................................................................4

*Kottler v. Deutsche Bank AG*,
   2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010) ........................................................18

*Lapin v. Goldman Sachs & Co.*,
   254 F.R.D. 168 (S.D.N.Y. 2008) .............................................................................10

*In re Lehman Bros. Sec. & ERISA Litig.*,
   2013 WL 440622 (S.D.N.Y. Jan. 23, 2013) .............................................20, 21, 28

*Leroy v. Paytel III Mgmt. Assocs., Inc.*,
   1992 WL 367090 (S.D.N.Y. Nov. 24, 1992)............................................................21

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ..............................................4, 24, 25

*In re Monster Worldwide, Inc. Sec. Litig.*,
   251 F.R.D. 132 (S.D.N.Y. 2008) ..................................................................31

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
   2012 WL 2899356 (S.D.N.Y. July 16, 2012) ......................................................22

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
   2013 WL 139556 (S.D.N.Y. Jan. 11, 2013) ................................................. passim

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
   810 F. Supp. 2d 650 (S.D.N.Y. 2011)..............................................................8, 22

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
   2011 WL 3874821 (S.D.N.Y. Aug. 16, 2011) ................................................1, 16

*N.J. Carpenters Health Fund v. RALI Series 2006-Q01 Trust*,
   477 F. App'x 809 (2d Cir. 2012) ................................................................12, 14

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
   2012 WL 4865174 (S.D.N.Y. Oct. 15, 2012) .............................................. passim

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
   709 F.3d 109 (2d Cir. 2013).......................................................................12, 13

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012)..............................................................19, 20, 28, 29

*In re Omnicom Grp., Inc. Sec. Litig.*,
   2007 WL 1280640 (S.D.N.Y. Apr. 30, 2007).....................................................32

*In re Parmalat Sec. Litig.*,
   2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008).............................................17, 21, 24

*Police & Fire Ret. Sys. of the City of Detroit v. Indymac MBS, Inc.*,
   721 F.3d 95 (2d Cir. 2013).......................................................................18, 25, 26

*Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
   280 F.R.D. 130 (S.D.N.Y. 2012) .......................................................... passim

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
   277 F.R.D. 97 (S.D.N.Y. 2011) ............................................................ passim

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)...............................................................................4

*Seijas v. Republic of Arg.*,
   606 F.3d 53 (2d Cir. 2010)...............................................................................10

*Steinmetz v. Bache & Co.*,
   71 F.R.D. 202 (S.D.N.Y. 1976) ........................................................................18

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
   2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005) .....................................................14

*Tiro v. Pub. House Invs. LLC*,
   288 F.R.D. 272 (S.D.N.Y. 2012) ..................................................................33, 34

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
   283 F.R.D. 199 (S.D.N.Y. 2012) .............................................................1, 16, 17

*In re U.S. Foodservice Inc. Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013).............................................................................10

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
   669 F.3d 632 (5th Cir. 2012) ...........................................................................34

*Wagner v. Barrick Gold Corp.*,
   251 F.R.D. 112 (S.D.N.Y. 2008) ......................................................................30

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011).....................................................................................11

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) .............................................................21, 28, 29

## STATUTES, RULES & REGULATIONS

15 U.S.C. § 77k(e) ...................................................................................................10

15 U.S.C. § 77l(b) ....................................................................................................10

Federal Rules of Civil Procedure

   Rule 15(c)............................................................................................................26
   Rule 17(a)............................................................................................................26
   Rule 23 .......................................................................................................... passim

## OTHER AUTHORITIES

H.R. Rep. No. 104-369 (1995)....................................................................................33

J. William Hicks, 17 *Civil Liabilities: Enforcement & Litigation Under the 1933
   Act* (2013)............................................................................................................5

## I.    INTRODUCTION

This case is ideally suited for class treatment for the reasons discussed in Plaintiffs' opening brief. Plaintiffs' claims are typical of the more than 1,667 investors in the Class; common legal and factual questions predominate over individual ones; Plaintiffs have no conflicts with the other Class members and have retained and are overseeing competent counsel; and a class action is a superior way to adjudicate this action. Presented with similar records in nearly identical class actions involving residential mortgage-backed securities ("RMBS"), six other courts in this District granted class certification.[1]

Defendants' various contentions do not defeat certification. The minor differences in the information available to investors over time, in investor sophistication, and in the collateral underlying the Offerings – differences that exist in every securities class action – are insufficient to defeat class certification. In the words of Judge Rakoff, "[d]efendants' arguments grossly overstate the differences." *Merrill*, 277 F.R.D. at 113 (rejecting the same arguments that Defendants make here about supposed differences). After all, the test is not whether differences exist; the test is whether those differences predominate. They do not. They are overwhelmed by the common legal and factual questions this case presents.

The varying types of loans backing the Certificates (*i.e.*, fixed rate, adjustable rate, first lien, or second lien) are immaterial to issues for class certification. Courts in this jurisdiction have uniformly certified classes in RMBS actions involving different types of collateral. *See, e.g., Merrill*, 277 F.R.D. at 114 (certifying a class with 18 trusts that were prime, subprime, and Alt-A); *IndyMac*,

---

[1] *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2011 WL 3874821 (S.D.N.Y. Aug. 16, 2011) ("*DLJ*"); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97 (S.D.N.Y. 2011) ("*Merrill*"); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199 (S.D.N.Y. 2012) ("*Tsereteli*"); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280 F.R.D. 130 (S.D.N.Y. 2012) ("*Goldman RMBS*"); *In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226 (S.D.N.Y. 2012) ("*IndyMac*"); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2012 WL 4865174 (S.D.N.Y. Oct. 15, 2012) ("*RALI II*").

286 F.R.D. at 243 (same, with 10 trusts). Those courts "swiftly rejected" the argument that differences in loan type create insurmountable differences in the materiality of certain alleged misstatements. *See Merrill*, 277 F.R.D. at 114. The misrepresentations here are common across all Offerings regardless of loan type. All Class members were victims of the same widespread abandonment of underwriting and appraisal standards across all loan types.

Differences in the timing of class member purchases also do not defeat class certification because common issues nevertheless predominate over individual issues. *See, e.g., Merrill*, 277 F.R.D. at 116-17, 119 (finding that "what was known about Defendants' practices at different points in time" did not defeat class certification and that "the slew of newspaper articles and public reports" raised "an issue subject to generalized proof"); *RALI II*, 2012 WL 4865174, at *3 (all class members are "likely to be subject to the same knowledge … defense."); *Goldman RMBS*, 280 F.R.D. at 137, 139 (rejecting argument that "differences in publicly available information over time" create individualized issues "sufficient to overwhelm common [ones]."). The *Merrill* court, for example, certified a class with class members who purchased certificates "more than a year after the prospectus supplements for those offerings became effective" and "after more than 12 monthly distribution reports became available to holders for those offerings." 277 F.R.D. at 114. Regardless of timing, the predominant issue remains the misrepresentations in the Offering Documents.

Differences in the sophistication and investment objectives of class members are also irrelevant. The federal securities laws – Section 11 in particular – protect sophisticated and unsophisticated investors alike. *See Funke v. Life Fin. Corp.*, 2003 WL 1787125, at *2 (S.D.N.Y. Apr. 3, 2003) ("[I]nasmuch as reliance is not an element of a Section 11 … claim, a plaintiff's 'sophistication' regarding securities and investment practices is ***irrelevant***.'"). Thus, the inclusion of "sophisticated investors" in the class does not defeat class certification. *See Goldman RMBS*, 280

- 2 -

F.R.D. at 138-39 (certifying RMBS class containing "institutional investors" with a "depth of knowledge" of the RMBS industry, as well as investors (like Plaintiffs) who relied on experienced asset managers). Moreover, while investors may well have had different objectives when they purchased the Offerings, such objectives are irrelevant to claims arising under Section 11.

Finally, Plaintiffs are adequate class representatives. Each of the named Plaintiffs is an institutional investor that has been appointed as class representative and/or lead plaintiff in numerous other securities class actions (including several RMBS class actions in this District). Each is actively participating and supervising Class counsel in this litigation. As demonstrated by their actions in this case, each is motivated and committed to prosecuting this action and proving Defendants' misrepresentations across all Offerings, even those offerings from which Plaintiffs did not purchase. Certification is especially appropriate given that this Court has already found that Defendants' misconduct "'implicates the same set of concerns'" across all 13 Offerings. *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2013 WL 139556, at *3 (S.D.N.Y. Jan. 11, 2013) ("*January 11 Order*") (finding that Plaintiffs have class standing to pursue claims related to all Offerings). Plaintiffs have satisfied all elements of Rule 23, and respectfully submit that the Court should certify the Class.

## II.    PLAINTIFFS SATISFY RULE 23(b)

Section 11 imposes "a ***stringent standard of liability*** on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-83 (1983). The statute's aim is "not so much to compensate the defrauded purchaser as to promote enforcement of the Act and to deter negligence by providing a penalty for those who fail in their duties." *Globus v. Law Research Serv., Inc.*, 418 F.2d 1276, 1288 (2d Cir. 1969). Thus, the statute "places a relatively ***minimal burden*** on a plaintiff," requiring only that "a plaintiff [who] purchased a security issued pursuant to a registration statement . . . show a material misstatement or omission to establish his

- 3 -

*prima facie* case." *Herman*, 459 U.S. at 382. There is no requirement that the plaintiff prove scienter, reliance, or loss causation. *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004). Once a plaintiff establishes an untrue statement or omission, "[l]iability against the issuer of a security is ***virtually absolute, even for innocent misstatements***." *Herman*, 459 U.S. at 381-83.

Moreover, "[t]here is no language limiting claims to those investors who purchase their shares in a public offering." *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000). The securities need only be "originally registered under the allegedly defective registration statement – so long as the security was indeed issued under ***that*** registration statement and not another." *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003) (emphasis in original). Thus, any person who acquires the security may sue under Section 11 "'regardless of whether he bought in the initial offering, a week later, or a month after that.'" *Id.*

Claims under Section 11 are "particularly well-suited to class treatment." *In re Bank One Sec. Litig./First Chicago S'holder Claims,* 2002 WL 989454, at *4 (N.D. Ill. May 14, 2002). Due to its "formulaic nature," "[Section] 11 leaves defendants with little room to maneuver" at the class certification stage. *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 785 (3rd Cir. 2009). Among other things, "a [Section] 11 case will ***never*** demand individualized proof as to an investor's reliance or knowledge." *Id.* at 784. For these reasons, courts in this District and elsewhere have certified innumerable Section 11 class actions, including six RMBS actions nearly identical to this one.

### A.    Common Questions Predominate

"Courts generally focus on the liability issue," and not potential affirmative defenses, "in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *11 (S.D.N.Y. Dec. 23, 2009). Given that a plaintiff must only show the existence of a material untrue statement or omission in the Offering

Documents, courts "usually find that common factual and legal issues ... predominate" in Securities Act cases. J. William Hicks, 17 *Civil Liabilities: Enforcement & Litigation Under the 1933 Act*, § 4:43 (2013). The Court should find the same here.

1.      **Defendants' Misrepresentations and Omissions Were
        Common Across All Offerings and Are Subject to Common Proof**

The Offering Documents for each Offering represented that the loans underlying the Offerings were originated in accordance with the lenders' underwriting guidelines, the Uniform Standards of Professional Appraisal Practice ("USPAP") and Morgan Stanley's loan purchasing standards.[2] The purpose of these standards was to determine: (1) the borrower's ability to pay its monthly obligations related to the loan; and (2) the adequacy of the mortgaged property as collateral for the loan. *See id.* Defendants' representations were virtually identical for each of the Offerings, regardless of whether the Offering contained first-lien, second-lien, fixed-rate or adjustable-rate mortgages. *See id.* Contrary to these uniform representations, however, lenders systematically disregarded even basic underwriting standards, and Morgan Stanley disregarded its loan purchasing standards. *See id.* at ¶¶38-44, 83. Appraisers also routinely failed to follow USPAP, resulting in pervasive inflated appraisals and understated loan-to-value ("LTV") ratios. *See id.* at ¶¶83-99. Accordingly, the riskiness of the loans underlying the Offerings – regardless of type – was much higher than disclosed. *See id.* at ¶¶96-99; *see also* Expert Report of Joseph R. Mason ("Mason Report"), ¶¶5-6. Here, as in *Merrill*, "it is the substantially similar statements common to each Prospectus and Supplement that are the clear focus of the Amended Complaint." *See* 277 F.R.D. at 114.

Defendants do not dispute making identical representations across the 13 Offerings. Instead,

---

[2] *See* ¶¶35, 38, 77-78, 83. Unless otherwise noted, references to "¶_" or "¶¶_" are to the Fourth Amended Complaint for Violations of the Federal Securities Laws (ECF No. 177) ("FAC").

Defendants point to minor differences and argue that their misrepresentations are not subject to common proof because (1) the employees that worked on the Offerings were not always identical; (2) different Morgan Stanley trading desks sold first- and second-lien Offerings; and (3) the originators of the underlying loans are not identical across Offerings. *See* Defendants' Opposition to Plaintiffs' Motion for Class Certification, ECF No. 265 ("Def. Br.") at 32. "Defendants' arguments grossly overstate the differences." *Merrill*, 277 F.R.D. at 113

*First*, Morgan Stanley's "Securitized Products Group" ("SPG") prepared all of the Offerings using identical securitization practices.



As *Merrill* recognized in certifying a class of 18 offerings backed by different types of loans, offerings created pursuant to the same procedures

---

[3] *See* ▮▮▮▮▮▮▮ Plaintiffs' Motion For Class Certification, ECF No. 235 ("Pl. Br.") at 19, Table 2. Unless otherwise noted, all "Exhibit" or "Ex." references are to the Declaration of David R. Stickney in Support of Plaintiffs' Reply in Further Support of Motion for Class Certification and Appointment of Class Representatives and Co-Class Counsel, filed herewith.

[4] *Id*. at 68:6-13; 70:10-72:9. Defendants' assertion that different employees worked on different Offerings is irrelevant and inaccurate. Predominance is satisfied not when the exact same employees work on each offering, but where, as here, the policies, procedures and misstatements are identical across Offerings. *Merrill*, 277 F.R.D. at 113**.**

and processes satisfy predominance:

> [T]he common issues here overwhelm the individual ones. To begin with … 'each of the Certificates … were created and issued pursuant to [the] same process by the same Defendants.' ***The alleged flaws common to that process, which resulted in the misstatements, will be the subject of common proof.***

277 F.R.D. at 113 (emphasis added).

*Second*, Defendants' assertion that some originators did not contribute loans to all Offerings does not defeat predominance because the number of ***common*** originators across the Offerings is substantial. There are 17 originators (24% of the loans) common to ***all*** 13 Offerings, 34 originators (46% of the loans) in at least 12 Offerings, and 59 originators (62% of the loans) in at least 10 Offerings. *See* Pl. Br., Table 1. At least 80% of the originators (accounting for 97.2% of all loans) are in the five Offerings Plaintiffs purchased. *See id.*, Chart 1A.

Defendants simply ignore these undisputed facts. Defendants also ignore that Morgan Stanley Mortgage Capital Inc. ("MSMC") either originated or purchased loans in all 13 Offerings, accounting for nearly 65% of all loans. *See* Ex. 1. "MSMC's alleged misconduct with respect to each of the [13] offerings 'implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class.'" *January 11 Order*, 2013 WL 139556, at *3. Therefore, whether Wachovia was "an originator unique to MSM 2006-8AR," Def. Br. at 32, is irrelevant because that Offering contained hundreds of millions of dollars of loans issued or purchased by originators common to all of the Offerings.

Defendants' argument focuses only on the originators that were "disclosed in the prospectus supplements."[5] This case, however, concerns representations made about loans from ***all*** originators,

---

[5] Def. Br. at 32. Notably, many of the originators that Defendants claim are "unique" to a particular Offering are, according to Defendants' SEC filings, included in multiple Offerings. As just one example, Wachovia was an originator in at least six Offerings. *See* Ex. 4 at MS_PT_00037309, 39005, 40676, 42767, 44818, 51703 (various pooling and servicing agreements).

whether disclosed or not. ¶¶4, 7. Defendants made uniform non-originator-specific representations in the Offering Documents, including that Morgan Stanley conducted reviews of originators, and conducted due diligence "[p]rior to acquiring *any* residential mortgage loans." Ex. 5 at MS_PT_00035261, 37051, 38685, 40357, 42432, 44562, 46509, 47693, 49872, 51451, 53200, 54501, 56359 (prospectus supplement excerpts).  The appropriate inquiry with respect to originators, therefore, is whether there is sufficient commonality across Offerings that common issues outweigh individual ones. *Cf. January 11 Order*, 2013 WL 139556, at *3 (common originators implicated "same set of concerns"). Such commonality exists here.

*Third*, even if there are minor differences among the originators or loans, the issue is whether originators "*systematically disregarded*" underwriting guidelines, not whether there were violations as to particular originators or loans. *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 672 (S.D.N.Y. 2011) (Offering Documents failed "to disclose the alleged systematic disregard of underwriting criteria and improper loan origination practices," regardless of loan type). Evidence of "large scale, systematic practices of originators" failing to meet guidelines will prove Plaintiffs' claims. *Id.* at 673; *see also Emps.' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 152 (S.D.N.Y. 2011) (plaintiffs can prove their claims through evidence of "'widespread abandonment of underwriting guidelines.'"). Accordingly, any minor differences among loan types do not defeat predominance.

In sum, Morgan Stanley's securitization machine created, issued, and sold each of the Offerings through substantially similar Offering Documents that all contained the same misrepresentations. There is also substantial overlap among the Offerings' originators. These common facts will provide common proof for the misrepresentations and omissions at issue.

## 2.    The Structure of the Certificates Supports Predominance

Defendants' assertion that there is a lack of commonality because some Certificates were

backed by second-lien mortgages misses the point. Def. Br. at 17. All of the prospectus supplements, regardless of whether the loans were first- or second-lien, or fixed- or adjustable-rate, contained substantially similar misrepresentations.[6] Plaintiffs will prove widespread abandonment of standards across all loan products. Accordingly, the type of loan underlying each Offering is immaterial.[7] *See Merrill*, 277 F.R.D. at 106-07 (certifying class of 18 offerings, which contained subprime, Alt-A and prime loans).

While Defendants contend that second-lien and first-lien loans were underwritten in a different manner, they ignore ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████[8]

---

[6] For example, the Offering Documents uniformly represented that, as to MSMC: "Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses." *See* Ex. 5 MS_PT_00035259, 37034, 38672, 40336, 42411, 44549, 46506, 47675, 49856, 51439, 53197, 54485, 56347 (prospectus supplement excerpts). *See also id.* at MS_PT_00037036-8, 47677-9, 54487-9 (showing identical underwriting criteria for American Home loans in fixed and adjustable rate offerings); MS_PT_00040337-8, 42412-3, 47676-7 (showing identical underwriting standards for Morgan Stanley Credit Corporation loans in fixed and adjustable rate offerings).

[7] Even a finding that the differences among loans are material still would not defeat certification. All of the loan types included in the 13 Offerings are included in at least one of the Offerings purchased by Plaintiffs, and Plaintiffs have incentive to establish that guidelines were systematically disregarded across all loan types.

[8] Moreover, as Dr. Mason explains in his unchallenged expert declaration, all of the Offerings are affected in the same way by Defendants' misrepresentations. Mason Report, ¶¶5-8; 60-70; 83-92. The underwriting and appraisal misrepresentations made it impossible to accurately determine credit enhancements for all the

### 3.    Damages Can Be Proven Classwide

Plaintiffs in their opening brief showed through Dr. Mason's expert declaration that: (1) classwide damages can be calculated in a formulaic manner described in the Securities Act; and (2) there are several ways in which RMBS can be valued, including by modeling cash flows and obtaining prices from pricing services. *See* Mason Report, ¶¶105-09. Dr. Mason also explained that "all cash flows to the different securities in a given Offering are based on the performance of the same underlying collateral," and "[t]o the extent that there are untrue statements and/or material omissions in the Offering Documents for a given Offering, all securities in the Offering will be adversely affected." *Id.*, ¶88.

Under *Comcast Corp. v. Behrend* – a case Defendants rely on – a plaintiff must show at class certification only that its proposed damages methodology is "consistent with" its theory of liability.[9] Here, Plaintiffs' liability theory and damage methodology both derive directly from Section 11. *See also* 15 U.S.C. § 77k(e); § 77l(b). Thus, they are entirely consistent. And while it is true – as it is in any class action – that the specific amount of each Class member's damages may vary, this "does not defeat certification . . . [since] the method of calculating damages is [still] common to the class." *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 181 (S.D.N.Y. 2008); *see also Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010) ("[I]t is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification.").

---

Offerings. *See id.*, ¶¶60-70. As a result, all of the Certificates were "at greater risk of being mis-structured, and therefore worth less than otherwise believed." *Id.*, ¶70. As such, different credit enhancement structures among the Offerings cannot defeat predominance.

[9] 133 S. Ct. 1426, 1433 (2013); *see also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 n.8 (2d Cir. 2013) (finding that Plaintiffs' proposed methodology satisfied *Comcast* as it was "directly linked with their underlying theory of classwide liability"). In *Comcast*, the court found that plaintiffs failed to present a methodology that reflected the one theory of antitrust liability that had been found to meet Rule 23. Accordingly, the Supreme Court found that plaintiffs' methodology could not be applied classwide. *Id.* at 133 S. Ct. 1426, 1433, 1435. That situation is far different from the instant case.

Defendants' contention that Plaintiffs must provide a methodology for proving the affirmative defense of negative causation "is easily dispensed with." *Merrill*, 277 F.R.D. at 119. Under Section 11, it is Defendants – not Plaintiffs – that have the burden of proving that any portion of the damages was ***not*** the result of their false statements. *Id.* ("[I]t is Defendants who must marshal the evidence to support" negative causation). Moreover, causation is "a common, not an individual, issue." *Id.* At this stage, Plaintiffs need only demonstrate, as they have, that their liability theory is directly linked to their damages methodology. *Comcast*, 133 S. Ct. at 1433.

### 4.   Common Questions Will Provide Common Answers

Defendants concede that there are many common questions in this action. They argue, however, that Plaintiffs do not satisfy commonality because they have not shown that "common answers" will drive the resolution of this action.[10] As detailed in the Complaint, however, Defendants systematically securitized loans that did not meet their purchasing standards, lenders' underwriting standards, and USPAP. Plaintiffs will use common proof, including from Morgan Stanley's own files, to establish that the statements were false. Such uniform proof will provide "common answers" to the common questions of whether Defendants made false statements, whether Defendants violated the Securities Act, and whether Defendants systematically abandoned their loan-purchasing standards. *See Goldman RMBS*, 280 F.R.D. at 134; *Merrill*, 277 F.R.D. at 105-06.

### 5.   Defendants' Knowledge Defense Does Not Raise Individual Issues That Predominate

Differing levels of knowledge among class members does not defeat predominance.

---

[10] Def. Br. at 42-43. Morgan Stanley cites *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), but that case is factually inapposite. In *Wal-Mart*, the plaintiffs, 1.5 million female employees nationwide, were attempting to prove that the discretionary employment decisions of "thousands of managers" raised common questions. By contrast, here, there is a single securitization machine, common misstatements, and only 13 Offerings, all of which were issued within a seven-month period. Accordingly, "Wal-Mart has no effect on the commonality determination in this case." *See Merrill*, 277 F.R.D. at 105-06 ("The common questions presented by this case – essentially, whether the Offering Documents were false or misleading in one or more respects – are clearly susceptible to common answers.").

Nevertheless, Defendants contend that (1) later purchasers may have had more information about the Offerings than did earlier purchasers; and (2) certain investors were more sophisticated than others. In support, Defendants – as they did at the motion to dismiss stage of this case – submit a collection of public information regarding the Offerings' performance, downgrades, general news articles and mortgage industry commentary. None of these materials are sufficient to show – as they must to provide a defense under Section 11 – that investors had "**actual knowledge** of the specific untruth or omission." *N.J. Carpenters Health Fund v. RALI Series 2006-Q01 Trust*, 477 F. App'x 809, 813 (2d Cir. 2012) ("*RALI I*"); *see also N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) ("RBS") ("'There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a . . . prospectus on the basis that the information is public knowledge.'"). Courts in other RMBS cases have recognized that only "the actual due diligence results and loan files" would provide investors with actual knowledge of the misstatements. *RALI II*, 2012 WL 4865174, at *3. Here, Defendants do not – and cannot – dispute that investors never received such materials.[11]

Defendants' expert, James A. Overdahl, was never asked to, and did not, investigate investor knowledge. Rather, Mr. Overdahl was only asked to "identify the types of investors" and to "calculate certain statistics pertaining to the investors who purchased or acquired certificates . . . ." Overdahl Report, ¶¶5, 7. Therefore, he offers no evidence that any investor knew of the misrepresentations and omissions. Indeed, the Overdahl Report shows that many of the RMBS

---

[11] *See* Mason Report, ¶28;

[black redaction box]

*see also Merrill*, 277 F.R.D. at 119 (finding that predominance was not defeated because plaintiffs' investment managers denied knowledge of underwriting violations).

investors have more similarities than differences.

Even if there was a question as to whether Defendants' public materials were sufficient to impart actual knowledge, "differences in publicly available information over time" do not "create issues subject to individual proof sufficient to overwhelm common issues." *Goldman RMBS*, 280 F.R.D. at 137, 139; *Merrill*, 277 F.R.D. at 116-17, 119 (whether knowledge could be inferred from "the slew of newspaper articles and public reports" is "an issue subject to generalized proof"). As the *RALI II* court succinctly stated, without access to actual due-diligence results and loan files, all class members are "likely to be subject to *the same knowledge … defense*." 2012 WL 4865174, at *3 (emphasis added).

Thus, news articles regarding loosening underwriting standards are irrelevant. There is a big difference between *loosening* standards and *abandoning* standards. While investors *may* have been able to determine that Morgan Stanley and the originators had loosened their underwriting standards, investors had no way of knowing that Morgan Stanley and the originators systematically ignored even those "loosened" standards. None of the news articles or other information that Defendants point to informed investors that Defendants and originators had abandoned their standards.[12] Although investors may be able to account for a known relaxation of underwriting standards, as Dr. Mason explains, if Defendants' representations are inaccurate, "the market will be unable to establish the true risk of the loans and therefore structure and price that risk appropriately." Mason Report, ¶¶30, 40. Thus, generic materials concerning loosening guidelines or aggressive underwriting do not demonstrate actual knowledge because "[a]ggressive underwriting … does not

---

[12] Even if some of the materials related specifically to the Offerings – they do not – they would still be insufficient to prove actual knowledge. As the Second Circuit held in a similar RMBS class action, "[i]f courts held that *merely available, as opposed to widely known*, public information exposed an untruth or omission, thereby rendering it immaterial, they would effectively shift the burden of proof on Section 11's affirmative defense, presuming that the plaintiff *should* have known the relevant information rather than requiring the defendant to prove actual knowledge." *RBS*, 709 F.3d at 127 n.12 (emphasis in original).

amount to 'routine disregard [for] all underwriting guidelines.'" *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 2005 WL 2148919, at *9 (S.D.N.Y. Sept. 6, 2005).

Likewise, rating agency reports announcing downgrades of securities in 70 "subprime" securitizations, Def. Br. at 34, did not inform investors that the Offerings contained loans that did not comply with originators' underwriting standards. *See Goldman RMBS*, 280 F.R.D. at 140 (downgrades insufficient to impart actual knowledge). In fact, Defendants have repeatedly represented to the Court that "subprime" securitizations are irrelevant to the claims at issue here. September 11, 2013 Opinion and Order, ECF No. 248 at 3 ("*September 11 Order*"). Moreover, the rating agencies' downgrade reports said nothing about a failure to comply with underwriting and appraisal standards. *See* Def. Exs. 27, 29.

The *RALI/Harborview* cases cited by Defendants actually support Plaintiffs. In *RALI I*, the Second Circuit affirmed the district court's decision that, on the particular record in that case, class certification was inappropriate because individual issues of knowledge predominated. 477 F. App'x at 813. The court suggested, however, that with a "fuller record," the outcome may have been different. *Id.* Following the Second Circuit's guidance, the district court later certified the class after plaintiffs developed an "expanded record" that "assuage[d]" the court's "prior concern" regarding individualized issues of knowledge. *RALI II*, 2012 WL 4865174, at *3. In particular, the court noted that "adverse due diligence results and loan files, which could have yielded specific information about [the alleged] underwriting [non]compliance unlike loan tapes that merely convey loan characteristics, were not disclosed to the investors." *Id.* Here, investors were not provided access to the loan files or due-diligence results. *See* Mason Report, ¶28; ███████████████████

███████████████████████████████████

Defendants' contention that investors that purchased closer in time to the initial offering are

somehow differently situated than later purchasers ignores the plain language and intent of Section 11 and has been repeatedly rejected in RMBS class actions. *See, e.g., DeMaria*, 318 F.3d at 176 (under Section 11, any person who acquires a security traceable to the misleading registration statement may sue "'regardless of whether he bought in the initial offering, a week later, or a month after that'"); *Merrill*, 277 F.R.D. at 116-17, 119 (finding that "what was known about Defendants' practices at different points in time" did not defeat class certification).

Further, *RALI II* does not, as Defendants contend, require the class definition to be limited to investors that purchased only during specific time frames. As noted above, Section 11 extends to any person who acquires a security that is traceable to the misleading registration statement regardless of whether the purchase occurred in the initial offerings or later. In *RALI II*, unlike here, the plaintiffs proposed a "cumbersome" class that included purchasers in "59 separate [RALI] offerings" and "15 [Harborview] offerings." 2012 WL 4865174, at *4. The court noted that "the sheer number of offerings" caused the timing issue to present a "challenge" to class cohesiveness and the court therefore exercised its discretion under Rule 23(c) to modify the class. *Id.* Here, by contrast, there are no similar cohesiveness issues as the 13 Offerings were all issued from the same shelf within a seven-month time frame in 2006, and the initial complaint was filed in 2008.[13]

### 6.    Differences in Investor Makeup Do Not Defeat Predominance

Under Section 11, investor "'sophistication regarding securities and investment practices is irrelevant.'" *Funke*, 2003 WL 1787125, at *2. For this reason, multiple courts have recently found that investor sophistication does not alone defeat predominance:

> [W]hile demonstrating that certain class members are sophisticated investors may

---

[13] Defendants' contention that the Class is not ascertainable because loan originators are excluded from the Class definition is without merit. Def. Br. at 30. In fact, during discovery, Defendants provided Plaintiffs with a list of all originators that contributed loans to the 13 Offerings. Accordingly, the originators, along with those entities' successors and assigns, are readily identifiable.

indicate that these class members were familiar with the MBS market and even understood that there were varying standards for and exceptions to underwriting guidelines used in the industry generally and by IndyMac Bank in particular, ***it does not establish that any prospective class member likely knew or had notice that the Offering Documents contained misstatements or omissions about IndyMac Bank's adherence to underwriting standards for the Certificates at issue*** in this case.

*IndyMac*, 286 F.R.D. at 239; *see also DLJ*, 2011 WL 3874821, at *7 n.1; *Goldman RMBS*, 280

F.R.D. at 137; *RALI II*, 2012 WL 4865174, at *3; *Tsereteli*, 283 F.R.D. at 213.

Moreover, it is irrelevant that some investors may have conducted "their own pre-investment due diligence, including through individual discussions with Morgan Stanley." Def. Br. at 30. Conspicuously missing from Defendants' suppositions are any specifics about the substance of the discussions, or other evidence indicating that Morgan Stanley told investors that the loans did not comply with underwriting, purchasing, and appraisal standards. For example, Defendants cite ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Importantly, investors were not provided access to the loan files or due-diligence results. *See* Mason Report, ¶28; ▮▮▮▮▮▮▮▮▮▮▮▮ Moreover, Defendants do not claim that any investor colluded with them in structuring Offerings containing loans that were not as represented.[15] *See Goldman RMBS*, 280 F.R.D. at 137 ("there was 'no

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- 16 -

allegation . . . that any class member actually participated in the [alleged conduct,]' and 'the evidence in the record that any class member knew of false statements in the Offering before purchase [was] weak at best.'").[16] Accordingly, all investors – investment managers, public pension funds, and universities – regardless of sophistication, investment strategy or due-diligence practice, are similarly situated.[17]

**B.     A Class Action Is Superior to Other Methods of Adjudication**

This case involves at least 1,667 geographically dispersed Class members. Mason Report, ¶¶102, 104. "Requiring [plaintiffs'] claims to proceed as separate cases on behalf of multiple plaintiffs therefore would be inefficient, would fragment the recovery effort, and would diminish the incentives for pursuing the claims." *Tsereteli*, 283 F.R.D. at 217; *accord In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215, at *8 (S.D.N.Y. Mar. 7, 2011); *Goldman RMBS*, 280 F.R.D. at 141 ("several other benefits" of class treatment are "the elimination of the risk of inconsistent judgments, benefits in terms of judicial resources, and the familiarity of the Southern District of New York with securities law.").

Moreover, whether the class includes "institutional investors [that] might be capable of bringing individual actions to remedy their alleged injuries" is largely irrelevant. *In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *4 (S.D.N.Y. Aug. 21, 2008) ("Although it is possible that some institutional investors might be capable of bringing individual actions … those parties who choose

---

[16] Defendants find no support in *In re Initial Public Offering Securities Litigation*, 471 F.3d 24, 43 (2d Cir. 2006). There, unlike here, "[t]he claim that lack of knowledge is common to the class [was] thoroughly undermined by the ***Plaintiffs' own allegations*** as to how widespread was knowledge of the alleged scheme." *Id.* (emphasis added).

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

not to do so 'should not be deprived the opportunity to pursue this [class] action simply because some [other] litigants … [might pursue] parallel actions.'"). In any event, only 12 investors in nine of the 13 Offerings have filed individual cases. Almost *none* of those cases allege Section 11 claims and the total value of Certificates at issue is a mere 11% of the total value of the 13 Offerings here. The fact that there are fewer individual cases than Offerings is a particularly strong indication that there is a lack of appetite for individual actions.[18]

Finally, a live class claim is vastly superior to a time-barred individual one. Under the Second Circuit's recent decision in *Police & Fire Ret. Sys. of the City of Detroit v. Indymac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013) ("*Detroit v. IndyMac*"), Defendants argue that Class members could be barred by the statute of repose from filing future individual actions. Denial of class certification would thus leave Class members without any legal remedy through no fault of their own. *See, e.g., Berkley v. United States*, 45 Fed. Cl. 224, 234 (1999) ("[A]n expiring statute of limitations is a 'legitimate concern' when deciding whether or not to certify a class, and one which weighs in plaintiffs' favor."). Accordingly, a class action is superior in this case.

## III.   PLAINTIFFS SATISFY RULE 23(a)

### A.   Plaintiffs' Claims Are Typical

In their opening papers, Plaintiffs established that, for all 13 Offerings, "'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82-83 (2d Cir. 2004); *IndyMac*,

---

[18] The cases cited by Defendants do not compel a different conclusion. In *Steinmetz v. Bache & Co.*, 71 F.R.D. 202 (S.D.N.Y. 1976), *19* putative class members among only 185 bondholders had initiated separate lawsuits, eight having been brought to recover the smallest or second smallest units in which the securities could be purchased, and a number already "disposed of" through verdicts, voluntary dismissal and settlements. *Id.* at 205. Similarly, in *Kottler v. Deutsche Bank AG*, 2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010), *25* putative class members among only 186 persons had initiated separate lawsuits and others had already settled their claims. *Id.* at *5.

- 18 -

286 F.R.D. at 235; *Merrill*, 277 F.R.D. at 106-07. For example, all Offerings:

- were assembled by the same Morgan Stanley securitization platform using nearly identical processes, entities and personnel, including the same sponsor, depositor and underwriter. Pl. Br. at 11;
- contained loans originated by 17 common originators, including MSMC, which originated or purchased loans in all Offerings, *id.*; and
- contained substantially similar untrue representations and omissions concerning underwriting, appraisal, and loan purchase practices, which resulted in similar undisclosed operational risks affecting all Offerings. *Id.*

Accordingly, as with six prior RMBS class actions, typicality is readily established here.

Defendants do not challenge that all claims arise from the same course of events and that each Class member makes similar legal arguments. Instead, they contend that Plaintiffs' claims are atypical because Plaintiffs (1) did not purchase Certificates in eight Offerings; (2) are supposedly subject to unique defenses; and (3) purchased their Certificates at different times and from Offerings with different characteristics. Def. Br. at 33. Each of these contentions fails to rebut typicality.

### 1.   Plaintiffs' Claims Are Typical Because They Raise the Same Set of Concerns

The Court has already determined that, under the Second Circuit's decision in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs*, Plaintiffs have class standing for 13 Offerings, as the Offerings all contain mortgages originated by the same lenders, and thus implicate the "same set of concerns." *January 11 Order*, 2013 WL 139556, at *3 (citing *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012), *cert. denied*, *Goldman, Sachs & Co. v. NECA-IBEW Health & Welfare Fund*, _ U.S. _, 133 S. Ct. 1624 (2013) ("*Goldman*")). For distinct, but logically consistent reasons, Plaintiffs satisfy typicality, as Plaintiffs and the Class will establish liability using "'the same course of events'" and "'similar legal arguments.'" *See* Pl. Br. at 10-14.

Without contesting that the claims raise the same set of concerns across all Offerings, Defendants contend that Plaintiffs do not satisfy typicality for eight Offerings because no Plaintiff

purchased Certificates in those Offerings. Def. Br. at 24 n.16. A bright line rule where no plaintiff can be typical unless they purchased the securities at issue, however, is contrary to law. Indeed, courts in this circuit have "repeatedly certified classes where the class representatives had not invested in all of the subject securities." *See In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2000); *see also Dynex*, 2011 WL 781215, at *3 (certifying class of RMBS purchasers even though named plaintiff did not purchase in all bonds); *Freudenberg v. E*Trade Fin. Corp.*, 2008 WL 2876373, at *5-6 (S.D.N.Y. July 16, 2008); *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 440622, at *2 (S.D.N.Y. Jan. 23, 2013).

*Goldman* confirmed that typicality is not determined by whether a plaintiff purchased in the security at issue: "'a class representative can establish the requisite typicality under Rule 23 if the defendants committed the same wrongful acts in the same manner against all members of the class,' *even if the class representative lacks standing to sue on every claim asserted by the class*."[19] Here, Plaintiffs not only have standing to pursue claims related to the 13 Offerings, those claims also are typical of Plaintiffs' claims because, as in *Goldman*, the common proof necessary to determine whether Class members were injured in a similar manner will center on whether the originators backing the Offering from which Plaintiffs purchased "abandoned [their] underwriting guidelines, rendering defendants' Offering Documents false or misleading." 693 F.3d at 163. Typicality is thus satisfied because Plaintiffs and the Class will establish liability using "'the same course of events'" and "'similar legal arguments.'" *Flag Telecom*, 574 F.3d at 35.

A recent post-*Goldman* decision from this district granting class certification confirms that,

---

[19] 693 F.3d at 158 n.9. Defendants' contention that *Goldman* requires "equal, if not greater" scrutiny to be applied "to the standing issue … at the class certification stage" is without merit. Def. Br. at 1, 20. Nothing in *Goldman* heightened the legal standard to be applied. To the contrary, *Goldman* recognized that class standing and class certification are "separate" inquiries. 693 F.3d at 159 n.9. Here, the Court has already decided the class standing issue, and now only must determine whether Plaintiffs have the "ability to represent the interests of absent class members under Fed. R. Civ. P. Rule 23(a)." *Id.*

contrary to Defendants' contention, a plaintiff's claims can be typical of the class, even if it did not purchase every security at issue. In *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437 (S.D.N.Y. 2013), the plaintiffs moved to certify a class of investors in both common stock and bonds, even though no plaintiff purchased bonds. *Id.* at 441. In granting plaintiffs' motion, Judge Daniels determined that class standing was satisfied because the alleged misstatement "implicates the same set of concerns for all investors in ... stocks and bonds..." *Id.* at 452. The court found that typicality was satisfied for similar reasons; namely, because plaintiffs' claims arose "out of the same alleged public misstatement that caused injury to shareholders and bondholders alike." *Id.* at 444. Accordingly, Defendants' contention that Plaintiffs cannot represent investors in the eight offerings in which they did not purchase must be rejected.

### 2.    Potential Affirmative Defenses Do Not Defeat Typicality

"[P]otential affirmative defenses against individual plaintiffs do not preclude class certification for claims under Section 11." *Lehman Bros.*, 2013 WL 440622, at *3. Only defenses that are "unique" to the plaintiff and "threaten to become the focus of the litigation" can affect certification. *Parmalat*, 2008 WL 3895539, at *5. The "'unique defense rule," however, "is not rigidly applied in this Circuit'" and is "intended to protect plaintiff class – not to shield defendants from a potentially meritorious suit." *Id.* In fact, "it is beyond reasonable dispute that a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members."[20]

---

[20] *Id.* Defendants' cases are factually distinguishable. In *Leroy v. Paytel III Mgmt. Assocs., Inc.*, 1992 WL 367090, at *2-3 (S.D.N.Y. Nov. 24, 1992), the plaintiff was subject to a unique statute-of-limitations defense because it wrote a letter demonstrating ***actual knowledge*** of the fraud two years before it claimed it learned of the fraud. Here, there are no facts in the record indicating that any investor had actual knowledge of Defendants' misstatements, much less two years before the complaint was filed. Likewise, in *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (2d Cir. 1990), unlike here, the plaintiff was subject to a unique defense because it continued to purchase securities despite the fact that it had

- 21 -

### a.    PERS Is Not Subject to a Unique Statute-of-Limitations Defense

Rehashing an argument that this court has twice rejected, Defendants assert that PERS is subject to a statute-of-limitations defense. *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2012 WL 2899356, at *1-3 (S.D.N.Y. July 16, 2012) ("*July 16 Order*") ("The lack of specificity, combined with the fact that Plaintiffs' Certificates retained their unblemished ratings into 2008, is fatal to Defendants' motion."); *see also Morgan Stanley*, 810 F. Supp. 2d. at 670. Defendants' contention is no more persuasive now than it was at the motion to dismiss stage.[21]

Not only are Defendants' publicly available materials – performance data, minor rating downgrades and general news articles – insufficient to establish that PERS had sufficient information to file a claim more than a year before the initial complaint, their public nature makes them equally applicable to all investors, rather than uniquely to PERS. *Goldman RMBS*, 280 F.R.D. at 136 ("I find little evidence that the nature of [PERS]'s susceptibility to the affirmative defense is distinctly different from that of any other institutional investor"); *Merrill*, 277 F.R.D. at 116 (finding PERS' claims were not time-barred and that even if defendants' materials were sufficient, the issue would be common to all class members).

 This characterization is simply inaccurate. The cited testimony makes *no reference whatsoever* to misstatements regarding underwriting or appraisal standards.

---

"notice of, and [had] investigated, the alleged fraud." *Id.* at 179-80. Here, no Plaintiff had facts sufficient to plead a claim until, at the earliest, August 2008, and the last Plaintiff purchased a Certificate in July 2007.

[21] The Securities Act statute of limitations is one year and commences only where "a plaintiff could have pled '33 Act claims with sufficient particularity to survive a 12(b)(6) motion." *See July 16 Order*, 2012 WL 2899356, at *2. Here, PERS filed the initial complaint on December 2, 2008, and, as this Court has twice determined, the information in the market as of December 2007 was "sweepingly general" and insufficient to start the clock running. *Id.*

In fact, the excerpt refers only to ████████████████████████████████████████

the same generic topics the Court has twice found to be insufficient.  Moreover, Defendants have

repeatedly contended in this action that "subprime" is irrelevant to these claims.[22] Defendants'

"creative cutting and pasting of [PERS'] over-200 page deposition," does not support their position.

*See Goldman RMBS*, 280 F.R.D. at 140.

In any event, the evidence shows that PERS lacked sufficient information to plead viable

claims until, at the earliest, late 2008. ██████████████████████████████████████



By

diligently filing its complaint on December 2, 2008, PERS easily complied with the one-year statute

of limitations. Therefore, there is no threat that such a defense against it will become the focus of

this litigation. *Goldman RMBS*, 280 F.R.D. at 140 ("the supposed individual issues" relating to

PERS' compliance with the statute of limitations were, in fact, common ones).

**b.      PERS Is Not Subject to a Unique Actual Knowledge Defense**

Defendants principally contend that PERS is subject to a unique "actual knowledge" defense

because it purchased its Certificates after the initial Offering. Def. Br. at 36. This contention,

however, is without merit, as "[f]actual differences involving the date of acquisition, type of

securities purchased and manner by which the investor acquired the securities will not destroy

---

[22] *September 11 Order* at 3 ("defendants, through counsel, have represented to the Court that there are no
subprime offerings in this case"). ████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct." *Marsh*, 2009 WL 5178546, at \*10; *Parmalat*, 2008 WL 3895539, at \*5; *see also DeMaria*, 318 F.3d at 176 (under Section 11, any person may sue "'regardless of whether he bought in the initial offering, a week later, or a month after that'").

Even if the timing of PERS' purchase was relevant (it is not), Defendants put forth no evidence that PERS – or any Class members – *knew* of the underwriting and appraisal misstatements prior to purchasing Certificates. Def. Br. at 12. Instead, they again rely on their collection of publicly available information, but concede that no investors were provided with loan files or due diligence results. As explained above, without access to actual due-diligence results and loan files, all Class members are "likely to be subject to *the same knowledge ... defense*." *RALI II*, 2012 WL 4865174, at \*3; *see also supra*, § II.A.5.

As Plaintiffs and the Class are "subject to *the same knowledge ... defense*," there is no possibility that a unique knowledge defense will "become the focus of the litigation." *Parmalat*, 2008 WL 3895539, at *5.

### c.      PERS' Purchase in 2006-14SL Does Not Defeat Typicality

Defendants next contend that PERS is atypical because it purchased in an Offering that contained second-lien loans. Def. Br. at 37. Defendants are wrong. For the same reasons that loan type does not defeat commonality, it does not defeat typicality. *See supra*, § II.A.2. The misrepresentations between Plaintiffs' Offerings and the Additional Offerings are identical no matter whether the Offerings contained Alt-A, prime, fixed-rate, adjustable-rate, first- or second-lien loans. The Morgan Stanley Seller Guide directed that originators determine whether borrowers had "a reasonable ability and likelihood of repaying their mortgage debt" – irrespective of loan type. Plaintiffs will prove through common evidence that MSMC, and the other originators that contributed loans to the Offerings, engaged in widespread abandonment of these standards across all loan products. Accordingly, the type of loan is immaterial to typicality. *See Marsh*, 2009 WL 5178546, at *10 (the "type of securities" is immaterial for typicality purposes, as long as "each class member was the victim of the same material misstatements and the same fraudulent course of conduct"); *Merrill*, 277 F.R.D. at 109.

### d.      The Additional Plaintiffs Are Not Subject to a Statute-of-Repose Defense

Defendants cite a "unique statute of repose defense" relating to the Additional Plaintiffs where none exists. As set forth in Plaintiffs' opposition to Defendants' motion for reconsideration of the Court's September 15, 2011 Order seeking to dismiss Additional Plaintiffs, the Court has already determined that *Detroit v. IndyMac* – the sole basis for Defendants' motion for reconsideration – "will not affect the scope of Plaintiffs' claims." *January 11 Order*, 2013 WL 139556, at *3; *see also*

Pl. Opp. to Def. Mot. for Recons., ECF No. 224; Endorsed Ltr. from Darryl J. Alvarado to The Honorable Laura Taylor Swain, ECF No. 227. This is because *Detroit v. IndyMac* affects only those claims brought (1) for the first time after the expiration of the statute of repose or (2) by intervenors in an attempt "to revive claims that were dismissed from the class complaint for want of jurisdiction." 721 F.3d at 101, 110. Neither scenario is present here, as the Additional Plaintiffs simply joined the timely filed initial complaint, which asserted their claims. Additional Plaintiffs did not intervene and the Court always had jurisdiction over their claims. In fact, *Detroit v. IndyMac* stated explicitly that it "implicates only those claims and defendants as to which [a lead plaintiff] would lack standing under [*Goldman*]."[23]

Moreover, even if *Detroit v. IndyMac* affected Additional Plaintiffs' claims in this action (it does not), Additional Plaintiffs are members of the putative class free to serve as lead plaintiffs and class representatives. *See Hevesi*, 366 F.3d at 83 ("[T]he PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class."). Courts have repeatedly found that where, as here, a plaintiff's claims were asserted timely on its behalf, that plaintiff may serve as a class representative. *See* ECF No. 224 at 16-17 (collecting cases). This is so even where that plaintiff was not previously appointed lead plaintiff and even where the appointment as class representative occurs after the expiration of the applicable statute of repose.[24]

---

[23] *Id.* at *111 n.19. Additional Plaintiffs and their claims are also properly included in this case because their claims "relate back" to the initial complaint pursuant to Fed. R. Civ. P. 15(c) and because their joinder is justified by Fed. R. Civ. P. 17(a). *See* ECF No. 224, § III.B; *see also* ECF No. 227.

[24] *Id.* According to Defendants, a finding that PERS is inadequate would be "fatal to class certification." Def. Br. at 35. But as the Second Circuit held in *Hevesi*, lead plaintiffs are not the only class members that can be appointed class representatives. 366 F.3d 70, 83. Indeed, any class member may serve as a class representative so long as they satisfy Rule 23. *Id.* Here, if PERS or any other Plaintiff is found to be inadequate, the others can continue to serve as class representatives. The cases cited by Defendants, both of which address a single proposed class representative found to be inadequate, do not hold otherwise. *See* Def. Br. at 35.

- 26 -

**B.      Plaintiffs Will Fairly and Adequately Represent the Class**

The question whether a named plaintiff will adequately represent the class turns on "whether (1) plaintiff's interests are antagonistic to the interests of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Flag Telecom*, 574 F.3d 29, 35. "The focus is on uncovering conflicts of interest between named parties and the class they seek to represent."[25]

**1.      Plaintiffs Have the Same Incentive as the Class to Prove the Falsity of Defendants' Common Misrepresentations**

Plaintiffs have no conflict with the Class.  In fact, Plaintiffs' interests are perfectly aligned with the Class' because they purchased Certificates through Offering Documents that contained the same common misrepresentations.  Plaintiffs and Class members therefore share the common goal of proving the falsity of those common misrepresentations. As discussed above, Defendants made essentially the same misrepresentations about the quality of loan underwriting and appraisals in every Offering, regardless of whether the underlying loan pools contained first or second mortgages, Alt-A or prime loans, or adjustable or fixed-rate mortgages. The misrepresentations concerned the quality of the underwriting and appraisals, not what types of loans were included in the pools. More importantly, the loans backing the Certificates that Plaintiffs purchased were originated by the same lenders that originated the loans backing the Certificates purchased by absent class members. Indeed, $7.8 billion out of $8.0 billion – or *97.2%* – of the aggregate loan amount across the 13 Offerings was originated by lenders that originated loans in the five deals purchased by the proposed class

---

[25] *Id.* Defendants suggest that *Goldman* somehow requires courts to more closely scrutinize whether a class representative will adequately represent the class when the class representative did not purchase all of the securities at issue. *See* Def. Br. at 20. *Goldman* requires no such thing. *Goldman* did not change in any way the test for determining whether a class representative will fairly and adequately represent the class. *Goldman* simply noted that the standing question and the adequacy question are distinct, and that just because a class representative has standing to assert class claims does not mean that it will in all instances be able to fairly and adequately represent the class.

representatives. *See* Pl. Br., Chart 1B. As the Second Circuit held in *Goldman*, "each Certificate-holder within an Offering or Group backed by loans originated by similar lenders has the **same 'necessary stake in litigating'** whether those lenders in fact abandoned their underwriting guidelines." 693 F.3d at 164. Thus, Defendants' misrepresentations and misconduct infected all Certificates equally, and proving those misrepresentations and that misconduct will benefit purchasers of all Certificates equally. Plaintiffs therefore are fully motivated to prove the falsity of Defendants' misrepresentations across all Offerings.

Nevertheless, Defendants contend that Plaintiffs are inadequate to represent purchasers of Certificates in the eight Offerings that the Plaintiffs did not purchase because they do not stand to benefit economically from proving such claims. *See* Def. Br. at 21. Not only is Defendants' assertion contrary to precedent, but, taken to its logical conclusion, it would prevent a court from ever certifying a class where the plaintiff had not purchased every security at issue. As Judge Baer has noted, "[c]ourts have repeatedly certified classes where the class representatives had not invested in all of the subject securities." *Dreyfus*, 2000 WL 1357509, at *3. In fact, several courts in this district have certified classes where the plaintiff did not purchase some of the securities involved. *See, e.g., Dynex*, 2011 WL 781215, at *3 (lead plaintiff could represent purchasers of two series of bonds even though it did not purchase bonds from one); *Lehman Bros.*, 2013 WL 440622, at *2 (finding that the class representatives' claims were sufficiently similar to permit them to adequately represent investors in other securities because the securities were issued off of the same shelf registration and the misrepresentations were substantially similar); *Winstar*, 290 F.R.D. at 443-45 (certifying class of purchasers of company's common stock and certain bonds even though no class representative had purchased any bonds); *Dreyfus*, 2000 WL 1357509, at *3.

Defendants' argument for a *de facto* rule prohibiting Plaintiffs from representing Class

- 28 -

members that purchased different securities also undercuts *Goldman.* If, as Defendants urge, a plaintiff may never adequately represent purchasers of securities that the plaintiff itself did not purchase – even where, as here, Defendants committed the same wrongful acts in the same manner against all members of the Class – then *Goldman's* holding becomes meaningless. There is nothing in the *Goldman* decision to support the blanket prohibition that Defendants urge. To the contrary, *Goldman* expressly noted that the trial court had erred when it based its conclusion that the plaintiff lacked standing "on the (mistaken) assumption that 'only when . . . other people bought the same *securities* that the plaintiff bought' may a 'practically identically situated' plaintiff serve as their '*class* representative.'" *Goldman*, 693 F.3d at 158, n.9. Judge Daniels' post-*Goldman* decision in *Winstar* to certify a class of both stock and bond purchasers even though no class representative had purchased bonds further disproves any notion of a blanket rule that a plaintiff can never adequately represent purchasers of securities that the plaintiff did not buy. *See Winstar*, 290 F.R.D. at 443-45.

### 2. Plaintiffs Are Actively Participating in This Litigation and Are Supervising Experienced Counsel

Taking snippets from depositions out of context, Defendants contend that Plaintiffs lack "independent knowledge" of the facts alleged in the Complaint and are not sufficiently involved in the litigation. Not so. Here, Plaintiffs' representatives testified to their understanding of the nature of the claims. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- 29 -

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ Such knowledge

more than meets the level required of class representatives in a complicated case like this one.[26]

Plaintiffs also testified to their full understanding of their fiduciary roles and responsibilities

to the Class as class representatives. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ This evidence shows that

Plaintiffs are committed to representing the interests of all Class members.

Moreover, even if Plaintiffs' representatives were uninformed about some of the details of a

complex action like this one, "a plaintiff need not have expert knowledge of all aspects of the case to

qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be

expected." *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 118 (S.D.N.Y. 2008). The proposed class

---

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

representative need only be "aware of the basic facts underlying the lawsuit and … not … likely to abdicate his obligations to fellow class members." *Id.* The Supreme Court has "expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000). Thus, "class representative status may be denied only 'where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008) (quoting *Baffa,* 222 F.3d at 61).

### 3.      None of Defendants' Other Attacks on Plaintiffs Are Valid

Defendants contend that PERS is inadequate to represent the Class because the Mississippi Attorney General ("AG"), acting on behalf of PERS, decided to bring this action and is controlling how it is conducted. *See* Def. Br. at 38. Defendants' flawed argument is founded on a false distinction ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ PERS fulfills its obligation to "check the otherwise unfettered discretion of counsel in prosecuting the suit." *Beck v. Status Game Corp.,* 1995 WL 422067, at *4, 6 (S.D.N.Y. July 14, 1995). It certainly does not, as Defendants suggest, make PERS a "pawn" controlled by class counsel. Def. Br. at 38.

Defendants also contend that the size of Pompano Beach's investment renders it inadequate

to represent the Class. It does not. Pompano Beach has a clearly articulated incentive to prosecute this case as a class representative. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ *See, e.g., In re Omnicom Grp., Inc. Sec. Litig.*, 2007 WL 1280640, at \*6 (S.D.N.Y. Apr. 30, 2007) ("[I]n 'complex securities litigation, named plaintiffs are not expected to possess expert knowledge of the details of the case and must be expected to rely on expert counsel.'"). NECA is

more than adequate to represent the Class.

Finally, Defendants wrongly claim that West Virginia joined this case "solely at the behest of counsel." Def. Br. at 9. In fact, West Virginia joined this case after analyzing the Complaint and discussing the litigation with counsel. ███████████████████████████

By any standard, Plaintiffs are adequate. Indeed, Plaintiffs are exactly the kind of institutional investors that Congress had in mind when it enacted the PSLRA. *See* H.R. Rep. No. 104-369, at 3, 5 (1995) (Conf. Rep.) ("The Conference Committee seeks to increase the likelihood that institutional investors will serve as lead plaintiffs" because "[i]nstitutions with large stakes in class actions have much the same interests as the plaintiff class generally."). That is why numerous courts have certified classes with Plaintiffs as the class representative, including several courts in this district that appointed them to represent class members in pending RMBS class actions. And that is why no court has ever found any of them inadequate to represent absent class members. There is no reason why this Court should be the first to do so.

## C.     Numerosity Is Satisfied

The Class is sufficiently numerous to satisfy Rule 23(a)(1). Plaintiffs' expert, Dr. Mason, conservatively counted at least 1,667 unique investors in the proposed Class, and concluded that each Offering likely had at least 40 investors. Mason Report, ¶¶102-103. Dr. Mason also explained how he arrived at those numbers. This evidence is more than sufficient to satisfy Plaintiffs' burden of establishing numerosity. As Defendants' own cases recognize, a precise quantification of class members is not required and a reasonable estimate of the number, like the one Plaintiffs provided here, is enough. *See Tiro v. Pub. House Invs. LLC*, 288 F.R.D. 272, 278 (S.D.N.Y. 2012); *Edge v. C. Tech Collections, Inc.*, 203 F.R.D. 85, 89 (E.D.N.Y. 2001).[27]

---

[27] Nor do these cases otherwise support Defendants' arguments. In *Tiro*, the numerosity requirement was satisfied. *See* 288 F.R.D. at 278. And in *Edge*, plaintiffs' attempt to establish numerosity was pure

Rather than challenge Dr. Mason's conclusions, Defendants contend that it is not enough for Plaintiffs to show that over 1,600 investors purchased Certificates. Rather, they argue, Plaintiffs also must calculate each investor's damages in order for that investor to be included in the Class. Such calculations would require a claims process following notice under Fed. R. Civ. P. 23(e). The law does not impose such burden on a party seeking class certification. *Tiro*, 288 F.R.D. at 278.

The language that Defendants claim requires Plaintiffs to prove damages in order to count investors – "and were damaged thereby" – is routine in class definitions and does not require any special inquiry. *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639-40 (5th Cir. 2012) ("In fact, the 'damaged thereby' language is routine in class definitions, and no court has found it to be problematic. A New York district court held that the phrase 'damaged thereby' is 'superfluous,' merely conveying a basic standing requirement.") (citing *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 492 (S.D.N.Y. 2009)); *see also In re FleetBoston Fin. Corp. Sec. Litig.*, 2005 WL 3579050, at *2-5 (D.N.J. Dec. 28, 2005) (rejecting defendants' argument that plaintiffs' numerosity calculation wrongly assumed that shareholders were damaged and finding the argument "more appropriately considered on a motion for summary judgment"). Indeed, courts have been unconcerned with similar class definitions when finding that numerosity is met. *See Merrill*, 277 F.R.D. at 100 (granting plaintiffs' motion to certify a class using class definition that included "and were damaged thereby"); *Goldman RMBS*, 280 F.R.D. at 133 (same).[28] Plaintiffs have established the class is numerous and Defendants' objections should be rejected.[29]

---

speculation, based only on plaintiffs' assertion that defendants "almost certainly sent out hundreds . . . of letters." *See* 203 F.R.D. at 89. In contrast, here plaintiffs have provided more than mere speculation as to the number of distinct investors in the Offerings. Pl. Br. at 5.

[28]   Defendants have not identified a single potential class member counted in Dr. Mason's analysis who was not damaged.

[29]   Defendants' cases do not require a different result. *Amchem Prods., Inc. v. Windsor* did not address the element of numerosity under Rule 23(a), but rather concerned the requirements of Rule 23(b)(3). *See* 521 U.S.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) certify this case as a class action pursuant to Rule 23(a) and 23(b)(3); (2) appoint Plaintiffs as Class Representatives; and (3) appoint Robbins Geller Rudman & Dowd LLP and Bernstein Litowitz Berger & Grossmann LLP as Co-Class Counsel.

DATED:  December 16, 2013                BERNSTEIN LITOWITZ BERGER
                                                                & GROSSMANN LLP
                                             DAVID R. STICKNEY
                                             RICHARD D. GLUCK
                                             MATTHEW P. JUBENVILLE
                                             JONATHAN D. USLANER
                                             L. REZA WRATHALL

                                             DAVID R. STICKNEY

                                             12481 High Bluff Drive, Suite 300
                                             San Diego, CA  92130
                                             Tel:    (858) 793-0070
                                             Fax:   (858) 793-0323
                                             davids@blbglaw.com
                                             rich.gluck@blbglaw.com
                                             matthewj@blbglaw.com
                                             jonathanu@blbglaw.com
                                             laurence.wrathall@blbglaw.com

---

over 40 investors. *See* 269 F.R.D. 252, 255 (S.D.N.Y. 2010); *cf. Merrill Lynch*, 277 F.R.D. at 105 (recognizing that joinder of even 100 investors' claims would be impractical).

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
MAX W. BERGER
DAVID L. WALES
JEROEN VAN KWAWEGEN
KATHERINE STEFANOU
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:   (212) 554-1400
Fax:   (212) 554-1444
mwb@blbglaw.com
davidw@blbglaw.com
jeroen@blbglaw.com
katherine.stefanou@blbglaw.com

Counsel for Lead Plaintiff and Co-Lead Counsel for
the Class


DATED:  December 16, 2013       Respectfully submitted,

ROBBINS GELLER RUDMAN
   & DOWD LLP
ARTHUR C. LEAHY
DANIEL S. DROSMAN
DARRYL J. ALVARADO
L. DANA MARTINDALE
ANGEL P. LAU


DANIEL S. DROSMAN  by DAS

655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Tel:   (619) 231-1058
Fax:   (619) 231-7423
artl@rgrdlaw.com
dand@rgrdlaw.com
dalvarado@rgrdlaw.com
dmartindale@rgrdlaw.com


- 36 -

ROBBINS GELLER RUDMAN
   & DOWD LLP
LUKE O. BROOKS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Tel:    (415) 288-4545
Fax:    (415) 288-4534
lukeb@rgrdlaw.com